## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RICHARD F. MILLER,
**Plaintiff,**

v.

PHILLIP HOLZMANN, *et al.*,
**Defendants.**

Civil Action No. 95-1231 (RCL/JMF)

## REPORT AND RECOMMENDATION
## AND MEMORANDUM OPINION

This case was referred to me for full case management. There are so many motions[1] dealing with so many different topics that a brief word of introduction is in order.[2]

## INTRODUCTION

As a result of the Camp David Peace Accords in the late 1970's, the Agency for International Development ("AID") made available to the Egyptian government a large amount of money to complete a wastewater project. The Egyptian government awarded the contracts on what were thought to be sealed, competitive bids. But, as the 11th Circuit Court of Appeals explained:

> The prequalified bidders conspired to manipulate the competitive
> bids on the contracts by designating which company would win the
> bid in question before the bids were submitted. The bidders also

---

[1] Attached as Appendix A is a list of all pending motions.

[2] Confusion is also created because so many of the corporate defendants have the word "Harbert" (or an abbreviation of it) in their name and an individual named Bill Harbert is also a defendant. Attached as Appendix B is a chart showing "who's who."

> arranged "loser's fees," lucrative subcontracts, or promises of winning future bids for the other bidders. The winning bidder added these costs into its bid. As a result, USAID paid not only an inflated price for the project, but also the loser's fees for the non-prevailing bidders.

United States v. Anderson, 326 F.3d 1319, 1323 (11th Cir. 2003).

The "Anderson" in that case title is Elmore Roy Anderson, a defendant in this case, who was convicted in the United States District Court for the Northern District of Alabama. There are three contracts involved in this case, that were also the subject of the criminal case, Contract 20A, Contract 07 and Contract 29.

In 1995 Richard Miller, a relator, brought a *qui tam* action under the False Claims Act, 31 U.S.C. §§ 3729-3732,[3] premising his action on Contract 20A. In 2001, the United States[4] filed a complaint in intervention and based its False Claims Act case on that contract and the other two. While two of the defendants in the criminal case are also defendants in this civil case, relator and the government have also named other parties as defendants.

Several defendants have filed the many motions that are currently pending, but it is important to note that not all defendants make all motions. Hence, in each topical subsection of this document, I identify the precise name of the motion and the movant with the understanding that the motion will be granted or denied only as to that defendant. Finally, I have also resolved motions made by the relator and the government.

---

[3] All references to the United States Code are to the electronic versions that appear in Westlaw and Lexis.

[4] Hereafter "the government."

2

I should also note that the resolution of one motion may have significant consequences and may, in the long run, render other motions moot.  I have not dealt with these consequences, as it would be presumptuous of me to assume that Judge Lamberth will agree with my resolution of the pending matters.  Thus, I deal with each motion as a separate and distinct entity.

A final word about my being assigned this case for "full case management."  While that term is not defined in the local rules, it has come to mean that a magistrate judge has complete responsibility for a case from its filing until trial before the district court judge.  That assignment cannot, of course, increase the magistrate judge's jurisdiction in excess of the statutory definition of it in 28 U.S.C. § 636 or beyond the limitations of the local rules. LCvR 72.2.  Thus, as to those motions that are dispositive, my resolution of them takes the form of a report and recommendation, and counsel are advised, in accordance with LCvR 72.3(b), that failure to file timely objections to the findings and recommendations set forth in my reports may waive their clients' right to appeal from an order of the District Court adopting such findings and recommendations.  See Thomas v. Arn, 474 U.S. 140 (1985).

## DISCUSSION

I.      Statute of Limitations

This section addresses arguments made in the following motions: 1) Defendant J.A. Jones Construction Company's Motion to Dismiss [#27], 2) Defendants Harbert Construction Services (U.K.) Ltd. and Bill Harbert International Construction, Inc.'s Motion to Dismiss the Government's Complaint in Intervention [#162], 3) Defendant Harbert International, Inc.'s Motion for Judgment on the Pleadings [#209] and Defendant Harbert Corporation's Motion for

Judgment on the Pleadings [#210].

     A.    <u>Pertinent Allegations</u>

The government and relator allege that:

1)    On June 30, 1988, defendants Harbert International Inc., and J.A. Jones Construction Co., Inc., formed an unincorporated Joint Venture to bid on Contract 20A, to be funded by AID. The invitation to bid was issued by an entity called the Cairo Wastewater Organization. <u>United States' Complaint in Intervention</u> ("Complaint in Intervention") ¶¶ 19-20, 22;

2)    Defendants Philipp Holzmann Akteingesellschaft (a German corporation), Harbert International, Inc., and the defendant Roy Anderson conspired to rig the bidding on this contract by paying their co-conspirators to either submit higher bids than the Joint Venture or not to bid at all. <u>Id.</u> ¶ 23. AID accepted the Joint Venture's bid and entered into a contract with the Joint Venture on July 11, 1989. <u>Id.</u> ¶ 22; and

3)    In the period beginning on October 3, 1989 and ending on June 20, 1993, the Joint Venture submitted and AID paid $107, 071,324.35 premised on 33 monthly invoices that are detailed in Schedule A, an attachment to the Complaint in Intervention. The government then alleges similar bid rigging schemes as to Contracts 07 and 29. Contract 07 involved invoices that were submitted and paid from September 5, 1991 to January 18, 1995. Contract 29 involved invoices that were submitted and paid from July 10, 1990 to September 19, 1996. The pertinent invoices, listed in Schedules A, B, and C, are also attachments to the Complaint in Intervention. Both the government and relator premise

claims upon the False Claims Act, 31 U.S.C. §§ 3729-3732.

_____B.     Filing Dates

_____On June 30, 1995, the relator, Richard Miller, filed his original complaint against the following defendants: 1) Philipp Holzmann, A.G., 2) Bill Harbert International Construction, Inc., 3) Harbert International Establishment, Inc., 4) Harbert Corporation, 5) Harbert International, Inc., 6) Harbert U.K. Services, Ltd., 7) J.A. Jones Construction Co., 8) Fru-Con Construction Corp., and 9) Sabbia A.G.

On June 28, 1999, relator then filed a first amended complaint, naming two additional defendants: 1) American International Contractors, Inc. and 2) George A. Fuller Co.

Miller's original complaint was filed under seal.[5]  On July 20, 1999, the seal was lifted on Miller's First Amended Complaint as to defendants Philipp Holzmann, A.G., J.A. Jones Construction Co., and Fru-Con Construction Corp.,[6] as well as to the parent corporation of Fru-Con. to 1) permit these defendants to advise the government whether they had "additional information pertaining to the allegations in the complaint" and 2) to discuss settlement. Memorandum in Support of United States' Unopposed Ex Parte Application for Partial Lifting of Seal at 1.  The record does not indicate whether the government actually made a copy available to these defendants.

On October 19, 1999, to allow the government to engage in settlement discussions with certain defendants, the seal on Miller's First Amended Complaint was lifted as to the following:

---

[5] The False Claims Act permits such sealing. 31 U.S.C. § 3730(b)(2).

[6] Not named as a defendant in the government's Complaint in Intervention.

1) American International Contractors, Inc. and 2) George A. Fuller Co., as well as to the parent corporation of Fuller.

On January 16, 2001, relator filed his <u>Second Amended Complaint for False Claims Act Violations and Demand for Jury Trial</u> ("Second Amended Complaint"), again naming two additional defendants: 1) Bill L. Harbert and 2) Roy Anderson.  In all other respects, the relator's first two amended complaints are substantially identical to the original complaint.  Thus far, all of relator's complaints only make claims pertaining to Contract 20A.

On February 12, 2001, Miller's Second Amended Complaint was ordered unsealed and served upon all defendants.

On March 13, 2001, the United States filed its Complaint in Intervention against the following defendants: 1) Philipp Holzmann A.G., 2) Bill Harbert International Construction, Inc., 3) Harbert International Establishment, Inc., 4) Harbert Corporation, 5) Harbert International Inc., 6) Harbert U.K. Services, Ltd., 7) J.A. Jones Construction Co., 8) Sabbia A.G., and 9) Roy Anderson.  The government's Complaint in Intervention includes claims pertaining to Contract 20A, but adds claims pertaining to Contracts 07 and 29.

On December 6, 2002, relator filed a <u>Motion for Leave to File Third Amended Complaint</u>, which sought to add claims pertaining to Contracts 07 and 29.  Relator's motion will be granted and, as a result, both the government and relator now allege claims pertaining to all three contracts.

C.       <u>The False Claims Act Statute of Limitations</u>

A violation of the False Claims Acts is committed either when one "presents, or causes to

6

be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval" (31 U.S.C. § 3729(a)(1)) or "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(3). Thus, civil actions may be brought against those individuals who either present false claims or conspire to do so.

The statute of limitations for the False Claims Act, which applies both to claims of false allegations as well as claims of conspiracy,[7] provides the following:

**(b)** A civil action under section 3730 may not be brought--

**(1)** more than 6 years after the date on which the violation of section 3729 is committed, or

**(2)** more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date

_____

[7] The statute of limitations applies the same way to both conspiracy claims and to claims premised on the submission of false claims; both run from the date of the submission of the claims.  In a persuasive opinion, Judge Friedman has concluded that the law of this Circuit requires that in a conspiracy claim premised on the False Claims Act, "'the statute of limitations in a civil damages action for conspiracy run separately from each overt act that is alleged to cause damage.'" United States ex rel Fisher v. Network Software Assocs., 180 F. Supp. 192, 195 (D.D.C. 2002) (quoting Lawrence v. Acree, 665 F.2d 1319, 1324 & n.7 (D.C. Cir. 1981)). "Under this rule, relator may attempt to prove the underlying conspiratorial agreement through those overt acts that occurred after [a date six years before the date of the filing of the complaint] but not those that occurred before that date; if successful, he may recover damages for all violations committed as a part of the conspiracy from that date forward." United States ex rel Fisher v. Network Software Assocs., 180 F. Supp. at 195.  The submission of the claims to the government _seriatim_ are the overt acts and the statute of limitations begins to run anew upon the submission of each claim. Id.

on which the violation is committed, whichever occurs last.

31 U.S.C. § 3731(b) (2000).

Thus, the statute of limitations creates two distinct limitations periods.  First, under § 3731(b)(1), a claim may be filed within six years from the date of the presentation of the false claim for payment or approval.  United States v. Rivera, 55 F.3d 703, 708-09 (1st Cir. 1995); United States ex rel. Kreindler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1157 (2d Cir. 1993), cert. denied, 508 U.S. 973 (1993).  Cf. United States v. Vanoosterhout, 898 F. Supp. 25 (D.D.C. 1995), aff'd, 96 F.3d 1491 (D.C. Cir. 1996).  If the government does not learn of the claim until after the tolling of the six year limitations period, it may still file a claim under § 3731(b)(2), that provides for a second statute of limitations period.  Such a filing can occur, however, only if the government can establish that it only knew or reasonably should have known of the false claim a maximum of three years prior to the filing of its complaint and only so long as the complaint is not filed any later than ten years after the original presentation of claims for payment or approval.

       1.    Relation Back and the Government's Claims

The government filed its Complaint in Intervention on March 13, 2001.  The government, argues, however, that its Complaint in Intervention must be deemed to relate back to June 30, 1995, the filing date of the relator's initial complaint.  If the government can relate its Complaint in Intervention back to that date then, under the six year rule, it can complain about claims filed from June 30, 1989 to the present and thereby capture all the claims on Schedule A/Contract 20A (Claims running from 10/03/89 - 6/20/93), Schedule B/Contract 07 (Claims running from 9/5/91 - 1/18/95) and Schedule C/Contract 29 (Claims running from 7/10/90 - 9/19/96) even though it

has to admit that the defendants were not aware of the existence of relator's Second Amended

Complaint until it was unsealed on February 12, 2001 and even though the statute of limitations

would have run as to many of these claims if the court used the actual date of the filing of the

Complaint in Intervention as opposed to the date of the filing of relator's initial complaint, six

years earlier.

