UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**RICHARD F. MILLER,**

    **Plaintiff,**

    **v.**                                                  **CA No. 95-01231 (RCL/JMF)**

**PHILLIP HOLZMANN, et al.,**

    **Defendants.**

**ORDER**

In my initial report and recommendation, I granted the government limited discovery to see if it could establish (1) that Harbert Construction Services U.K. Ltd[1] had sufficient contacts with the United States to support a claim of general jurisdiction and (2) that UK's involvement in and knowledge of the bid rigging conspiracy at issue in this case was sufficient to permit the exercise of personal jurisdiction over it.[2] Miller v. Holzmann, No. 95-CV-1231, 2006 WL 568722 (D.D.C. March 9, 2006).

As to the latter, I noted that American courts have asserted personal jurisdiction over an alien corporation upon the showing that it performed an act outside the United States that had a reasonably foreseeable impact in the United States. Id. at *21. I concluded that if, for example, the government could show that UK's management was aware of the bid rigging conspiracy, that a representative of UK participated in it and that UK, aware of the conspiracy, tried to cover up

---

[1] Hereafter "UK."

[2] For a further explanation of the conspiracy charged, see Miller v. Holzmann, No. 95-CV-1231, 2006 WL 568722, at *2 (D.D.C. March 9, 2006).

the unjustified profits that were made, UK could be found to have performed acts that could be expected to have an impact in the United States, i.e., the payment by the United States Treasury of invoices that were inflated because of the bid rigging. Id. at *22.

Additionally, I found that the allegations in the relator's and the government's complaints concerning UK were insufficient and I demanded that they be amended to particularize UK's involvement in the bid rigging conspiracy. The government has now done so and I have found that, as amended, the government's Second Amended Complaint in Intervention is sufficient because it has made sufficiently specific allegations of UK's participation in that conspiracy.

But, there is an extraordinary difference between what the government and relator allege and what they can prove. If they do not establish the truth of their allegations as to UK's participation at the trial and their case falls apart, then UK will have been subjected to an exercise of jurisdiction over its person without warrant and in violation of the due process clause which, of course, precludes the exercise of jurisdiction over an alien corporation unless it has such sufficient contacts with the forum that the due process clause is not offended. Id. at *21.

How a court determines whether the facts asserted in favor of personal jurisdiction without subjecting the defendant to a trial has been resolved in the analagous area of establishing that a foreign sovereign is or is not subject to immunity under the Foreign Sovereign Immunities Act by permitting the court to resolve the jurisdictional facts. The court of appeals has therefore explained:

> When the defendant has thus challenged the factual basis of the court's jurisdiction, the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant. Instead, the court must go beyond the pleadings and resolve the disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss.

Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000).

Consistent with that guidance I will hold an evidentiary hearing at which the government will be obliged to establish by a preponderance of the evidence that the allegations made in support of its assertion of jurisdiction over UK's person are true.

The hearing will be held on December 21, 2006 at 9:30 a.m. To prepare for it, I have reviewed the parties' pleadings to identify what facts are truly in dispute. In the interests of expedition, the parties are ordered to show cause in writing by December 14, 2006 why I should not conclude that there is no genuine issue of material fact that the following statements are true:

1. UK, incorporated under British law, was founded in May, 1979 to provide support services in the United Kingdom for international construction operations, not including operations in the United States. Original shareholders were Harbert International Establishment ("HIE") (9999 shares) and Henry Issacson, who had 1 share. In May 1979, UK entered into a Services Agreement with HIE under which UK would provide administrative support services for HIE.

2. Ray Anderson, president of HIE, hired Colin Edward Towsey and made him managing director of UK. Issacson's share was redeemed and HIE conveyed 5100 shares to Towsey who became the majority shareholder.

