**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**RICHARD F. MILLER,**
**Plaintiff,**

**v.**

**PHILIPP HOLZMANN *et al.*,**
**Defendant.**

**Civil Action No. 95-1231 (RCL/JMF)**

## REPORT AND RECOMMENDATION

Currently pending and ready for resolution is Defendants Harbert Construction Services (U.K.) Ltd. and Bill Harbert International Construction Inc.'s Motion to Dismiss the Government's Complaint in Intervention [#162]. For the reasons stated herein, I recommend that the motion be granted in part and denied in part.

## FINDINGS OF FACT

There is no genuine issue as the following finding of facts:[1]

1. Harbert Construction Services (U.K.) Ltd. ("UK"), incorporated under British law, was founded in May 1979 to provide support services in the United Kingdom for international construction operations, not including operations in the United States. Original shareholders were Harbert International Establishment ("HIE") (9999 shares) and Henry Isaacson, who had 1 share. In May 1979, UK entered into a Services Agreement with HIE under which UK would provide administrative support services for HIE.

[1] These facts were derived by the court following their initial proposal and subsequent review by counsel for all relevant parties.

2. Roy Anderson, president of HIE, hired Colin Edward Towsey and made him managing director of UK. Isaacson's share was redeemed and HIE conveyed 5100 shares to Towsey, who became the majority shareholder, owning 51% of the company.

3. Bill Harbert signed at least one UK corporate document in the United States.

4. UK provided engineering and estimating services in reference to bids on contract 20A. UK also provided procurement and recruiting services under representative agreements with Harbert-Jones on contracts 20A and 07 but provided no engineering or estimating services with respect to the bids on contract 07. None of these services were provided in the United States.

5. UK had a sterling account at Lloyds Bank in London. The signatories on this account were Harbert, T.R. Kitchens, Anderson, and Towsey. Kitchens, Anderson and Harbert are American citizens.

6. Harbert, Kitchens, Anderson, and Towsey (singly) had the authority (a) to withdraw or deal with any of the Company's property or securities; (b) to sign any indemnities or counter-indemnities to the Bank; © to arrange for the granting of credits or the issue of guarantees by the Bank at home or abroad; (d) to arrange for the discounting of any bills endorsed on behalf of the Company and (e) to give instructions with regard to the purchase or sale of any securities, or foreign exchange.

7. UK does not have an office or banking accounts in the United States and has never solicited any business in the United States. It has never carried on any activity in the United States.

8. Anderson, also President of Bilhar, directed projects on which UK would work and

       instructed Towsey to hire employees on behalf of UK.

9. In 1981, Anderson interviewed Ian Young and told Towsey to hire him to start UK's estimating and engineering department. Anderson then told Young to hire Kenneth Turner to assist Young. Anderson regularly discussed estimating issues with Young and Turner; Towsey did not because he lacked the expertise.

10. Towsey prepared the invoice of charges incurred by UK on contract 20 and the re-bid of contract 20A. That invoice reflected that UK had direct costs totaling $404,027.52, including work done by Young and Turner on that contract. Towsey estimated indirect costs of $557,219.20; 50% of that was overhead for UK's London office. Work on contract 20A was 50% of the work done by UK in the period from 1985 to 1988.

11. In 1990, at the request of Bilhar, then known as HIE, Towsey compiled all the costs involved in the preparation of bids from 1985 to the award of contracts 20 and 20A in 1989 and prepared an invoice. The invoice was submitted to the Harbert-Jones Joint Venture. When UK was paid, it transferred the funds to HIE as reimbursement since HIE had already paid UK for its expenses.

12. Representatives of Harbert and Jones met in the London office of UK to decide a bid price for contract 20A.

13. Towsey had no discussions with Anderson as to what the bid was on contract 20A. He was not aware of what the bids were on that contract. He also had no knowledge of the Harbert-Jones' profit on contract 20A and could not say that final bid preparation on contract 20A took place in London.

14. On July 18, 1988, Young signed the tender for contract 20A to Cairo Wastewater

      Organization, identifying himself as chief estimator for Harbert International Inc. ("HII") and Jones, a joint venture. Young was not an estimator for HII but an employee of UK.

15. Actual initial tenders on contract 20A were not submitted until August 4, 1998 and were rejected. Final tenders on contract 20A were submitted on December 12, 1998. By then, Turner had been gone from UK for six months and Young had left two months before.

