## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ ) | |
| **UNITED STATES OF AMERICA,** ) | |
| *ex rel.* **RICHARD F. MILLER,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 95-1231 (RCL)** |
| ) | |
| **BILL HARBERT INTERNATIONAL** ) | |
| **CONSTRUCTION, INC.,** *et al.***,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

### MEMORANDUM OPINION

I.    INTRODUCTION

This Memorandum Opinion confirms and explains the Orders issued by this Court during the April 27, 2007, hearing concerning defendants Bill L. Harbert ("Harbert") and E. Roy Anderson's ("Anderson") motions for judgments as a matter of law on statute of limitations grounds, except as to one false claim against Anderson relating to contract 29.

Relator filed his original complaint under seal on June 30, 1995, alleging an overarching conspiracy to rig bids on USAID contracts for construction programs in Egypt in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.* (2007).  The extent of this complaint was limited to claims on contract 20A.  Neither defendant Harbert nor defendant Anderson was named in this iteration of the complaint.  Over five years later, on December 28, 2000, the relator filed his Second Amended Complaint against the defendants, including for the first time, defendants Anderson and Harbert.  As with the relator's first complaint, the relator's Second

Amended Complaint only specified claims arising out of contract 20A.  Shortly thereafter, on

March 13, 2001, the government filed its Complaint in Intervention against all of the defendants

listed in the relator's Second Amended Complaint, including Anderson, but *not including*

defendant Harbert.  Unlike the relator's Second Amended Complaint, the government's

Complaint in Intervention included claims arising out of all three contracts at issue in this case:

contracts 20A, 29, and 07.  The relator did not include claims arising out of either contract 29 or

07 until March 9, 2006, when the relator filed his Third Amended Complaint.

Prior to the commencement of trial, defendants Harbert and Anderson moved to dismiss

as time-barred plaintiffs' causes of action against them, pursuant to § 3731 of the FCA.  Under

this section:

> [a] civil action under section 3730 may not be brought: (1) more than 6 years after
> the date on which the violation of section 3729 is committed, or (2) more than 3
> years after the date when facts material to the right of action are known or reasonably
> should have been known by the official of the United States charged with
> responsibility to act in the circumstances, but in no event more than 10 years after the
> date on which the violation is committed, whichever occurs last.[1]

In response to the defendants' motions, this Court issued a series of pretrial Opinions addressing

the propriety of the claims against both defendants under each statute of limitations provision.

Specifically, this Court found that, if the six-year limitations period under the FCA were

to apply, the relator's claims against defendants Anderson and Harbert as to all three contracts at

issue would be barred completely due to the fact that the relator's claims against both Anderson

and Harbert were brought more than six years after the FCA violations occurred on contract 20A.

---

[1] 31 U.S.C. § 3731.

For the same reason, all but one of the government's claims against defendant Anderson[2] would be time-barred under the six-year limitations period.[3]

Relying on its decision in *United States ex rel. Pogue v. Diabetes Treatment Centers of America*, 474 F. Supp. 2d 75 (D.D.C. Feb. 7, 2007) (Lamberth, J.), however, this Court noted that the three-year alternate statute of limitations under § 3731(b)(2) applied to the government and relator alike. *See id.* at 89. Accordingly, the Court indicated that the relator and government's claims against Harbert and Anderson could be deemed timely if the evidence showed that the plaintiffs' respective claims were filed within three years of the point in time the government knew or should have known of facts material to the cause of action against Harbert and Anderson. If the evidence demonstrated that the government knew or reasonably should have known facts material to the right of action against Harbert and Anderson more than three years prior to December 28, 2000 when the relator's complaint was filed,[4] however, then the

---

[2] This is a single claim on contract 29, which is the only FCA claim that occurred within six years of the date the government's Complaint in Intervention against Anderson was filed.

[3] The government did not bring any claims against defendant Harbert. Therefore, though defendant Anderson's motion for judgment as a matter of law extends to both the relator and the government, defendant Harbert's similar motion extends only to claims brought by the relator.

[4] The timeliness of the plaintiffs' complaints under the three-year limitations period set forth in § 3731(b)(2) is measured from the date of the relator's complaint due to the fact that a government's complaint in intervention is deemed to be an amendment of the relator's complaint, if the elements of relation back under Rule 15(c) of the Federal Rules of Civil Procedure are satisfied. Therefore, the government's complaint against Anderson, *qua* amended pleading, may relate back to the relator's Second Amended Complaint against Anderson provided that the government's complaint arises out of the same conduct and occurrences as the conduct set forth in the relator's Second Amended Complaint, and provided that the relator's Second Amended Complaint is timely filed under the three-year limitations period. As this Court has previously held, the government's Complaint in Intervention in this case averred claims against Anderson arising out of the same conduct and occurrences as those claims in the relator's Second Amended Complaint, and sought remedy against the same defendant (Anderson). Additionally, many of

3

plaintiffs could not take advantage of the three-year provision under § 3731(b)(2), and their

claims would be measured under the six-year provision under § 3731(b)(1).

On April 27, 2007, this Court conducted a hearing out of the presence of the jury to

determine when, as a matter of law, the government knew or reasonably should have known facts

material to the cause of action brought by plaintiffs.[5]  At the hearing, this Court GRANTED

defendants Harbert and Anderson's motions for judgment as a matter of law on statute of

limitations grounds, and ORDERED that all claims against defendant Bill Harbert be

---

the FCA claims on contract 20A brought by the relator against Anderson fall within the ten year
window allowed under § 3731(b)(2).  Therefore, the Court finds that the government's claims as
to defendant Anderson relate back to the date the original claims against Anderson were filed:
December 28, 2000.  Therefore, the government's knowledge must be measured from three years
prior to this same date.
    Under the six-year limitations period, however, the government would not be able to
relate back to the relator's Second Amended Complaint because the claims against Anderson in
the relator's Second Amended Complaint would be untimely under § 3731(b)(1), and an amended
pleading may not relate back to an untimely original pleading.  As § 3731(b)(1) points out, the
six-year period is measured from the time of the violation of the FCA, rather than the
government's knowledge of the violation.  *See* 31 U.S.C. § 3731(b)(1).  Therefore, only those
violations that occurred within six years of the filing date of the complaint may be timely
brought.  Here, the relator's claims against Anderson extended only to contract 20A, of which the
last violation occurred more than six years prior to the relator's filing the Second Amended
Complaint.  Accordingly, the timeliness of the government's Complaint in Intervention under the
six-year limitations period in § 3731(b)(1), if it is found to apply, must be measured by the date
the government's Complaint in Intervention was filed: March 13, 2001.

