UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* RICHARD F. MILLER, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 95-1231 (RCL) |
| BILL HARBERT INTERNATIONAL CONSTRUCTION, INC., *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION & ORDER

Before the Court are a number of matters related to the form of judgment to be entered in this case. Based upon the papers submitted by the parties, the applicable law, and the entire record herein, which now includes the verdict of the jury following trial of the False Claims Act claims in this case, the Court holds that the government may not pursue its equitable claims since they would result in a double recovery, and holds that relator Richard Miller is entitled to judgment on the pleadings on all of defendant HII's counterclaims.

**I. Motion for Entry of Judgment: Common Law Equity Claims**

The government seeks judgment on its common law claims of unjust enrichment and payment under mistake of fact, and HII and HC have opposed, arguing that the government is not entitled to a judgment on those claims that would be duplicative of the judgment in the FCA case. *See* Response of HII and HC to Mot. for Entry of Judgment [871]. For its part, the government claims that it "does not seek a double recovery for both its False Claims Act claims

as well as its common law claims," but is nonetheless "entitled to a finding of liability on its common law claims." Mot. for Entry of Judgment [863] at 13. The government acknowledges that "[o]nce the False Claims Act judgment is satisfied, then the United States' common law claims would be deemed extinguished." *Id*. at 14.

The claims for unjust enrichment and payment under mistake of fact are essentially duplicative of each other and seek the same relief that has been awarded under the jury's verdict in the FCA case. *See Ellipso, Inc. v. Mann*, 460 F.Supp. 2d 99, 104-105 (D.D.C. 2006) (setting forth elements of unjust enrichment); *United States v. Bouchey*, 860 F.Supp. 890, 894 (D.D.C. 1994) (same); *United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970) (setting forth elements of payment under mistake of fact); *LTV Education Systems, Inc. v. Bell*, 862 F.2d 1168, 1175 (5th Cir. 1989) (same).

It is true that the government in an FCA case generally may plead theories in the alternative, even if different claims seek relief for the same injury, so long as there is ultimately only one recovery. *See United States v. United Technologies Corp.*, 255 F.Supp. 779, 785 (S.D. Ohio 2003) (common law and FCA claims may proceed together because, while government "will not be allowed to recover twice, [it] may defer its election of remedy until trial on the merits"). But where, as here, judgment issues in favor of the government in an FCA case, the equitable claims cannot be pursued, since an adequate remedy has been had at law, and since any further recovery would be duplicative and thus unwarranted. *See United States ex rel. Augustine v. Century Health Servs.*, 136 F.Supp. 2d 876, 895-896 (M.D. Tenn. 2000) (where FCA liability was established, unjust enrichment and payment-by-mistake claims dismissed as duplicative); *Brooks v. Department of Agriculture*, 841 F.Supp. 833, 840 (N.D. Ill. 1994) (where FCA liability

established, unjust enrichment claim dismissed as duplicative); *United States v. Rogan*, 459 F.Supp. 2d 692, 728 (N.D. Ill. 2006) (setting aside claims for fraud and mistake of fact where government had already recovered damages under FCA, "to avoid double redress for a single wrong").

The government has received a verdict in its favor on the FCA claims, and judgment is being entered. The Court will not proceed with the academic exercise of considering liability on the equitable claims, since any recovery under them would be duplicative.

## II.  Motion for Judgment on Pleadings: Counterclaims

Relator Richard Miller has filed a Motion for Judgment on the Pleadings [861] on HII's counterclaims against him, which were asserted in HII's Answer.[1] [408] The first counterclaim is for breach of fiduciary duty, while the other two seek contribution and indemnification for the government's equitable claims.

Under Rule 12(c) of the Federal Rules of Civil Procedure, "[a]fter the pleadings are closed but within such time frame as not to delay the trial, any party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Such motion shall be granted "if the movant shows, at the close of pleadings, that no issue of material fact remains to be resolved, and that he or she is entitled to judgment as a matter of law." *Johnson v. District of Columbia*, 2006 WL 2521241 at *2 (D.D.C. 2006) (Kessler, J.) (citing *Terry v. Reno*, 101 F.3d 1412, 1423 (D.C. Cir. 1996); *Haynesworth v. Miller*, 820 F.2d 1245, 149 n.11 (D.C. Cir. 1987); *Summers v. Howard*

---

[1]As HII has noted, its claims might properly be deemed cross-claims or third-party claims, since Miller has sued on behalf of the government, the real party in interest. The cases discussed *infra* involve all three kinds of claims, and in this case the classification is not outcome determinative.