The relation back that the government is seeking is predicated on Rule 15(c)(2) of the

Federal Rules of Civil Procedure.  Rule 15(c)(2) permits the claims asserted in an amended

complaint to relate back to the date of the filing of the original complaint if the claim asserted in

the amended pleading arose "out of the conduct, transaction, or occurrence set forth or attempted

to be set forth in the original pleading."  As Judge Urbina of this court has concluded, "the

government's complaint in intervention is an amendment of the relator's complaint." United

States v. MWI Corp., 254 F. Supp. 2d 69, 76 (D.D.C. 2003) (citing United States ex rel. Alsaker

v. CentraCare Health Sys. Inc., No. 99-CV-106, 2002 WL 1285089, at *1 (D. Minn. June 5,

2002); United States v. ex rel. Cosens v. Yale-New Haven Hosp., 233 F. Supp. 2d 319, 325 (D.

Conn. 2002)).  Thus, the government's claims may relate back if they arose out of the same

conduct as the relator's claims.

For most actions, the statute of limitations is tolled when a complaint is filed, triggering

the requirement that defendant be notified of its existence by service of a summons and

complaint within 120 days of  the filing. Fed. R. Civ. P. 4(m).  A False Claims Act action is

unique in that the court may postpone the unsealing of the relator's complaint as well as service

on the defendant upon the government's application.  The result is that the extensions granted

may permit the government to postpone the service of relator's complaint for a period of time

greater than the statute of limitations for the claims being asserted by both relator and the government.  Thus, as occurred here, the government postponed the unsealing of relator's complaint and then filed claims that would otherwise have been barred by the statute of limitations by filing a Complaint in Intervention in hopes that it would be deemed to relate back to the date of the filing of relator's complaint in 1995.

The above-listed defendants insist that the statute of limitations under the False Claims Act is tolled only upon the filing of the government's Complaint in Intervention on March 13, 2001 or, at worst, upon the unsealing of the relator's complaint on February 12, 2001.  They claim that it was not until then that they received actual notice of the relator's or government's claims as to Contract 20A.  Unfortunately for the defendants, the contention that the statute of limitations is not tolled until the unsealing of the relator's complaint has been rejected by every court in which it has been made. In re Cardiac Devices Qui Tam Litig., 221 F.R.D. 318, 355-58 (D. Conn. 2004); United States ex rel Downy v. Corning, Inc., 118 F. Supp 2d 1160, 1170 (D. N.M. 2000); United States ex rel. Costa v. Baker & Taylor, Inc., No. 95-CV-1825-C, 1998 WL 230979, at * 3 (N.D. Cal. March 20, 1998).[8]

It must be recalled that the government secured extensions of time within which to notify the court of its intervention in relator's action upon a showing that this court concluded presented good cause, i.e., potential interference with the ultimately successful criminal prosecution of some of these defendants in Alabama.  It would be irrational to impute to Congress the intention

---

[8] United States ex rel. Wilkins v. North Am. Constr. Corp., No. 95-CV-5614-H, 2001 WL 34109383, at *13 (S.D. Tex. Sept. 26, 2001), is not to the contrary.  The court's statement that an amended complaint cannot be permitted to relate back to a complaint filed under seal if the statute of limitations has run as to the claims asserted in the amended complaint was made in reference to government's claims other than those asserted under the False Claims Act.

to permit such enlargements yet bar the government's ultimate intervention on statute of

limitations grounds when each enlargement sought received express judicial approval.

I part company, however, with relator and government when they argue that their claims

based on Contracts 07 and 29 should relate back to relator's initial complaint that was based

solely on Contract 20A.  I do not see how it could be said that the latter claims arose out of the

same transaction or occurrence as the claims based on Contract 20A since they are based on

entirely different contracts. Fed. R. Civ. P. 15(c)(2) (claim asserted in amended pleading must

arise out of conduct, transaction, or occurrence set forth in original pleading).  The conduct,

transaction or occurrence that is the subject of relator's original complaint is the rigging of the

bid on Contract 20A.  The rigging of other bids are based on other contracts and the passing

reference in the complaint to the possibility that a club existed to control prices on AID contracts

in Egypt and that discovery might reveal other rigged bids[9] is, at best, a warning of a potential

that discovery might yield.  It does not, in my view, set forth a transaction or occurrence that can

be said to have generated the legal claim as to Contract 20A as well as the legal claims premised

on Contracts 07 and 29.

Thus, the government's claims as to Contracts 07 and 29 must rest on their own feet,

either the unsealing date of relator's complaint, February 12, 2001, or the filing date of the

government's Complaint in Intervention just about one month latter on March 13, 2001.  Claims

based on invoices submitted prior to February 12, 1995 or March 13, 1995 are barred unless the

government can avail itself of the three year discovery rule and establish that, although the claim

was submitted prior to those dates in 1995, the government's Complaint in Intervention was filed

---

[9] Second Amended Complaint ¶ 37.

"no more than 3 years after the date when facts material to the right of action are known or should have been known by the official of the United States charged with responsibility to act in the circumstances" (31 U.S.C. § 3729(b)(2)) and none of the claims are over ten years old.

As Judge Urbina has stated: "Analyzing when the responsible government official knew or should have known facts material to the FCA or equity claims is 'a complex factual determination to be made by the district court.'" United States ex rel Purcell v. MWI Corp., 254 F. Supp. 2d 69, 78 (D.D.C. 2003).  It certainly cannot be made on a record consisting only of the parties' allegations.  I therefore recommend that, once discovery has ended, the government submit a detailed memorandum, premised on specific facts, showing that it may still avail itself of the three year discovery provision as to Contracts 07 and 29 and that it may still press claims relating to claims submitted more than six years but no greater than ten years prior to the filing of its own Complaint in Intervention.

  2.  Relator's Claims

The consequence of these rulings for the running of the statute of limitations as to relator's claims are, in many respects, dependent on the resolution of the motions to dismiss the government's Complaint in Intervention on the grounds that the claims asserted in it are barred by the statute of limitations.  If the government can assert a claim, it is not necessary to ascertain whether relator can assert that claim and the parties have not addressed the significance for relator's claim of having been sealed upon the application of the United States as it pertains to whether the pertinent date for statute of limitations purposes is the filing or the unsealing date.  While I am anxious to resolve all the issues presented, I am reluctant to resolve an issue that may never arise and that the parties have not briefed in light of my ruling on motions to dismiss the

Complaint in Intervention on the grounds of the statute of limitations.  I therefore will recommend that the motions to dismiss relator's Second Amended Complaint be denied without prejudice, pending the completion of the discovery and the resolution of the motions to dismiss the Complaint in Intervention on statute of limitations grounds.  For the same or similar reasons, I will grant relator's Motion for Leave to File the Third Amended Complaint without prejudice to the defendants' moving to dismiss it on the grounds that consideration of all the claims asserted in it are barred by the statute of limitations.

II.     Failure to Plead Fraud with Particularity

        This section addresses arguments made in the following motions: 1) Defendant J.A. Jones Construction Company's Motion to Dismiss [#27], 2) Defendant Roy Anderson's Motion to Dismiss [#58], 3) Defendants Harbert Construction Services (U.K.) Ltd., Bill Harbert International Construction, Inc. and Bill L. Harbert's Motion to Dismiss the Relator's Second Amended Complaint [#161], 4) Defendants Harbert Construction Services (U.K.) Ltd. and Bill Harbert International Construction, Inc.'s Motion to Dismiss the Government's Complaint in Intervention [#162] and 5) Defendant Harbert International, Inc.'s Motion for Judgment on the Pleadings [#209].

        Three of the corporate defendants and two of the individual defendants seek dismissal of the complaints on the grounds that, in violation of Rule 9(b) of the Federal Rules of Civil Procedure, the allegations fail to state with the requisite particularity "the circumstances constituting the fraud."

        A.     The Allegations of Relator's Second Amended Complaint and of the Complaint in Intervention

_____ 1.    Allegations of Relator's Second Amended Complaint

The first 22 paragraphs of this complaint identify the parties and the nature of the lawsuit.

Paragraph 23 charges Philipp Holzmann, a German corporation, with conspiring with defendants

Harbert, Fru-Con, American International and/or Fuller and "possibly others" to ensure that the

lowest bid on Contract 20A was to be submitted by a Joint Venture between Harbert

International Inc. (said to be a subsidiary of Harbert Corporation)[10] and J.A. Jones Construction

Co., Inc.[11]   The Joint Venture, known as Harbert/Jones, was owned 60% by Harbert and 40% by

Jones.

The complaint further alleges that Harbert/Jones submitted the rigged bid on Contract

20A (¶ 24) and, once the bid was accepted, submitted 33 partial invoices totaling $107,071,327

(¶ 28).   Ultimately, Harbert/Jones made more than a 60% profit on Contract 20A, in excess of

$65 million (¶ 30).   Paragraph 32 claims that "[d]efendants have engaged in numerous acts of

subterfuge to conceal the excess profits from Contract 20A."   For the purposes of the motions I

am about to discuss, the significant "acts of subterfuge" are that:

> (a)    Defendants Philipp Holzmann and Harbert International,
> Inc. refused to allow a Jones cost engineer to be assigned to
> Contract 20A;
>
> * * *
>
> (c)    Defendants Harbert U.K. Services, Ltd. and Philipp
> Holzmann charged the Harbert/Jones Joint Venture for
> "pre-bid consulting services" and "U.S. consulting
> services."   Upon information and belief, the purpose of this

---

[10] The entities involved in this case are often hard to differentiate because so many of them have the word "Harbert" in their names.   Bill Harbert is an individual and term "Harbert" is used by the parties to describe him and Harbert Corporation, a Delaware corporation.   I will use the word "Harbert" to mean the corporation, not the person.   I will call the person "Bill Harbert."

[11] This company is in bankruptcy in North Carolina.

transfer was to pay other contractors pursuant to the
conspiracy;

(d)      Defendant Harbert wire-transferred approximately $3.35
million to Philipp Holzmann for fictitious "preconstruction
costs";

(e)      As managing venturer of the Harbert/Jones Joint Venture,
Defendant Harbert entered into a "sale/leaseback"
transaction for construction equipment used on Contract
20A with Defendant Sabbia[12] . . . However, while
Harbert/Jones made eighteen lease payments of
$800,000.00 each to Sabbia, the $4 million for the "sale"
portion of the transaction was never received by Harbert/Jones but instead was maintained

Second Amended Complaint ¶ 32.

Finally, the remainder of the complaint alleges the consequences of the defendants'

action, sets forth the two claims for relief, and demands relief.

2.      <u>Allegations of The United States' Complaint in Intervention</u>

The government's complaint tracks the Second Amended Complaint but specifies, in

paragraph 23, that "[d]efendants Holzmann, Harbert, and Anderson conspired together and with

other co-conspirators to ensure that the lowest bid was submitted by the Joint Venture on

Contract 20A.  Defendants Holzmann and Harbert agreed to pay the co-conspirators to submit

higher bids or to not bid at all."  Paragraph 24 then alleges that the Joint Venture submitted a bid

on Contract 20A, as did one other company, but does not identify that company other than to call

it a "co-conspirator."  In paragraph 29, the government indicates that the Joint Venture submitted

33 invoices and attaches to the Complaint in Intervention "Schedule A," which lists the date and

amount of each claim submitted.