3. Towsey owned 51% of the company.

4. Bill Harbert signed UK corporate documents in the United States.

5. UK provided engineering and estimating services in reference to bids on contract 20A. UK also provided procurement and recruiting services under representative agreements with Harbert-Jones on contracts 20A and 07 but provided no engineering or estimating

services with respect to the bids on contract 07.  UK provided no services whatsoever with respect to contract 29.  None of these services, whenever they were provided, were provided in the United States.

6. Bill Harbert and Ray Anderson were signatories on UK's two checking accounts and they and Tommy Kitchens could deal with UK's property or securities, sign counter indemnities, arrange for credits or guarantees from the Bank and exchange any checks or promissory notes on behalf of UK.

7. UK does not have an office or banking accounts in United States and has never solicited any business here. It has never carried on any activity in the United States.

8. Anderson directed projects on which UK would work and directed Towsey to hire employees on behalf of UK.

9. In 1981, Anderson interviewed Ian Young and told Towsey to hire him to start UK's estimating and engineering department.  Anderson then told Young to hire Kenneth Turner to assist Young.  Anderson regularly discussed estimating issues with Young and Turner; Towsey did not because he lacked the expertise.

10. Towsey prepared the invoice of charges incurred by UK on contract 20A.  That invoice reflected that UK had direct costs totaling $404,027.52, including work done by Young and Turner on that contract.  Towsey estimated indirect costs of $557, 219.20; 50% of that was overhead for UK's London office.  Work on contract 20A was 50% of the work done by UK in the period from 1985 to 1988.

11. At the request of HIE in 1990, Towsey compiled all the costs involved in the preparation of bids from 1985 to the award of contracts 20 and 20A in 1989 and prepared an invoice.

      Costs included those of UK, HIE and independent consultants. The invoice was submitted to the Harbert Jones Joint Venture. When UK was paid, it transferred the funds to HIE as reimbursement since HIE had already paid UK for its expenses.

12. Representatives of Harbert and Jones met in the London office of UK to decide a bid price for contract 20A.

13. Towsey had no discussions with Anderson as to what the bid was on contract 20A. He was not aware of what the bids were on that contract. He also had no knowledge of the Harbert-Jones' profit on contract 20A and could not say that final bid preparation on contract 20A took place in London.

14. On July 18, 1998 Young signed the tender for contract 20A to Cairo Wastewater Organization, identifying himself as chief estimator for HII and Jones, a Joint venture. Young was not an estimator for HII but an employee of UK.

15. Actual initial tenders on contract 20A were not submitted until August 4, 2998 and were rejected. Final tenders on contract 20A were submitted on December 12, 1998. By then, Turner had been gone from UK for six months and Young had left two months before.

16. Towsey knew funding for the project was to come from USAID.

17. On March 27, 1990, Towsey received a letter from Peter Schmidt of Holzmann. Towsey called Anderson, who directed him to forward invoices to Kitchens in Alabama.

18. Towsey used UK funds to pay these invoices. They were for engineering services for proposals on other jobs, not the job in Egypt involved in this case. Reimbursement to UK was from HIE, not from the Harbert Jones joint venture because these invoices had nothing to do with the contract in Egypt.

19. Harbert UK was reimbursed by HIE for paying these invoices.

20. In April 26, 1991, Holzmann asserted that Harbert UK owed it 112,402-85 DM and that UK had promised on December 19, 1990 that the Birmingham office would handle the payment but that the office never paid Holzmann.

21. Towsey spoke to Tommy Kitchens on April 26, 1991 about this matter.

22. On April 30, 1991, Towsey faxed Holzmann and stated that the invoice owed to Holzmann was with the Harbert Head Office in Alabama and "out of his hands."

23. At the direction of Anderson, UK entered into a service agreement with the Jones-Harbert Joint Venture to provide procurement services for equipment, materials and personnel.

24. UK billed the joint venture $5,000 per month for services for four months; UK was to submit support billings for contract 07 from 1993 to 1994 but never did.

**SO ORDERED.**

 

Dated:                                                                                                                    _____
                                                                                                      JOHN M. FACCIOLA
                                                                                                      UNITED STATES MAGISTRATE JUDGE