16. Towsey knew funding for the project was to come from USAID.

17. On March 27, 1990, Towsey received a letter from Peter Schmidt of Holzmann. Towsey called Anderson, who directed him to forward invoices to Kitchens in Alabama.

18. Towsey used UK funds to pay these invoices. They were for engineering services for proposals on other jobs, not the job in Egypt involved in this case.

19. Reimbursement to UK was from HIE, not from the Harbert-Jones Joint Venture because these invoices had nothing to do with the contract in Egypt.

20. On April 26, 1991, a company called HSG (a Holzmann entity) asserted that Harbert UK owed it 112,407.85 DM and that UK had promised on December 19, 1990, that the Birmingham office would handle the payment but that the office never paid Holzmann.

21. Towsey spoke to Kitchens on April 26, 1991, about this matter.

22. On April 30, 1991, Towsey faxed HSG, stating that the invoice owed to Holzmann was with the Harbert Head Office in Alabama and "out of his hands."

23. At the direction of Anderson, UK entered into a service agreement with the Jones-Harbert Joint Venture to provide procurement services for equipment, materials, and personnel.

24. UK billed the joint venture $5,000 per month for services for four months; UK was to submit support billings for contract 07 from 1993 to 1994 but never did.

**The Testimony of Colin Edward Towsey**

25. Towsey is a British citizen. Towsey Tr.[2] at 14. He joined what was then known as the Harbert Howard company as administration manager in February 1979. Towsey Tr. at 20-21.

26. Towsey met with Anderson who was setting up a service organization to support the overseas operations of various parent companies. Towsey Tr. at 22. Anderson hired Towsey. Towsey Tr. at 24. In May 1979, an entity named Harbert Construction Services (U.K.) Limited was incorporated. Towsey Tr. at 31. Towsey became its managing director in 1982 and, as noted above, ultimately owned 51% of its shares. Towsey Tr. at 64.

27. Towsey hired secretaries and engineers for UK in 1980 and 1981. Towsey Tr. at 39. The purpose of UK was to provide support services for the international operations of various Harbert enterprises. Towsey Tr. at 31-32. Thus, Towsey, for example, undertook a recruiting campaign to hire persons who would work for one of the Harbert enterprises in Israel or Egypt. Towsey Tr. at 57, 61. He also would procure replacements items for equipment. Towsey Tr. at 78, 80.

28. In 1982, Harbert had provided Towsey with a power of attorney that permitted Towsey to act on behalf of UK. Towsey Tr. at 99-100.

29. The services provided to what was then called Harbert International Establishment (later to be called Bilhar) were pursuant to a service agreement that specified the duties that UK

[2] "Towsey Tr." is a reference to Towsey's deposition, which was taken in London on June 9, 2006.

would perform. Towsey Tr. at 46, 51-52.

30. Anderson, who often passed through London and was President of HIE, would decide what work would come from HIE for UK to perform, would explain to Towsey what HIE expected, and would then expect Towsey to perform it. Towsey Tr. at 44, 60. Towsey, however, did not consider Anderson his superior; Towsey believed that he was in charge of the operation of UK. Towsey Tr. at 34.

31. The only service agreement UK had with any entity was its service agreement with HIE until UK entered into a service agreement with the Harbert-Jones Joint Venture. Towsey Tr. at 63.

32. Anderson was traveling extensively looking for work for HIE. Towsey Tr. at 82. He had an apartment in London. Id. If Anderson decided that HIE should bid on a contract one of the HIE engineers would decide whether to submit a bid. Towsey Tr. at 79.

33. Anderson and HIE thought it would better for UK to have more engineering staff to help with the estimation of bids. Towsey Tr. at 91. Anderson decided to form UK's estimating and engineering team. Towsey Tr. at 89. In 1981 Anderson interviewed an engineer named Young and directed Towsey to hire him. Towsey Tr. at 89-90.

34. Young then introduced an engineer named Turner to Anderson and Anderson approved Towsey's hiring Turner. Towsey Tr. at 91.

35. Anderson intimated that they had a big bidding program coming and that they needed more strength from the engineering and estimating side of UK. Towsey Tr. at 91. Towsey understood that the contract or contracts would be funded by a United States funding organization that he later learned was the Agency for International Development.

Towsey Tr. at 92.