    [5] Defendant Harbert, with the concurrence of defendant Anderson, proposed at the pretrial
conference and again during a colloquy after the jury had been excused for the day that the statute
of limitations issue be heard by the Court instead of the jury.  (*See* Trial Tr. 49, Mar. 9, 2007;
Trial Tr. 142-45, Apr. 13, 2007 P.M.)  In response, plaintiffs indicated, both in open court and in
a Statement [795] filed with the Court, that they were willing to waive their jury trial right to the
extent necessary to permit the Court to resolve the statute of limitations issue as to defendants
Harbert and Anderson.  (*See* Statement [795] at 1-2; Trial Tr. 95, Apr. 17, 2007.)  Though
plaintiffs objected to the portion of the defendants' proposal that the jury resolve the issue if the
Court were to find against the defendants, this objection is rendered moot by the fact that the
Court found in favor of the defendants on the statute of limitations issue.

DISMISSED, and that all claims except the final claim on contract 29 against Roy Anderson be DISMISSED on the grounds that the government reasonably should have known facts material to the cause of action prior to December 28, 1997, and that no rational jury could find otherwise. The Court's analysis in support of its decision follows.

II.     ANALYSIS

    A.     STANDARD OF REVIEW

"If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may . . . grant a motion for judgment as a matter of law against the party on that claim or defense . . . ." Fed. R. Civ. P. 50(a)(1)(B).  A party is entitled to a judgment as a matter of law in its favor only if "no reasonable jury could reach a verdict" in the opposing party's favor. *Holbrook v. Reno*, 196 F.3d 255, 259 (D.C. Cir. 1999).  In resolving a motion for a judgment as a matter of law, a court must "view the evidence in the light most favorable" to the non-moving party, and must "resolve all conflicts in [the non-moving party's] favor." *Id.* at 259-60.  A court should not direct a judgment as a matter of law in favor of a party if reasonable minds might differ as to the import of the evidence presented before the court.  *Borgo v. Goldin*, 204 F.3d 251, 254 (D.C. Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)).

    B.     ANALYSIS

        1.     Purpose and Rules of Interpretation of Statutes of Limitations

Throughout this Court's determination of whether the government should have known of facts material to the right of action, it is important to keep in mind both the purpose behind, and the methodology in interpreting, statutes of limitations.  As the Supreme Court has held, statutes

of limitations "represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that 'the right to be free of stale claims in time comes to prevail over the right to prosecute them.'" *United States v. Kubrick*, 444 U.S. 111, 117 (1979) (quoting *R.R. Tels. v. Ry. Express Agency*, 321 U.S. 342, 349 (1944)). Statutes of limitations are designed to "afford[] plaintiffs what the legislature deems a reasonable time to present their claims [while simultaneously] protecting defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise." *Kubrick*, 444 U.S. at 117 (citing, *inter alia*, *United States v. Marion*, 404 U.S. 307, 322, n.14 (1971)).  Accordingly, courts "are not free to construe [a statute of limitations] so as to defeat its obvious purpose, *which is to encourage the prompt presentation of claims*." *Kubrick*, 444 U.S. at 117 (emphasis added).

2.      Section 3731(b)(2) Analysis

The relevant issue before this Court is whether, applying the three-year statute of limitations under § 3731(b)(2) of the FCA, the plaintiffs' claims against defendants Harbert and Anderson were timely.  The timeliness of a plaintiff's complaint under § 3731(b)(2) of the FCA depends upon a determination of *when* the fraud at issue was known or reasonably should have been known.  *See United States v. Intrados/Intl. Mgmt. Group*, 265 F. Supp. 2d 1, 12 (D.D.C. 2002) (Urbina, J.).  Though this Court has previously found that a relator may take advantage of the three-year period under § 3731(b)(2), the statute of limitations under that section begins to run from the point in time *the government* knew or reasonably should have known of facts material to the right of action.  *Cf. Pogue*, 474 F. Supp. 2d at 85 ("[31 U.S.C. § 3731](b)(2)'s

6

three-year statute of limitations applies across the board, measured *by the government's knowledge*.") (emphasis added).  Therefore, this Court must determine whether no reasonable jury could find that the government reasonably should not have known facts material to the right of action prior to December 28, 1997.[6]

In making the determination of whether a plaintiff–in this case, the government–"should have known" facts material to the right of action based in fraud for purposes of measuring when a statute of limitations begins to run, courts have repeatedly applied a "discovery-due diligence" standard, which is rooted in principles of equitable tolling.  *See, e.g.*, *Sprint Commc'ns. Co. v. Fed. Commc'ns. Comm'n*, 76 F.3d 1221 (D.C. Cir. 1995); *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480 (D.C. Cir. 1989); *Richards v. Mileski*, 662 F.2d 65 (D.C. Cir. 1981); *Fitzgerald v. Seamans*, 553 F.2d 220 (D.C. Cir. 1977).[7]   Under the "discovery-due diligence" standard, the

---

[6] *See supra* note 4.  Obviously, this issue is being decided upon the defendants' Rule 50 motions for judgment as a matter of law.  In order to determine what no reasonable jury could find, however, this Court must first inquire as to whether the government reasonably should have known of the material facts, and then assess whether no reasonable jury could find otherwise.

[7] Though these cited cases are based on claims arising under the Federal Tort Claims Act ("FTCA"), courts have consistently interpreted the "should have known" standard under both the FCA and FTCA identically in light of the common intent and nearly identical language under both statutes.  *See, e.g.*, *United States ex rel. Purcell v. MWI Corp.*, 254 F. Supp. 2d 69, 77 (D.D.C. 2003) (Urbina, J.) (analyzing section 3731(b)(2) and 2416(c) together for the purposes of resolving a motion to dismiss); *United States v. Tech Refrigeration*, 143 F. Supp. 2d 1006, 1010 (N.D. Ill. 2001) (analyzing a section 3731(b)(2) claim by reference to section 2416(c)); *United States v. Kensington Hosp.*, 1993 WL 21446, at *13 (E.D. Pa. 1993) (describing the common intent behind sections 3731(b)(2) and 2416(c)); *Compare* 28 U.S.C. § 2416 ("For the purpose of computing the limitations periods . . . , there shall be excluded all periods during which . . . facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances . . . ."), *with* 31 U.S.C. § 3731(b)(2) ("A civil action . . . may not be brought . . . more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed . . . .")  Moreover,

7

running of the statute of limitations does not begin at the point the plaintiff has sufficient information to prevail at trial, or even when a plaintiff is aware that the conduct at issue is actionable under the law.[8]  Rather, courts have consistently found that a limitations period begins to run under the "should have known" standard at the point in time that the government official charged with bringing the civil action "discovers, or by reasonable diligence could have discovered, the basis of the lawsuit."  *See, e.g.*, *Sprint Commc'ns. Co. v. Fed. Commc'ns. Comm'n*, 76 F.3d 1221 (D.C. Cir. 1995); *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480 (D.C. Cir. 1989); *Richards v. Mileski*, 662 F.2d 65 (D.C. Cir. 1981); *Fitzgerald v. Seamans*, 553 F.2d 220 (D.C. Cir. 1977).   That is, the limitations period starts to run on "the first date that the injured party possesses sufficient critical facts to put him on notice that a wrong has been committed and that he need investigate to determine whether he is entitled to redress."  *Loughlin v. United States*, 230 F. Supp. 2d 26, 40 (D.D.C. 2002) (quoting *Zeleznik*, 770 F.2d at 23 (3d Cir. 1985)).