*University*, 127 F.Supp.2d 27, 29 (D.D.C. 2000) (Harris, J.)). The analysis for Rule 12(c) motions is "virtually identical to that which governs motions to dismiss pursuant to Rule 12(b)(6)." *Johnson*, 2006 WL 2521241 at *2 (internal quotation omitted).

## A. Fiduciary Duty Counterclaim

As to the fiduciary duty claim, HII alleges that Miller was an officer at J.A. Jones Construction Co. from 1986 to 1991, and then became an officer at J.A. Jones, Inc., the former's corporate parent. Counterclaim ¶ 7; Answer [408] at 18. J.A. Jones Construction was a joint venture partner with certain of the Harbert companies in bidding and performing on Contract 20A and Contract 07, and in bidding on Contract 29. *Id.* at ¶ 18. HII was an investor in the Harbert companies. *Id.* HII alleges that Miller became aware of evidence of the bid rigging conspiracy at issue in this case, hints that he had a role in perpetrating or at least concealing the fraud, and asserts that he violated a fiduciary duty to HII by failing to report the fraud to HII or the government at an earlier time.

### 1. Fiduciary Duty Counterclaim: Viability Under False Claims Act

Miller argues that the claim for breach of fiduciary duty is foreclosed under the False Claims Act. A number of cases have barred particular counterclaims in FCA cases. In what appears to be the first case to so hold, the court rested its consideration on policy grounds, reasoning that:

> To permit the counterclaim pleaded would set a precedent that would be a strong deterrent to the institution of genuine informer's actions. We may assume that some informers would get their information of the fraud on the government by being implicated in the perpetration of the fraud. Fear of a counterclaim, based on the charge that the informer himself was solely involved and the defendants relied upon his judgment and integrity, would in the average case discourage the institution of qui tam actions. The reason Congress gave a genuine informer a share in the recovery was to encourage qui

tam actions in the interest of the government. It seems to me that a sensible application of the qui tam statute should bar the plea of a counterclaim against the informer.

*United States ex rel. Rodriquez v. Weekly Publications, Inc.*, 74 F.Supp. 763, 769 (S.D.N.Y. 1947).

In *Rodriquez*, the counterclaim was premised on the allegation that the *qui tam* relator himself was responsible for the fraud and had led the defendant astray, so it was in the nature of an action for indemnification. Later cases that followed *Rodriquez* elaborated more fully on its logic, and the principal such case is *Mortgages, Inc. v. U.S. District Court for the District of Nevada (Las Vegas)*, 934 F.2d 209 (9th Cir. 1990), where FCA defendants were barred from bringing third-party complaints against the *qui tam* relators. The third-party complaints essentially sought contribution and indemnification for the FCA violations based on the relators' alleged role in their commission.

The Ninth Circuit began its analysis by pointing out that the FCA does not mention a right to contribution or indemnification, and nothing about its history or purpose suggests that Congress intended to provide one. "The FCA is in no way intended to ameliorate the liability of wrongdoers by providing defendants with a remedy against a qui tam plaintiff with 'unclean hands.'" *Id*. at 213. Nor was such a right to be found in federal common law, as it would serve only private interests and, by punishing relators and thus discouraging them from bringing suit, would actually imperil the federal interests which the FCA seeks to vindicate. *Id.* The congressional intention to *not* allow counterclaims was supported by the fact that Congress did choose to include *explicit* provisions for reducing the award of a wrongdoing relator and otherwise acknowledging his misdeeds, but with the benefit redounding to the government, not to the other wrongdoers. *See, e.g.,* 31 U.S.C. § 3730(d)(3). If Congress had intended to allow

wrongdoers to shift costs to relators, it would have done so explicitly. This is especially true because any right to contribution from a relator would upset the carefully calibrated framework under which relator compensation is to be figured.