The government then addresses Contract 07, alleging that defendants Holzmann, Harbert,

_____

[12] Sabbia is a Liechtenstein corporation owned by Holzmann. Second Amended
Complaint ¶ 11.

and Anderson, "on behalf of the Joint Venture, conspired together and with a co-conspirator to rig the bids on Contract 07." <u>Id.</u> ¶ 38.  These same defendants are then accused of agreeing with an unnamed co-conspirator that the wining bidder would pay the losing bidder a "loser's fee." <u>Id.</u> ¶ 39.  The next paragraphs indicate that the conspiracy came to fruition; the Joint Venture submitted the only bid and paid the co-conspirator a loser's fee. <u>Id.</u> ¶¶ 40-42.  The Joint Venture got the contract and submitted the 22 invoices indicated on "Schedule B," which is attached to the Complaint in Intervention. <u>Id.</u> ¶¶ 43-44.  Schedule B also states the date of each claim and the amount paid.

Finally, the government speaks to Contract 29.  Once again, the government claims that Holzmann, Harbert and Anderson conspired with each other and an unnamed co-conspirator to rig the bids on this contract. <u>Id.</u> ¶ 51.  These three parties agreed that the Joint Venture would submit a higher, complimentary bid. <u>Id.</u> ¶ 52.  This time, the unnamed co-conspirator got the contract and "the defendants Holzmann and Harbert received $3.4 million from the co-conspirator" for "losing." ¶¶ 55-56.  "Schedule C," attached to the Complaint in Intervention, sets out the date of each claim and the amount paid out.

B.     <u>Controlling Legal Precedents</u>

Rule 9(b) applies to FCA actions, including claims of conspiracy to violate the FCA. <u>Barrett v. Columbia/HCA Healthcare Corp.</u>, 251 F. Supp. 28, 34-36 (D.D.C. 2003) (citing <u>United States ex rel. Joseph v. Cannon</u>, 642 F.2d 1371, 1383 (D.C. Cir. 1981).  The latter case teaches that the requirements of Rule 9(b) must be read in consonance with Rule 8(a), that states that a pleading need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  Reading them together, therefore,  requires the plaintiff to

16

state, for example, the time, place and content of false representations made to induce the government to pay the false claim.  By the same logic, when conspiracy is alleged, the plaintiff must specify who participated in the agreement to submit the false claim and when that agreement was made.

An initial review of the complaints suggests that they sufficiently set forth the nature of the false claims made.  Bid rigging yields false claims cognizable under the False Claims Act, United States ex rel Marcus v. Hess, 317 U.S. 537, 544-45 (1993), and these complaints specify how the bid rigging scheme was hatched, the date the contract was let, and the exact date each false claim was submitted.  However, the corporate defendants' insistence that their involvement in the scheme is not specified has merit.

C.      Defendant Harbert Construction Service U.K. Ltd.

The only specific references to this defendant in the Second Amended complaint or the Complaint in Intervention are: 1) that it is an English corporation in which another defendant, the defendant Harbert International Establishment, holds a 49 percent share (Second Amended Complaint ¶ 9; Complaint in Intervention ¶ 15), 2) that defendant Roy Anderson was its President (Second Amended Complaint ¶ 16), and 3) that it engaged in one of the acts of subterfuge alleged in paragraph 32 of the Second Amended Complaint and paragraph 34 of the Complaint in Intervention.  Thus, there are no allegations of what specific role, if any, this corporation played in the hatching of the bid rigging scheme or when anyone who represented it agreed to engage in that scheme.  In my view, those defects are fatal and must be corrected by relator and the United States amending their complaints and specifying whether a representative of this corporation (who shall be identified by name, if possible) agreed with representatives of

17

Holzmann, Harbert, and Anderson (again named, if possible) to submit the rigged bids on

Contract 20A.  The United States shall also indicate whether a representative of this corporation

(again, named if possible) agreed with Holzmann, Harbert and Anderson that the winning bidder

on Contract 07 would pay the losing bidder a "loser's fee" and that the Joint Venture would

submit the higher bid and receive a payment from the co-conspirator who got the contract.

Finally, relator and the government must specify whether a representative of Harbert U.K. agreed

with Holzmann, Harbert and Anderson that the Joint Venture would submit a higher,

complimentary bid on Contract 29 so that the unnamed co-conspirator could get the contract.

> D.    Defendant Bill Harbert International Construction, Inc.

The Second Amended Complaint describes this company as a Delaware corporation that

controls and operates Defendant Harbert International Establishment, Inc. Second Amended

Complaint ¶ 5.  The Complaint in Intervention describes it as a Delaware corporation that

controls and operates Defendant Harbert International Establishment, Inc., a Liechtenstein

corporation. Complaint in Intervention ¶ 12.  Paragraph 23 of the Second Amended Complaint

states that in 1991, as a consequence of a reorganization of the Harbert entities, Contract 20A

was assigned to Harbert International Establishment, which is owned and controlled by Bill

Harbert International Construction, "and these companies began participating directly in the

conspiracy."  In contrast, there is no further reference to this company in the Complaint in

Intervention after it is identified in paragraph 12.

Once again, I view these allegations as insufficient because they do not specify what role,

if any, representatives of this company played in the conspiracy to rig the bids and the

consequential submission of the false claims.  Relator and the United States must cure these

defects in the same manner I have required as to the Defendant Harbert Construction Services U.K., Ltd. by specifying what roles specific, named representatives of Harbert International Construction, Inc. played in the agreement to rig the bids on all three contracts and in the submission of the claims.

      E.      J.A. Jones Construction Co.

The Second Amended Complaint alleges that Holzmann conspired with the defendant Harbert Corporation to ensure the lowest bid on Contract 20A was submitted by the Joint Venture owned by Harbert International, Inc. (a subsidiary of defendant Harbert Corporation) and J.A. Jones. Second Amended Complaint ¶ 23.  It states that Jones did not supply managerial personnel to the project (id. ¶ 26), that it made a profit "far in excess of the profit that would have been possible in an open competition," (id. ¶ 30) and the "Jones internal group was not permitted to visit the site and audit the project." Id. ¶ 32(b).

The Complaint in Intervention also identifies J.A. Jones Construction as one owner of the Joint Venture but does not contain the allegations about this company in paragraphs 23, 26, 30 and 32 as to Contract 20A.  J.A. Jones Construction Co. is not named in the rest of the Complaint in Intervention.

Relator's allegations are insufficient because they do not allege that Jones formed the Joint Venture with the Harbert Corporation with an intention to rig the bids or with knowledge that they were to be rigged.  It also fails to allege that the actions that this company took or did not take were intended to aid in the conspiracy to rig the bids.  Thus, even construed liberally, there is no specific allegation of knowing complicity in the bid rigging scheme or even knowledge of it.  These deficiencies will have to be cured in any amended complaint.

The Complaint in Intervention is worse.  It only identifies the company as a Delaware

corporation and a wholly owned subsidiary of Holzmann. Complaint in Intervention ¶ 16.  That

is insufficient and, like relator, the government will have to allege knowing complicity in the bid

rigging scheme or knowledge of it in any amended complaint.

      F.      <u>Defendant Bill Harbert</u>

This individual is named in the Second Amended Complaint as Chairman of defendant

Bill Harbert International Construction, Inc. and former Chairman of Harbert International

Establishment, Inc. Second Amended Complaint ¶ 15.  Responding to his challenges to the

sufficiency of the complaint, relator points to paragraphs 23-32, insisting that they "specifically

allege that Bill L. Harbert participated in the bid rigging that ultimately led to the false claims

that were submitted to the United States." <u>Opposition to Defendants' Motion to Dismiss and</u>

<u>Memorandum in Support of Relator Richard F. Miller's Motion for Leave to File Third</u>

<u>Amended Complaint for False Claims Act Violations</u> at 7.  Relator then states that these

paragraphs describe the agreement to submit the rigged bid on contract 20A and that, by rigging

the bidding, defendant Bill L. Harbert "caused the joint venture and its co-conspirators to submit

the collusive, non-competitive bids that constitute false claims." <u>Id.</u>

I have reviewed the allegations in paragraphs 23-32 and I am afraid they do no such thing.

The words "Bill L. Harbert" do not appear in those paragraphs; the "Harbert" whose activities are

described in those paragraphs is a corporation, not an individual.  There is no allegation that Bill

L. Harbert personally participated in the discussions that led up to the agreement to rig the bids or

that he caused anyone or any entity that agreed to rig the bid to do so.  The complaint will have to

be corrected to allege such specific, individual participation if relator intends to impose liability

on Bill L. Harbert as an individual.

      G.      <u>The Defendant Roy Anderson</u>

      As noted above, the government's Complaint in Intervention identifies Anderson as the

President of the defendants Harbert International Establishment Inc., a Liechtenstein corporation,

and Harbert Construction Services U.K., Ltd. Complaint in Intervention ¶ 18.  The Complaint in

Intervention also identifies Anderson as the Vice President of defendant Harbert International,

Inc. and as Harbert International's sponsor representative to the Harbert/Jones joint venture. <u>Id.</u>

Further, the Complaint in Intervention specifically identifies Anderson, by name, as a person who

agreed with Holzmann and Harbert (i.e., the company, not the person) to rig the bids on the three

contracts. <u>Id.</u> ¶¶ 23, 38 and 51.  Although his participation is set forth in detail, he claims that

"there appear to be no direct allegations against Anderson in the Complaint." <u>Memorandum of

Law In Support of Defendant Roy Anderson's Motion to Dismiss</u> at 12.  There certainly are; he

is specifically identified as personally participating in the conspiracy to rig the bids on all three

contracts.

      Moreover, Anderson's motion has been overtaken by events.  He was the defendant in a

criminal trial in which he was found guilty and the government has now filed a detailed <u>Motion

for Partial Summary Judgment</u>, accompanied by a <u>Statement of Material Facts as to Which There

Is No Genuine Issue</u>, that specifies Anderson's personal participation in the bid rigging

conspiracy in great detail.  Indeed, Anderson has filed an equally detailed response to the

government's allegations. <u>Responses of Roy Anderson to Plaintiff's Statement of Material Facts

as to Which There is No Genuine Issue</u>.  Surely, after all of this, Anderson understands the nature

of the case the government is making against him.  His claim that it is "impossible"[13] to respond

to the allegations made against him without more specific allegations in the complaint rings

hollow.  He needs no greater particularity than he has had.[14]

III.    Issue Preclusion

This section addresses arguments made in the following motions: 1) Defendant Philipp

Holzmann AG's Motion to Dismiss for Failure to State a Claim [#83] and 2) Plaintiff United

States' Motion for Partial Summary Judgment [#142].

A.    Defendant Philipp Holzmann AG's Motion to Dismiss for Failure to State a Claim

On August 18, 2000, Philipp Holzmann and the United States submitted a plea agreement

to the United States District Court for the Northern District of Alabama, which stated that in the

period beginning as early as June, 1988 and continuing through January 18, 1995, Holzmann

"participated in a conspiracy to rig bids on certain USAID-funded construction contracts in

Egypt." Plaintiff United States' Motion for Partial Summary Judgment, Exhibit 2, ¶ 4(a)-(b).  In

the agreement, Holzmann acknowledged that, pursuant to § 8B1.1(a)(2) of the United States

Sentencing Guidelines, "the Court may order it to pay restitution to the victims of the offense."