36. UK's estimating on the contract that would ultimately be awarded to the Harbert-Jones Joint Venture as contract 20A began in 1985. Towsey Tr. at 145. Young's work on the estimate would have been done in the UK office in London. Towsey Tr. at 146. In an interrogatory, UK stated that Young and Turner provided engineering and estimating services in connection with the bids on contract 20A. Towsey Tr. at 148. Towsey confirmed that Turner performed these kind of services for a part of the period in question. Towsey Tr. at 158.

37. Young was the chief estimator for UK. Towsey Tr. at 160.

38. On a document dated July 18, 1988, the subject of which is "Tender for Contract 20A-Sewers and Collectors," there appears the signature of Young, who is identified as the Chief Estimator for Harbert International Inc., an American corporation. Towsey Tr. at 166. UK's corporate name does not appear under Young's name or anywhere else in the document. Towsey Tr. at 167.

39. In 1988, Anderson gave the executive order to close UK's London office. Towsey Tr. at 93. The London office was closed and all employees, save Towsey, were let go. Towsey Tr. at 88. Towsey moved the operation to his home. Id.

40. Harbert and Towsey signed the audited financial statement for UK as of January 31, 1989. Towsey Tr. at 95-96.

41. The service agreement required UK to provide travel services for employees of HIE, so UK paid for Anderson's travel. Towsey Tr. at 108-09. The agreement also provided for the payment of Anderson's annual health screening and housewares for Anderson's

apartment in Cairo. Towsey Tr. at 112.

42. Each month, UK would send monthly returns, reflecting UK's expenditures, to HIE in Birmingham. Towsey Tr. at 130.

43. Towsey believed that he would need HIE's agreement to pay service awards to staff upon the closure of the London office. Towsey Tr. at 139-40.

44. In early 1990, Anderson, on behalf of HIE, directed Towsey to review all the costs involved in the preparation of the bid for the contract that would be called contract 20A from 1985 to its award. Towsey Tr. at 186. The invoice Towsey prepared reflected those costs. Id. It reflected the salary of staff and the travel expenses paid for various persons, three of whom were Americans. Towsey Tr. at 188-89. There were also charges for printing, courier services, secretarial assistance, and vaccinations for employees going overseas. Towsey Tr. at 189.

45. Fifty percent of the office overhead was allocated to contract 20A. Towsey Tr. at 190. Work on that contract (and its predecessor, contract 20) constituted 50% of all the work done in the period from 1985-1988. Id.

46. The invoice, submitted on Harbert Construction Services letterhead, was paid by the Harbert-Jones Joint Venture. Towsey Tr. at 193-94. Since UK had already been paid for these costs by HIE, UK sent the money it got in payment of the invoice to HIE. Towsey Tr. at 255.

47. UK also had a representative agreement for UK to provide services with reference to contract 07; it was signed by Towsey and the project manager. Towsey Tr. at 235. Anderson would have directed UK to provide these services. Towsey Tr. at 236.

48. The agreed billings for UK to charge the joint venture for these services was $5,000 per month and it would have included work on all three contracts at issue in this case. Towsey Tr. at 239-40.

49. Towsey received a letter from Schmidt, dated March 27, 1990, transmitting invoices from a German company called HSG demanding payment of several invoices. Towsey Tr. at 199, 202-03. Towsey was surprised to receive it; he could not relate the charges on the invoices to anything that he had heard about or talked about. Towsey Tr. at 201. The invoices referred to "Engineering Services Air Force Turkey," but UK had not provided any services to such project. Id. He had not heard of any of the other projects specified in the invoices either. Towsey Tr. at 201. The costs claimed by HSG were not costs incurred by UK. Towsey Tr. at 203-04.

50. Towsey faxed the invoices to Anderson and was told to forward them to Kitchens in Birmingham. Towsey Tr. at 201.

51. Towsey received another invoice (Towsey exhibit 30) demanding payment for services provided UK that were provided for projects unknown to Towsey. Towsey Tr. at 225.

52. After a dispute over the exchange rate, Kitchens instructed Towsey that the invoices be paid and UK did so. Towsey Tr. at 203, 212.

**The Testimony of Alfred Hill**

53. Alfred Hill was chief estimator and vice president of Harbert International Establishment. Hill Tr.[3] at. 7. He reported to Anderson. Id.