In cases where defendants have not engaged in affirmative acts of fraudulent

---

two judges within this district have found that the tenets of the "discovery-due diligence" standard apply to statute of limitations issues arising under the FCA.  *Cf. United States v. Intrados/Intl. Mgmt. Group*, 265 F. Supp. 2d 1, 12 (D.D.C. 2002) (Urbina, J.) (finding that the "should have known" standard under § 3731(b)(2), much like the equitable tolling doctrine, "assumes the party charged with the responsibility of uncovering the fraud will do so with due diligence"); *United States v. Uzzell*, 648 F. Supp. 1362, 1367 (D.D.C. 1986) (Green, J.) (finding that the principles of equitable tolling apply to statute of limitations determinations under § 3731 of the FCA).  Accordingly, this Court finds that the reasoning applied to FTCA cases for the purposes of interpreting the "should have known" standard applies with equal force to the same standard found under § 3731(b)(2) of the FCA.

[8] *See Kubrick*, 444 U.S. at 120-22 (finding that, the statute of limitations was triggered *prior to* the plaintiff's awareness of whether the defendant's conduct was actionable under the law).

concealment, a plaintiff is deemed to have sufficient notice of critical facts to set the statute of limitations running if the plaintiff has inquiry notice of the injury and its cause. *Cf. Kubrick*, 444 U.S. at 120; *Cf. Sprint*, 76 F.3d at 1228 (citing *Riddell*, 866 F.2d at 1491). In such a case, a plaintiff "may not wait passively until evidence of actual injury surfaces." *Loughlin*, 230 F. Supp. 2d at 40. Rather, a plaintiff *must*, within the statutory period, "make a diligent inquiry into the facts and circumstances that would support that claim," so as to determine whether and whom to sue. *Sprint*, 76 F.3d at 38; *cf. Kubrick*, 444 U.S. at 122; *Davis v. United States*, 642 F.2d 328, 331 (9th Cir. 1981) (citing *Kubrick*, 444 U.S. 111 (1979)). Where no fraudulent concealment exists, a plaintiff's failure to exercise due diligence in discovering the material facts underlying the cause of action is fatal to those claims. *See Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 151 (1984).

In cases where the defendant has engaged in fraudulent concealment, however, the defendant must prove that the plaintiff had a higher degree of knowledge than inquiry notice of the fraud in order to prevail on a statute of limitations defense. *Riddell*, 866 F.2d at 1491. The defendant has the burden of "coming forward with any facts showing that the plaintiff could have discovered their involvement or the cause of action had [the plaintiff] exercised due diligence." *Richards v. Mileski*, 662 F.2d 65, 71 (D.C. Cir. 1981).

Accordingly, this Court must make three determinations. First, the Court must determine whether the defendants engaged in any fraudulent concealment of the injury.[9] Second, the Court must determine at what point the government was on notice of the injury alleged in the

---

[9] As this inquiry sets the standard of knowledge of the injury for the government, the Court must conduct this inquiry first.

complaint.  Third, if the plaintiff is deemed to have been on notice, the Court must determine

whether the plaintiff exercised due diligence in conducting an inquiry into determining whether a

cause of action existed.

> 3.      Fraudulent Concealment Analysis

Plaintiffs contend that Harbert and Anderson's activities in covering up their respective

involvement in the alleged conspiracy constituted affirmative acts of fraudulent concealment.

Accordingly, plaintiffs argue that, under principles of equitable tolling, the three-year statute of

limitations should be tolled unless the defendants can establish that the government could have

discovered the defendants' involvement by exercising due diligence.  In plaintiffs' opinion, the

fact that the criminal investigation undertaken by the Antitrust Division at the DOJ did not

uncover direct evidence of the defendants' involvement in the conspiracy until 1999 is proof that

the Civil Division would not have uncovered the fraud even if it had exercised due diligence.

(*See* JML Hr'g Tr.166, Apr. 27, 2007.)  Accordingly, plaintiffs argue that the statute of

limitations should be tolled until 1999, when the government uncovered more direct evidence of

the defendants' involvement in the conspiracy.  There are a number of problems with this

argument.

First, plaintiffs' argument incorrectly interprets the fraudulent concealment standard.

Under the law of this Circuit, "the doctrine of fraudulent concealment does not come into play,

whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on

notice of a potential claim." *Hobson* v. Wilson, 737 F.2d 1, 35 (D.C. Cir. 1984).  That is, the

doctrine of fraudulent concealment will toll a statute of limitations only insofar as the injury to

the plaintiff and its cause is concealed by the defendants.  Once a plaintiff becomes aware of

these two pieces of information, however, the clock begins to run for statute of limitations

purposes.  Neither a lack of knowledge of the specific pattern of fraudulent activity, or an

inability to know the particular identities of some of the perpetrators of the fraud alters this result.

Moreover, "[t]he fact that a reasonably diligent investigation would not have discovered the

defendant's involvement is no longer relevant for the purposes of accrual of the statute of

limitations."[10]  Therefore, the limitations period will only be tolled if the defendants' acts in

concealing the fraud prevented the government from discovering that it had been injured by the

alleged conspiracy.[11]

---

[10] *Zeleznik v. United States*, 770 F.2d 20, 24 (3d Cir. 1985) (citing *Davis v. United States*, 642 F.2d 328 (9th Cir. 1981), *cert. denied*, 455 U.S. 919 (1982)).

[11] This finding is not inconsistent with the D.C. Circuit's finding in *Hobson* that "[a] plaintiff's knowledge of the grounds for a suit must generally extend to an awareness of the persons responsible for plaintiff's injury . . . [and that] simply because a person knows he has been injured by one person cannot reasonably mean he should be held to know of every other participant [in the fraud]." *Hobson*, 737 F.2d at 35.  To the contrary, *Hobson* points out that this ruling "by no means impl[ies] that a plaintiff may postpone suit until he knows every defendant by name and title." *Id.*  The *Hobson* Court noted that a plaintiff would be held to know of certain individuals' involvement in a fraudulent scheme based solely on their relationship to known perpetrators of the fraud.  *See Hobson*, 737 F.2d at 35 n.109 (noting that a plaintiff "is held to know that subordinates might be implicated if their superiors are involved in a wrong," and would in turn be precluded from bringing a later suit against the subordinate after the statute of limitations has run); *see also Fitzgerald*, 553 F.2d at 229.
    The facts in this case fall squarely within the standard set forth in *Hobson*.  It is undisputed that the government knew in June 1995 that Messrs. Harbert and Anderson owned and/or controlled many of the companies that were named as defendants in this case by the relator.  It is also undisputed that the acts of corporations are implemented and carried out by individuals.  Based on the facts of this case, the relationships between Messrs. Harbert and Anderson and the corporate entities that were initially named as defendants were so intertwined that the Court finds that the government could not have been unaware that Messrs. Harbert and Anderson might be implicated if the many companies that they owned and operated were found to be involved in wrongdoing.  Therefore, even under the *Hobson* standard, the government's knowledge of the grounds of the suit extends to an awareness of both Messrs. Anderson and Harbert, and the plaintiffs are not entitled to a postponement of the statute of limitations.