The unavailability of contribution and indemnification for a defendant under the False Claims Act now seems beyond peradventure. *United States ex rel. Taylor v. Gabelli*, 2005 U.S. Dist. LEXIS at *49, Civil Action No. 03-8762 (S.D.N.Y. 2005); *United States ex rel. Mikes v. Straus*, 931 F.Supp. 248, 261-62 (S.D.N.Y. 1996); *United States v. Dynamics Research Corp.*, 441 F.Supp. 2d 259 (D.Mass. 2006); *United States ex rel. Scott v. Metro. Health Corp.*, 2005 U.S. Dist. LEXIS 35591, Civil Action No. 02-485 (W.D. Mich. 2005); *United States ex rel. Public Integrity v. Therapeutic Tech., Inc.*, 895 F.Supp. 294, 296 (S.D. Ala. 1995); *United States v. Nardone*, 782 F.Supp. 996, 999 (M.D. Pa. 1990); *United States v. Kennedy*, 431 F.Supp. 877 (C.D. Cal. 1977). These courts have been alert to the likelihood that clever defendants will seek what federal law denies them under the guise of affirmative state law rights of action, and have held that "there can be no right to assert state law counterclaims that, if prevailed on, would end in the same result." *Mortgages*, 934 F.2d at 214; *see also Israel Discount Bank Ltd. v. Entin*, 951 F.2d 311 (11th Cir. 1992) (where one district court dismissed FCA defendant's claims as impermissibly seeking indemnification by its co-conspirators, second district court correctly applied res judicata to bar the defendant's fraud case against same parties, since it was in essence the same cause of action); *Heart Doctors, P.S.C. v. Layne*, 2006 U.S. Dist. LEXIS 71396 (E.D. Ky. 2006); *United States ex rel. Madden v. General Dynamics Corp.*, 4 F.3d 827 (9th Cir. 1993). Emerging from these cases is the rule that an FCA defendant found liable of FCA violations may not pursue a counterclaim that will have the equivalent effect of contribution or indemnification.

On the other hand, courts have held that "a qui tam defendant may maintain a claim for independent damages; that is, a claim that is not dependent on a finding that the qui tam defendant is liable." *United States ex rel. Stephens v. Prabhu*, 1994 WL 761237 at *1, Civil Action No. 92-653 (D. Nev. 1994). These cases recognize that not all counterclaims in FCA cases will be contrary to the statute's interests, and that there would be real due process concerns if *all* counterclaims were to be barred, particularly compulsory ones, which would be lost forever. *See United States ex rel. Burch v. Piqua Engineering, Inc.*, 145 F.R.D. 452, 456-57 (S.D. Ohio 1992) (expressing due process concerns); *Madden*, 4 F.3d at 830-31 (same); Kent D. Strader, Comment: *Counterclaims Against Whistleblowers: Should Counterclaims Against Qui Tam Plaintiffs be Allowed in False Claims Act Cases?*, 62 U. Cinn. L.Rev. 713 (1993) (same). For these reasons, it has been said that "the modern trend does not support a ban on compulsory counterclaims which are based on damages which are 'independent' of the qui tam claim." *United States ex rel. Mikes v. Straus*, 931 F.Supp. 248, 263 (S.D.N.Y. 1996). Yet at the same time, these cases have warned that "[i]f a qui tam defendant is found liable the counterclaims can then be dismissed on the ground that they will have the effect of providing for indemnification or contribution." *United States ex rel. Madden v. General Dynamics Corp.*, 4 F.3d 827, 830-31 (9th Cir. 1993).

These cases demonstrate that there are two ways in which an FCA defendant's counterclaim may seek "independent damages" and thus be permissible. The use of the word "independent" has led to some confusion, and courts would be better served to describe the permissible claims as "not dependent on the fact of FCA liability." In short form, claims by an FCA defendant have been properly permitted where the success of the FCA defendant's claim

does not *require* a finding that the defendant is liable in the FCA case.

The first and most obvious of the two categories is where the conduct at issue is distinct from the conduct underlying the FCA case. This can be so even where there is a close nexus between the facts, so long as there is a clear distinction between the facts supporting liability against relator and the facts supporting liability against the FCA defendant. For instance, claims by FCA defendants have been held to be independent where a relator allegedly breached her fiduciary duty to her employer – the FCA defendant – by failing to deliver to it a subpoena that was sent to her as the employer's agent, *United States ex rel. Grandeau v. Cancer Treatment Centers of America* 2005 WL 300414, Civil Action No. 99-8287 (N.D. Ill. 2005), or where defendant sought costs against a relator who, despite being successful on her FCA claims, had committed subsequent, serious litigation abuses, *United States ex rel. Scott v. Metropolitan Health Corp.*, 2005 WL 3434830, Civil Action No. 02-485 (W.D. Mich. 2005), or where an FCA defendant that was found not liable in an overbilling case brought a counterclaim against the relator for deleting other, unrelated billing records. *United States ex rel. Hartman v. Allegheny General Hospital*, 2005 U.S. Dist. LEXIS 18321 at *15, Civil Action No. 02-1948 (W.D. Penn. 2005). These causes of action are truly independent of the FCA claims because none of them require as an essential element that the FCA defendant was liable – or not liable – in the FCA case. As the cited examples illustrate, the acts that give rise to these causes of action are separate from the acts on which FCA liability is predicated, so the defendant's cause of action can prevail regardless of the outcome in the FCA case.