Id. ¶ 6(a).

---

[13] Memorandum of Law In Support of Defendant Roy Anderson's Motion to Dismiss at
12.

[14] Note that Harbert International, Inc. attacks the sufficiency of the government's unjust
enrichment claim.  But, its sufficiency is judged by the more forgiving standard that a complaint
may be dismissed for failure to state a claim only if "'it appears beyond doubt that the plaintiff
can prove no set of facts in support of his claim.'" Gilvin v. Fire, 259 F.3d 749, 756 (D.C. Cir.
2001) (citations omitted).  If the government can prove that any defendant received a greater
profit because the bid was rigged on a contract, it has a claim for unjust enrichment against that
defendant.

Since the enactment of the Sentencing Guidelines, federal judges are required to complete a judgment and commitment in every criminal case.  One section is called the "Statement of Reasons" and is designed to have the judge articulate why he is or is not adopting the findings and guidelines application in the pre-sentencing report.  In the "Statement of Reasons" at issue here, the judge who sentenced Holzmann to 60 months probation and a fine of $30 million wrote: "The court finds that there is no victim of defendant's criminal conduct and consequently no restitution is ordered." Plaintiff United States' Motion for Partial Summary Judgment, Exhibit 1 at 5.

Holzmann pleaded guilty on August 18, 2000. Plaintiff United States' Motion for Partial Summary Judgment, Exhibit 4, Transcript of Arraignment, Plea and Sentencing at 23, Line 10. The judge dispensed with a pre-sentencing report and proceeded to sentencing immediately. Id. at 26, Line 1.  The judge indicated his understanding of the offense level and the culpability score and the resulting fine range of $22, 276,080 to $44,522,160 and then stated "restitution is not an issue in this case." Id. at 26, line 9.

From those eight words, Holzmann argues that the United States is precluded from proceeding with this action because there has now been a judicial finding that there was no victim of the crimes to which it pleaded guilty.

Holzmann relies upon United States v. U.S. Currency in the Amount of $119,984, 129 F. Supp. 2d 471 (E.D.N.Y. 2001), for the proposition that findings made during a sentencing hearing should be given issue preclusive effect.  However, that decision has now been reversed. United States v. U.S. Currency in the Amount of $119,984, 304 F.3d 165 (2d Cir. 2002).  The

Second Circuit[15] first recalled that in an earlier case, S.E.C. v. Monarch Funding Corp., 192 F.3d 295, 303 (2d Cir. 1999), it had stated "in broad and emphatic terms that 'precluding relitigation on the basis of [sentencing] findings should be presumed improper.'" United States v. U.S. Currency in the Amount of $119,984, 304 F.3d at 172 (quoting S.E.C. v. Monarch Funding Corp., 192 F.3d at 306). The court then indicated that this presumption was strong enough to require a showing from the party seeking issue preclusion that it would be fair and efficient to preclude relitigation. United States v. U.S. Currency in the Amount of $119,984, 304 F.3d at 173. Moreover, if the court finds that the application of estoppel will not promote efficiency, that in itself suffices to preclude its application. Id.

As the Second Circuit indicated, the interest in efficiency is not promoted if the result of preclusion is to complicate and lengthen the criminal proceeding. Id. In this case, the criminal proceeding was designed to be brief. The parties had an obvious interest in its prompt conclusion since they agreed to complete it in one day and dispense with a pre-sentencing investigation report. Moreover, Holzmann and the government agreed that Holzmann was aware of the government's False Claims Act case against it when it pleaded guilty. Had the government known that what the judge said at sentencing would in itself preclude the False Claims Act action, it would have taken protective action to insure that the judge's findings did not have that effect. What possible interest would be served by requiring the government to do that when Holzmann admitted that it had rigged the bids and thereby victimized the government

---

[15] Oddly, this appears to be the only Circuit that has considered this question. See W. Ackerman, Precluding Defendants from Relitigating Sentencing Findings in Subsequent Civil Suits, 101 Colum. L. Rev. 128, 138 (2001) (noting how few courts have been compelled to resolve such questions and suggesting reasons).

that paid the invoices inflated by the bid rigging?  Moreover, even if Holzmann could overcome

its inability to show why the preclusion advances the interest in efficiency and the court

proceeded to the traditional analysis to determine whether the government should be precluded

from proceeding with its False Claims Act action, Holzmann's demand would still fail.

The parties agree, as they must, that the party seeking preclusion must establish that the

issue to be precluded must have been "'contested by the parties and submitted for judicial

determination in [a] prior case,' so long as 'the issue was actually and necessarily determined by

a court of competent jurisdiction in that prior case' and 'preclusion in the second case [would]

not work a basic unfairness to the party bound by the first determination.'" Government of

Rwanda v. Johnson, 409 F.3d 368, 374 (D.C. Cir. 2005) (citing Yamaha Corp. of America v.

United States, 961 F.2d 245, 254 (D.C. Cir. 1992)).

First, the only issue "litigated" in the criminal action was whether the court should

impose a restitution obligation upon Holzmann pursuant to the requirements of 18 U.S.C. §

3663A and the Sentencing Guidelines.  It is impossible for that issue to be litigated in the False

Claims Act action the government has brought.  Second, the preclusion works a gross unfairness

to the government and the interests it represents.  No reasonable lawyer worthy of the name

would have thought for a moment that a determination as to whether the government was a

victim for the purposes of imposing a restitution obligation would, *ipso facto*, wipe out a False

Claims Act action.  Moreover, it borders on the sinful for the taxpayers to lose whatever right

they have to recover from a party that admitted that it rigged bids and stole their tax money

simply because a judge stated in passing that there was no victim of the crime to which

Holzmann pleaded guilty, when he made that statement for an entirely different reason.

B.      Plaintiff United States' Motion for Partial Summary Judgment

        1.      As to Anderson

The United States Court of Appeals for the 11th Circuit has found that the government established at the criminal trial of defendant Elmore Ray Anderson that Anderson had participated in a conspiracy to rig the bids on the three contracts at issue here. United States v. Anderson, 326 F.3d 1319, 1332 (11th Cir. 2003) ("There is no question Anderson engaged in bid rigging. There is also no question the purpose of the bid rigging was to defraud the government.").

The United States seeks to use Anderson's criminal conviction to preclude him from relitigating the issue of whether he engaged in a conspiracy to rig the bids and to defraud the United States. Plaintiff United States' Motion for Partial Summary Judgment.

        a.      The Need For Discovery

Anderson resists the government's Motion for Partial Summary Judgment.  He contends that he needs discovery to establish the difference between the government's Complaint in Intervention and the indictment in his criminal case, and that his now-affirmed conviction should therefore not have the preclusive effect the government seeks.

Obviously, resolution of the extent of the preclusive effect of the prior criminal conviction will define what discovery, if any, Anderson is entitled to since it will define the remaining claims or defenses.  See Fed. R. Civ. P. 26(a) (stating that discovery must relate to claim or defense).  I will therefore resolve the issue of the preclusive effect of the criminal conviction and then turn to whether Anderson is entitled to any discovery.

        b.      Issue Preclusion

26

As I have explained, the conditions for the imposition of issue preclusion (collateral estoppel) are that the same issue was contested by the parties and submitted for judicial review in the prior case; that issue was necessarily determined in the prior case, and preclusion in the second case would not work a basic unfairness to the party to be bound.  See supra pp. 25-26.

   c.  Anderson's Argument

The jury in Anderson's criminal case returned a general verdict of guilty of conspiracy to violate the Sherman Act by agreeing to submit rigged bids on the three contracts (count 1) and conspiracy to defraud AID in the procurement of construction services on the three contracts (count 2).  Anderson explains that the judge in his criminal trial charged the jury that it could find him guilty of conspiracy if it found that any one of the conspirators committed at least one of the overt acts charged in the conspiracies.  According to Anderson, it follows that it cannot be said that the issues presented in the civil action were necessarily and actually decided against him in the criminal action.  Therefore, issue preclusion should not apply.

   d.  Preclusion in Criminal Cases

The courts have not hesitated to find that a criminal defendant can be precluded from re-litigating an issue resolved against him in a criminal trial. Emich Motors Corp. v. Gen. Motors Corp., 340 U.S. 558 (1951); SEC v. Bilzerian, 29 F.3d 689, 694 (D.C. Cir. 1994).[16]  Indeed, they have specifically precluded defendants convicted of rigging bids on government contracts from re-litigating the issue in a subsequent False Claims Act action based on the payments the government made on invoices submitted under the bid rigged contract. United States v. Cripps,

---

[16] See generally Michelle S. Simon, Offensive Issue Preclusion in the Criminal Context: Two Steps Forward, One Step Back, 34 U. Mem. L. Rev. 753 (2004).

460 F. Supp. 969, 975 (E.D. Mich. 1978); United States v. Kates, 419 F. Supp. 846, 851-52 (E.D. Pa. 1976).  See United States v. Killough, 848 F.2d 1523, 1528 (11th Cir. 1988) (kickback scheme); United States v. Thomas, 709 F.2d 968, 972 (5th Cir. 1983) (making of false statements for purposes of obtaining payments from the government).

When a general verdict is rendered, there may be difficulties in ascertaining its issue preclusive effect when it is not clear what overt act the jury found was committed by one of the conspirators. Columbia Plaza Corp. v. Sec. Nat'l Bank, 676 F.2d 780, 790 (D.C. Cir. 1982).  It hardly follows, however, that the rendering of a general verdict in a criminal case renders issue preclusion improper.  To the contrary, the author of Columbia Plaza, when sitting as a district court judge,[17] held that "a criminal conviction is conclusive proof and operates as an estoppel on defendants as to the facts supporting the conviction in a subsequent civil action." United States v. Uzzell, 648 F. Supp. 1362, 1363 (D.D.C. 1986).  She therefore concluded that the defendants' conviction for conspiring to defraud the government by filing false claims under the 8(a) program of the Small Business Administration precluded them from denying their liability under the False Claims Act. Id. at 1365-66.  In reaching that conclusion she dismissed the broad argument repeated here by Anderson, that the possibility that the jury found that a conspirator committed only one overt act of the many charged, prevented the verdict from having a preclusive effect in the False Claims Act action.  She stated:

> Defendants' argument that the verdict may rest on only the first overt act is without merit. The jury returned a guilty verdict on Count 1, and nothing in the record indicates that anything less than all of the specific acts alleged in the count were determined by the jury in reaching that verdict. Furthermore, the Fourth Circuit Court

---

[17] Judge Joyce Hens Green sat by designation in Columbia Plaza.

> of Appeals' opinion discussed the entire fraudulent scheme, specifically noted the disbursements to Martec, and found the evidence of conspiracy "overwhelming," not based merely on the first overt act.

Id. at 1365.

In a case where the evidence cannot be described as "overwhelming," ascertaining the preclusive effect of a conspiracy conviction, premised on proof of one or many overt acts charged, may be more challenging.  Thus, in a particularly careful opinion, Judge Oberdorfer limited the collateral estoppel effect of a guilty plea in a conspiracy case in a subsequent False Claims Act action to the essential elements of the conspiracy to which the defendant pled guilty. Alsco-Harvard Fraud Litig., 523 F. Supp. 790, 804 (D.D.C. 1981).  In that case, the collateral estoppel effect of the conviction was limited to the preclusive effect of the determination that the defendants conspired to defraud the United States through knowingly submitting false, fictitious, or fraudulent statements to the United States. Id.

e.      Application to this Case

This careful analysis eliminates any necessity of ascertaining whether the jury in the criminal case found one or more overt acts to have been committed.  Its use here yields the conclusion that the United States is entitled to the same preclusive effect because the essential elements of the conspiracies charged in the criminal case are identical to the conspiracies charged in the civil case.