54. During his deposition, he was examined about four invoices that HSG sent to UK. Hill

[3] "Hill Tr." is a reference to Hill's deposition, which was taken on October 24, 2006.

Tr. at 58. He testified that none of them was a proper charge against contract 20A. Id.

**The Testimony of Thomas Kitchens**

55. Kitchens went to work for Harbert International Establishment in 1975, having worked for another Harbert enterprise since 1960. Kitchens Tr.[4] at 21-22. He was vice president of Harbert International Establishment at least as of July 15, 1988. Kitchens Tr. at 24. He also examined the four invoices HSG sent to UK and testified that he could not see that any of the services for which HSG demanded payment related to contract 20A. Kitchens Tr. at 96-97.

**The Testimony of R. Terry Windle**

56. R. Terry Windle went to work for Harbert International, Inc. in 1983 and was employed there until 1990 as an accountant. Windle Tr.[5] at 16-17, 22. He went to London on five or six occasions to review UK's accounting records at the behest of Kitchens. Windle Tr. at 83, 90. He reported to Kitchens, who he recalled was employed by Harbert International, Inc. Windle Tr. at 84. On a monthly basis, he would review the accounting information sent to his office in Birmingham and, if the information was approved, he would transfer the appropriate amount of money to UK. Windle Tr. at 114, 122. Large payments would require the approval of Kitchens or Harbert. Windle Tr. at 130-31. Harbert International Establishment reimbursed UK for its payment of invoices submitted by HSG. Windle Tr. at 142.

---

[4] "Kitchens Tr." is a reference to Kitchens' deposition, which was taken on October 17, 2006.

[5] "Windle Tr." is a reference to Windle's deposition, which was taken on October 19, 2006.

## CONCLUSION OF LAW

The court may exercise jurisdiction over the person of UK as to contract 20A because that jurisdiction is premised on UK's doing of an act that its agent and employees had to know would have an impact in the United States and because UK otherwise had sufficient contacts with American corporations and citizens to justify this court's exercise of its jurisdiction. There is, however, no basis to exercise jurisdiction over UK as to contracts 07 and 29.

## Introduction

In an earlier Report and Recommendation,[6] I indicated that jurisdiction over the person of an alien corporation could be based on (1) the corporation's contacts with the United States, if those contacts established such a sufficient presence in the United States that the exercise of that jurisdiction could not be described as unfair (general jurisdiction); or (2) on a transaction or occurrence in which the corporation performed an act that had a reasonably foreseeable impact in the United States and the litigation is based on that transaction or occurrence (special jurisdiction). Id. at *21. Hence, I concluded that the exercise of jurisdiction over Holzmann was proper because of its plea of guilty in an American court to conspiring to rig the bids and the specificity of the government's allegations of Holzmann's direct participation with Harbert International, Inc. and Anderson in the bid-rigging conspiracy. Id. at *23. In my view, "[t]hese allegations are sufficient in themselves to warrant the exercise of specific jurisdiction over Holzmann upon the theory that they performed acts that were intended or could reasonably have been expected to have an impact in the United States, i.e., the payment from the United States Treasury of the invoices submitted under the rigged contracts." Id.

---

[6] Miller v. Holzmann, No. 95-CV-1231, 2006 WL 568722 (D.D.C. Mar. 9, 2006).

I reached a different conclusion as to UK, finding that the allegations were specific enough to warrant additional discovery to see if the United States and relator could find a sufficient evidentiary basis that would justify the exercise of either general or specific jurisdiction over UK. Id. at *22.

**The Evidentiary Standard**

As I indicated in an earlier Order,[7] the district court is granted discretion as to how to resolve the issues of fact pertaining to jurisdiction that may arise when it is invited to exercise jurisdiction over a foreign sovereign. In In re Baan Co. Sec. Litig., 245 F. Supp. 2d 117, 124-26 (D.D.C. 2003), Judge Huvelle marshaled substantial authority for her conclusion that, once a court has permitted discovery pertaining to jurisdiction, the court must accept as true allegations made as to jurisdiction by the plaintiff that are supported by "concrete evidence." Thus, the court may not resolve factual issues that have arisen during jurisdictional discovery, lest it usurp the jury's function or require the plaintiff to prove her case as a condition of proceeding with general discovery. Rather, once plaintiff supports her allegations regarding jurisdiction over the defendant's person with evidence, the motion to dismiss for lack of jurisdiction must be denied even though the parties are bitterly divided on the truth of those allegations and their division creates a genuine issue of material fact. Id.