Here, any reasonable jury would have to find that the government was directly aware of myriad pieces of evidence pointing to a scheme to defraud the United States government involving the submission of bids on multiple contracts for construction jobs in Egypt. The relator's Disclosure Statement very clearly lays out that a conspiracy existed to rig bids on USAID contracts in Egypt, and detailed the manner in which the conspiracy was acted out by its participants. (JML Hr'g Tr.15-18.)[12] The allegations within the relator's complaint also detailed similar information about the injury to the government and its cause. Both the Disclosure Statement and the Complaint were provided to the government in 1995. Accordingly, no reasonable jury could find that the government did not have knowledge of the injury from which this cause of action stems. Therefore, the three-year statute of limitations cannot be tolled on grounds of fraudulent concealment because the government was aware of the injury at the time the relator's Complaint and Disclosure Statement were filed in 1995.

Second, even if limitations periods were able to be tolled due to concealment of an individual's particular involvement in a fraud, it is clear–and, consequently, no reasonable jury could find otherwise–that the government knew of defendants Harbert and Anderson's identities in association with the fraud in this case prior to December 28, 1997. In fact, at the time the relator filed his Disclosure Statement with the government in 1995, the government had in its possession–and had access to–information that pointed to defendants Anderson and Harbert as members of the conspiracy at issue. *See infra* Section II.B.4.a; *see also supra* note 11.

Accordingly, the Court finds that no reasonable jury could find that fraudulent

_____

[12] Namely, the Disclosure Statement stated that the bids on Contract 20A were rigged, that the joint venture paid Fru-Con and B&B to submit complementary bids, and that AICI was paid not to bid so that the Harbert-Jones Joint Venture could win the bid. (JML Hr'g Tr.15-18.)

concealment of the injury occurred.  Therefore, the Court finds that the requisite level of

knowledge of the injury that the defendants must prove the government had prior to December

28, 1997 is inquiry notice.  That is, the defendants must prove the government had sufficient

information that "would lead an ordinary prudent person to investigate the matter further."

Black's Law Dictionary 1091 (8th ed. 2004).

    4.  Inquiry Notice Analysis

      a.  Government Had Inquiry Notice of Injury

  Based upon the evidence presented at the hearing, it is clear that the government had

inquiry notice of the injury and its cause.  The relator's Complaint and Disclosure Statement filed

with the government in June 1995 provided in detail the various pieces of evidence and

allegations supporting a finding that the defendants engaged in a conspiracy to rig bids on

USAID contracts in Egypt.  In these documents, the relator named key participants, both

individuals and corporate entities, who allegedly participated in the fraudulent scheme.  The

relator also provided factual support in the form of exhibits and attachments to the Disclosure

Statement that corroborated his allegations of wrongdoing toward the government.

  In addition, the relator provided the government with ample evidence to put the

government on inquiry notice that defendants Anderson and Harbert were likely involved in

causing the injury to the government.  For example, with respect to Mr. Anderson, Mr. Bell[13]

admitted during his testimony that the relator referred to Anderson approximately a dozen times

throughout the Disclosure Statement itself.  (JML Hr'g Tr. 64.)  Additionally, Mr. Bell

acknowledged that the relator indicated in his Disclosure Statement the various leading roles Mr.

---

[13] Mr. Robert Bell is counsel for the relator.  (JML Hr'g Tr. 8.)

Anderson played in running the companies charged in the conspiracy, including the facts that Mr.

Anderson was president of Harbert UK, and was Harbert International, Inc.'s sponsor

representative to the Harbert-Jones joint venture.  (JML Hr'g Tr. 65.)  In these capacities, the

Disclosure Statement stated that Anderson "played a leading role in the organization and

activities of the 'Frankfurt Club' of U.S. contractors qualified to do business in Egypt for

construction projects.  (JML Hr'g Tr. 65.)  Perhaps most importantly, Mr. Bell testified that the

relator *explicitly stated* in his Disclosure Statement that he considered Anderson a "central

participant in the conspiracy," at one point calling him a "ringleader" in the conspiracy at issue.

(JML Hr'g Tr. 64, 65.)

With respect to Mr. Harbert, the disclosure statement also clearly detailed Mr. Harbert's

ownership and high-level involvement in the various companies alleged to have participated in

the fraud.[14]  Mr. Harbert was also listed as a participant in the quarterly meeting in November

1990, at which questions were raised as to the propriety of pre-bid cost figures on contract 20A.[15]

Additionally, the Disclosure Statement points out that Mr. Harbert had signed wire transfers of

money to satisfy Holzmann invoices that "appeared to be false," and was responsible for

approving and signing payments for "the most glaring example of a questionable transaction,"

namely the sale-leaseback transaction between the Joint Venture and Sabbia.  (*Id.* at 20.)  The

___

[14]  Indeed, the very fact that many of these allegedly-participating companies bore Mr. Harbert's name can not be discounted in assessing Mr. Harbert's connection to the fraud at issue. Similarly, the significant financial windfall that Mr. Harbert stood to gain by virtue of his ownership of many of the companies that allegedly participated in this fraudulent scheme bears weight.

[15]  Mr. Harbert's involvement in this meeting bears significance because the relator's Disclosure Statement lists this meeting as the catalyst for his discovery of the bid-rigging conspiracy.  (*See* Disclosure Statement at 12.)

14

Disclosure Statement also states that Bill Harbert signed an amendment to the Harbert-Jones

Joint Venture agreement allowing each party to charge home office overhead to overseas

projects; a process that "was not Jones Construction's general practice," and appeared to be

"another means of reducing (by over $3 million) the profit margin on these contracts."  (*Id.* at

22.)  Even more, the relator provided to the government a copy of this agreement signed by Mr.

Harbert, as an attachment to the Disclosure Statement.  (*Id.* at 44.)  Finally, the two most

significant examples of Bill Harbert's involvement in the fraud that are detailed in the Disclosure

Statement are: (1) Bill Harbert's efforts to conceal the conspiracy by ensuring the relator was not

involved in future Joint Venture meetings after the relator had begun to question suspicious

activities; and (2) rumors of Bill Harbert's promise to Alf Hill and Tommy Kitchens to make

them millionaires for their participation in rigging contract 20A.  (JML Hr'g Tr. 46-50.)