The second category of permissible claims by an FCA defendant is where the defendant's claim, though bound up in the facts of the FCA case, can only prevail if the defendant is found

*not* liable in the FCA case. This is where the word "independent" has sewn confusion. These claims are actually quite dependent, but they depend on a finding that the FCA defendant is not liable, whereas the impermissible class of claims depend on the FCA defendant being found liable. The FCA defendant thus has a cause of action for damage to him independent of his FCA liability. These claims have surfaced in the form of libel, defamation, malicious prosecution, and abuse of process – claims that succeed upon a finding that the relator's accusations were untrue. Once the question of FCA liability has been determined in the defendant's favor, there is less of the risk*,* envisioned by *Mortgages* and other cases, of deterring would-be relators, and no risk that a wrongdoer will be allowed to shift its costs. The simple rule that emerges from these cases is therefore that a claim by an FCA defendant which requires for its success a finding that the FCA defendant is liable is the kind of claim barred by the FCA.

Illustrations are provided by the cases. For instance, in *United States ex rel. Burch v. Piqua Engineering, Inc.*, 145 F.R.D. 452, 456-57 (S.D. Ohio 1992), an FCA defendant counterclaimed against the relator, alleging breach of various duties based on poor work performance, and also defamation. The court allowed all claims to go forward, which was decidedly correct. The poor work performance claim was independent of the FCA claims in the first sense described by this Court – it could succeed or fail regardless of whether defendant violated the FCA. The defamation claim was separate from the FCA claims in the second sense described by this Court; the defendant could sustain its claim only if it prevailed on the FCA claims and demonstrated there was no truth to the relator's allegations.

Similarly, in *United States ex rel. Stephens v. Prabhu*, 1994 WL 761237 at *1, Civil Action No. 92-653 (D. Nev. 1994), the defendants brought claims against relator for libel, trade

9

libel, abuse of process, malicious prosecution, and infliction of emotional distress, all arising from the relators' allegations that defendants had submitted false claims. The court allowed the claims to go forward, recognizing that if defendants were found not liable in the FCA case, their counterclaims would be viable. If they were found liable in the FCA case, then their counterclaims would fail as a matter of law, and in addition would be barred by the FCA as impermissible attempts to seek contribution or indemnity. But when defendants brought third-party claims against other individuals who they alleged had participated in submitting the false claims, the court disallowed these claims, since they could only succeed if defendants were held liable, and thus were barred under the FCA.

These cases come together to form a sensible rule. If a defendant's counterclaim is predicated on its own liability, then its claims against a relator typically will allege that the relator participated in the fraud, or caused the defendant some damage by the act of being a relator, that is, by disclosing the defendant's fraud. The first kind of action seeks contribution or indemnity, rights that are not provided by the FCA because they would deter relators, allow wrongdoers to shift their costs, and would disrupt the intended framework of incentives and punishments established by the FCA. The second kind of action has the same effect of providing contribution or indemnity, with the perverse twist that the relator is not even accused of contributing to the defendant's fraud. If such suits were allowed, they would punish *innocent* relators, which would be a significant deterrent to whistleblowing and would imperil the government's ability to detect, punish, and deter fraud. The FCA contains several provisions seeking to protect relators from retaliation, and it would run counter to this policy if the Court were to allow retaliatory suits against truthful relators.