Count 1 of the indictment charged that the defendants, including Anderson, entered into a conspiracy to suppress and eliminate competition on construction contracts funded by AID in an unreasonable restraint of interstate and foreign trade and commerce, and that the substantial

terms of the conspiracy were to rig the bids on certain United States-funded construction

contracts in Egypt and ensure that the designated winner would be awarded the contract and

receive payment from the United States. <u>Plaintiff United States' Motion for Summary Judgment</u>,

Exhibit 5, ¶¶ 3-4.

Count 2 of the indictment charged that the parties, again including Anderson, conspired

to defraud the United States by agreeing to inflate and manipulate the prices to be paid on the

USAID-funded contracts to be awarded to ensure that the Harbert-Jones Companies would be the

low bidder on Contracts 20A and 07 and that Sadelmi U.S.A., Inc. would be the low bidder on

Contract 29. <u>Id.</u> ¶ 5.  This count then charged that it was part of this conspiracy to deceive the

United States into believing that the prices bid on these three contracts were arrived at

"independently, competitively and without consultation or agreement with competing bidders

when, in fact, the prices bid were non-competitive and collusive and resulted from

communications and agreements between and among the defendants and non-competitors." <u>Id.</u>

The Complaint in Intervention, in paragraphs 3 and 5, charges that the government's

action "arises out of a conspiracy entered into between defendants through their respective

agents, to cause the submission of false and inflated claims to the United States" and that "[t]he

purpose of the conspiracy was to obtain a collusive, artificially inflated, and noncompetitive price

for the projects . . ."  After identifying the parties, the complaint explains how the bidding on the

contracts was rigged and states that each of the invoices submitted on each of the three contracts

were inflated "because the defendants, pursuant to their secret agreement . . ." had obtained the

contract at an artificially high price. <u>Id.</u> ¶¶ 32, 47, and 58.  The government then seeks relief by

virtue of the facts recounted in its allegations: 1) that defendants presented false claims to the

United States, id. ¶ 65; 2) that defendants made false statements to get false or fraudulent claims

paid, id. ¶ 66; and 3) that defendants conspired with each other to defraud the United States by

having false or fraudulent claims paid. Id. ¶ 67.

This analysis of the indictment establishes that, irrespective of what the jury may have

found as to any overt act, it would have been impossible for it to find the defendant guilty

without finding that: 1) he knowingly participated in a conspiracy to rig the bids on the three

contracts, thereby insuring that the winning bidder would win the contract and the right to

payments by the United States, and 2) he knowingly participated in a conspiracy to deceive the

United States into believing that the bids on the three contracts were the product of

competitive bidding when in fact they were the product of bid-rigging.  The comparison of the

indictment and the Complaint in Intervention then indicates that: 1) count 2 of the indictment,

charging the conspiracy to defraud, is identical to the conspiracy charged in the first cause of

action in the Complaint in Intervention, and 2) count 1 of the indictment charges the identical

bid rigging that underlies all of the causes of action charged in the Complaint in Intervention.

It therefore follows that Anderson must now be precluded from litigating that: 1) he conspired

with others to rig the three contracts to cause the designated winner to be awarded the contract

and receive payments from the United States, and (2) he conspired with others to defraud the

United States into believing that the prices to be  bid on the three contracts were arrived at

independently when, as Anderson knew, they were the product of rigged bids.

As explained earlier, it is true as a matter of law that payments sought from the United

States that are the product of rigged bids are false claims under the False Claims Act. United

States ex rel. Marcus v. Hess, 317 U.S. at 544-45; United States v. Cripps, 460 F. Supp. at

975.  Hence, Anderson is precluded from relitigating whether the payments sought pursuant to the three contracts awarded were false claims.  The government is therefore entitled to summary judgment to that extent.

f.    Discovery Permitted

I conclude, however, that Anderson is not precluded from litigating the amount of the payments made under the three rigged bids and any resulting damages to relator or the government.  The overt acts charged as to both indictments charge the receipt of payments on the contracts (e.g., overt acts (h), 18, 19, and 20 as to count one and overt acts (x)(y)(z) and (aa) as to count two).  There seems to have been testimony at the criminal trial relating to these payments.  See Plaintiff's Statement of Material Facts ¶ 102.  It is also true, however, that after the trial, a government agent, Scott Nichols, did a summary of the invoices submitted and the government relies upon that summary rather than trial testimony in support of its motion. Id. ¶ 101.  The government's reliance upon Nichols' declaration cuts against the contention that the jury verdict conclusively establishes what invoices were submitted and how much was paid.  Moreover, as I have explained, I have hewn as closely as I can to Judge Oberdorfer's restricting the preclusive effect of the criminal conviction to the conspiracy counts themselves without considering the overt acts.  My refusing to grant the government's motion in its entirety means that Anderson's discovery must be limited to evidence pertaining to them.  He is precluded from litigating any other issue.

I appreciate that Anderson seeks greater discovery to establish the supposed differences between the indictment and the Complaint in Intervention.  I have just explained, however, that the two documents are identical in the conspiracies they charge, for the purposes

32

of the preclusive effect I am finding.  Nevertheless, Anderson seeks to secure documents and

to take the deposition of Peter Schmidt, who he describes as the person said to be the ring

leader of the bid rigging scheme, in order to establish the supposed differences between the

indictment and the Complaint in Intervention.

Unquestionably, this Circuit favors a liberal interpretation of Rule 56(f) of the Federal

Rules of Civil Procedure and requires the denial of a motion for summary judgment if "it

appears from the affidavits of a party opposing the motion that the party cannot for reasons

stated present by affidavit facts essential to justify the party's opposition." Fed. R. Civ. P.

56(f).  Yet, confronted with a defendant whose guilt of conspiring to rig bids was established

beyond a reasonable doubt and whose conviction was affirmed against, *inter alia*, a challenge

to the sufficiency of the evidence, surely it is fair of the court to ascertain what specific

discovery is needed and whether it is likely to lead to evidence that will defeat the

government's claim or provide Anderson with a defense to it. Fed. R. Civ. P. 26(b)(1).

First, as to Peter Schmidt, there is no indication whatsoever that he has any

information pertinent to the supposed differences between the Complaint in Intervention and

the indictment that Anderson insists are significant.  Moreover, those differences as to which

Anderson seeks discovery are completely unimportant, let alone relevant to some claim or

defense.  The indictment and the Complaint in Intervention are based upon the identical theory

that the Egyptian project was funded by AID and that the invoices submitted by the contractor

who got the bid-rigged contract were submitted to an Egyptian entity, the Cairo Wastewater

Authority.  The Cairo Wastewater Authority then submitted them to AID, who paid them.

The indictment charged that the payments made under the rigged contracts were paid from the

United States Treasury while the Complaint in Intervention charges that the claims were

submitted to the Egyptian authority who then submitted them to AID who paid them.

Compare Plaintiff United States' Motion for Partial Summary Judgment, Ex. 5, ¶¶ (h), (19),

(z), and (bb) with Complaint in Intervention ¶¶ 29-30, 44-45.  Anderson hardly needs

discovery to establish what is already known and accepted by everyone involved in this case,

that the contractor billed the Egyptian authority who sent the bills to AID.  Moreover, if

discovery showed that there was some difference between what the Egyptian authority

received from the contractor and what AID paid, it would hardly defeat the government's case

that whatever AID ultimately paid was based on a false claim under the False Claims Act.

2.    As to Holzmann

As just explained, a plea of guilty precludes the defendant from re-litigating the facts

conclusively established by his plea.  Hence, Holzmann is barred by its plea of guilty from re-

litigating what it admitted to when it entered its guilty plea, that in the period beginning as

early as June, 1988 and continuing through January 18, 1995, it participated in a conspiracy to

rig bids on USAID-funded construction contracts in Egypt and agreed with its conspirators to

suppress competition on contracts 20A and 07.  Plaintiff United States' Motion for Partial

Summary Judgment, Exhibit 2, Plea Agreement, ¶ 4(a)-(b).  Because, as I have indicated, it is

true as a matter of law that invoices submitted pursuant to a rigged bid are false claims under

the False Claims Act, the government is entitled to summary judgment that Holzmann

submitted false claims as to these two contracts.  But, as was true of Anderson, Holzmann is

entitled to discovery as to the damages that flow to relator and the government from that

judgment. Moreover, since it made no admission as to Contract 29, the United States is not

34

entitled to summary judgment in any manner as to that contract.

   3.  <u>As to Bilhar</u>

  The government also moved for summary judgment against Bilhar International

Establishment, which it claims to be formerly known as Harbert International Establishment.

However, as discussed below, the two are distinct entities.  Bilhar International Establishment

was never served with the Complaint in Intervention, and is therefore not a party to this action.

Harbert International Establishment Inc. has been dismissed from this action due to the

government's naming of the wrong party in its Complaint.

IV. <u>Pre-Emption of the False Claims Act by the Foreign Assistance Act</u>

  This section addresses arguments made in the following motions: 1) <u>Defendant Philipp</u>

<u>Holzmann AG's Motion to Dismiss for Failure to State a Claim Because the Foreign</u>

<u>Assistance Act Preempts the Causes of Action on Which this Lawsuit Is Based</u> [#173] and 2)

<u>Defendant Bill Harbert, Bill Harbert International Construction, Inc., Harbert International</u>

<u>Establishment, Inc., and Harbert Construction Services (U.K.) Ltd.'s Motion to Dismiss</u>

[#220].

  A.  <u>Exclusive Action</u>

  Because the claims in this case were submitted to AID, the United States could have

also proceeded with a civil action under a provision of the Foreign Assistance Act that

authorizes the President to institute suit in a district court to recover from any person who

presents to any bank or other financial institution or any officer, agent, or employee of the

United States a false claim for funds made available under that Act. 22 U.S.C. § 2399(b).

Instead, it choose to proceed under the False Claims Act by intervening in the action brought

by the relator.  To the defendants who have filed these motions, this choice was fatal because the provision of the Foreign Assistance Act that authorizes the President to bring such a suit repeals by implication the provisions of the False Claims Act that permit a *qui tam* action by a relator or the intervention in such an action by the Attorney General.

A defendant's conduct may give rise to civil actions under two different statutes.  If a plaintiff chooses one rather than another, her opponent may claim the statute not chosen creates such an intricate and inter-connected scheme of remedies for the prosecution of the action that Congress must have intended that this intricate scheme be used exclusively by those who would prosecute a claim under authority other than the scheme created by the statute.  E.g., City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, ___, 125 S. Ct. 1453, 1458 (2005); Blessing v. Freestone, 520 U.S. 329, 341 (1997); Brown v. Gen. Servs. Admin., 425 U.S. 820, 828-29 (1976).  As the Supreme Court indicated in Rancho Palos, this analysis does not implicate whether the more specific statute repeals the more general one.  City of Rancho Palos Verdes v. Abrams, 125 S. Ct. at 1458 n.2.  Both continue to exist but only one may be used to prosecute the cause of action that is cognizable under either of them.

A comparison of the statutes at issue here indicates that the Foreign Assistance Act does not create a means of enforcement so significantly different from the means of its enforcement under the False Claims Act that Congress must have intended that the former be the only way in which a false claim, premised on a payment of financial assistance under the Foreign Assistance Act, be prosecuted.  The only significant differences in the statutes are that: 1) the Foreign Assistance Act permits the prosecution of a false claim to be premised on a false claim submitted to a bank or other financial institution as well as an officer or agent of

the United States while the False Claims Act is limited to the latter and 2) the remedies are different.  Other than those differences, the two statutes compliment each other.  If the government learns of the fraud, it can prosecute under either.  If a private person learns of the fraud and brings a False Claims Act action, the government can intervene and prosecute it or permit the relator to prosecute it herself.