Fortunately, in this case, there is no real dispute as to the fundamental facts of the creation of UK, the nature of its obligations to HIE, its role in the preparation of the bids on contract 20A and its payment of certain invoices tendered by HSG, a Holzmann entity, that are described in my findings. The parties are, however, bitterly divided on the intent with which the

[7] Order of 11/28/06 at 2-3.

preparation of the bids and the payments were made. To UK, these acts were innocently done without any knowledge whatsoever of any attempt to rig the bids and then disguise a payoff to Holzmann for its role in that conspiracy. According to relator and the government, UK, through its agents, participated in the bid-rigging and the payoff. But, it is certainly not necessary for me to resolve that controversy in order to resolve the jurisdictional issue. Instead, I can premise the exercise of jurisdiction on the uncontroverted facts.

**A Hybrid Form of Jurisdiction**

As I have explained, the court may exercise general, personal jurisdiction over an alien corporation as to any cause of action if the corporation's contacts with the United States are sufficient to render the exercise of that jurisdiction reasonable. It may exercise special, personal jurisdiction over a cause of action premised on an act, wherever it was done, when it was reasonably foreseeable that the act would have consequences in the United States and exercise of that jurisdiction is reasonable.

It must be recalled, however, that these two means of exercising jurisdiction do not exhaust the court's power. As the Restatement of Conflicts of Law §52 (Second) (1971) points out, a court of a state or of the United States "may exercise judicial jurisdiction over a foreign corporation where the corporation has such a relationship to the state that it is reasonable for the state to exercise such jurisdiction." Thus, the court must look to all pertinent indicia to ascertain whether the exercise of personal jurisdiction is reasonable.

In this case, I have concluded in my ultimate conclusion of law that UK's doing of acts pertaining to the preparation of the bid on contract 20A are in themselves a sufficient predicate for the exercise of jurisdiction. I should note that the other contacts between UK and United

States citizens and United States corporations merely undergirds the reasonableness of this exercise of special jurisdiction. There is, therefore a legitimate means of creating for this case a hybrid form of jurisdiction that is both based on the act and on the contacts between UK and United States citizens and United States corporations.

**The Premise for the Exercise of Special Jurisdiction**

Those uncontroverted facts are that Young and Turner, agents and employees of UK, did the estimating on a bid for contract 20A and that they, along with Towsey, knew that it was a bid on a contract that was funded by an agency of the United States. Young signed a tender for contract 20A as the chief estimator for Harbert International, Inc. In my view, their work on the preparation of the bid and its submission was an act that they had to know would have the consequence of causing money appropriated by the United States Congress to be paid to Harbert International, Inc., if the bid was successful and the contract, contract 20A, was awarded. Their doing of that act, one that they had to know would have an impact on the United States Treasury, is sufficient to permit the court to exercise jurisdiction over UK as to the government and the relator's claim for relief, which is based on that act.

It is of little moment to me that the bid Young signed was not accepted and that a final tender was prepared and submitted in December 1998, when Young and Turner had left the employ of UK. Their work while still employed by UK was part of a process that began when they were employed and consummated in success, albeit after they left. The transaction or occurrence is all the work of UK done on the bid for contract 20A and that transaction or occurrence may serve as the premise of the court's jurisdiction over UK as to that contract.

**The Contacts Between UK and the United State Establish That the Exercise of Personal**

**Jurisdiction Is Fair**

To comply with the due process clause, the exercise of personal jurisdiction over an alien corporation must be fair.  That showing turns on whether the alien corporation has sufficient minimum contacts with the United States that the maintenance of the suit does not offend traditional notions of fair play and justice. In re Baan, 245 F. Supp at 126.  In my view, although UK did no business in the United States, its contacts with United States' corporations and citizens were more than minimal and justify the exercise of jurisdiction over the claim for relief based on contract 20A.

First, UK was created by American citizens, acting as agents for one or more American corporations, for the specific purpose of providing services to companies that were bidding on projects that were going to be funded by agencies of the United States.

Second, an American citizen, Anderson, acting on behalf of both American and foreign corporations,[8] directed the projects on which UK would work.

Third, Anderson interviewed the men who would do the estimating on contract 20A and directed Towsey to hire them.