In total, the allegations presented to the government in June 1995 draw specific links

between the defendants and the injurious conduct (the bid-rigging conspiracy).  Therefore, it is

clear that an ordinary prudent person presented with the information that the government had in

its possession prior to December 28, 1997 regarding defendants Harbert and Anderson would

have investigated the matter further to ascertain the level of their involvement in the bid-rigging

conspiracy.  An ordinary prudent person presented with this type of information would not have

sat on their hands, as the government did in this case.  Accordingly, the Court finds that no

reasonable jury could find that the government did not have inquiry notice of both the injury

caused by the alleged conspiracy, and the involvement in the fraud by defendants Harbert and

Anderson.

b.      Interaction Between Federal Rules of Civil Procedure and

15

Limitations Period

Still, plaintiffs argue that these statements about defendants Harbert and Anderson are mere allegations that needed to be substantiated in order to justify filing a valid complaint under the Federal Rules of Civil Procedure.  (JML Hr'g Tr. 80-81, 158-60.)  They contend that there was no direct evidence of bid-rigging, and that some of the allegations within the Complaint and Disclosure Statement were based on rumor and multiple levels of hearsay.  (*Id.*)  This level of evidence, plaintiffs argue, was insufficient to warrant the government's intervention and the filing of a complaint against defendants Harbert and Anderson.  (*Id.*)  Accordingly, plaintiffs argue that the statute of limitations could not begin to run until more substantial direct evidence of the bid-rigging conspiracy was uncovered; in this case, plaintiffs allege this occurred in 1999.  (*Id.*)

Though plaintiffs are certainly correct that the requirements of particularity, and information and belief do dictate the sufficiency of information and allegations needed in order to file a valid complaint with the Court,[16] these pleading requirements are wholly inapposite to a statute of limitations discussion.  Statutes of limitations are *not* open-ended guarantees that an injured party has whatever time it needs to bring a proper claim.  Rather, statutes of limitations represent a "Congressional determination of a reasonable amount of time for injured parties to discover and make claims."  *Zeleznik*, 770 F.2d at 24 (citing *Kubrick*, 444 U.S. at 117).

Accordingly, an injured party's satisfaction of these pleading requirements is not a trigger for the running of a limitations period, but is rather a procedural endgame that the injured party must reach before the limitations period expires.  In other words, once the injured party is on notice that it has a claim, the injured party has the amount of time under the statute of limitations

---

[16] *See* Fed. R. Civ. P. 9(b), 11(b)(3).

to attempt to bring a claim that satisfies the pleading requirements set forth in the Federal Rules

of Civil Procedure.  Here, the fact that the government felt it needed additional time to

investigate the allegations averred in the relator's Disclosure Statement and Complaint before

being able to file a proper complaint does not alter the point in time the limitations period began

to run for claims brought against defendants Anderson and Harbert.  Accordingly, the Court finds

that the government had inquiry notice of the injury, at the latest, on or about August 4, 1995.[17]

     5.     Due Diligence Analysis

As Judge Green pointed out in *Uzzell*, "[t]he term 'discovered,' of course, assumes due

diligence" on the part of the government official who is responsible for uncovering the material

facts at issue.  *Uzzell*, 648 F. Supp. at 1367.  The exercise of due diligence by plaintiffs is

necessary in order to prevent–and at the very least, to mitigate–the inequitable result of allowing

the government "to bring an action whenever it had the inclination to discover the material facts."

*Id.* (internal citations omitted).  In fact, as the Supreme Court has noted, a party who fails to act

diligently in uncovering material facts underlying the cause of action "cannot invoke equitable

principles to excuse that lack of diligence."  *Baldwin County Welcome Center v. Brown*, 466 U.S.

147, 151 (1984).  Therefore, tolling the statute of limitations is proper "unless the facts show that

the plaintiff failed to exercise due diligence in discovering the material facts underlying his cause

---

[17] This date correlates to the date the second set of attachments to the relator's Disclosure Statement was filed.  As the Supreme Court has found, as a general rule a party is deemed to have notice of the contents of a document within the party's power and possession.  *Cf. Livingston v. Maryland Ins. Co.*, 11 U.S. (7 Cranch) 506, 538 (1813).  Therefore, the date upon which the government is deemed to have notice of the facts that are sufficient to give rise to inquiry notice of the injury and its cause must be calculated from the date the government received those facts.  As the facts giving rise to inquiry notice were set forth in the relator's Complaint and Disclosure Statement with its attachments, the government's inquiry notice is measured from August 4, 1995.

of action." *Richards v. Mileski*, 662 F.2d 65, 70-71 (D.C. Cir. 1981).

To determine whether a plaintiff properly exercised due diligence in uncovering a cause of action, a court must make "a fact-specific judgment in each case as to what the court expects a reasonable plaintiff to do in uncovering the elements of his claim." *Intrados*, 265 F. Supp. 2d at 11 (citing *Hohri v. United States*, 782 F.2d 227, 246 (D.C. Cir. 1986), *vacated and remanded on other grounds*, 482 U.S. 64 (1987)).  A court must measure "the plaintiff's efforts to uncover his cause of action against what a reasonable person would have done in his situation given the same information." *Richards*, 662 F.2d at 71.

In this case, it is clear that the government attorneys did not exercise due diligence in attempting to uncover the material facts of the causes of action at issue in this case, and that the government's failure to act was unreasonable under the circumstances.  The relator filed his first complaint on June 30, 1995.  Along with his first complaint, the relator submitted a Disclosure Statement, also filed on June 30, 1995.  (JML Hr'g Tr. 9.)  The Disclosure Statement was provided to attorneys at the U.S. Department of Justice's ("DOJ") Antitrust Division and Civil Division.  (JML Hr'g Tr. 26.)  Inside this Disclosure Statement, the relator included "all material evidence and information" in his possession relating to the alleged conspiracy at issue.  (JML Hr'g Tr. 62-63.)  The Disclosure Statement also included a series of documents corroborating the facts, suspicions, allegations and beliefs put forth by the relator therein.  (JML Hr'g Tr. 19.)  Later, on August 3, 1995, the relator submitted an additional set of documents to help corroborate the information and allegations within the Disclosure Statement.  (*Id.*)[18]  At the time

---

[18] And yet, though these documents contained *all* material evidence and information relating to the bid-rigging conspiracy, Ms. Mark indicated that she only "more or less" reviewed these documents.  (JML Hr'g Tr. 110-11.)

18

the relator filed his Disclosure Statement, and Mr. Bell "thought we had a very good case to go

forward, and [that] the Civil Division would be . . . ready to intervene."  (JML Hr'g Tr. 71-72.)[19]

Indeed, at the hearing, Ms. Mark confirmed Mr. Bell's position when she indicated that

"presumably, upon the filing of the [relator's] complaint, the United States could have elected to

intervene."  (JML Hr'g Tr. 126.)

After the Disclosure Statement and both sets of documents were submitted, the relator

met with government attorneys, including Ms. Mark from the Civil Division of the DOJ, Mr.

Morgan from the U.S. Attorney's office (collectively the "Civil Attorneys"), and a number of

attorneys from the Antitrust Division at the DOJ, including Bill Dillon (collectively the

"Antitrust Attorneys").  (JML Hr'g Tr. 21.)  In a "lengthy, all day meeting" that took place on

approximately August 4, 1995, the relator and his counsel shared information with the

government attorneys, both Criminal and Civil.  (JML Hr'g Tr. 21-22, 67.)

And yet, over the course of the next *four years* after the meeting, the Civil Attorneys did

virtually nothing to discover any material facts underlying the fraudulent conspiracy.[20]  First, the

---

[19] In fact, Mr. Bell testified that he had a conversation with Ms. Mark before 1999–before
two of the co-conspirators came forth and reached settlements with the government–in which he
inquired as to why the Civil Attorneys had not intervened.  (JML Hr'g Tr. 70.)  In this
conversation, Ms. Mark indicated to Mr. Bell that the government had not yet made a decision to
intervene, and might not intervene at all.  (*Id.*)  This response from Ms. Mark, and indeed the
entire pace of the Civil Attorneys' investigation of the relator's civil claims "jarred" Mr. Bell, and
disappointed him.  (JML Hr'g Tr. 72.)

[20] In fact, the only active involvement the Civil Attorneys appeared to have with this case
was their regular correspondence with Mr. Bell every four to six months to discuss whether the
plaintiffs should seek an extension of the period during which the relator's complaint remained
sealed so that they could await the completion of the criminal investigation.  (JML Hr'g Tr. 67-
68.)

Civil Attorneys did not make any attempts to obtain information from the ongoing criminal investigation into the matter conducted by the Antitrust Attorneys.  For example, though OIG investigators used by the Civil Attorneys were conducting interviews and making inquiries into the case to assist the Antitrust Attorneys, the Civil Attorneys never saw or attempted to see the OIG investigation file at all.  (JML Hr'g Tr. 95.)  The Civil Attorneys also made no attempts whatsoever to review any of the OIG investigators' notes of the interviews.  (JML Hr'g Tr. 93-94.)  In fact, the Civil Attorneys never made any attempt to determine who, if anyone, was interviewed by the OIG investigators.  (JML Hr'g Tr. 103.)   Nor did the Civil Attorneys ask the OIG agents, as a part of their investigation, to issue subpoenas to the companies participating in the bid-rigging conspiracy.  (JML Hr'g Tr. 148-49.)  In addition, the Civil Attorneys never reviewed or requested to review the file from the FBI's investigation into this matter.  (JML Hr'g Tr. 109.)  As if this were not enough, the Civil Attorneys never requested from the relator–at the time, a potential co-plaintiff in the civil action–that he provide the Civil Attorneys a copy of all the information given by the relator to the Antitrust Attorneys to assist in the investigation.  (JML Hr'g Tr. 113.)[21]

Second, the Civil Attorneys made no attempts to investigate the bid-rigging allegations under their own efforts.  The Civil Attorneys made no efforts to interview key individuals listed in the Complaint and Disclosure Statement to verify the allegations contained within those documents.  For example, the Civil Attorneys never attempted to meet with either John Ollis,

---

[21] The Civil Attorneys' failure to request information from the relator is particularly egregious in light of Ms. Mark's admission that there was no reason for their failure to ask, and Mr. Bell's statement that the relator would have had no problem with giving the Civil Attorneys all of the information the relator provided to the Antitrust Attorneys.  (*See* JML Hr'g Tr. 22, 113.)

notwithstanding the fact that Mr. Ollis could have easily verified two of the most critical pieces

of information tying Harbert and Anderson to the bid-rigging conspiracy, namely that: (1) Bill

Harbert had requested that only he and Johnnie Jones attend the Joint Venture meetings after the

relator had begun raising questions as to possible improprieties in the bid-rigging process; and

(2) Roy Anderson admitted to Ollis that Philipp Holzmann, acting primarily through Peter

Schmidt, had organized the "Frankfurt Club" of all the contractors to rig bids on USAID

contracts in Egypt.  (*See* JML Hr'g Tr. 48-49, 65-66.)  Additionally, the Civil Attorneys never

made attempts to follow up with either Alf Hill or Tommy Kitchens to verify the allegations that

Bill Harbert promised to make Messrs. Hill and Kitchens millionaires for their roles in helping to

rig the bid on contract 20A.  (JML Hr'g Tr. 46-47.)  Even if neither Mr. Hill or Mr. Kitchens

were available, the government very easily could have obtained similar verification of this last

allegation by discussing with the relator his involvement in a September 22, 1995 phone call with

Mr. Kitchens, in which Mr. Kitchens informed the relator that Bill Harbert had not made good on

the promise to make Kitchens and Hill millionaires, but was keeping both men "happy by

keeping both . . . on the payroll."  (JML Hr'g Tr. 31.)[22]  Ironically, though the Civil Attorneys did

nothing to verify these inculpatory allegations between June 1995 and December 1997, the

---

[22] The details of this conversation between the relator and Mr. Kitchens were transcribed
by an FBI agent investigating the bid-rigging conspiracy on behalf of the Antitrust Attorneys.
(Tr. 30-31.)  The fact that this conversation was a part of the criminal investigation is of no
moment due to the fact that this information was easily obtainable directly from the relator
himself.  Counsel for the relator indicated multiple times during the hearing that he was more
than willing to provide to the government information such as the transcript of this conversation
verifying his claim regarding the payments to Messrs. Hill and Kitchens.  (*See* JML Hr'g Tr. 22.)
Moreover, even if the relator were unable to provide the transcript of the conversation verifying
this claim, the government very easily could have contacted the relator and asked him whether he
had any contact with any of the individuals that might help corroborate his allegations, which
would have had the same effect in uncovering the details of the conversation.

plaintiffs point to these three pieces of information as being critical in their decisions to bring actions against defendants Anderson and Harbert.  (JML Hr'g Tr. 50-56.)

As this evidence shows, from August 1995 until June 1999, the Civil Attorneys exercised no due diligence whatsoever.  Put simply, the Civil Attorneys made a judgment call that the criminal investigation into the bid-rigging at issue was more important than the civil investigation.  Having made this decision, they then proceeded to do nothing, except wait for the Antitrust Attorneys to be finished with their criminal investigation into the bid-rigging conspiracy.  They made no attempts to build their case against the defendants either through cooperation with the parallel criminal investigation or through their own efforts.  Instead, the Civil Attorneys made "an assumption" that *everything* obtained during the course of the criminal investigation–even by OIG investigators working on behalf of both the Civil and Antitrust Divisions–was as a result of a grand jury, and could therefore not be obtained in order to aid the civil investigation due to Rule 6(e) of the Federal Rules of Criminal Procedure.[23]  (JML Hr'g Tr. 96-97.)

Still, plaintiffs offer two arguments in defense of their failure to exercise due diligence, and their argument that their actions were reasonable under the circumstances.  First, plaintiffs argue that the due diligence requirement should effectively be read out of the "reasonably should have known" inquiry due to the co-existence of parallel investigations by the Criminal and Civil Divisions into defendants' activities.  Therefore, plaintiffs assert that the only reasonable action

---

[23] The severity of the assumption made by Ms. Mark and the Civil Attorneys is exacerbated by the fact that Ms. Mark testified that she made this assumption without any knowledge of, or any attempt to ascertain, the standards governing the production of materials under Rule 6(e).  (JML Hr'g Tr. 135-37.)

for a government official in the Civil Division would be to "defer to the criminal investigation" in order to avoid "the risk of hurting a criminal investigation." (JML Hr'g Tr. 162.) Second, plaintiffs posit that much of what would have been sought was likely protected under Rule 6(e) of the Federal Rules of Criminal Procedure. (JML Hr'g Tr. 96-97.)

These arguments are flawed because they presume–incorrectly–that *all* information obtained in the criminal investigation was off limits to the civil investigation. As the Supreme Court's decision in *Sells Engineering* and its progeny[24] point out, however, there are procedural methods that DOJ attorneys in the Criminal and Civil Divisions can utilize in order to ensure cooperation between the two investigations.[25] As these cases point out, Civil Division attorneys *can* seek criminal grand jury information and evidence if they can establish before a judge that "the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed . . . ." *John Doe*, 481 U.S. at 112 n.8 (citing *Douglas Oil Co. v. Northwest Petrol Stops Northwest*, 441 U.S. 211, 222-223 (1979)). Though *Sells Engineering* stated that Civil Division attorneys could not have unfettered access to these grand jury materials, the Court in *John Doe* stated that the standard for relinquishing that information is a "highly flexible one, adaptable to different circumstances and sensitive to the fact that the requirements of secrecy are greater in some situations than in others." *John Doe*, 481 U.S. at

---

[24] 463 U.S. 418 (1983); *see also U.S. v. John Doe, Inc. I*, 481 U.S. 102 (1987).

[25] Indeed, as Chief Justice Burger noted in his dissent in *Sells Engineering*, "the civil provisions of the False Claims Act . . . were enacted as part of an integrated scheme of civil and criminal law enforcement." *Sells Engineering*, 463 U.S. at 472 (Burger, C.J. dissenting) (citing *United States v. Bornstein*, 423 U.S. 303, 305-07 n.1 (1976).

112.

Moreover, these arguments are based on the flawed premise that, under the FCA, when parallel civil and criminal investigations into the same conduct are underway, one investigation–invariably the civil investigation–must take a backseat to the other investigation. In the context of limitations periods, such an interpretation would create a situation where the existence of a criminal investigation could delay indefinitely the running of the civil limitation period under the FCA.  Such a result would run counter to the very purpose of statutes of limitation, which calls for the "the *prompt* presentation of claims." *Kubrick*, 444 U.S. at 117 (emphasis added).  Admittedly, some statutes, such as the Clayton Act, do specifically allow for an ongoing civil or criminal proceeding brought by the government to toll the statute of limitations in certain instances.[26]  There is, however, no such express provision in the FCA that would allow the statute of limitations to be suspended in a civil case during the pendency of a criminal investigation into the fraudulent conduct.  *See* 31 U.S.C. § 3731(b).  The Court will not read such a dramatic provision into the FCA.  As written, the statutes of limitation provisions under the FCA contemplate cooperation between attorneys conducting parallel criminal and civil investigations into like conduct so that each case–civil and criminal–can be brought against the defendants within the appropriate limitations period.

In sum, even if all of the information and testimony uncovered during the course of the

---

[26] *See* 15 U.S.C. § 16(i) ("Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, . . . the running of the statute of limitations in respect to every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter . . . .").

criminal investigation was protected by Rule 6(e),[27] there exists a working procedure whereby

attorneys in the Civil Division at DOJ can seek to obtain information from an ongoing parallel

criminal investigation.  Moreover, even if the strictures under Rule 6(e) appear to prevent the

Civil Attorneys from obtaining the information from the attorneys conducting the criminal

investigation, there is nothing in the rule that appears to prevent the Civil Attorneys from seeking

out this information on their own from the same witnesses used in the criminal investigation.[28]

Indeed, the FCA's own provisions demand that the Civil Attorneys make efforts in earnest to

obtain the information so that the action may be filed within the limitations period, even in the

face of an ongoing criminal investigation.  *See* 31 U.S.C. § 3731(b).

Accordingly, this Court finds that a reasonable Civil Division attorney *would* have–and

*should have*–sought information from the criminal investigation being conducted by the Antitrust

Division.  At the very least, the Civil Attorneys should have taken steps on their own to

---

[27] This Court does not–and, indeed, need not–address whether a portion or all of the information unearthed during the course of the criminal investigation is protected under Rule 6(e) because this goes to the issue of *what* type of information would be found by exercising due diligence.  As the D.C. Circuit has found, however, courts only reach the merits of *what* an exercise of due diligence would have uncovered if the plaintiff exercises due diligence in the first place.  *Cf. Richards* 662 F.2d at 71 (finding that the defendant's burden of presenting facts showing that the plaintiff could have discovered the fraud arises only "when tolling is proper," and noting that tolling is proper "*unless* the facts show that the plaintiff failed to exercise due diligence in discovering the material facts underlying his cause of action").  In light of the Civil Attorneys' failure to exercise due diligence, the Court need not expand its inquiry into the merits of what the Civil Attorneys might or might not have uncovered as a result of following the Rule 6(e) procedures to obtain information from the parallel criminal investigation into the bid-rigging conspiracy at issue in this case.

[28] *See* Fed. R. Crim. P. 6(e)(2).  Though Rule 6(e)(2) extends the obligation of keeping matters occurring before a grand jury to grand jurors, interpreters, court reporters, operators of recording devices, persons who transcribe recorded testimony, attorneys for the government, or persons to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii), it does not extend the same obligation to witnesses who provide the information to the grand jury.  *See id.*

investigate the conduct at issue.  The failure by the Civil Division attorneys in this case to take

these steps, all the while blindly and incorrectly assuming that there would be no fruit to bear

from these efforts, was unreasonable under the circumstances.  Therefore, the Court finds that no

reasonable jury could find that the government exercised proper due diligence under the

circumstances of this case.

As the Supreme Court has stated, a party who fails to act diligently to preserve his or her

claim within the applicable limitations period cannot later invoke equitable principles to toll the

statutory period.  *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 151 (1984).  It stands

to reason, then, that a party who fails to act diligently to preserve his or her claim cannot hope to

toll the running of a limitations period that is rooted in the principles of equity, such as Section

3731(b)(2).

III.    APPLICATION OF LEGAL STANDARD TO FACTS OF THE PRESENT CASE

A.      Validity of Claims Under Three-Year Provision Under Section 3731(b)(2)

No evidence of fraudulent concealment of the injury having been shown by the plaintiffs,

the three-year statute of limitations under § 3731(b)(2) began to run the moment the government

was on inquiry notice of the conspiracy to violate the False Claims Act.  Based upon the evidence

proffered by defendants, no reasonable jury could dispute the fact that the government was on

inquiry notice of the injury when it was in possession of the relator's Complaint and Disclosure

Statement with both sets of attachments on August 4, 1995.  Therefore, this Court finds that the

three-year limitations period began to run from that date.  Neither the government nor the relator

filed their respective complaints against defendants Harbert and Anderson within three years of

August 4, 1995.

26

Therefore, applying the three-year limitations period under § 3731(b)(2), the relator's initial complaint against defendants Anderson and Harbert are time-barred.  The government's complaint against defendant Anderson[29] is similarly untimely under the three-year limitations period.

B.       Validity of Claims Under Six-Year Provision Under Section 3731(b)(1)

This resolution does not, however, end the Court's inquiry.  As § 3731(b) clearly states, plaintiffs receive the benefit of a statute of limitations beginning either: (1) six years from the date of the False Claims Act violation; or (2) three-years from the date the government knew or should have known of the False Claims Act violation, whichever period is longer.  *See* 31 U.S.C. § 3731(b).  Accordingly, this Court must determine whether a reasonable juror could conclude that any claims survive for either plaintiff against the defendants under the six-year limitations period.  The six-year statute of limitations under § 3731(b)(1) begins on the date six years prior to the date the complaint was filed, and ends at the filing of the relator's complaint.  *See Fisher*, 180 F. Supp. at 195.[30]  Accordingly, the relator may use any overt acts that occur within that time frame to prove the underlying conspiratorial agreement, but may not use overt acts occurring

---

[29] The government did not file a complaint against defendant Harbert.

[30] As this Court has already held, the complaints brought against defendants Harbert and Anderson may not relate back to the date the relator's original complaint was filed because neither defendant was an intended-but-mistakenly omitted defendant under Rule 15(c)(3) who might later be added and benefit from the relation back doctrine.  *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, No: 95-1231, 2007 WL 842082, at *2 (D.D.C. Mar. 19, 2007) (Lamberth, J.); *see also* Fed. R. Civ. P. 15(c)(3).  Therefore, the relevant filing dates for statute of limitations purposes are those of the relator's Second Amended Complaint and the government's Complaint in Intervention, in which defendants Harbert and Anderson are first mentioned as defendants.  Relator's Second Amended Complaint was filed on December 28, 2000, while the government's Complaint in Intervention was filed March 13, 2001.

27

prior to the date the statute of limitations began to run.  *See id.*

Therefore, any claim brought by either plaintiff against the defendants that was submitted within six-years of the filing date of each plaintiff's complaint[31] will be deemed timely. The government's Complaint in Intervention was filed on March 13, 2001, and included claims on all three contracts at issue in this case: contracts 20A, 29, and 07.  Therefore, the Court finds that any claim on any contract submitted on or after March 13, 1995 is timely under the six-year limitations period.  The claims for contract 20A were submitted October 3, 1989 and June 20, 1993.  The claims for contract 07 were submitted between September 5, 1991 and January 18, 1995.  The claims for contract 29 were submitted between July 10, 1990 and September 19, 1996.  Therefore, applying the six-year limitations period, the only claims brought by the government against defendant Anderson that are timely are those claims on contract 29 that were submitted on or after March 13, 1995.

By contrast, relator's Second Amended Complaint was filed on December 28, 2000, and included only claims on contract 20A.  Applying the six-year limitations period under § 3731(b)(1) of the FCA to the December 28, 2000 filing date, the plaintiffs would be able to bring claims on contracts that occurred on or after December 28, 1994.  The claims for contract 20A allegedly were submitted October 3, 1989 and June 20, 1993.  The last claim for payment on contract 20A was allegedly submitted on June 20, 1993, more than a year and a half outside of the limitations period.  Therefore, under the six-year limitations period, the claims against defendants Harbert and Anderson as to the remaining two contracts must also be dismissed because they were brought in the relator's third amended complaint, which was filed on March 9,

---

[31] *See supra* note 4.

2006.[32]

IV.   CONCLUSION

For the foregoing reasons, it is clear the government reasonably should have known "facts material to the right of action" as to defendants Harbert and Anderson prior to December 28, 1997, and that no reasonable jury could find otherwise.  Accordingly, all of the relator's claims on all contracts against defendant Harbert are untimely under the limitations periods prescribed by the FCA were dismissed.  Similarly, all of the relator's claims on all contracts against defendant Anderson, and all of the government's claims but one claim on contract 29 against defendant Anderson were dismissed as untimely under the FCA's statute of limitations.

In reaching this decision, the Court notes that it is a lamentable consequence that the relator's ability to take advantage of the three-year alternate limitations period under § 3731(b)(2) has been hamstrung in this case by the government's failure to exercise due diligence in investigating the civil claims against the defendants.  The relator may think it inequitable to punish one party's ability to bring a claim based upon the actions–or, in this case, patent inaction–of another party.  Such an argument, however, fails to recognize the obvious effect that the twelve year tenure of this case had on the presentation of the claims against the defendants.  Indeed, the very things that statutes of limitations are designed to prevent–loss of evidence, fading memories, disappearance of documents–were undeniably present in this case.  Allowing the relator in this case to bring claims outside of the limitations period notwithstanding the

---

[32] As this Court has previously found, an amended complaint may not relate back to an untimely original complaint.  *See United States ex rel. Miller v. Holzmann*, No. 95-1231, 2007 U.S. Dist. LEXIS 15596, at *20 n.13. (D.D.C. Mar. 7, 2007) (Lamberth, J.) (citing *Henderson v. Bolanda*, 253 F.3d 928, 931 (7th Cir. 2001); *Papenthien v. Papenthien*, 16 F. Supp. 2d 1235, 1241 (S.D. Cal. 1998)).

29

government's unreasonable inaction under the circumstances would fashion a remedy that would run counter to the very purpose of statutes of limitations in general.[33]  The Court is not free to construe statutes of limitation in that manner.  *See Kubrick*, 444 U.S. at 117.

Finally, as the Supreme Court has stated, "[i]n the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law."  *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980). Along these lines, the Court hopes that the relator's case will serve as an example that will encourage greater cooperation between attorneys conducting parallel criminal and civil investigations into similar fraudulent conduct, and will encourage relators to be more vigilant in their pursuit of *qui tam* claims under the FCA.  More importantly, the Court hopes that this case will remind all parties of the importance of statutes of limitations, and the concrete consequences that come when parties fail to exercise diligence in heeding them.

Signed by Royce C. Lamberth, United States District Judge, June 14, 2007.

---

[33] *See supra* Section II.B.1.