*United States ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, is directly on point with the case before this Court, and is consistent with the line of cases explained above. 779 F.Supp. 1252 (N.D. Cal. 1991). In that case the district court dismissed the counterclaims of an FCA defendant who sought recovery against relators for breach of contractual, fiduciary and statutory duties, all because the relators allegedly "never advised Lockheed management of their concerns about the conduct of fellow Lockheed employees." *Id.* at 1253. The court reasoned that "to permit defendant to pursue a counterclaim for breach of contract and breach of loyalty for the failure to first raise its concerns with the alleged wrongdoer, would allow wrongdoers to retaliate against whistleblowers, and is contrary to legislative intent." *Id*. at 1254. Though not elaborated on at great length, this case is consistent with those holding that FCA defendants should not be able to seek the equivalent of indemnification, even when they wrap their claim in the garb of another cause of action. The only way for the *Newsham* defendant to prevail on its counterclaim is if it was found liable in the FCA case. Otherwise there was no tort and no damage.

The claim in *Newsham* is the same as the claim here: that the relator should have informed the defendant of his suspicions of fraudulent activity. In essence, it is a claim that the relator should have become a relator sooner, or that he should have informed the defendant before informing the government. Allowing such a claim would place affirmative duties on a relator that the FCA does not envision. It also would create the perverse result of making a truthful relator pay to offset the liability of a wrongdoing FCA defendant. This would be the equivalent of contribution or indemnification, and is not allowed. Where an element of an FCA defendant's claim is that the defendant is liable under the FCA, then the FCA bars that claim.

This is doubly true where, as here, the jury does indeed render a verdict finding the FCA defendant liable in fact. For these reasons, the fiduciary duty counterclaim is barred and judgment on the pleadings in favor of relator is appropriate.[2]

## 2. Fiduciary Duty Counterclaim: Sufficiency of Allegations

Even if it were permissible under the FCA, HII's fiduciary duty counterclaim would still fail because HII has not identified a cognizable duty owed to it by Richard Miller. HII fails to specify which state's law should apply here, but under the laws of either of the likely candidates, Alabama and North Carolina, as well as under general laws of agency, there is no fiduciary duty of the sort alleged here.[3]

We can put aside for one moment a few issues that HII never addresses, such as why Miller owed a duty to the joint venture during the time he worked not for Jones, the joint venturer, but for its parent, or why duties owed to the joint venture would run to HII as an investor in a joint venturer, and not just to the joint venturer. To summarize the allegations, HII alleges that when the Harbert companies and Jones entered into joint ventures to bid or perform

---

[2]HII attempts to gin up a permissible cause of action by claiming that Miller is being sued not for his conduct as a relator, but his conduct before he knew about the FCA and became a realtor. But as the D.C. Circuit has indicated, albeit in a slightly different context, the preparation of an FCA suit by a relator can include acts taken well in advance of the filing of a suit, reaching even to conduct that occurs before the relator knows about the FCA. "Were that not the case, only lawyers – or those versed in the law – would be protected by the statute, as only they would know from the outset that what they were investigating could lead to a False Claims Act prosecution." *United States ex rel. Yesudian v. Howard University*, 153 F.3d 731, 741 (D.C. Cir. 1998). It is the policy of the FCA to encourage would-be relators to come forward with information, and to protect them from retaliation, as a general matter, not just once they have already filed suit and become actual relators. The distinction urged by HII lacks real meaning and would be unworkable in practice.

[3]The Jones companies are North Carolina corporations; HII is an Alabama company. No one has explained what law governs their joint venture.

on the contracts at issue in this case, Miller became an agent or subagent of the joint venture and HII, such that he owed fiduciary duties to the joint venture and HII, which had invested in the Harbert companies that formed the joint ventures. He allegedly violated these duties when he learned of information suggesting that the bid rigging conspiracy in this case was afoot, yet did not report this information to HII. Instead he chose – it is alleged – to continue to collect information and allow the conspiracy to move forward until his *qui tam* case was at its strongest, at which point he became a relator and took his information to the government. This conduct violated fiduciary duties to HII, such as the duties of loyalty and the duty to keep his principal informed.

To support this surprising allegation, HII points to the commonplace notion that when Jones and the Harbert companies entered into their joint ventures, they stood in a relation similar to partnership, with each at the same time standing in a position similar to partners and agents of each other. HII then alleges that Miller, an agent of Jones, became an agent or subagent of HII.

A claim for breach of fiduciary duty requires that: (1) defendant had a fiduciary duty to plaintiff; (2) which was breached; and (3) injury resulted. *See* Restatement (Second) Torts § 874 ("One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation."). "For a fiduciary duty to exist there must first be a fiduciary relationship, which is a relationship in which 'there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Estate of Smith v. Underwood*, 487 S.E.2d 807, 812 (N.C. 1997) (quoting *Curl v. Key*, 316 S.E.2d 272, 275 (N.C. 1984)); *see also Strickland v. Lawrence*, 627 S.E. 2d 301, 306-07 (N.C. 2006).

Joint venturers do indeed take on some fiduciary duties to each other, but always cabined in breadth by the scope of the joint undertaking. As has been well stated:

> A joint venture is an association of persons with intent, by way of express or implied contract, to engage in and carry out a single business venture for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, without creating a partnership or a corporation, pursuant to an agreement that there shall be a community of interest among them as to the purpose of the undertaking, and that each participant shall stand in the relation of principal as well as agent as to each of the other coadventurers, with an equal right of control of the means employed to carry out the common purpose of the venture.

*Environmental WasteControl, Inc. v. Browning-Ferris Indus., Inc.*, 657 So. 2d 885, 887 (Ala. 1995) (quoting *Arndt v. City of Birmingham*, 547 So. 2d 397 (Ala. 1989)). North Carolina courts have agreed that entering a joint venture is not the same as "creating a partnership in the legal or technical sense of the term." *Pike v. Wachovia Bank & Trust Co.*, 161 S.E. 2d 453, 460 (N.C. 1968) (quoting *In re Simpson*, 222 F.Supp. 904 (M.D.N.C. 1963)). But while "a partnership and a joint adventure are distinct relationships, they are governed by substantially the same rules." *Id.* (collecting authorities); *see also McDuffie v. Hooper*, 315 So. 2d 573, 576 (Ala. 1975). As the excerpt from *Environmental WasteControl* points out, forming a joint venture for a limited purpose is not the same as forming a partnership or unitary corporation for all purposes; distinctions of corporate form still remain.

"Each member of a joint adventure is both an agent for his coadventurer and a principal for himself." *Pike v. Wachovia Bank & Trust Co.*, 161 S.E. 2d 453, 460 (N.C. 1968). Joint venturers thus stand like business partners, who "are each other's fiduciaries as a matter of law," *The HAJMM Co. v. House of Raeford Farms, Inc.*, 403 S.E. 2d 483, 489 (N.C. 1991), and who have "a right to know all that the others know, and each is required to make full disclosure of all

material facts within his knowledge in any way relating to the partnership affairs." *Casey v. Grantham*, 79 S.E. 2d 735, 738 (N.C. 1954). "[E]ach party to a joint venture has a right in some measure to direct the conduct of the other *through a necessary fiduciary relationship*," and "each joint venturer must stand in the relation of principal, as well as agent, as to each of the other coventurers." *Cheape v. Town of Chapel Hill*, 359 S.E. 2d 792, 799-800 (N.C. 1987) (emphasis in original; internal quotation omitted).

It is clear then that the Harbert and Jones companies had duties to each other in relation to the subject matter of each joint venture, lasting for the duration of each venture. HII then asserts that because Jones was a coventurer with the Harbert companies and as such owed them the duties of an agent, Jones' employee, Miller, also became an agent of the joint venture, or possibly a subagent, and thus owed duties directly to the joint venture and to HII, including the duty to keep HII informed.

"A principal agent relationship exists when (1) the agent has authority to act for the principal and (2) the principal has control over the agent." *Estate of Smith*, 487 S.E. 2d at 816 (citing *Colony Associates v. Fred L. Clapp & Co.*, 300 S.E. 2d 37 (N.C. 1983)). Moreover, these parties must agree that there is to be a principal-agent relationship, because the "relation of agency is created as a result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents so to act. The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on the principal's behalf and subject to his control." *Ware v. Timmons*, 954 So. 2d 545, 552 (Ala. 2006) (quoting Restatement (Second) Agency § 1 cmt. a).

In turn, "[a] subagent is a person appointed by an agent to perform functions that the

agent has consented to perform on behalf of the agent's principal and for whose conduct the appointing agent is responsible to the principal," but an "agent may appoint a subagent only if the agent has actual or apparent authority to do so." Restatement (Third) of Agency § 3.15(1),(2). Perhaps more elegant is the expression that a subagent is "a person appointed by an agent empowered to do so, to perform functions undertaken by the agent for the principal, but for whose conduct the agent agrees with the principal to be primarily responsible." Restatement (Second) of Agency § 5(1). "If the agent hires the subagent to carry out the principal's request, the subagent is the agent of the agent only. If the principal directs, either expressly or impliedly, the agent to hire the subagent, the subagent becomes the agent of the principal." *Estate of Smith* at 816. The subagent must be aware of who its ultimate principal is in order to have a fiduciary duty to that principal. *Select Creations, Inc. v. Paliafito America, Inc.*, 911 F.Supp. 1130, 1152-53 (E.D. Wisc. 1995) (applying New York and Wisconsin law). A subagent can be liable in tort to his principal if he violates his fiduciary duty of loyalty. *In re Salem Mills*, 881 F.Supp. 1109, 1117 (N.D. Ill. 1995).

These basic precepts of agency law establish that agency relationships do not emerge by accident, as well they should not. In the case of a joint venture, the venturers assume fiduciary relations with each other by choice and as part of their agreement. In doing so they do not, absent an agreement or some other indication of intent, necessarily place all of their employees and other agents under the dominion of their coventurer. If entering a joint venture had that effect, each joint venture would in essence be a temporary merger, something contrary to principles of corporate law. HII does not set forth any authority in support of its proposition that Miller automatically became HII's agent by virtue of the parties entering a joint venture.

16

Nor does HII put forward any allegations that the parties affirmatively designated Miller as an agent of HII or intended him to act as such, or that he ever knew HII was his principal or treated it as such. There is no allegation that the principal, be it the joint venture or HII itself, authorized Jones to engage Miller as a subagent. Nor is it alleged that Jones did place Miller at the disposal of the joint venture or HII. HII does not assert that Miller knew of or assented to this arrangement. There is no allegation that Miller knew he was subject to the authority of HII, that he attempted to act on behalf of HII, or that he considered himself bound to act in HII's interest. Furthermore, under HII's theory, HII would be liable for the acts of its subagent, Miller. *See Booker v. United American Ins. Co.*, 700 So. 2d 1333, 1335 n.2 (Ala. 1997) (citing 3 C.J.S. Agency § 265; 3 Am. Jur. 2d Agency § 163). Nothing in the counterclaim suggests that any of the joint venturers agreed to such an arrangement.

Nor is there any allegation that HII or the joint venture had control or exercised control over Miller, a requisite to finding that he was their agent or subagent. HII cites no evidence that it or the joint venture had the kind of "overmastering influence" over Miller typical of a principal over its agent, or that Miller "purport[ed] to act or advise with the other's interest in mind," rather than the interest of his Jones employers. *University Federal Credit Union v. Grayson*, 878 So. 2d 280, 290-91 Ala. 2003).

There is thus no allegation of any intent by any of the parties that Miller was to stand in the position of HII's agent or subagent. He remained only the agent of Jones, and owed his fiduciary duties only to it. While the joint ventures at issue were memorialized in agreements, HII does not argue that there is any contractual basis for its novel theory of fiduciary duty. HII is only left with its argument that Miller automatically became HII's agent or subagent by virtue of

the fact that his employer entered into a joint venture with the Harbert companies. As stated, there is no support for this theory of automatic agency. Having failed to identify a cognizable fiduciary duty owed to it by Miller, HII fails to state a claim for relief, a further reason why judgment on the pleadings is appropriate.[4]

**B. Counterclaims for Contribution and Indemnity**

HII also brought two counterclaims seeking contribution and indemnity for each of the government's equitable claims. Because the Court has already determined that the government may not proceed on its equitable claims, the counterclaims are moot, and judgment on the pleadings is appropriate as to them.

**III. Conclusion**

For the foregoing reasons, the government is not entitled to pursue its claims for equitable relief on theories of unjust enrichment and payment under mistake of fact, and the judgment that the Court will enter will not include those claims. Relator's Motion [861] for Judgment on the Pleadings as to HII's counterclaims is GRANTED; HII's counterclaims are hereby DISMISSED; and judgment is ENTERED against HII and in favor of relator Richard Miller on HII's counterclaims.

SO ORDERED.

Signed by United States District Judge Royce C. Lamberth, August 3, 2007.

---

[4] HII's claim also would be foreclosed by the jury verdict. HII's claim is predicated on its alleged lack of knowledge of any of the events giving rise to the FCA case. This allegation is inconsistent with the jury's verdict, which found HII liable for knowingly participating in the bid rigging conspiracy. Any failure to inform HII of the misconduct it had knowingly committed could not have caused it injury.