These defendants harp on the *qui tam* provision in the False Claims Act, insisting that a private action by the relator against a person who has defrauded the government of funds made available under the Foreign Assistance Act could interfere with the delicate relations between this country and another.  They find it significant that the President has delegated all his responsibilities under the Foreign Assistance Act to the Secretary of State[18] while the determination to bring an action under the False Claims Act or to intervene in one brought by a relator is made by the Attorney General.[19]  Hence, they insist that a relator could damage this country's relationship with another country by bringing a False Claims Act action that the Secretary believes should not be brought.

First, we can hope that the country will never have a Secretary of State who will believe that permitting someone to escape the consequences of defrauding the United States is in the country's best interest.  The Secretary of  State has many responsibilities but practicing misprision of a felony is not one of them.

 Moreover, by statutory command, the Attorney General has the exclusive right to

---

[18] Executive Order Nos. 12, 163, 44 Fed. Reg. 56, 673 reprinted as amended in 22 U.S.C. § 2381.

[19] 31 U.S.C. § 3730(a)-(b)(1).

prosecute matters in the courts of the United States unless, as it not true here, Congress has granted a federal agency or officer that right. 28 U.S.C. § 516.  There is nothing in the two statutes or anything we know about them that could possibly permit the inference that in this one unique area Congress intended to displace the Attorney General's power to prosecute civil actions for fraud by giving that power to the Secretary of State.  If that is true, that means the statute granting the Attorney General the exclusive right to prosecute civil actions in the courts of the United States has also been silently and impliedly repealed along with the ancient understanding that the Attorney General alone controls litigation in the courts of the United States when the interests of the United States are at issue. The Confiscation Cases, 74 U.S. 454, 457 (1868).  See FTC v. Guignon, 390 F.2d 323, 324 (8th Cir. 1968) (exclusive power to represent federal agency in action to compel enforcement of agency subpoena resides in the Attorney General); In re: Ocean Shipping Antitrust Litig., 500 F. Supp. 1235, 1238-39 (S.D.N.Y 1980).

Moreover, this is much ado about nothing.  The Executive Branch speaks with one voice in the courts of the United States.  Assuming the Secretary of State determines that a relator's False Claims Act action should not proceed, and her views are accepted by the President, the Attorney General, at the President's command, can compel the dismissal of the relator's action.  Thus, the "international crisis" defendants conjure is averted.

B.      Repeal by Implication

As explained, defendants' first argument is directed to whether the remedy chosen is the correct remedy and presumes the continued existence of both statutes.  Defendants' second argument must go farther and establish that the provision authorizing *qui tam* actions in the

Federal Tort Claims Act was repealed by implication by the provision of the Foreign

Assistance Act that authorizes the President to prosecute civil actions against those who

defraud the government of funds made available under the Foreign Assistance Act.  The

burden of establishing such a repeal is well nigh insuperable.  Defendants must establish that

the provisions in two statues are in irreconcilable conflict or that the latter act covers the

whole subject of the earlier one and is clearly intended as a substitute. Branch v. Smith, 538

U.S. 254, 273 (2003).  Moreover, "[w]e have repeatedly stated, however, that absent 'a clearly

expressed congressional intention,' Morton v. Mancari, 417 U.S. 535, 551, 94 S.Ct. 2474, 41

L.Ed.2d 290 (1974), 'repeals by implication are not favored'" Id. (quoting Universal

Interpretive Shuttle Corp. v. Washington Metropo. Area Transit Comm'n, 393 U.S. 186, 193

(1968).[20]  See Matushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 380 (1996) (courts have

seldom, if ever, held that a federal statute is impliedly repealed; "[t]he rarity with which we

have discovered implied repeals is due to the relatively stringent standard for such findings,

namely, that there be an "'irreconcilable conflict'" between the two federal statutes at issue").

See also United States v. Royal Caribbean Cruises Ltd., 11 F. Supp. 2d 1358, 1365 (S.D. Fla.

1998) (government may proceed under a general statute or a specific one in the absence of

irreconcilable conflict between the general and specific one because only a positive

repugnancy between the two permits the conclusion that the specific one impliedly repealed

the general one).

Here, the only pertinent difference between the two statutes as enacted, that one grants

---

[20] Accord Kappus v. C.I.R., 337 F.3d 1053, 1058-59 (D.C. Cir. 2003); Calloway v. United States, 216 F.3d 1, 10 (D.C. Cir. 2000).

the President the authority to prosecute the civil actions based on fraud while the other

authorizes the Attorney General and relators is hardly a "positive repugnancy" nor an

"irreconcilable conflict."  To the contrary, as I have explained, they are easily and perfectly

reconciled when one understands the Attorney General's exclusive statutory power over

litigation involving the interests of the United States and his power to prevent the relator from

prosecuting an action if the Attorney General believes that it is not in the best interests of the

United States that relator do so.[21]

V.      Lack of Personal Jurisdiction

        This section address arguments made in the following motions: 1) Defendant Philipp

Holzmann AG's Motion to Dismiss for Lack of Personal Jurisdiction [# 82] and 2) Defendants

Harbert Construction Services (U.K.) Ltd. and Bill Harbert International Construction Inc's

Motion to Dismiss the Government's Complaint in Intervention [#162].

        When a statute, such as the False Claims Act authorizes service of process "at any

place within or outside the United States,"[22] this court can exercise personal jurisdiction over a

corporation that is served with process anywhere in the world, provided its exercise of that

jurisdiction does not offend the due process clause. In re: Baan Co. Sec. Litig., 245 F. Supp.

2d 117, 126 (D.D.C. 2003); In re: Baan Co. Sec. Litig., 81 F. Supp. 75, 76-77 (D.D.C. 2000).

---

        [21] Holzmann's claim that the Foreign Assistance Act pre-empts the government's
common law claims for Money Paid under Mistake of Fact and Unjust Enrichment fails for the
same reason.  There is no showing that permitting the government to sue to recover money paid
on the basis of a fraud conflicts with permitting the government to secure recovery under state
common law theories of recovery.  Instead, the two remedies either duplicate or supplement each
other.  See Webster v. Pacesetter, Inc., 171 F. Supp. 2d 1, 14 (D.D.C. 2001).

        [22] 31 U.S.C. § 3132(a).

The jurisdiction asserted may be general or specific.  It is general if the alien corporation's contacts with the United States create such a sufficient presence in the United States that the exercise of jurisdiction over any lawsuit against it cannot be described as unfair.  If general jurisdiction is unavailable, the court may exercise specific jurisdiction over a claim "if [the] defendants have 'purposefully directed [their] activities at residents of the forum' and 'the litigation results from alleged injuries that 'arise or relate to those activities.'" In re: Baan Co. Sec. Litig., 245 F. Supp. 2d at 126-27 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)).  Thus, specific jurisdiction can be based, for example, on a transaction that occurred outside the United States because the alien corporation performed an act outside the United States that had a reasonably foreseeable impact in the United States.  In such a situation, that alien party could reasonably be expected to be haled into an American court and the exercise of personal jurisdiction over it is fair. In re: Baan Co. Sec. Litig., 245 F. Supp. 2d at 132 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) and Restatement (Second) of Conflict of Laws, § 50).[23]

There is an obvious imbalance in information when an alien corporation is sued because it knows the nature of its contacts or presence in the United States and its opponent does not.  On the other hand, bare allegations alone should not force an alien corporation to

---

[23] That section of the Restatement provides:

> A state has power to exercise judicial jurisdiction over a foreign corporation which causes effects in the state by an act done elsewhere with respect to any cause of action arising from these effects unless the nature of these effects and of the corporation's relationship to the state makes the exercise of such jurisdiction unreasonable.

defend itself in the United States if a court here cannot exercise jurisdiction over it.  In this jurisdiction, the quandary is solved and the balance struck in favor of permitting the plaintiff limited "jurisdictional discovery" designed to explore the facts (and only the facts) that pertain to the exercise of jurisdiction.  It is an abuse of discretion for a district court to prohibit such discovery if "the opponent of the motion has made allegations specific enough to permit the conclusion that discovery may enable him to establish that assertion of jurisdiction over the opponent's person meets the requirements of the Due Process Clause." In re: Baan Co. Sec. Litig., 81 F. Supp. 2d at 76-77 and cases cited therein.[24]

     A.     Application to Harbert Construction Services (U.K.) Ltd.

   First, as to general jurisdiction, the government alleges that it is aware that this defendant has "entered into a contract with a company in Hawaii in connection with contracts with the Army Corps of Engineers." Plaintiff United States' Opposition to Defendants Harbert Construction Services (U.K.) Ltd. and Bill Harbert International Construction, Inc.'s Motion to Dismiss Plaintiff's Complaint in Intervention and Plaintiff's Motion for Leave to File First Amended Complaint at 30, n.12.

   Second, as to specific jurisdiction, the government alleges that Anderson, the President of this company, was a direct and personal participant in the agreement to rig the

---

[24] I.e., GTE New Media Servs. Inc. v. BellSouth Corp., 199 F.3d 1343, 1351-52 (D.C. Cir. 2000).  Compare Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C., 148 F.3d 1080, 1088-90 (D.C. Cir. 1998) and Naartex Consulting Corp. v. Watt, 722 F.2d 779, 787 (D.C. Cir. 1983) with El-Fadl v. Cent. Bank of Jordan, 75 F.3d 668, 675 (D.C. Cir. 1996) and Crane v. Carr, 814 F.2d 758 (D.C. Cir. 1987) and Edmond v. United States Postal Serv., 949 F.2d 415, 424 (D.C. Cir. 1991).  See also Goodman Holdings v. Rafidain Bank, 26 F.3d 1143, 1147 (D.C. Cir. 1994), cert. denied,513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995); Foremost-McKesson v. Islamic Republic of Iran, 759 F.Supp. 855, 861 (D.D.C. 1991).  A more recent decision to the same effect is Gorman v. Ameritrade, 293 F.3d 506, 513 (D.C. Cir. 2002).

bids[25] and that the company itself charged the Joint Venture, the actual bidder, for "pre-bid

consulting services" and "U.S. consulting services." Complaint in Intervention ¶ 34(a).

Certainly, if the government makes its allegations as to this defendant more particularly, as I

have ordered, and then fleshes them out through discovery, they might show that the

company's management structure was aware of what Anderson was doing and either approved

it or did not object and that the company, aware of the rigged bid, tried to cover up the

unjustified profits that were made.  Such proof might support the conclusion that this British

company performed acts that were intended or could reasonably have been expected to have

an impact in the United States, i.e., the payment by the United States Treasury of invoices that

were inflated because of the bid rigging.  Indeed, it is the law of this Circuit that "it is an abuse

of discretion to deny jurisdictional discovery where the plaintiff has specifically alleged: (1)

the existence of a conspiracy, (2) the nonresident's participation, and (3) an injury-causing act

of the conspiracy within the forum's boundaries." Edmond v. United States Postal Serv., 949

F.2d at 425.  That seems to be the situation here.

     On the other hand, the government's allegations are certainly not at all like the utterly

insubstantial and conclusory allegations in those rare cases where the court of appeals has

affirmed the refusal to permit discovery.  E.g. Caribbean Broad. Sys., Ltd. v. Cable & Wireless

P.L.C., 148 F.3d at 1090 (no facts "remotely suggesting" that defendant had any contacts with

the forum); Goodman Holdings v. Rafidain Bank, 26 F.3d at 1147 (discovery not permitted

when "we do not see what facts additional discovery could produce that would affect our

jurisdictional analysis"); Naartex Consulting Corp. v. Watt, 722 F.2d at 787 (dismissal

---

[25] Complaint in Intervention ¶¶ 23, 38-39, 51-52.

appropriate when, *even after discovery*, all plaintiff said of defendants was that they were "alleged co-conspirators").  I will therefore consider permitting the government discovery devoted exclusively to locate information that is likely to lead to evidence bearing on 1) UK's contacts with the United States to support a claim of general jurisdiction and 2) UK's involvement in and knowledge of the alleged agreements that Anderson entered into to rig the bids on the three contracts, once the government makes its allegations as to this defendant more specific.

B.    Application to Holzmann

The government specifically alleges that Holzmann was a direct participant with the defendant Harbert International Inc. and Anderson in the conspiracy to rig the bids on contracts 20A, 07 and 29. Complaint in Intervention ¶¶ 23, 38, 52.  More specifically, the complaint alleges that Holzmann, aware of the conspiracy, charged the Joint Venture "for pre-bid consulting services and U.S. consulting services." Id. ¶ 34 (a).  It also specifically charges that Holzmann, Harbert International and Anderson agreed with a conspirator that the winning bidder would pay the losing bidder a sum certain, a "loser's fee" (id. at ¶ 39), that the same three defendants would submit a higher complimentary bid on Contract 29 and that Holzmann and Harbert International received $3.4 million from the conspirator who got the contract. Id. ¶ 56.  Finally, the government alleges, and it is certainly true, that Holzmann pleaded guilty in the district court in Alabama to conspiring to rig the bids on two of the contracts. Id. ¶ 60.

These allegations are sufficient in themselves to warrant the exercise of specific jurisdiction over Holzmann upon the theory that they performed acts that were intended or could reasonably have been expected to have an impact in the United States, i.e., the payment

from the United States Treasury of the invoices submitted under the rigged contracts.

VI.    Invalid Summons

This section address arguments made in the following motions: 1) Defendant Roy Anderson's Motion to Dismiss [# 58] and 2) Defendants Harbert Construction Services (U.K.) Ltd., Bill Harbert International Construction, Inc. and Bill L. Harbert's Motion to Dismiss the Relator's Second Amended Complaint [#161].

The government first attempted to serve the defendant Roy Anderson by mailing to his counsel a request for waiver of service.  The summons and complaint were in the envelope.  On the second occasion, a government agent went to Atlanta, Georgia and hand delivered the summons and complaint to Anderson's counsel.  There is no dispute that on the two occasions the government attempted to effect service upon the defendant, Roy Anderson, the summons was not signed by the Clerk of this Court and did not bear the Court's seal. Anderson, by his counsel, has since moved to dismiss the Complaint in Intervention on the grounds that it fails to allege his participation in the bid rigging scheme with particularity.  He has also filed a most detailed response to the government's Motion for Summary Judgment and its Statement of Material Facts as to Which There is no Genuine Issue.  Furthermore, as I have already concluded, Anderson has had adequate notice of the allegations in the government's Complaint in Intervention at least in terms of whether the allegations in the Complaint are particularized enough to provide such notice.  Nevertheless, Anderson seeks dismissal solely because of the defects in the summons.  He relies on cases that view defects in the summons as failing to confer jurisdiction over the person served with the defective summons, i.e., Ayres v. Jaconbs & Crumplar, 99 F.3d 565, 569 (3d Cir. 1996); Cloyd v.

Arthur Anderson & Co., 151 F.R.D. 407, 409 (D. Utah 1993) and United States v. Nat'l

Muffler Mfg., 125 F.R.D. 453, 455 (N.D. Ohio 1989).  The government insists that, since

Anderson's counsel has had the complaint since March 14, 2001 and then got a second copy,

hand-delivered, Anderson has had actual notice of the complaint and the defects in the

summons should be disregarded.

In this Circuit, Anderson's "jurisdictional" view of defects in service of the summons

has not been accepted.  Instead, the inquiry has been whether there has been any prejudice to

the opposing party from his opponent's failure to effect, for example, service in a timely

manner.  In Hobson v. Wilson, 556 F. Supp. 1157, 1185-86 (D.D.C. 1982), for example,

Judge Oberdorfer declined to dismiss a case even though "plaintiffs' counsel have displayed

unusual indifference to the requirements of service of process" because the defendant could

not show prejudice.  His possessing actual knowledge of the claims against him barred him

from exploiting the "technical defects" of plaintiff's service of process. Id. at 1186.  The court

of appeals affirmed, stating:

> In this case, while we share Judge Oberdorfer's view that plaintiffs
> displayed "unusual indifference" to the requirement of service, we
> also find entirely reasonable his conclusion that defendant Jones
> was not prejudiced by the delay. Absent prejudice, we cannot find
> that the motion to dismiss was improperly denied, particularly
> since plaintiffs obviously were trying to prosecute their claim when
> the motion was filed.

Hobson v. Wilson, 737 F.2d 1, 45-46 (D.C. Cir. 1984).  The court of appeals then noted that

"[d]ismissal is a severe sanction, and alternative sanctions are not only permissible but often

preferred." Id. at 46, citing 9 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE §

2370 (1971) ("appellate courts do not look favorably on dismissal with prejudice if there are

lesser sanctions that could vindicate the purpose of the rules").

Then, in F.T.C v. Campagnie De Saint-Gobain-Pont-a-Mousson, 636 F.2d 1300 (D.C. Cir. 1980), the court of appeals stated:

> The general attitude of the federal courts is that the provisions of Rule 4 should be liberally construed in the interest of doing substantial justice and that the propriety of service in each case should turn on its own facts within the limits of the flexibility provided by the rule itself. This is consistent with the modern conception of service of process as primarily a notice-giving device. 4 C. Wright & A. Miller, Federal Practice and Procedure: Civil s 1083, at 332-33 (1969 & Supp.1977) (emphasis added). See also id. s 1063, at 204: The primary function of Rule 4 is to provide the mechanisms for bringing notice of the commencement of an action to defendant's attention and to provide a ritual that marks the court's assertion of jurisdiction over the law. (emphasis added).

Id. at 1313 n.61.

This case has since been read by two other Circuits for the proposition that defendant's answer and appearance in the action should itself be enough to prevent any technical error in form from invalidating the process and requiring the dismissal of the action. United Food & Com'l Wkrs U. v. Alpha Beta Co., 736 F.2d 1371, 1382 (9th Cir. 1984); Sanderford v. Prudential Ins. Co., 902 F.2d 897, 900 (11th Cir. 1990).  The view that the defendant's appearance and subsequent participation in the action is ordinarily sufficient to prevent a technical error in the form of the summons from warranting dismissal has gained acceptance by many courts[26] and is

---

[26] E.g. Libertad v. Welch, 53 F.3d 428, 440-41 (1st Cir. 1995); Gottfried v. Frankel, 818 F.2d 485, 492-93 (6th Cir. 1987); Alfa Corp v. Alfagres S.A., 385 F. Supp. 2d 1230, 1239 (M.D. Ala. 2005); Frankston v. Denniston, 376 F. Supp. 2d 35, 39 (D. Mass. 2005); Wortham v. Am. Family Ins. Co., No. 01-CV-2067-C, 2002 WL 31128057 at *2 (N.D. Iowa Sept. 17, 2002); Schoemann v. Natural Energy Corp., No. 99-CV-3129, 2000 WL 269892 at *3 (E.D. La. March 9, 2000); Louisiana Acorn Fair Housing v. Quarter House, 952 F. Supp. 352, 355 (E.D. La. 1997).

said by the two authoritative commentators to be the prevailing view of the federal courts. 1 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 4.03[3][b] (3d ed. 1997) (if defendant appears, motion to dismiss will probably be denied; minor defect on face of the summons does not necessarily deprive the court of personal jurisdiction over the defendant); 4A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1088 (3d ed. 2002) (same).

It is, of course, true that the strict jurisdictional view would find the existence of prejudice irrelevant and find no significance in the fact that the defendant appeared and answered.  But, the one Circuit opinion and the two district court opinions relied upon by Anderson[27] that articulate that view, are inconsistent with the holdings in this Circuit that prejudice must be shown to permit the dismissal of an action premised on a failure to serve the summons properly.  Moreover, there is authority, premised in two instances on a decision in this Circuit, that the defendant's appearing in the action and participating in the action ordinarily prevents any technical error in the summons from being the basis of dismissal of the action.

Second, it is hard to square the supposed "jurisdictional" nature of service of process with the reality that the Federal Rules permit the allegedly defective summons to be amended, Federal Rules of Civil Procedure 4(a), and permit service to be effected after the 120 day deadline set out in Rule 4(m) upon a showing of good cause.  If the service was "jurisdictional," defects in it

---

[27] Note that the defendant relies upon United States v. Nat'l Muffler Manu. Inc., 125 F.R.D. at 453, for the proposition that an unsigned summons cannot be amended. Memorandum of Law in Support of Defendant Roy Anderson's Motion to Dismiss at 4.  But, in that case, the court acknowledged and applied the principle that the defendant's having actual notice of the complaint may render any defect in the summons remedied and permit the plaintiff to effect the service that was quashed.

could not be cured by an amendment.

Third, the concept of the jurisdictional nature of service of process seems inconsistent with the Supreme Court's statement that: "[s]ervice of process . . . is properly regarded as a matter discrete from a court's jurisdiction to adjudicate . . . against a particular individual or entity." Henderson v. United States, 517 U.S. 654, 671 (1996).

Finally, the facts in this case illustrate that dismissing a complaint without any showing of prejudice and despite the defendant's appearance and participation in the action can lead to a pernicious and absurd result.  It cannot be denied that the complaint was mailed to Anderson's counsel.  The government then dispatched to that same lawyer's office a government agent who delivered a second copy of the complaint to the same lawyer.  There is and cannot be any showing whatsoever that Anderson's participation in the lawsuit would have been any different had the summons borne the Clerk's signature and the seal of the Court.  If this case were to be dismissed, it would be hard to imagine how form could be any more exalted over substance or how there could be any great distance between the "harm" done by the government's failing and the "wrong" it did.[28]

VII.   Wrong Party

This section addresses arguments made in the following motions: 1) Defendant Harbert International Establishment, Inc.'s Motion to Dismiss the Government's Complaint in Intervention [#132] and 2) Plaintiff's Motion for Leave to File Third Amended Complaint

---

[28] Note that Harbert Construction Services (U.K.) Ltd., Harbert International Construction and Bill L. Harbert complain that relator has not served them with relator's Second Amended Complaint.  But, in light of their receipt of the government's Complaint in Intervention in 2001, I see no prejudice to them from not being formally served with relator's Second Amended Complaint since they have had notice in fact of the claims made by relator.

[#110].

As I have noted, the use of the word "Harbert" or abbreviations of it in so many of the

defendants' names can bred confusion.  Thus, in its Complaint in Intervention the government

named as a defendant, Harbert International Establishment, Inc. and claimed that it was a

Liechtenstein corporation with its principal place of business in Birmingham, Alabama. ¶ 6.  It

turns out, however that there is another corporation, Harbert International Establishment, Inc.,

that was incorporated in 1999 in Alabama. <u>Plaintiff's Motion for Leave to File First Amended</u>

<u>Complaint</u> at 31 n.14.  Additionally, the grand jury in Alabama returned an indictment against an

entity named "Bilhar International Establishment f/k/a[29] Harbert International Establishment.

<u>Plaintiff's Motion for Partial Summary Judgment</u>, Exhibit 5 at 1.  This company, the defendant in

the criminal case, is the Liechtenstein corporation, not the one in Alabama.  Putting "Inc." after

the words "Harbert International Establishment" in the Complaint in Intervention was incorrect.

The government has now moved, however, to amend its Complaint in Intervention to correct the

names of two[30] of the defendants it had sued.  That motion should be granted but the Alabama

company understandably has moved to dismiss the government's case against it given the

government's concession that it mistakenly named it as a party in the first place.  The

government protests that its service upon the Alabama company should be deemed service upon

the entity called "Bilhar International Establishment f/k/a Harbert International Establishment,"

i.e., the Lichtenstein corporation that used to be known as "Harbert International Establishment,"

---

[29] "Formerly known as."

[30] The other correction is to change the name of the defendant identified as "Harbert U.K. Services, Ltd." to "Harbert Construction Services (U.K.) Ltd."  There is no opposition to this motion from the latter company and it will be granted.

the same name as the Alabama corporation except for the word "Inc."

First, the Alabama corporation must be dismissed; it should not have been named in the first place and it specifically denied in its answer that it is a Liechtenstein corporation, that its principal place of business was in Alabama, and that Bill Harbert International Construction, Inc. "controls and operates" the Alabama corporation. <u>Answer of Defendant Harbert International Establishment Inc.</u> ¶ 12.  This surely gave notice that the government has mis-identified the defendant it intended to sue because the indictment identified the party as being organized under the laws of Lichtenstein (Plaintiff's Motion for Partial Summary Judgment, Exhibit 5, ¶ 7) and the government knew or should have known from the indictment that it was suing a Liechtenstein corporation.

Second, this is nothing like the situation to which the government equates it, where a party uses the wrong name to sue a party and the mistake is apparent and should, in fairness, be corrected.  Here, the government sued the wrong entity and the name of the Liechtenstein company is not merely another name for it.  The Lichtenstein company is a distinct entity and it has never been served,[31] entered an appearance or answered the Complaint in Intervention.  Until it does, it is not a party and it is impossible for the court to exercise jurisdiction over a party that was never even served with the summons and complaint by the stratagem of "amending" the complaint to name it as a party without its being served with the required process.

This means that, while the government's motion to amend should be granted, the

---

[31] The parties quarrel over whether service upon counsel for the Alabama corporation was intended to be service upon the Lichtenstein company.  Be that as it may, there in nothing in the record showing an attempt to serve the summons and complaint and the filing of proof of service in compliance with the requirements of Rule 4 of the Federal Rules of Civil Procedure.

Alabama corporation's motion to dismiss should be granted as well.  The consequences of this

for the Lichtenstein corporation, named for the first time as a defendant in the now-amended

complaint, remain to be seen.  In the meanwhile, I will require the government to file the

amended complaint in its proper format and I will deem all the defendant's motions to dismiss

the Complaint in Intervention to have been also been made to dismiss that Complaint, as

amended.  There is therefore no necessity for those defendants who moved to dismiss the

Complaint in Intervention to do anything more to preserve those motions since the government

will only be permitted to change the name of one defendant and to add a defendant not previously

named.

VIII.    The Bankruptcy of J.A. Jones Construction Company

       This section addresses arguments made in the following motions: 1) Defendant J.A. Jones

Construction Company's Motion to Dismiss [#27] and 2) Notice of Bankruptcy and Suggestion

of Stay [#140, #141].

       The defendant J.A. Jones Construction Co., Inc., has filed a Notice of Bankruptcy and

Suggestion of Stay, indicating that on September 25, 2003 it filed a voluntary petition for relief

under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western

District of North Carolina and it seeks a stay pursuant to section 362(a) of the Bankruptcy Code,

11 U.S.C. § 362(a).  The government resists the stay,[32] relying on section 362(b)(4) that exempts

from the automatic stay provision the commencement or continuation of a proceeding by a

governmental unit to enforce "such governmental unit's or organization's police and regulatory

_____

       [32] United States' Response to J.A. Jones Construction Company's Notice of Bankruptcy
and Suggestion of Stay at 2.

52

power." 11 U.S.C. § 362 (b)(4).  The defendant protests that "it is by no means settled law that the government is entitled to the exception contained in 11 U.S.C. § 362(b)(4)" and cites one case, In re Bicoastal Corp., 118 B.R. 854 (M.D. Fla. 1990). J.A. Jones Construction Company's Reply to the United States Response to Notice of Bankruptcy and Suggestion of Stay at 1-2. Unfortunately for this defendant, it has been settled since at least[33] the decision in In re Commonwealth Cos., Inc., 913 F.2d 518, 520 (8th Cir. 1990) that "Section 362(b)(4) excepts the government's proposed FCA [i.e. False Claims Act action] against the debtors from the automatic stay up to and including the entry of a money judgment."  Accord United States ex rel. Goldstein v. P&M Draperies, Inc., 303 B.R. 601, 603 ( D. Md. 2004) ("[I]t is well settled that an action under the False Claims Act qualifies as an action to enforce the government's 'police or regulatory power'"); United States ex rel. Rahman v. Oncology Assocs., P.C., No. 95-CV-2241, 2000 WL 1074304, at *5 (D. Md. July 24, 2000); United States ex rel. Jane Doe v. X, Inc., 246 B.R. 817, 818 (E.D. Va. 2000) ("[T]here is ample authority holding that laws, such as the False Claims Act, that are designed to prevent or stop fraud, or to fix damages for fraud already committed, are police or regulatory laws."); In re Mickman, 144 B.R. 259, 261-262 (E.D. Pa. 1992); In re Selma Apparel Corp., 132 B.R. 968, 969-70 (S.D. Ala. 1991).  See also United States v. Nicolet, 857 F.2d 202, 209-10 (3d Cir. 1988).  Most significantly, this Court itself followed Commonwealth and specifically held that a False Claims Act case falls within the exception to the stay provision.  United States ex rel Marcus v. NBI, Inc., 142 B.R. 1, 3-4 (D.D.C. 1992) (Lamberth, J.).

---

[33] Note that in In re Commonwealth Cos., Inc., the Eighth Circuit placed primary reliance for its conclusion that a False Claims Act action fell within the exclusion upon this Court's decision in CPI Crude Inc v. U.S. Dep't of Energy, 77 B.R. 320 (D.D.C. 1987).

Jones attempts to distinguish this case on the grounds that there will be a disruption of its reorganization in the bankruptcy court if the government is permitted to proceed. J.A. Jones Construction Company's Reply to the United States Response to Notice of Bankruptcy and Suggestion of Stay at 2.  But, that disruption occurs in every case where the government proceeds with a False Claims Act against the debtor and Congress has determined that the government must be permitted to proceed and has not granted the courts any discretion to weigh that disruption against any other interest.  The Suggestion of Stay should therefore be denied.

**CONCLUSION**

An Order accompanies this Report and Recommendation and Memorandum Opinion.

_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

Dated:

## APPENDIX A: Pending Motions

Docket No.      Motion

| | |
|---|---|
| #27 | Defendant J.A. Jones Construction Company's Motion to Dismiss |
| #58 | Defendant Roy Anderson's Motion to Dismiss |
| #82 | Defendant Philipp Holzmann AG's Motion to Dismiss for Lack of Personal Jurisdiction |
| #83 | Defendant Philipp Holzmann AG's Motion to Dismiss for Failure to State a Claim |
| #132 | Defendant Harbert International Establishment, Inc.'s Motion to Dismiss the Government's Complaint in Intervention |
| #140/#141 | Notice of Bankruptcy and Suggestion of Stay |
| #142 | Plaintiff United States' Motion for Partial Summary Judgment |
| #161 | Defendants Harbert Construction Services (U.K.) Ltd., Bill Harbert International Construction, Inc. and Bill L. Harbert's Motion to Dismiss the Relator's Second Amended Complaint |
| #162 | Defendants Harbert Construction Services (U.K.) Ltd. and Bill Harbert International Construction, Inc.'s Motion to Dismiss the Government's Complaint in Intervention |
| #173 | Defendant Philipp Holzmann AG's Motion to Dismiss for Failure to State a Claim Because the Foreign Assistance Act Preempts the Causes of Action on Which this Lawsuit Is Based |
| #209 | Defendant Harbert International, Inc.'s Motion for Judgment on the Pleadings |
| #210 | Defendant Harbert Corporation's Motion for Judgment on the Pleadings |
| #220 | Defendant Bill Harbert, Bill Harbert International Construction, Inc., Harbert International Establishment, Inc., and Harbert Construction Services (U.K.) Ltd.'s Motion to Dismiss |
| #228 | Defendant Bill Harbert, Bill Harbert International Construction, Inc., Harbert International Establishment, Inc., and Harbert Construction Services (U.K.), Ltd.'s Amended Motion to Dismiss |

## APPENDIX B: Who's Who

| Party Name | U.S. Citizen? | Relationship to other parties | Alleged Role |
|---|---|---|---|
| Richard F. Miller | Y | - At time of contract award, VP and Controller of J.A. Jones Const. Co. | - Relator |
| Phillip Holzmann | Y | - Indirect whole owner of J.A. Jones Const. Co.<br><br>- Direct or indirect owner of Sabbia A.G. | - Defendant |
| Bill Harbert Int'l Const., Inc. | Y | - Controls and operates Harbert Int'l Est. Inc. | - Defendant |
| Bilhar Int'l Est., Inc. *f/k/a* Harbert Int'l Est., Inc. | Y | - Controlled and operated by Bill Harbert Int'l Const., Inc.<br><br>- Holds 49% share of Harbert U.K. Services, Ltd. | - Defendant<br><br>- Contract assignee from Joint Venture |
| Harbert Corp. | Y | - Wholly owns Harbert Int'l Inc. | - Defendant |
| Harbert Int'l, Inc. | Y | - Wholly owned subsidiary of Harbert Corp. | - Defendant<br><br>- Partner in Joint Venture that was awarded contract (60% owner) |
| Harbert U.K. Services, Ltd. | Y | - 49% owned by Harbert Int'l Est., Inc. | - Defendant |
| J.A. Jones Const. Co., Inc. | Y | - Indirect wholly-owned subsidiary of Phillip Holzmann | - Defendant<br><br>- Partner in Joint Venture that was awarded contract (40% owner) |
| Fru-Con Const. Corp. | N | - Competitor of other defendants | - Defendant in relator's case<br><br>- Paid to submit complementary bid |

| Sabbia A.G. | Y | - Directly or indirectly owned by Phillip Holzmann | - Defendant in relator's case<br><br>- Conduit for payoffs made in furtherance of conspiracy |
|---|---|---|---|
| American Int'l Contractors Inc. | N | - Originally incorporated as George A. Fuller Co.  Name "George A. Fuller Co." was sold to another company in 1989 | - Defendant<br>- Paid not to bid |
| George A. Fuller Co. | N | - Competitor of other defendants | - Defendant in relator's case<br>- Paid not to bid |
| Bill L. Harbert | N | - Chairman of Harbert Int'l Const. Inc, former Chairman of Harbert Int'l Est. Inc. | - Defendant |
| Roy Anderson | Y | - Former president of Harbert Int'l Est. Inc., former president of Harbert U.K. Services, Ltd., Harbert Int'l Inc.'s sponsor representative to the Joint Venture | - Defendant |