Fourth, UK expended nearly one million dollars in the preparation of the bid on contract 20A, money that it was reimbursed by funds appropriated by Congress.  In a three-year period, UK's work on contract 20A was 50% of its business.

Fifth, UK had no capital.  Every penny or pound it had was given only after its demand for funding was approved by a Harbert employee based in Birmingham, Alabama.

---

[8] Anderson was simultaneously vice president of Harbert International, Inc., an American corporation, and Harbert International Establishment, a Liechtenstein corporation.

Sixth, while Towsey managed UK's London office, he saw himself obliged to seek direction from Harbert entities based in America with regard to the payment of HSG invoices. These invoices were paid only after an employee based in America authorized their payment. This was also true of payments to be made to the staff upon the closing of the London office.

Seventh, Harbert, an American citizen, and Towsey signed the auditing financial statement for UK in 1989, the year after the bid on contract 20A was submitted.

Eighth, it was Anderson, not Towsey, who decided to close the London office.

Ninth, an American accountant, Windle, reviewed UK's accounting statements on five or six occasions at the behest of another American, Kitchens, who worked for an American company, Harbert International, Inc. Additionally, on a monthly basis, Windle would review UK's accounting information that was sent to his office in Birmingham and, if the information was approved, he would transfer an appropriate amount of money to UK. Large payments required the approval of Kitchens or Harbert, both American citizens who were employed by or owned American companies; Kitchens was based in Birmingham.

It is not necessary to go as far as the government's theory that UK was the alter ego of an American Harbert enterprise to sustain jurisdiction. These contacts combined with UK's acts with reference to contract 20A convince me that the exercise of jurisdiction over UK on the hybrid theory I have advanced is perfectly consistent with the due process clause.

**Inconvenience and Hardship**

I must also take into consideration the cost and expense to UK if it has to defend itself in an American court. There are only three British citizens, former employees of UK, who could be witnesses in this case. Nobody has been able to find two of them, Stone and Turner, and the

third, Towsey has already given his deposition which can be admitted into evidence. If Towsey is needed as a witness, he need only board a plane and, as the British put it, "hop over the pond."

Moreover, UK is already represented by competent counsel who are intimately familiar with this case. Thus, for UK, defense of this case can hardly be described as so burdensome that it is then so unfair as to constitute a violation of due process.

That minimal inconvenience is outweighed by the factors I have already detailed above–(a) that jurisdiction may be based on the acts performed to secure contract 20A for Harbert International, Inc., an American company; and (b) that UK has sufficient contacts with the United States and its citizens to justify the exercise of jurisdiction over a claim for relief based on contract 20A.

There is no evidence before me of similar weight as to UK's participation in the bidding process as to contracts 07 and 29. All we know is that there was a service agreement between UK and Harbert International Establishment as to contract 07 and that some payments were made pursuant to it; there is no information as to any UK role as to contract 29. I therefore have to find that it would offend due process to exercise personal jurisdiction over UK as to these two contracts. Unlike contract 20A, there is no act by UK as to these two contracts upon which jurisdiction could be based.

I appreciate that the relator and the government assert jurisdiction on the basis of an overarching conspiracy theory that makes UK, as a conspirator, responsible for all the acts of its fellow conspirators–namely, all three contracts. I cannot however premise jurisdiction over UK on that bare bones allegation, unsupported by any evidence disclosed during the discovery I just permitted. Simply put, there is no evidence that would permit me to conclude that (1) Towsey

perjured himself when he denied any knowledge of or complicity in the conspiracy to rig the bid on contract 20A and (2) Young and Turner, who worked for UK, knew of the conspiracy to rig the bid on that contract and knowingly participated in it. Without any evidence whatsoever, it is impossible for me to conclude that their participation in a conspiracy to rig that bid is a premise for the assertion of personal jurisdiction over UK on the government's and relator's conspiracy theory.

## CONCLUSION

Based on the above, I therefore recommend that Defendants Harbert Construction Services (U.K.) Ltd. and Bill Harbert International Construction Inc.'s Motion to Dismiss the Government's Complaint in Intervention [#162] be denied as to the claim for relief based on contract 20A and granted as to contracts 07 and 29.

**Failure to file timely objections to the findings and recommendations set forth in this report may waive your right of appeal from an order of the District Court adopting such findings and recommendations. See Thomas v. Arn, 474 U.S. 140 (1985).**

Dated:

JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE