## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **RICHARD F. MILLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 95-1231 (RCL)** |
| | ) | |
| **PHILIPP HOLZMANN, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

      Ironically enough, this sordid tale of filthy dealing and dirty money began in the sewers of

Cairo.  After the Camp David Accords of 1979, the United States saw an opportunity to reward

Egypt for its recognition of Israel with funding for public works projects.  According to

plaintiffs' evidence, defendants also saw an opportunity:  to enrich themselves at U.S. taxpayers'

expense by colluding to secure, and then overcharge on, contracts for these projects.

      Nearly twenty years after these underlying events, this multi-defendant[1] conspiracy case

came to trial.[2]  Over the course of seven weeks, a jury absorbed a vast amount of evidence,

---

[1] Of the numerous defendants named in relator Richard F. Miller's ("Miller") original complaint, seven proceeded to trial last spring: individual defendants Bill L. Harbert ("Harbert") and E. Roy Anderson ("Anderson"); and corporate defendants Harbert Corporation ("HC"), Harbert International, Inc. ("HII"), Bill Harbert International Construction, Inc. ("BHIC"), Bilhar International Establishment f/k/a Harbert International Establishment ("Bilhar" or "HIE"), and Harbert Construction Services (U.K.) Ltd. ("HUK").  The Court dismissed plaintiffs' claims against Harbert on April 27, 2007, on statute of limitations grounds.  (*See* Order of May 4, 2007 [854], at 3.)

[2] Relator filed his original complaint under seal on June 30, 1995.  The government then spent nearly six years investigating his allegations.  Judge William B. Bryant unsealed the case on February 12, 2001.  Another five years passed before the case was reassigned to this Court, on

including testimony from forty-one witnesses and over 500 exhibits, and witnessed a vigorous

and thorough defense. After resolving numerous factual disputes and weighing the credibility of

each witness, the jury returned a verdict for plaintiffs on May 14, 2007, awarding over $34

million in damages to the United States. This Court ultimately fixed total liability at

$90,438,087.66.[3]

Each defendant now challenges the jury's verdict and/or the Court's judgment.[4]  Their

---

December 2, 2005.  After allowing just over one year for discovery and pretrial proceedings, this
Court commenced trial on March 19, 2007.

[3] The jury apportioned damages among the three contracts at issue as follows:
$29,920,000.00 on Contract 20A, $3,400,000.00 on Contract 29, and $1,026,029.22 on Contract
07.  (Verdict Form [858] at 9, 10, 12.)  In accordance with 31 U.S.C. section 3729(a), the Court
then trebled the damages award for each contract.  (Mem. Op. of Aug. 10, 2007 [882] at 11.)
The Court next set off amounts the government received from settling co-defendants,
apportioning the $13.7 million total across the three contracts.  (*Id.* at 10-11.)  It further
determined the appropriate civil penalty to be $10,000 per false claim, yielding a total penalty of
$1,100,000.00.  (*Id.* at 7-9, 11.)  The Court calculated the total liability in this case – the sum of
the trebled damages and civil penalties – to be $90,438,087.66, for which defendants BHIC, HII,
HC, and Bilhar are jointly and severally liable.  (*Id.* at 11.)  Because the jury found defendant
HUK liable on only Contract 20A, it shared joint and several liability on $78,825,454.00 of this
amount.  (*Id.*)  Finally, because the Court had dismissed all claims against defendant Anderson
save one on statute of limitations grounds, he shared joint and several liability in the amount of
$149,615.20.  (*Id.* at 11-12.)

[4] For convenience and brevity, the Court will cite the parties' motions as follows:
Anderson's Post-Judgment Motions [893] ("Motion One"); HII's Motion for Judgment as a
Matter of Law [894] ("Motion Two"); HC's Motion for Judgment as a Matter of Law [895]
("Motion Three"); BHIC and HUK's Motion for Judgment as a Matter of Law [896] ("Motion
Four"); HII and HC's Motion for a New Trial as to All Claims [897] ("Motion Five"); Bilhar's
Motion for Post-Trial Judgment as a Matter of Law, or in the Alternative, for a New Trial [898]
("Motion Six"); BHIC and HUK's Motion to Alter, Amend, or Vacate the Judgment [899, 901]
("Motion Seven"); and BHIC and HUK's Motion for New Trial [900, 904] ("Motion Eight").
Corresponding opposition briefs and replies will be similarly numbered.
    Where appropriate, the Court will indicate which defendant(s) make(s) which arguments,
but in large part, defendants have incorporated one another's arguments by reference.  (*E.g.*,
Motion Two at 1 n.1 (joining arguments and requests for relief in Motion Eight, Sections I-IV;
Motion Four, Sections IV-VI; Motion Seven, Sections I-II, IV; and Motion One, Sections 1-5);

motions present issues relevant to both liability and damages.  Defendants' challenges, in their

new trial motions, to this Court's evidentiary and other rulings necessarily implicate the

sufficiency of the evidence objections raised by their motions for judgment as a matter of law.

Hence, this Opinion first considers defendants' proposed grounds for a new trial, then considers

the sufficiency of the evidence along with defendants' other offered bases for judgment as a

matter of law, and finally evaluates certain defendants' arguments for remittitur and/or relief.

I.      **Applicable Legal Standards**

A.      **Rule 59(a) – New Trial**

Federal Rule of Civil Procedure 59(a) affords a court discretion to grant a new trial on all

or some issues "for any reason for which a new trial has heretofore been granted in an action at

law in federal court."  Fed. R. Civ. P. 59(a).  Such reasons have included excessive damages,

"substantial errors . . . in the admission or rejection of evidence[,] or the giving or refusal of

instructions."  *Nyman v. FDIC*, 967 F. Supp. 1562, 1569 (D.D.C. 1997) (Urbina, J.).  Yet "minor

evidentiary errors . . . in the course of a long trial," do not suffice.  *Wild v. Alster*, 377 F. Supp.

2d 186, 189 (D.D.C. 2005) (Walton, J.) (quotation marks and citations omitted).  Rather, the

court's discretion to grant a new trial – which is to be exercised "sparingly and cautiously,"

*Miller v. Penn. R.R. Co.*, 161 F. Supp.633, 641 (D.D.C. 1958) (Holtzoff, J.) – "has generally

been understood to include actions rendering the trial unfair."  *Sparshott v. Feld Entm't, Inc.*, 311

F.3d 425, 433 (D.C. Cir. 2002).  Only "a clear miscarriage of justice," *Wild*, 377 F. Supp. 2d at

189, or "manifest error of law or fact" will warrant a new trial, *Nyman*, 967 F. Supp. at 1569.

---

Motion Three at 1 n.1 (incorporating same arguments and requests, along with those made by HII
in Motion Two); Motion Six at 1 (adopting "all other contentions made by all other defendants in
their respective post-trial motions").)

When a court concludes that the jury's "verdict is against the weight of the evidence," rather than grant judgment as a matter of law, it may instead order a new trial. *Nyman*, 967 F. Supp. at 1569; *see* Fed. R. Civ. P. 50(b)(2). "The standard for a new trial is less onerous than the one applicable to a Rule 50 motion." *Nyman*, 967 F. Supp. at 1569. But just as with a motion for judgment as a matter of law, the Court should "not disturb a jury verdict 'unless the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not disagree on the verdict.'" *Duncan v. Wash. Metro. Transit Auth.*, 240 F.3d 1110, 1113 (D.C. Cir. 2001) (en banc) (quoting *Curry v. District of Columbia*, 195 F.3d 654, 659 (D.C. Cir. 1999)).

## B.      Judgment as a Matter of Law – Rule 50

Under Federal Rule of Civil Procedure 50, a court may, on motion, direct entry of judgment contrary to a jury verdict when "a reasonable jury would not have a legally sufficient evidentiary basis to find for that party on that issue." Fed. R. Civ. P. 50(a). Courts "do not, however, lightly disturb a jury verdict." *McGill v. Munoz*, 203 F.3d 843, 845 (D.C. Cir. 2000). A court may enter judgment contrary to that verdict only when "the evidence[,] and all reasonable inferences that can be drawn therefrom[,] are so one-sided that reasonable men and women could not" have reached the jury's verdict. *Scott v. District of Columbia*, 101 F.3d 748, 752 (D.C. Cir. 1996).

"[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the movant that the jury was not required to believe." *In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 80 (D.D.C. 2006) (Hogan, C.J.) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)). Further, "the court must draw

4

all reasonable inferences in favor of the nonmoving party, and it may not make credibility

determinations or weigh the evidence." *Reeves*, 530 U.S. at 150. "Credibility determinations,

the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Thus, a court should grant a Rule 50 motion only when, "under the governing law, there can be

but one [] conclusion as to the verdict" – that it defies reason. *Id.* at 250.

### C.      Remittitur – Rule 60(b)

Federal Rule of Civil Procedure 60(b) empowers courts to grant relief from a final

judgment when "the judgment has been satisfied, released, or discharged." Fed. R. Civ. P.

60(b)(5). "[A] motion for a credit on a judgment should be treated as a Rule 60(b)(5) motion for

relief from [that] judgment." *Kassman v. Am. Univ.*, 546 F.2d 1029, 1033 (D.C. Cir. 1976) (per

curiam). Like a motion for a new trial, "the decision to grant or deny a rule 60(b) motion is

committed to the discretion of the District Court." *United Mine Workers 1974 Pension v.*

*Pittston Co.*, 984 F.2d 469, 476 (D.C. Cir. 1993).

### D.      Alteration or Amendment – Rule 59(e)

Federal Rule of Civil Procedure 59(e) provides for alteration or amendment of a

previously-entered judgment. Fed. R. Civ. P. 59(e). "While the court has considerable discretion

in ruling on a 59(e) motion, the reconsideration and amendment of a previous order is an

extraordinary measure." *Zyko v. Dep't of Def.*, 180 F. Supp. 2d 89, 90 (D.D.C. 2001) (Urbina,

J.). Hence, such a motion "need not be granted unless the district court finds that there is . . . 'the

need to correct a clear error or prevent manifest injustice.'" *Firestone v. Firestone*, 76 F.3d

1205, 1208 (D.C. Cir. 1996) (quoting *Nat'l Trust v. Dep't of State*, 834 F. Supp. 453, 455

(D.D.C. 1993)).

## II.    New Trial Motions

### A.    Prior Criminal Proceedings

In 2002, Defendant Bilhar pleaded guilty to an antitrust conspiracy in violation of the Sherman Act, 15 U.S.C. section 1.  (*See* Exs. A, B to Pl.'s Mot. [558].)  In its Order of March 14, 2007, this Court granted plaintiffs' motion *in limine* [558] to preclude Bilhar from contesting its liability on Contracts 20A and 29 based on this plea.  (*See* Mem. Op. & Order of Mar. 14, 2007 [713] at 5-6; Mem. Op. & Order of Mar. 20, 2007 [738] at 1-2 (denying motion for reconsideration).)  The Court subsequently admitted both Bilhar's plea agreement and the accompanying Joint Rule 11 Memorandum, against all defendants, under Federal Rule of Evidence 803(22).  (Mem. Op. & Order of Mar. 16, 2007 [722] at 3-4; Mem. Op. & Order of Mar. 20, 2007 [738] at 2 (denying motion for reconsideration); Mem. Op. & Order of Mar. 21, 2007 [743] at 4-5 (denying motion to sever).)  Defendants challenge both rulings.[5]

---

[5] Defendants also challenge this Court's refusal to strike testimony given by Rainer Hermann at defendant Anderson's criminal trial, which this Court admitted against Anderson, alone, under Federal Rule of Evidence 804(b)(1).  (Mem. Op. & Order of Mar. 16, 2007 [722] at 4-7.)  They contend this evidence was relevant only to plaintiffs' claims concerning Contracts 20A and 07, and that once this Court dismissed those claims against Anderson on statute of limitations grounds, it should have stricken the testimony.  (Motion Five at 10.)  They further insist the jury must have erroneously predicated its verdict against the other defendants on Hermann's testimony because it "was the sole source of first-hand evidence that Holzmann actually paid a loser's fee to [Bilfinger & Berger] on Contract 07." (*Id.*)

This claim lacks merit for two reasons.  First, while Hermann's testimony may have been the only *first-hand* evidence of the loser's fee, it was not the *only* evidence.  Werner Hoffmeister subsequently testified that "after several discussions, Holzmann paid the loser's fee" of 1.5 million dollars or deutschmarks.  (Mar. 22, 2007 PM Tr. at 68-70, 86-87.)  To the extent the jury considered the Hermann testimony against the other defendants, it was merely cumulative of other evidence.

Second, and more fundamentally, this Court *twice* instructed the jury that it should consider Hermann's testimony *only* against Anderson.  (Mar. 22, 2007 PM Tr. at 101; May 4,

1.      **Collateral Estoppel**

"Courts have often held that issues determined in connection with a criminal conviction

may be preclusively established in later civil trials."  *Otherson v. Dep't of Justice*, 711 F.2d 267,

271 (D.C. Cir. 1983).  While recognizing that at least seven other Circuits have done so, our

Court of Appeals has not taken a definitive position on whether issues determined in connection

with a defendant's *guilty plea* may similarly be given preclusive effect.  *Id.* at 275 n.8.

Meanwhile, district courts in this Circuit have routinely treated criminal convictions –

including those based on guilty pleas – "[a]s conclusive proof of the facts supporting the

conviction," and have thus given them preclusive effect in subsequent civil actions.  *See, e.g.*,

*Int'l Telecomm. Satellite Org. v. Colino*, No. 88-1266, 1992 U.S. Dist. LEXIS 4887, at *20

(D.D.C. Apr. 15, 1992) (Lamberth, J.); *United States v. Uzzell*, 648 F. Supp. 1362, 1363 (D.D.C.

1986) (Green, J.).  As a general matter, issue preclusion between the same parties[6] is available

---

2007 AM Tr. at 42-43.)  While defendants dismiss this notion as "pure sophistry," (Reply Five at
7), the law presumes that jurors follow their instructions, *see, e.g.*, *Richardson v. Marsh*, 481
U.S. 200, 206 (1987) (citing "the almost invariable assumption of the law that jurors follow their
instructions").  Defendants' internally inconsistent argument does not persuade the Court to
abandon this bedrock presumption.  They contend "the only way the Court could have assured
the jury . . . would not misuse the Hermann testimony" – in violation of this Court's repeated
limiting instruction – "was to strike it" – by issuing yet another instruction.  (Reply Five at 8.)
Defendants do not elaborate on why they believe the jury would wholly disregard one instruction
but adhere scrupulously to another, and the distinction is not evident to the Court.
     For these reasons, the Court concludes any error in its refusal to strike the Hermann
testimony after dismissing the Contract 20A and 07 claims against Anderson was harmless.

     [6] The "same parties" requirement was crucial to the *Otherson* court's attempt to reconcile
other circuits' extension of issue preclusion to facts established by a guilty plea, with apparently
contrary dicta in a recent U.S. Supreme Court decision.  711 F.2d at 275 n.8, 277 n.11.  The court
ultimately identified "a middle ground" in which a plea's preclusive effect would turn on whether
the government, as opposed to a new party, sought to invoke preclusion in the later civil action.
*Id.* at 277 n.11.  This distinction makes particular sense where in the second trial, "the
government [is] enforcing . . . a form of civil relief arising out of the original crime" because

where, in the prior proceeding, (1) an identical issue[7] (2) was actually litigated (3) and necessarily

determined, and where (4) "[p]reclusion in the second trial [would] not work an unfairness."

*Otherson*, 711 F.2d at 273.  When the proceeding is a criminal one, and the defendant enters a

guilty plea, preclusion "extends only to those issues that were essential to the plea."  *Alsco-*

*Harvard Fraud Litig.*, 523 F. Supp. 790, 802 (D.D.C. 1981) (Oberdorfer, J.).

Bilhar now insists it merits a new trial because the central issues in the False Claims case

were not essential to its plea to antitrust conspiracy.  (Motion Six at 2; Reply Six at 7-9.)  Before

examining this contention, the Court must first elucidate precisely which issues it precluded

Bilhar from contesting in this civil trial.  This Court treated Bilhar's guilty plea as conclusively

establishing that Bilhar: (1) knowingly submitted or caused to be submitted to the government a

false or fraudulent claim; (2) knowingly made or used, or caused another to make or use, a false

or fraudulent record or statement to get the government to pay its claim; and (3) conspired with

one or more persons – at least one of whom performed an act to effect the conspiracy's object –

to get a false or fraudulent claim allowed or paid by the U.S.  (*See* Mem. Op. & Order of Mar.

14, 2007 [713] at 5-6; Verdict Form [858] at 2, 3, 4, 6, 7).

Next, "it is necessary to examine the issues [Bilhar] necessarily admitted by pleading

---

such "a claim [] would presumably have been barred the second time under claim preclusion
were criminal courts not specialized tribunals." *Id.*   Here, because the United States is a plaintiff
and seeks civil relief for harm arising from the Sherman Act conspiracy, the "same parties"
requirement is clearly satisfied.

[7] Bilhar briefly contends preclusion was erroneous here because "[t]he claims in the
criminal and the instant civil case were not identical." (Motion Six at 2.)  While Bilhar is,
indeed, correct that a Sherman Act conspiracy need not involve submission of any false
statement to the government, its assertion nonetheless misses the mark.  The collateral estoppel
doctrine requires merely identity of *issues*, not identity of *claims*.  *See* Restatement (Second) of
Judgments § 27 (1982).

guilty." *Alsco-Harvard Fraud Litig.*, 523 F. Supp. at 802.  As Bilhar concedes, (Motion Six at 2-4), its plea embraces the bare elements of a Sherman Act conspiracy, *McCarthy v. United States*, 394 U.S. 459, 466 (1968) (guilty plea is an admission of all elements of the charge).  These elements are: "(1) the conspiracy charged was formed, and it was in existence at or about the time alleged; (2) the defendant knowingly formed or participated in that conspiracy; and (3) the activity that was the object of the conspiracy was within the flow of, or substantially affected, interstate or foreign commerce."  (Ex. B to Pl.'s Mot. [558] at 3.)  Thus, by pleading guilty, Bilhar conclusively established that it had knowingly entered into "a continuing agreement, understanding, and concert of action" to "rig the bids" on U.S. government-funded Contracts 20A, 29, and 07.  (*Id.* at 4, 5.)

Construed in this narrow sense, Bilhar's plea establishes, at least, that it conspired with others to get a false or fraudulent claim allowed or paid by the United States: claims submitted to the government under any contract secured through a collusive conspiracy are, inevitably, false or fraudulent.  *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543-45 (1943) (characterizing claims submitted under contract obtained through collusive bidding as "false" under the False Claims Act ("FCA")).[8]

For issue preclusion to have been proper, however, Bilhar's plea must also have established that claims *were actually submitted* pursuant to that conspiracy (which would also

---

[8] *See also Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787-88 (4th Cir. 1999) (collecting cases in which FCA liability was imposed for claims submitted under contracts originally obtained through false statements or fraudulent conduct); *United States ex rel. Alexander v. Dyncorp, Inc.*, 924 F. Supp. 292, 298 (D.D.C. 1996) (Harris, J.) (stating that if defendant obtained government contract fraudulently, as complaint alleged, "then all claims submitted under the contract are fraudulent").

constitute the requisite overt act for FCA conspiracy).  As this Court previously concluded in

ruling on the government's original motion *in limine*, (Mem. Op. & Order of Mar. 14, 2007 [714]

at 5-6), and on Bilhar's motion for reconsideration, (Mem. Op. & Order of Mar. 20, 2007 [738]

at 1-2), it did.

Bilhar's guilty plea extends to the essential elements of a Sherman Act conspiracy, but its

reach does not end there.  Federal Rule of Criminal Procedure 11(f) mandates that before

entering judgment on a guilty plea, a court must "mak[e] such inquiry as shall satisfy it that there

is a factual basis for the plea."  Fed. R. Crim. P. 11(f).  Because the court may not enter judgment

without this factual basis, there is good reason to give preclusive effect to factual admissions

made in Rule 11 proceedings.  Though he avoids a contested trial, "a defendant who pleads guilty

does not save the court as much work as does a party who" – for example – "stipulates to the

truth of a fact in a civil trial."  *Otherson*, 711 F.2d at 275 n.8.  Moreover, because the court must

conduct a Rule 11 inquiry, "the facts underlying a guilty plea are more reliable than those

established only by stipulation."[9]  *Id.*  Disincentives to litigate other than the truth of every fact

---

[9] The defendant's overt acknowledgment or validation of these facts adds to their
reliability.  In *International Telecommunications Satellite Organization v. Colino*, No. 88-1266,
1992 U.S. Dist. LEXIS 4887 (D.D.C. Apr. 15, 1992) (Lamberth, J.), the defendant had pleaded
guilty to interstate transportation of money taken by fraud, and after reviewing the factual proffer
filed in connection with the charges, he specifically admitted to certain facts contained therein.
1992 U.S. Dist. LEXIS 4887, at *19.  In a subsequent civil suit brought by the victim, this Court
held Colino could not deny "the facts supporting his conviction as they [were] contained in the
factual proffer *reviewed and accepted by him*." *Id.* (emphasis added).

Similarly, where a defendant meticulously edited his indictment before pleading guilty to
selected portions, the Second Circuit Court of Appeals concluded his plea's collateral estoppel
effect could extend to those facts alleged in the indictment.  *United States v. Podell*, 572 F.2d 31,
36 (2d Cir. 1978).  The court explained:

> Podell carefully struck the portions of the indictment to which he did not desire to
> plead guilty, even deleting language in the crucial paragraph in this case -

alleged in an indictment may impact a defendant's decision to plead guilty.  *See Haring v. Prosise*, 462 U.S. 306, 318-19 (1983) (describing possible pragmatic motivations for defendant's guilty plea).  But as the Eleventh Circuit has observed, "[a] federal criminal defendant wishing to avoid both a trial and any collateral estoppel effects may ask for court permission to plead *nolo contendere*."  *In re Raiford*, 695 F.2d 521, 523 (11th Cir. 1983).  Moreover, a defendant may choose to plead only to particular portions of an indictment, thus limiting his plea's potential preclusive effect.  *See*, *e.g. United States v. Podell*, 572 F.2d 31, 36 (2d Cir. 1978).

These considerations suggest that factual admissions in a Rule 11 proceeding may broaden a guilty plea's preclusive effect beyond the mere abstract elements of the crime charged.[10]  Indeed, various other courts have approved the extension of pleas' collateral estoppel effects to defendants' accompanying factual admissions.  *See*, *e.g.*, *DeCavalcante v. Commissioner*, 620 F.2d 23, 24, 26, 28 & n.10 (3d Cir. 1980) (approving Tax Court's holding that defendant who had pleaded guilty to conspiracy to operate an illegal gambling enterprise could not deny connection with gambling activities admitted during Rule 11 hearing); *United States v. Electro-Therapeutics, Inc.*, No. 94 Civ. 4008, 1996 U.S. Dist. LEXIS 2563, at *7-9

---

paragraph 5(c) of Count One.  We conclude that by exhibiting such painstaking care to remove particular language from Paragraph 5(c), Podell in effect and, indeed, in actuality, admitted the truth of the remainder of the paragraph's allegations . . . .  This conclusion is bolstered by Podell's statement in open court during the guilty plea allocution that he was pleading guilty to the selected portions of the indictment.

*Id.* at 36 & n.11.

[10]  *Cf. Alsco-Harvard Fraud Litig.*, 523 F. Supp. at 804 (holding U.S. could not use defendants' general conspiracy plea "as a catch-all for conclusively establishing the specific manner by which that conspiracy was effectuated, even though a recital of the alleged scheme [was] included in . . . the indictment").

11

(S.D.N.Y. Mar. 6, 1996) (precluding defendant who pleaded guilty under general conspiracy statute from denying overt acts admitted during plea proceedings).[11]

In one such case, the defendants, who managed a home health services company, had pleaded guilty to conspiracy to commit health care fraud and mail fraud based on their submission of reimbursement claims to Medicare for personal expenses. *United States v. Szilvagyi*, 398 F. Supp. 2d 842, 844, 848 (E.D. Mich. 2005). In a subsequent FCA action, the U.S. sought damages from the same defendants for "knowingly present[ing], or caus[ing] to be presented, . . . a false or fraudulent claim for payment or approval" by the United States.[12] *Id.* at 844; 31 U.S.C. § 3129(a)(1) (2008). During the plea colloquy, both defendants had "admitted, as part of the factual basis of their guilty pleas, that they intended for the cost reports [they had] submitted to Medicare to contain illegitimate costs for the construction of their home." 398 F. Supp. 2d at 849. "Since they intended the false claims to be submitted," section 3729(a)(1)'s *scienter* element was satisfied, and the court estopped them from denying liability. *Id.*

---

[11] Judge Green followed an analogous approach in giving preclusive effect to a jury verdict in *United States v. Uzzell*. There, a jury had convicted the defendants of criminal conspiracy to defraud the United States, which required an overt act. *See* 648 F. Supp. at 1365. In a subsequent FCA action, the United States sought to preclude the defendants from contesting their liability based on four of the thirty-nine overt acts alleged in the indictment count on which they had been convicted. *Id.* at 1363, 1364. The defendants argued that the jury may have premised its verdict on only one of those overt acts. *Id.* at 1365. But after "examin[ing] the record to determine exactly what was decided in the criminal proceeding," Judge Green found "nothing . . . indicate[d] that anything less than all of the specific acts alleged in the count were determined by the jury in reaching [its] verdict." *Id.* at 1364, 1365. She thus held the conviction conclusively established the defendants had committed all thirty-nine acts, including the four which comprised FCA violations. *See id.* at 1366.

[12] The government's complaint also alleged a conspiracy under 31 U.S.C. section 3129(a)(3), and the *Szilvagyi* court found the plea to health care and mail fraud conspiracy necessarily embraced the elements of this claim. *See* 398 F. Supp. 2d at 848.

Here, in the Rule 11 memorandum accompanying its plea agreement, Bilhar acknowledged that it "and its co-conspirators did those things that they . . . conspired to do" – most saliently, that bids were submitted on Contracts 20A, 29, and 07 "pursuant to the terms of the bid-rigging conspiracy" and that the co-conspirators thereafter performed the contracts.[13] (Ex. B to Pl.'s Mot. [558] at 5.)  As Bilhar rightly points out, a Sherman Act conspiracy need not involve an overt act.  (Motion Six at 4 (citing *Nash v. United States*, 229 U.S. 373 (1913)).)  Yet the overt acts Bilhar admitted in the Rule 11 memorandum were nonetheless "essential to [its] plea" because they supplied a factual basis, without which the criminal court, under Rule 11, could not accept Bilhar's plea.[14]

---

[13] Bilhar may not avoid collateral estoppel by claiming the memorandum "does not specifically state . . . that Bilhar itself committed any particular one of the listed acts."  (Reply Six at 9.)  Under the civil counterpart to the venerable *Pinkerton* rule,

> once [a] conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy.  A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable . . . so long as the purpose . . . was to advance the overall object of the conspiracy.

*Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983).

[14] Equitable principles lend further support to this conclusion:

> Where a party assumes a certain legal position in a proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.

*Davis v. Wakelee*, 156 U.S. 680, 689 (1895).
This equitable doctrine, judicial estoppel, does not automatically apply to facts admitted in a guilty plea colloquy.  *Thore v. Howe*, 466 F.3d 173, 185 (1st Cir. 2006).  Rather, courts may invoke judicial estoppel at their discretion.  *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).  *See also Thore*, 466 F.3d at 187 (after reviewing for abuse of discretion, affirming district court's application of judicial estoppel based on defendant's statements at the time he pleaded guilty).

13

Hence, the Court did not err in precluding Bilhar from contesting its liability for conspiracy and on Contracts 20A and 29.

## 2.    Admission of Bilhar's Guilty Plea

Under our Federal Rules of Evidence, relevance is a threshold requirement for admissibility – evidence must have some tendency to make the existence of any material fact either more or less probable.  Fed. R. Evid. 401, 402.  Even relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice."  Fed. R. Evid. 403.  Defendants contend that Bilhar's plea agreement and Rule 11 memorandum lacked any probative value – as to Bilhar or any other defendant – or alternatively, that the danger of unfair prejudice substantially outweighed any probative value these documents might have

---

Considerations relevant to this exercise of discretion include: (1) whether the party's present position is clearly inconsistent with its previous position; (2) whether the party "succeeded in persuading a court to accept the party's earlier position"; and (3) whether "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 750-51.

Here, in entering its guilty plea, Bilhar acknowledged that it and/or its co-conspirators had performed specific, overt acts in furtherance of the bid-rigging conspiracy.  (*See* Ex. B to Pl.'s Mot. [558] at 5.)  First, if permitted to contest liability in the False Claims case, Bilhar would (presumably) have adopted a contrary stance: in essence, though it had agreed with others to rig bids on Contracts 20A, 29, and 07, nothing had come of this pact.  Such a position would be "clearly inconsistent with" its admissions in the Rule 11 memorandum.  *See* 532 U.S. at 750.

Second, in accepting Bilhar's guilty plea, to fulfill its duties under Rule 11, the criminal court must have relied on Bilhar's representations; thus, Bilhar "succeeded in persuading [that] court to accept [its] earlier position."  *See id.*

Third and finally, if not estopped from assuming a contrary position here, Bilhar would have imposed a significant and unfair detriment on the opposing party.  *See id.* at 751.  Under the plea agreement, Bilhar negotiated a fine in a specified amount, payable over time in installments rather than in one lump sum, and received assurances of non-prosecution for itself and its corporate affiliates as well as their current and former directors, officers, and employees.  (*See* Ex. A to Pl.'s Mot. [558] at 5-6, 10-14.)  Having reaped these benefits from its factual admissions, Bilhar may not, now, force the government to expend the considerable time and resources that would be required to litigate the very same facts Bilhar has already acknowledged.

had. (*See* Motion Five at 6-10; Motion Eight at 5-9.) Both arguments fail.

First, although Bilhar's liability had been conclusively established, it remained free to contest causation and damages. (Mem. Op. & Order of Mar. 14, 2007 [713] at 6.) The plea agreement and Rule 11 memorandum had "probative value over and beyond the preclusive effect" given to the underlying plea, (Mem. Op. & Order of Mar. 20, 2007 [738] at 2), in that they tended to show *how* Bilhar and its co-conspirators pursued and accomplished their objectives.[15] These factual details were relevant to whether Bilhar caused damages to the United States. For example, the Rule 11 memorandum states that the conspirators met and agreed "to increase the price level of bids on USAID-funded Contracts 20A, 29, and 07." (Ex. B to Pl.'s Mot. [558] at 5.) While not conclusive, this statement tends to make it more likely that the United States paid more on these contracts than it otherwise would have, absent any collusion – a decidedly material issue.

Even more rudimentary logic demonstrates these documents' probative value as to the other defendants' liability. To meet its burden as to the conspiracy charge, the government had

---

[15] BHIC and HUK cite several cases for the proposition that because Bilhar could not contest its liability, these documents lacked any evidentiary value as to Bilhar. (Motion Eight at 5.) Yet these authorities in no way establish that evidence relevant to material, contested issues should be excluded merely because it conclusively establishes other issues. *See Siclades v. Hartford Cas. Ins. Co.*, 94 Fed. Appx. 882, 883 (3d Cir. 2004) (where plaintiffs were estopped from seeking consequential damages, evidence of such damages was "irrelevant because [plaintiffs] would not be permitted under the law to recover them"); *United States v. United States Currency in Amount of $228,536.00*, 895 F.2d 908, 913, 920-21 (2d Cir. 1990) (where defendant was estopped from arguing property was seized in violation of the Fourth Amendment, testimony barely material to the existence of probable cause would be irrelevant in subsequent civil forfeiture proceeding); *Sherrock Bros. v. DaimlerChrysler Motors Co. LLC*, 465 F. Supp. 2d 384, 387, 391, 394 (M.D. Pa. 2006) (where plaintiff was estopped from bringing *ultra vires* and bad faith claims because state courts had fully adjudicated them, evidentiary hearing on these very issues "would [] be meaningless").

to prove by a preponderance of the evidence that, *inter alia*, a conspiracy to get a false or

fraudulent claim allowed or paid by the U.S. existed, and these defendants were participants

therein.  *See* 31 U.S.C. § 3129(a)(3) (2008).  The facts recited in the plea agreement and Rule 11

memorandum tend to prove that a conspiracy of the type alleged by the government existed.[16]

Hence, they held significant probative value as to Bilhar's co-defendants.

Second, any danger of unfair prejudice these documents may have posed to these co-

defendants[17] was substantially diminished by their redaction and by the limiting instructions

given to the jury both immediately after the documents were introduced into evidence,[18] (Apr. 10,

---

[16] *Cf. United States v. Vandetti*, 623 F.2d 1144, 1147 (6th Cir. 1980) (mere *fact* of co-defendant's conviction, alone, was irrelevant to defendant's guilt).

[17] Defendants do not explain how these documents could be unfairly prejudicial to Bilhar, and it is not immediately obvious to the Court.  The facts recited in the plea agreement and Rule 11 memorandum were certainly persuasive evidence, but particularly due to these documents' nature, it would not be *unfair* for the jury to assign great weight to Bilhar's voluntary admissions.

[18] Defendants also take issue with the timing of the Court's limiting instruction, insisting it should have been given immediately when plaintiffs' counsel mentioned Bilhar's conviction during his opening statement.  (Motion Eight at 8.)  Opening statements, however, are not evidence – as the jury in this case was instructed.  (Mar. 20, 2007 AM Tr. at 25.)  This Court gave a limiting instruction when the plea agreement and Rule 11 memorandum were actually placed in evidence.  (Apr. 10, 2007 PM Tr. at 100.)  Defendants offer no authority for their contention that instructions limiting a jury's use of evidence should be read three weeks in advance of that evidence's introduction.
    Relatedly, HC and HII misconstrue this Court's pre-trial rulings as establishing a "step-by-step" procedure under which evidence of Bilhar's prior criminal proceeding would be admissible against them only if they challenged the voluntariness of its plea.  (*See* Motion Five at 4, 6.)  BHIC and HUK apparently share this misconception.  (*See* Motion Eight at 8 n.2.)  Consequently, they protest plaintiffs' counsel's reference to these proceedings in his opening statement as unfairly prejudicial.  As the Court clarified in denying defendants' motions for reconsideration, the guilty plea and Rule 11 memorandum were admissible.  (Mem. Op. & Order of Mar. 20, 2007 [738] at 2.)  It is hardly unusual for counsel to preview admissible evidence he intends to present during his case-in-chief in an opening statement.  Furthermore, defendants' present complaints ring hollow:  Bilhar's counsel also discussed the prior criminal proceeding in his opening statement – at far greater length and in much deeper detail than the government's

2007 PM Tr. at 100), and again in the Court's final instructions, (May 4, 2007 AM Tr. at 44-45).

As this Court acknowledged in its original ruling on this issue, the plea agreement and Rule 11 memorandum "pose[d] certain problems" – "[w]ithout guidance, the jury could become confused and assume that unrelated references in those documents to defendants in this case must mean that they were the others with whom Bilhar conspired" – and accordingly, all reference to these defendants was redacted before the documents' admission.  (Mem. Op. & Order of Mar. 16, 2007 [722] at 3.)  Nonetheless, defendants contend the documents' generic references to "co-conspirators" and their "conspicuous redactions" spawned the same confusion.[19]  (Motion Five at 9; Motion Eight at 8.)  The identified language could have occasioned no prejudice.[20]  Even absent any reference to "co-conspirators" in the documents, a reasonable juror – particularly one instructed on the definition of conspiracy, as the jury was here – would assume that Bilhar could

---

counsel – without drawing an objection from any other defendant.  (*See* Mar. 20, 2007 PM Tr. at 32-34.)

Finally, HII also decries government counsel's "transparent strategem to tar HII with the Bilhar guilty plea" by discussing the government's theory of liability for HII immediately following his reference to Bilhar's guilty plea.  (Motion Five at 4.)  Beneath this rhetorical gloss, however, the Court perceives no error.  Government counsel simply urged the jury to hold HII accountable for its own conduct and not to absolve HII simply because another defendant had admitted guilt.  (*See* Mar. 20, 2007 AM Tr. at 57 (citing HII's signing contracts and making representations to the U.S. government).)

[19] HII and HC protest the Court's ruling they could not inform the jury that no criminal charges had been filed against them.  (Motion Five at 9 n.2.)  But having been informed that Bilhar had faced criminal charges, and having heard nothing similar as to the other defendants, the jurors might well have inferred no other defendant among those present had been charged.  This inference was surely as reasonable as the competing, allegedly prejudicial, inference that *these* defendants must have been Bilhar's co-conspirators.

[20] Defendants somewhat melodramatically characterize the Rule 11 memorandum as "fraught with criminal words," but it is by no means surprising or unduly prejudicial that "criminal words" should appear in records of a *criminal* conviction.

not have entered into the pleaded conspiracy alone.

Yet defendants insist the jury must have "substitute[d] the prior criminal proceeding for its own judgment of the facts."  (Motion Six at 9.)  Introduction of another fact-finder's conclusions may create a risk that the jury will abdicate its duty to make an independent appraisal, but the gravity of this risk depends on the surrounding circumstances.[21]  Moreover, this Court places greater faith in the presumption – elemental to our justice system – that a properly instructed jury will follow the law.[22]  Here, this Court *twice* instructed the jury as follows:

> The fact that Bilhar pleaded guilty may not in any respect be considered against any other defendants, nor may any inference be drawn against them by reason of Bilhar's plea of guilty.  The guilty plea was the personal plea of [Bilhar] and was binding only upon it.  Guilt is personal.  The verdict as to each defendant before you must be considered separately with respect to that defendant solely upon the evidence against that defendant or the lack of such evidence.

(Apr. 10, 2007 PM Tr. at 100; May 4, 2007 AM Tr. at 44-45.)  In light of the thorough precautionary measures undertaken here, the Court concludes any danger of unfair prejudice was effectively mitigated[23] and did not substantially outweigh the documents' high probative value.

---

[21]  *See, e.g.*, *Gil-De-Rebollo v. Miami Heat Ass'ns, Inc.*, 137 F.3d 56, 64 (1st Cir. 1998) (declaring in personal injury suit that "[u]nder the circumstances, admission of [defendant's] criminal conviction would have allowed the jury to substitute the judgment reached in the criminal proceeding for its own," where circumstances included: (1) "jurors were presented with sufficient evidence to gauge the seriousness of [defendant's] actions and their effect on the plaintiff"; (2) "[i]n addition to the testimony of the plaintiff and other witnesses, the episode was recorded by a television camera and the tape was made available for the jury to watch"; and (3) the jury therefore "did not need evidence of [defendant's] criminal conviction to assess his role in the incident").

[22]  *See, e.g.*, *Richardson*, 481 U.S. at 206.  *See also United States v. Boone*, 437 F.3d 829, 838 (8th Cir. 2006) ("Where multiple defendants are tried together, the risk of undue prejudice is best cured through cautionary instructions to the jury . . . .").

[23]  None of the precedents to which defendants direct the Court's attention suggests – let alone, compels – a contrary conclusion.  *See United States v. Berkery*, 889 F.2d 1281 (3d Cir.

The plea agreement and Rule 11 memorandum were also hearsay, however, and even relevant hearsay evidence is inadmissible. Fed. R. Evid. 802. As in other areas of the law, myriad exceptions to this general rule exist, and this Court originally admitted these hearsay documents under one such exception, codified in Federal Rule of Evidence 803(22). (Mem. Op. & Order of Mar. 16, 2007 [722] at 3.) Defendants now attack this ruling on three, interrelated grounds.

First, they insist that one defendant's guilty plea may never be admitted against co-defendants in a subsequent civil trial. (Motion Five at 7-8; Reply Five at 6-7.) Yet Rule 803(22) itself expressly contemplates this scenario: it expressly does not reach "judgments against persons other than the accused," but *only* when they are "offered by the Government in a criminal prosecution for purposes other than impeachment." Fed. R. Evid. 803(22). Defendants' reading of the Rule entirely ignores this qualifying clause. Moreover, various precedents support the admission of co-defendants' guilty pleas against civil defendants. *See*, *e.g.*, *Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995) (one defendant's plea agreement was admissible under Rule 803(22) and established other defendants' liability); *Guillermety v. Gonzalez*, 491 F. Supp. 2d 199, 201 (D.P.R. 2006) (one defendant's guilty plea was admissible under Rule 803(22) to

---

1989) (ordering new trial on all counts where trial court erroneously required that sole defendant admit to conspiracy charge to qualify for entrapment instruction, even though court had admonished jury that defendant had not admitted related, "closely intertwined" substantive charges); *Warner v. Rossignol*, 538 F.2d 910 (1st Cir. 1976) (ordering new trial on damages despite brief curative instruction where "plaintiff's attorney persisted in going beyond the pleadings and the evidence, embroidering upon plaintiff's head injuries and the (completely speculative) consequences which might flow from those injuries . . . even after repeated warnings from the judge and in a manner . . . calculated to inflame the jury"); *Beck v. Wings Field, Inc.*, 122 F.2d 114 (3d Cir. 1941) (ordering new trial despite curative instruction where plane crash plaintiff's expert witness testified he had personally experienced identical plane crash due to same "ditch" on defendant's runway).

establish all defendants' liability).[24]

Second, defendants observe that Rule 803(22) permits introduction of a guilty plea only "to prove [] fact[s] essential to sustain the judgment," Fed. R. Evid. 803(22), and they suggest that Bilhar's admissions in the plea documents exceeded this scope.[25]  (*See* Motion Eight at 6; Reply Eight at 2.)  As explained above, however, because Federal Rule of Criminal Procedure 11 demands that a court assure itself of a factual basis for any guilty plea,  Fed. R. Crim. P. 11(f), the admissions in these documents *were* essential to Bilhar's plea.[26]  *See supra* part II.A.1.

Third and finally, citing the Advisory Committee's Note, defendants contend that Rule 803(22) provides for two, incompatible alternatives: a court may give preclusive effect to a prior conviction, *or* it may admit evidence of that conviction "for what it is worth."  (Motion Eight at 6-7; Reply Eight at 2-3; Reply Five at 6.)  If the former, defendants argue, then the evidence becomes devoid of probative value and consequently inadmissible.  (Motion Eight at 6.) Assuming, without deciding, that defendants have accurately interpreted the Note, giving

---

[24] In fact, courts have even admitted *non-parties*' guilty pleas against civil defendants. *See*, *e.g.*, *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401, 403 (8th Cir. 1995) (non-party employee's guilty plea and accompanying sworn statement were admissible against defendant employer in subsequent civil case);  *Newby v. Enron Corp.*, 491 F. Supp. 2d 690, 703 (S.D. Tex. 2007) (non-party's guilty plea was admissible against defendants in subsequent civil case).

[25] Defendants' only authority for this proposition is an unpublished disposition from this Circuit.  (*See* Motion Eight at 6 (citing *Lemire v. Comm'r of Internal Revenue*, 901 F.2d 1130 (D.C. Cir. 1990).)  In accordance with the Court of Appeals' instructions, however, the Court declines to rely on it as precedent.  D.C. Cir. R. 32.1, 36.

[26] *Cf. Columbia Plaza Corp. v. Security Nat'l Bank*, 676 F.2d 780, 789-90 (D.C. Cir. 1982) (where jury returned general conspiracy verdict, trial court properly determined no overt act *charged in indictments* was "essential" to sustain the verdict and thus correctly excluded indictments as inadmissible under Rule 803(22)).

preclusive effect to Bilhar's guilty plea would only render the plea documents irrelevant *to Bilhar's liability*.  It would in no way diminish their probative value – discussed above – as to the *other defendants'* liability.  And even if the Court erred in admitting the documents against Bilhar under Rule 803(22), they were nonetheless admissible against Bilhar as non-hearsay under Rule 801(d)(2)(A).[27]

Accordingly, the Court concludes its admission of Bilhar's plea documents was proper.

**B.    Hearsay Testimony**

Defendants next take issue with the Court's admission of certain testimony under Federal Rule of Evidence 801(d)(2)(E) and *United States v. Gewin*, 471 F.3d 197 (D.C. Cir. 2006).[28] (*See* Mem. Op. & Order of Apr. 27, 2007 [821] at 1-2.)  They contend this testimony was inadmissible hearsay because the statements were not made in furtherance of a conspiracy or joint venture.[29]  (Motion Five at 21-23.)

---

[27] Defendants cite abundant authority for the proposition, evident on the Rule's face, that party admissions are non-hearsay only when offered against the speaker – in this case, Bilhar. (*See* Motion Eight at 7.)  The Court did not, and does not, propose to hold otherwise.

[28]  The Rule exempts statements of a party's co-conspirators during the course and in furtherance of the conspiracy, when they are offered against the party.  Fed. R. Evid. 801(d)(2)(E).  *Gewin* extends the exception to joint venturers' statements during and in furtherance of the joint venture.  471 F.3d at 201-02.

[29] Defendants raise two additional points with which the Court may easily dispose.  First, they contend *Gewin* "is contrary to the plain language of Rule 801(d)(2)(E) and Supreme Court precedent."  (Motion Five at 20.)  Whatever else it may be, however, *Gewin* is binding precedent to which this Court must adhere.  Second, HC insists it was never a joint venturer, so even if the identified statements were admissible under 801(d)(2)(E) against the other defendants, they would nevertheless be inadmissible against HC.  (Motion Five at 23.)  For the reasons explained herein, any error was harmless.

### 1.     Richard Miller

First, defendants point to several statements by relator Richard Miller.  (Motion Five at

22.)  Miller testified that in 1990, after a meeting in Cairo on Contract 20A, John Ollis told him

of a conversation with defendant Anderson, in which Anderson "told him that every U.S.

contractor that was prequalified to do USAID work in Cairo was a member of a club that had

been set up and met in Frankfurt to essentially setup or rig the bids." (Mar. 28, 2007 PM Tr. at

90-91, 102-03.)  Defendants challenge only the second level in this double hearsay statement,

Ollis's statement to Miller.  (Motion Five at 22.)  Yet because plaintiffs did not offer this

statement for its truth, but rather for its effect on the hearer – Ollis's statement explained Miller's

motivation for raising concerns about the 20A project to his superiors at J.A. Jones, (Mar. 28,

2007 PM Tr. at 103-05) – it was not hearsay, *see* Fed. R. Evid. 801(c).  Moreover, given that

Ollis had related Anderson's statement directly to the jury the previous day, (Mar. 27, 2007 PM

Tr. at 41-42), Miller's repetition of the statement could hardly have prejudiced the defendants.

Miller also testified to statements by Jones President Charles Davidson.  (Mar. 28, 2007

PM Tr. at 104-05.)  After Miller shared what Ollis had told him in Cairo, Davidson advised

Miller that he would inform Johnie Jones, CEO of parent company J.A. Jones, Inc.  (*Id.*)

Defendants insist this statement advanced only Jones's interests, not those of the joint venture,[30]

(Reply Five at 11-12), but this myopic argument ignores the obvious benefit the joint venture

would derive from uncovering any illegality among its activities.  Miller and Davidson were then

---

[30] Defendants further argue that Davidson's suggestion "that Miller and Ollis tell their
wives what happened . . . in no way advanced any Joint Venture interests or any conspiracy."
(Motion Five at 22.)  Yet they do not explain, and the Court cannot surmise, how so mundane a
statement's admission could be so irreparably prejudicial as to warrant a new trial.

unaware whether and to what extent Anderson's statement might be true, and if it were, who in the joint venture partners' corporate hierarchies might be in on the scheme.  By warning one partner's CEO that some illegality might be afoot, Davidson would help to ensure that joint venture decision-makers could evaluate, and if necessary, act on, this potentially damaging information.  *Cf. United States v. Walls*, 70 F.3d 1323, 1327 (D.C. Cir. 1995) (warning that another co-conspirator could not be trusted furthered the conspiracy's objectives).  By sharing his intent to do so with Miller, he kept another joint venturer informed.  *See United States v. Snider*, 720 F.2d 985, 993 (8th Cir. 1983) (statements ensuring co-conspirator's "informed participation" advanced the conspiracy).  Moreover, even had Davidson's statement *not* been made in furtherance of the joint venture, defendants do not explain how its admission prejudiced them.[31] (*See* Reply Five at 10-11.)

Finally, defendants assert that Miller testified to statements by Fritz Biesecker in authenticating Plaintiffs' Exhibit 202.  (Motion Five at 22.)  Miller stated that he initially learned of this document when Biesecker showed it to him, and that Biesecker "discussed" it with him.  (Mar. 29, 2007 AM Tr. at 45-46.)  But contrary to defendants' assertion, (Reply Five at 12), it is *not* clear which of Miller's statements concerning the document, if any, simply parroted Biesecker, and defendants make no effort to distinguish among them.  Hence, the Court cannot conclude these statements were inadmissible hearsay.

---

[31] It also appears to the Court that Davidson's statement would have been admissible under Rule 803(3), which excepts statements of intention from the hearsay bar.  Fed. R. Evid. 803(3) & Advisory Committee's Note.  *See also Mutual Life Ins. Co. v. Hillman*, 145 U.S. 285 (1892) (admitting statement of intention to prove the act intended in fact occurred).  Plaintiffs do not specifically articulate this ground in their brief, however, so the Court will not address it.

2.      **John Ollis**

Second, defendants challenge certain statements related by John Ollis during his

testimony.  (Motion Five at 22-23.)  They first cite Davidson's advice to Ollis and Miller that

they retain personal attorneys, (Mar. 27, 2007 PM Tr. at 50-51), which plaintiffs claim was

offered merely for its effect on the listeners, "who subsequently sought legal counsel,"

(Opposition Five at 19).  Yet Ollis testified he consulted private counsel a full six to eight

months later, a delay that belies plaintiffs' argument.  (Mar. 27, 2007 PM Tr. at 54-55.)

Plaintiffs' perfunctory assertion that this statement falls within 801(d)(2)(E)'s exemption

likewise fails, as they do not explain how advice that Ollis and Miller seek *personal* legal

counsel would further the joint venture's interests.  (*See* Opposition Five at 19.)  Nonetheless,

considered in context, this statement's admission did not comprise "a clear miscarriage of

justice" that would prompt this Court to order a new trial.  *See Wild v. Alster*, 377 F. Supp. 2d

186, 189 (D.D.C. 2005) (Walton, J.).  Ollis testified only that during a meeting after Anderson's

Cairo disclosure, Davidson proposed that Miller and Ollis seek legal advice, "[b]ecause of

possible legal implication[s]."  (Mar. 27, 2007 PM Tr. at 50-51.)  The jury may have interpreted

this statement as reflecting consciousness of wrongdoing.  But Ollis's next comments – that

Davidson also asked him to brief a Jones corporate attorney, to whom Ollis related his

conversation with Anderson, and who then conducted an investigation, (*id.* at 51-54) –

thoroughly eclipsed his earlier statement in terms of prejudicial effect and value to plaintiffs'

case.  Hence, while its admission may have been error, a new trial is unwarranted.

Ollis also related a double hearsay statement: Manfred Pietchottka told Ollis he had

overheard Gunter Niebergall speaking to an unknown listener over the telephone.  (Mar. 27, 2007

24

PM Tr. at 60-61.)  The second link in this chain – from Pietchottka to Ollis – falls under Rule

801(d)(2)(E).  Pietchottka, a Jones employee, repeated Niebergall's statements about paying

other contractors to refrain from bidding in response to his supervisor's (Ollis) query about a

large and seemingly inexplicable payment to Holzmann. (*Id.* at 57-62.)  This statement advanced

the joint venture's interests in that Pietchottka – a joint venture partner employee – provided his

boss with "important background information" that Ollis requested while "carry[ing] out his

duties" as Vice President of one joint venture partner.  *See United States v. Tarantino*, 846 F.2d

1384, 1413 (D.C. Cir. 1988).

   The first link is more problematic.  Because plaintiffs cannot identify the person to whom

Niebergall spoke, defendants contend his statements cannot possibly have been in furtherance of

the bid-rigging conspiracy.[32]  (Reply Five at 12-13.)  This threshold admissibility issue was one

for the Court to determine by a preponderance of the evidence, *Bourjaily v. United States*, 483

U.S. 171, 175 (1987), and several elements of Ollis's testimony convince it that plaintiffs met

their burden.  First, Pietchottka indicated that he heard Niebergall, a Holzmann employee,

"talking to one of the other contractors" about a payment for not bidding on a contract.  (Mar. 27,

2007 PM Tr. at 62.)  Given plaintiffs' other evidence that the instant bid-rigging conspiracy

involved such payments among construction contractors, it would be reasonable to infer that

Niebergall was speaking to a co-conspirator about a promised payment.  A second fact bolsters

this inference: Pietchottka told Ollis that the conversation escalated into a "heated argument."

(*Id.*)  Finally, Niebergall ultimately directed the other party to talk to "PS," or Pieter Schmidt,.

---

[32]  Defendants do not appear to dispute the other required elements of Rule 801(d)(2)(E) –
that Niebergall, a Holzmann employee, was a co-conspirator, and that the bid-rigging conspiracy
was then ongoing.  *See* Fed. R. Evid. 801(d)(2)(E).

(*Id.*)  That Niebergall referred the other party to Schmidt, a pivotal figure in the overall conspiracy, and that the other party was familiar enough with Schmidt to associate these initials specifically with him, further suggest the mystery caller was a fellow conspirator.  Thus, it appears more likely than not Niebergall's statements to the unknown caller were made in furtherance of the conspiracy.  Accordingly, having reevaluated Ollis's statements' admissibility, the Court again concludes they were non-hearsay under Rule 801(d)(2)(E).

Finally, Ollis repeated Niebergall's statement that "he could bid the work for [Jones] in Egypt, because he knew all the prices before they were submitted."  (Mar. 27, 2007 PM Tr. at 63.)  Defendants characterize Niebergall's statement as "spilling the beans" and therefore outside the scope of Rule 801(d)(2)(E).  (Motion Five at 22-23 (citing *City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 559 (11th Cir. 1998)).)  Plaintiffs, however, insist "Niebergall was essentially attempting to recruit Ollis into the bid-rigging conspiracy by offering to handle Jones' bidding process for them," (Opposition Five at 20), which would have furthered the conspiracy's interests, *see City of Tuscaloosa*, 158 F.3d at 559.  Considered in context, the latter reading is more plausible.  At a dinner meeting between executives from Jones and Holzmann, during a discussion of Jones's international various projects, Niebergall, who represented Holzmann's International Division, offered to bid work for Jones on an international project.[33]  (*See* Mar. 27,

---

[33]  Ollis testified: "At that time we were discussing our – the work that we had in various places in Holzmann.  We were talking about their international work, because Linderman and Niebergall were in their International Division, and that's when Niebergall told me that he could bid the work for us in Egypt, because he knew the prices before they were submitted."  (Mar. 27, 2007 PM Tr. at 63.)

2007 PM Tr. at 62, 63.)  Rather than mere bragging or boasting,[34] Niebergall offered – at a

business meeting between corporate executives – to share the bid-rigging conspiracy's benefits

with Jones.  Hence, the Court concludes this statement was intended to advance the conspiracy's

objectives and was properly admitted under Rule 801(d)(2)(E).

### 3.      Ernest Teal

Third, defendants protest Ernest Teal's relation of double hearsay.  (Motion Five at 23;

Motion Eight at 10.)  Teal testified that Jurgen Schoenwasser told him Pieter Schmidt and Johnie

Jones had ordered Schoenwasser to cancel a scheduled audit of Contract 20A.  (Mar. 28, 2007

AM Tr. at 49.)  As plaintiffs explain, (Opposition Five at 20 n.24), Schoenwasser's statement to

Teal was not hearsay because plaintiffs offered it for its effect on Teal – to show why he did not

audit Contract 20A.  (Mar. 28, 2007 AM Tr. at 47-53.)  And considering that Schmidt was a key

player in the bid-rigging conspiracy, plaintiffs' proffered explanation – that Schmidt and Jones

ordered the audit cancelled "to conceal facts pertinent to the conspiracy and [] to the diversion of

profits," (Opposition Five at 21) – is wholly reasonable.[35]  Accordingly, Schmidt and Jones's

directions to Schoenwasser were likewise non-hearsay (under Rule 801(d)(2)(E)), and the Court

---

[34] Defendants suggest Niebergall was simply flaunting his inside knowledge, but in the cases they cite for this proposition, the declarants did not couch their boasts as express offers or invitations, such as Niebergall did here.  *See Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1011-12 (6th Cir. 1999) (trial court did not clearly err in construing CEO's verbal denial that collusive agreement existed, combined with his non-verbal conduct, as mere boasting that such an agreement did exist); *United States v. Birnbaum*, 337 F.2d 490, 494-95 (2d Cir. 1964) (trial court erred in admitting co-conspirator's narrative of defendant's "past double-dealing" to another co-conspirator because it was not made in furtherance of the conspiracy).

[35] As a preliminary matter, whether the statement was made in furtherance of the conspiracy was an issue for the Court to decide by a preponderance of the evidence.  *Bourjaily*, 483 U.S. at 175.

27

did not err in admitting Teal's testimony.

In sum, of defendants' myriad complaints concerning hearsay evidence, only one rings true. Ollis' recounting of Davidson's advice to Ollis and Miller that they retain personal attorneys, (Mar. 27, 2007 PM Tr. at 50-51), was not properly admissible either for its effect on the hearer or as a joint venturer's statement. Nonetheless, this statement's admission did not comprise "a clear miscarriage of justice" that would prompt this Court to order a new trial. *See Wild*, 377 F. Supp. 2d at 189.

### C.    McAfee Testimony

Over defendants' repeated and strenuous objections, this Court permitted Professor R. Preston McAfee to testify as an expert in the field of economics on plaintiffs' behalf. (Order of Apr. 4, 2007 [760]; Apr. 5, 2007 PM Tr. at 49, 58, 72-73.) Specifically, McAfee "was asked to explain how auctions and bidding work, how collusion in auctions work[s], and the incentives that are created for seeking cost-reducing technologies." (*Id.* at 75.) Defendants opposed – and still oppose – his testimony as an expert on these subjects. (*See* Motion Five at 37-44; Motion Eight at 18-25.)

Federal Rule of Evidence 702 principally governs admission of expert testimony. The party seeking to present the expert's testimony must convince the Court of its admissibility by a preponderance of the evidence. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 & n.10 (1993). In all instances, the proffered expert must be qualified "by knowledge, skill, experience, training, or education," and his testimony must be helpful to the trier of fact. Fed. R. Evid. 702. Generally, his testimony must be "based upon sufficient facts or data" and must also be "the product of reliable principles and methods," applied "reliably to the facts of the case." *Id.*

28

Evidently relying on this last phrase, defendants protest that McAfee's testimony was "completely unmoored from the facts of this case." (Motion Eight at 19.)[36] Yet courts routinely permit experts to "explain principles without applying them or offering an opinion on the ultimate issue." *See, e.g.*, *Erickson v. Baxter Healthcare, Inc.*, 151 F. Supp. 2d 952, 968 (N.D. Ill. 2001).[37] As the Advisory Committee's Note to Rule 702 recognizes,

> it might [] be important in some cases for an expert to educate the factfinder about general principles, *without ever attempting to apply these principles to the specific facts of the case* . . . . The [2000] amendment does not alter the venerable practice of using expert testimony to educate the factfinder on general principles.

Fed. R. Evid. 702 Advisory Committee's Note (emphasis added).[38] Thus, while an expert *may*

---

[36] *(See also* Motion Five at 38 ("Defendants' arguments were validated during *voir dire* of McAfee when he disavowed having any specific knowledge about the facts of the case."); Reply Eight at 14 ("plaintiffs were not entitled to shield McAfee's conclusions from scrutiny by blindfolding him and insulating him from any knowledge of the complex facts in this case").)

[37] *See also United States v. Mulder*, 273 F.3d 91, 102 (2d Cir. 2001) ("The government is free to offer expert testimony as background for an offense"); *Strauss Farms, Inc. v. Combs Commodities, Inc.*, No. 03-4046-RDR, 2005 U.S. Dist. LEXIS 6965, at *3-8 (D. Kan. Mar. 29, 2005) ("[it] is not a requirement of Rule 702, *Daubert*, or *Kuhmo*" that proffered expert's scientific knowledge be "specifically applied to the facts of this case").

[38] Defendants insist McAfee did not confine his testimony to "general principles" because he "offered conclusions regarding the 'direct costs' of 'cartel behavior.'" (Reply Eight at 14.) In particular, they take issue with his statements that a cartel bidder must "increase the price enough to account for all of the direct costs facing conspirators" and that such bidders face reduced incentives to discover cost-reducing technology prior to bidding. (Apr. 5, 2007 PM Tr. at 84-89, 103.) These statements simply described elements of the abstract cartel behavior model McAfee discussed throughout his testimony and did not exceed his purview as a "teaching witness." Defendants further complain that these supposed costs lack any basis in empirical analysis and thus comprise "nothing more than pure speculation" or "common sense in the guise of economic analysis." (Motion Eight at 23 & n.12.) While common sense dictates that those who engage in illegal collusion face a risk of getting caught, an economist looks at this risk differently: "it is part of every economic model that risks have costs . . . [and] bear a price." (Apr. 5, 2007 PM Tr. at 100.) McAfee made these risks and their role in pricing explicit, allowing the jurors to assess a cartel participant's bid selection as an economist would. His inability to cite an empirical study documenting these costs impacts the weight of this evidence, but not its admissibility.

29

base his opinion on "facts or data in the particular case . . . perceived by or made known to the

expert at or before the hearing," he may alternatively rely on facts or data "of a type reasonably

relied upon by experts in the particular field," whether admissible or not.  Fed. R. Evid. 703.

Hence, so long as McAfee's testimony satisfied Rule 702's other requirements, it was properly

admitted regardless of whether he reviewed facts particular to this case or applied the economic

principles he explicated to them.

When an expert testifies "to educate the factfinder on general principles,"[39] Rule 702

requires that: (1) the expert be qualified;[40] (2) the testimony address a subject matter on which

_____

[39]  As examples of such general principles, the Advisory Committee's Note cites "the
principles of thermodynamics, or bloodclotting, or [] how financial markets respond to corporate
reports."  Fed. R. Evid. 702 Advisory Committee's Note.  Courts have admitted such generalized
expert testimony to educate jurors on a wide variety of other subjects.  *See, e.g.*, *Mulder*, 273
F.3d at 101-02 (labor coalition behavior); *United States v. Locasio*, 6 F.3d 924, 936 (2d Cir.
1993) (structure and tactics of the Mafia); *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l,
Inc.*, No. C 03-1431 SBA, 2006 WL 1329999, at *4-5 (N.D. Cal. May 15, 2006)
(cardiopulmonary bypass and hemodialysis procedures); *Strauss Farms, Inc.*, 2005 U.S. Dist.
LEXIS 6965, at *3-8 (spontaneous combustion); *SEC v. Lipson*, 46 F. Supp. 2d 758, 767-68
(N.D. Ill. 1999) (accounting); *In re Eastern & S. Dist. Asbestos Litig.*, 772 F. Supp. 1380, 1386
(E. & S.D.N.Y. 1991) (asbestos and its side effects), *rev'd in part on other grounds by In re
Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831 (2d Cir. 1992).

[40]  Defendants do not overtly challenge McAfee's qualifications, but BHIC and HUK do
seem to raise this issue in their reply brief, contending that McAfee's lack of "specified
expertise" in "extremely complex and risky international construction projects, the competition
for which is severely limited by the requirements of the government entity that finances the
projects" disqualifies him from testifying to cartel and auction behavior in this case.  (Reply
Eight at 14.)  BHIC cites one case for this proposition.  *See In re Air Disaster at Lockerbie Scot.*,
37 F.3d 804 (2d Cir. 1994).  There, the Court of Appeals affirmed the trial court's exclusion of
testimony from two "explosives officers with Scotland Yard who specialized in street bombings"
for several reasons.  *Id.* at 825.

>    Their testimony as to the importance of x-rays would have been cumulative since
>    similar testimony was adduced from other witnesses.  Additionally these
>    witnesses' expertise as to x-rays [used by airline baggage screening equipment]
>    was *questionable* . . . .  Neither had experience in aviation bombings or security.

the factfinder can be assisted by an expert; (3) the testimony "fit" the facts of the case, and (4) the

testimony be reliable. Fed. R. Evid. 702 Advisory Committee's Note.   The latter three criteria

follow directly from the Supreme Court's landmark decision on Rule 702 in *Daubert*.   There, the

Court directed district courts evaluating proffered experts to conduct a "preliminary assessment

of whether the reasoning or methodology underlying the testimony is scientifically valid and of

whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*,

509 U.S. at 592-93.  This assessment's objective is two-pronged: it "ensure[s] the reliability and

relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Consequently, reliability is among the Advisory Committee's four criteria.  Fed. R. Evid. 702

Advisory Committee's Note.  Its second criterion – "that the evidence or testimony 'assist the

trier of fact to understand the evidence or to determine a fact in issue'" – "goes primarily to

relevance." *Daubert*, 509 U.S. at 591.  And its third criterion, "fit," simply restates this

relevancy consideration. *Id.*  *See also United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir.

1986) ("An additional consideration under Rule 702 – and another aspect of relevancy – is

---

Moreover, neither had any background or knowledge concerning the Flight 103 bombing itself.

*Id.* (emphasis added).  By contrast, here, McAfee's testimony was not cumulative.  Moreover, it is, indeed, questionable whether street bombing experts with no experience in aviation bombings or security would demonstrate expertise in x-ray equipment used in airline baggage screening. But BHIC does not explain why McAfee's model – which accounts for the impact on competition of "a qualification stage for potential suppliers," some of whom may be "already prequalified because they have bid on other matters," (Apr. 5, 2007 PM Tr. at 76) – is too generalized to apply to "extremely complex and risky international construction projects."  The Court will not attempt to make this argument on BHIC's behalf. *See Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)) ("Judges are not expected to be mindreaders.  Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.").

whether expert testimony proffered in the case is sufficiently tied to the facts . . . that it will aid

the jury in resolving a factual dispute.").

### 1.      Relevancy

Addressing the helpfulness requirement, defendants contend McAfee testified only "to

matters of 'common sense,' which [are] not the proper subject of expert testimony."  (Reply

Eight at 12.)  A review of his direct examination reveals that defendants have committed a

frequent error of non-economists: confusing correlation with causation.  McAfee's conclusions

may, to some degree, have accorded with "common sense" notions, but this coincidence does not

necessarily imply that his conclusions *derived* from "common sense."  McAfee explained to the

jury, *inter alia*, the U.S. federal government's standard procurement process, (Apr. 5, 2007 PM

Tr. at 76-77), auction bidders' incentives to discover cost-reducing technology, both before and

after bids are submitted, in competitive and collusive processes, (*id.* at 84-87, 93-94), and the

typical equilibrium points for winning bids in oral and sealed-bid auctions, (*id.* at 104-06).  These

are precisely the sort of specialized, technical matters concerning which a lay jury may benefit

from a qualified expert's tutelage.[41]  McAfee distilled complex economic concepts into language

---

[41] A survey of other decisions admitting or rejecting testimony by such "teaching
witnesses" confirms that theoretical models of economic actors' behavior are appropriate fodder
for expert testimony. *Compare* Fed. R. Evid. 702 Advisory Committee's Note (noting teaching
expert testimony would be admissible on "how financial markets respond to corporate reports"),
*Mulder*, 273 F.3d at 101-02 (admitting teaching expert testimony on labor coalition behavior),
*Locasio*, 6 F.3d at 936 (admitting teaching expert testimony on structure and tactics of the
Mafia), *and Lipson*, 46 F. Supp. 2d at 767-68 (admitting teaching expert testimony on accounting
principles), *with United States v. Fredette*, 315 F.3d 1235, 1240 (10th Cir. 2003) (refusing to
admit teaching expert testimony on operation of rebate programs); *United States v. Stevens*, 935
F.2d 1380, 1399 (3d Cir. 1991) (refusing to admit teaching expert testimony on tendency of
clearly suggestive photo array to cause misidentification); *Patterson v. McLean Credit Union*,
805 F.2d 1143, 1147 (4th Cir. 1986) (refusing to admit teaching expert testimony comparing
credit union clerical employees' qualifications); *Green v. Kinney Shoe Corp.*, 715 F. Supp. 1122,

that would be comprehensible to the jury.  While this may have enhanced his testimony's

persuasive value, it did not render that testimony inadmissible.[42]

Continuing with the subject of relevancy, defendants offer several arguments which the

Court construes as attacking McAfee's testimony's "fit" with the facts of this case.  They focus

predominantly on McAfee's reliance on a set of assumptions in articulating his model of cartel

behavior.  (Motion Five at 39, 41; Motion Eight at 19-21.)

As set forth in McAfee's testimony, several assumptions underpinned his analytic model:

(1) the government procurement process begins with a need; (2) "there is a qualification stage for

potential suppliers" of that need; (3) the government issues a sealed-bid tender, or request for

supply, to the qualified bidders; (4) interested, qualified bidders respond by submitting sealed

_____

1124 (D.D.C. 1989) (Revercomb, J.) (refusing to admit teaching expert testimony on significance of defendant employer's use of subjective criteria in promoting employees), *and Robertson v. McCloskey*, 676 F. Supp. 351, 353-55 (D.D.C. 1988) (Green, J.) (refusing to admit teaching expert testimony on effect of time on memory quality).

[42] The Eleventh Circuit Court of Appeals' opinion in *City of Tuscaloosa v. Harcros Chemicals* illustrates the distinction between proper matters for expert testimony and "common sense" factual determinations that lie within the jury's exclusive province.  *See* 158 F.3d at 564-67.  *City of Tuscaloosa* involved an alleged conspiracy among five chemical companies "to fix prices for repackaged chlorine in Alabama in violation of both federal and state antitrust law." *Id.* at 553.  Among other experts, the plaintiffs proffered statistician James McClave.  *Id.* at 562. McClave's testimony concerning his "statistical measurements of events in the Alabama chlorine market during the period of the alleged conspiracy" was admissible, but his "assertions regarding the existence of a conspiracy, . . . his characterization of certain bids as 'signals' to co-conspirators[,] . . . and his characterizations of documentary evidence as reflective of collusion" were not.  *Id.* at 565.  As the Court of Appeals explained, "the trier of fact [was] entirely capable of determining whether or not to draw such conclusions without any technical assistance from McClave or other experts."  *Id.*
    Here, McAfee's discourse on cartel behavior and incentives aided the jurors in understanding how a cartel such as that alleged by plaintiffs might operate, in theory.  But "the trier of fact [was] entirely capable of determining" whether the factual scenario sketched by plaintiffs' other witnesses comported with this theoretical model, and McAfee properly left this analysis to the jury.  *See id.*

bids; and (5) the government "either picks the lowest priced supplier or [] negotiates with that supplier." (Apr. 5, 2007 PM Tr. at 76-77.) He then explained how, under this set of assumptions, a prospective bidder would select his bid price in a competitive auction, (*id.* at 78-90), and how he would do so in a cartel situation, (*id.* at 90-104).

As defendants correctly point out, an expert may rely on assumptions, but those assumptions must be "based on fact." *Three Crown Ltd. P'ship v. Salomon Bros.*, 906 F. Supp. 876, 893-94 (S.D.N.Y. 1995) (excluding damages expert's testimony where he assumed, *inter alia*, that one of plaintiff's investment groups – "which, by its own admission, conducted highly leveraged discretionary trading which frequently had to be adjusted to keep pace with the rapidly changing market and that mandates ever evolving opportunities for profit and loss" – would have entered a particular future line of trades). *See also Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 569 (D.C. Cir. 1993) (holding damages expert's testimony should have been excluded where he assumed that decedent would have entered a wholly new line of work).

According to the defendants, "several of McAfee's key assumptions proved to be either demonstrably wrong or contrary to the testimonial record." (Motion Five at 41.) First, they cite his "assumption" that this case involved U.S. government procurement, explaining that Egyptian authorities managed the bidding on the contracts at issue here. (*Id.*) Yet the record reflects no such assumption. McAfee merely *analogized* the auctions in the instant case to the typical government procurement process:

> Q. What is your understanding of how the procurement process that you just described generally compares to the process that took place on the contracts at issue in this case?
>
> A. Well, my general understanding is that it's similar, it's the same, that is to say, there were announced needs, there were requests for bids, the bids were

submitted.  In one case there was negotiation that followed.  My understanding is
that it matches quite well.

(Apr. 5, 2007 PM Tr. at 78.)  Defendants were free to query McAfee about this analogy on cross-

examination and to argue any dissimilarities to the jury.[43]

Defendants save their harshest criticism for McAfee's assumption "that a cartel in fact

existed amongst all the bidders on the USAID contracts," (Motion Five at 39; *see also* Motion

Eight at 20), but yet again, meticulous examination of the record reveals no such assumption.

McAfee *never* assumed that a cartel existed *in this case*.[44]  (*See, e.g.*, Apr. 5, 2007 PM Tr. at 78

---

[43] In a footnote, defendants cite certain "unique features of construction procurement" that
purportedly render McAfee's theoretical model inapplicable.  (Motion Five at 42 n.20.)  But
McAfee's model *assumes* the very sort of "complicated layered bidding and competitive
negotiation" that defendants claim "distinguish" construction procurement:

A.  Assumptions about Government procurement in particular[:] . . . usually . . .
there is a qualification stage for potential suppliers.  In some cases suppliers are
already prequalified because they have bid on other matters, but it may be open
for qualifications of new bidders.  And in some matters they actually have to
qualify fresh to supply[,] . . . [a]nd the Government typically either picks the
lowest price supplier or it negotiates with that supplier . . . .

(Apr. 5, 2007 PM Tr. at 76-77.)  This excerpt also answers defendants' complaint that
"McAfee's theory about efficient markets is undercut by the fact that CWO and USAID
eliminated competitors from the process through nationality and source requirements."  (Motion
Five at 44.)  Clearly, McAfee's model accounts for some winnowing of the competitive field
based on factors other than pure economic efficiency.

[44] Defendants also complain that "McAfee's assumption and insinuation that padding
(including payoffs) must have been built into the bids is contradicted by [] unrebutted
testimony."  (Motion Five at 42.)  Again, however, just as McAfee never assumed a cartel existed
here, he likewise never assumed that any contractor *in this case* "padded" its bid *on these
contracts*.  Rather, he testified only that in a procurement bidding process, *when* a cartel exists, a
bidder must incorporate certain, inherent costs of collusion – "any payments made to
competitors, any payments that you make to employees . . . for added risks that they might be
facing, and any payments made to subcontractors," (Apr. 5, 2007 PM Tr. at 99) –  along with his
anticipated cost of performance into his bid to avoid a net loss, (*id.* at 99-100).  In its entirety,
this testimony pertained to a hypothetical situation.  McAfee neither declared nor implied that

("Q.  And I think it was correctly pointed out before the break that you're not making a

determination . . . here about whether there was a cartel or not, correct?  A.  That's correct."); *id.*

at 127 ("Q. – but you haven't made any determination whether there is a cartel in this case.  A.  I

have not.").)  Rather, he contrasted how a procurement auction would operate under competitive

conditions with how it would operate under collusive conditions, (*see id.* at 78-104), leaving the

jury to determine which scenario best "fit" the facts in this case.

Hence, the Court concludes McAfee's testimony as a "teaching witness" educated the

jury about theoretical characteristics of collusive behavior in an auction setting and assisted them

in determining whether events in this case bore the hallmarks of such collusion.[45]  While

McAfee's model may not have mimicked the facts herein in every minute detail, it was

"sufficiently tied to the facts of the case . . . [to] aid the jury in resolving [this] factual dispute."

*See  United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1986).

---

bids on Contracts 20A, 29, and 07 had been rigged.  He simply described how, *in theory*,
collusion like that alleged by plaintiffs would have affected an analogous contracting process.

[45] In their reply brief, HII and HC argue that the Court should have excluded McAfee's
testimony under Federal Rule of Evidence 403.  (Reply Five at 24.)  Expert testimony can,
indeed, be "both powerful and quite misleading."  *Daubert*, 509 U.S. at 595.  But if otherwise
admissible, it should not be excluded under Rule 403 unless its probative value is *substantially*
outweighed by the risk of unfair prejudice.  Fed. R. Evid. 403.  The Court recognizes that
McAfee's abstract testimony on cartel behavior was, to some extent, "inherent[ly] suggestive[]."
(*See* Reply Five at 24.)  In his questions to McAfee, however, both parties reduced the risk of
unfair prejudice to the vanishing point by *repeatedly* eliciting assurances that he was *not* familiar
with the facts of this case, that he did *not* know whether collusion had occurred here or what its
results might have been, and that he did *not* purport to render an opinion on any aspect of the
underlying facts.  (*See, e.g.*, Apr. 5, 2007 PM Tr. at 60-70, 78, 126-27.)  By the end of McAfee's
testimony, this horse was dead.  Any surviving vestige of unfair prejudice did not substantially
outweigh the significant probative value of McAfee's testimony. In short, McAfee explained how
a cartel like that alleged by plaintiffs would theoretically have functioned, and the jurors could
then compare the facts in evidence against McAfee's theoretical model, noting the similarities
and differences.  His testimony was highly probative and admissible under Rule 403.

2.        **Reliability**

"[T]he test of reliability is 'flexible,' . . . [and] the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho*, 526 U.S. at 141-42.  Defendants nonetheless contend the Court exceeded this broad latitude in admitting McAfee's testimony, which they claim was not "the product of reliable principles and methods" as required by Rule 702.[46]  (Motion Eight at 21-

---

[46] Defendants' complaint that McAfee "applied *no* principles or methods to the evidence" mistakes McAfee's role as a "teaching witness."  (*See* Motion Five at 42-43.)  For example, they point out that McAfee "presumably could have employed a methodology to determine whether there was a cartel at work in this case . . . and whether the most efficient firm won the bidding." (*Id.* at 42.)  Had his testimony relied on facts and data admissible in evidence in this case, defendants' presumption would likely be correct.  But in introducing McAfee's testimony, plaintiffs followed the "venerable practice of using expert testimony to educate the factfinder on general principles."  *See* Fed. R. Evid. 702 Advisory Committee's Note.  Defendants cannot obtain a new trial based on plaintiffs' entirely permissible strategic choice to use McAfee in this capacity.

This same reasoning applies to defendants' criticism that McAfee "failed to account for alternative explanations for the profits achieved on the USAID projects." (Motion Five at 42 n.31.)  Had McAfee testified that collusive behavior *by these defendants* accounted for their profits *on these contracts*, then he should have accounted for possible alternative explanations. *See, e.g.*, *Claar v. Burlington N.R.R.*, 29 F.3d 499, 502 (9th Cir. 1994).  But plaintiffs asked him to testify only about collusive behavior in auction settings generally, without seeking to label defendants' behavior in this case.  Defendants were free to present alternative explanations for the profits they earned to the jury, through expert testimony or other evidence.  Plaintiffs had no duty to do so on their behalf.

Further, defendants' allegation that "a substantial analytic gap exist[ed] between the data and the opinion proffered" goes to the weight of the evidence, not its admissibility. (*See* Motion Five at 42.)  If, indeed, McAfee's testimony addressed only "how efficient players theoretically act in an efficient market," (*id.*), then the inefficiencies defendants imply existed would detract from, but not destroy, his testimony's relevance.  When an expert purports to draw conclusions about what happened in a case, his opinion must hew closely to the facts.  *See, e.g.*, *Groobert v. Pres. & Dirs. of Georgetown Coll.*, 219 F. Supp. 2d 1, 9-10 (D.D.C. 2002) (Urbina, J.) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  But where, as here, the expert endeavors only to educate jurors about general principles, his testimony need only be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  *See Downing*, 753 F.2d at 1242.

23, 24-25.)

Though "[m]any factors will bear on the [reliability] inquiry," in *Daubert*, the Supreme

Court offered "some general observations" on the subject.  509 U.S. at 593.  Whether a theory or

technique has been tested, whether it has been subjected to peer review and publication, its

potential rate of error, and its "general acceptance" may all bear on its reliability.  *Id.* at 593-94.

As the Court emphasized in *Kumho*, however, a trial court has "considerable leeway in deciding

in a particular case how to go about determining whether particular expert testimony is reliable,"

and in doing so, it may consider any "reasonable measures" of that testimony's reliability.  526

U.S. at 152.

Because McAfee confined his testimony to general economic theory – in defense

counsel's words, "vanilla economics," (Apr. 5, 2007 PM Tr. at 125) – the Court believes two

factors discussed in *Daubert* are particularly "reasonable measures" by which to evaluate his

testimony's reliability, *see* 526 U.S. at 152.  First, according to McAfee's unrebutted statements,

his theories on auctions have formed the subject of over twenty peer-reviewed articles and

numerous other publications.  (Apr. 5, 2007 PM Tr. at 52-54.)  Second, though he did not

specifically describe the provenance of each portion of his testimony, it avowedly embodied

basic principles taught in undergraduate economics courses, which indicates the theories he

expounded are generally accepted in the field of economics.  (*See id.* at 125.)  Indeed, McAfee's

credentials rendered him supremely well-qualified to testify on generally-accepted economic

principles: he holds a Ph.D. and has taught at Purdue University, the University of Western

Ontario, the University of Texas, and the California Institute of Technology, where he currently

heads the economics department.  (*Id.* at 50-51.)  In light of these circumstances, the Court finds

38

McAfee's testimony was reliable, as required by *Daubert* and Rule 702.[47]

Because McAfee's testimony as a "teaching witness" satisfied both Rule 702's criteria and *Daubert*'s reliability and relevancy requirements, its admission was proper.

### D.    Jury Instructions

Defendants next challenge several jury instructions.[48]   A district court enjoys broad discretion in crafting language for jury instructions.   *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 556 (D.C. Cir. 1993).  Hence, "[t]he standard for determining whether an erroneous jury instruction mandates a new trial is the general harmless error standard."  *In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 89 (D.D.C. 2006) (Hogan, C.J.) (citing *Williams*

---

[47] Defendants point to McAfee's admission that his own empirical studies have not uniformly confirmed certain of his conclusions – namely, that in an article entitled "Collusive Bidding in Hostile Takeovers," McAfee and his co-authors described a bidding cartel's "negligible effect on the target's share price."  (Apr. 9, 2007 PM Tr. at 38-42.)  This contrary empirical result does cast some doubt on the value of McAfee's model.  (*See, e.g.*, Apr. 5, 2007 PM Tr. at 94-95 ("The purpose of bid-rigging is to . . . charge higher prices.").)  But as McAfee subsequently explained, collusion among bidders in a hostile takeover situation is *legal* in the United States, which differentiates the data examined in his paper from the principles he discussed in his direct testimony.  (*Compare* Apr. 9, 2007 PM Tr. at 51-52 *with* Apr. 5, 2007 PM Tr. at 99-100.)  In McAfee's cartel model, collusion was illegal, and this illegality influenced bidders' behavior.
Though defendants also highlight McAfee's failure to empirically study European construction industry cartels, (*see* Motion Eight at 22), this argument is specious in light of McAfee's other qualifications.

[48] HII and HC incorporate by reference, in full, their written objections to plaintiffs' proposed jury instructions [828] and their objections on the record.  (Motion Five at 23.) Contrary to defendants' assertion, the Court did not adopt plaintiffs' proposed instructions "wholesale," and those instructions underwent several substantive revisions before they were read to the jury.  The Court will not comb through defendants' prior filing to determine which objections remain pertinent.  Second, and similarly, the Court will not examine the record line by line to identify all of defense counsel's objections to jury instructions.  To the extent any such objections, whether in writing or in open court, survived the instructions' revisions and are not articulated in defendants' present briefs, the Court reaffirms its prior rulings on them.

*v. U.S. Elevator Corp.*, 920 F.2d 1019, 1022 (D.C. Cir. 1990)).

### 1.    "Knowingly"

Both substantive FCA provisions alleged in plaintiffs' complaint provide for liability only

when the defendant acts "knowingly."  31 U.S.C. § 3729(b)(1), (2) (2008).  In relevant part, this

Court defined "knowingly" for the jury as follows:

> . . . that a defendant, with respect to information: One, had actual knowledge of
> the information; or two, acted in deliberate ignorance of the truth or falsity of the
> information; or three acted in reckless disregard of the truth or falsity of the
> information . . . .  Plaintiffs may establish that a defendant had knowledge through
> circumstantial evidence . . . .  If it appears from the evidence in the case that a
> defendant or defendants had information which would lead a reasonably prudent
> person to make an inquiry through which he would have surely learn[ed] certain
> facts, then the defendant or defendants may be found to have had actual
> knowledge of these facts, the same as if the defendant or defendants had made
> such inquiry and had actually learned such facts.

(May 4, 2007 PM Tr. at 48-49.)  Defendants suggest this last sentence, referring to "reasonable

inquiry," reduced the knowledge standard to one of mere negligence.  (Motion Five at 24.)

Yet the FCA's *scienter* requirement clearly embraces the very circumstances the Court

described.  According to Judge Oberdorfer, Congress placed reckless disregard among the three

alternative *scienter* tests in the FCA "to address the refusal to learn of information which an

individual, in the exercise of prudent judgment, should have discovered."  *United States ex rel.*

*Ervin & Assocs., Inc. v. Hamilton Sec. Group*, 370 F. Supp. 2d 18, 42 (D.D.C. 2005).  Thus, the

FCA imposes liability "not just [on] those who set out to defraud the government, but also [on]

those who ignore obvious warning signs."  *Crane Helicopter Servs., Inc. v. United States*, 45

Fed. Cl. 410, 433 (Fed. Cl. 1999).  *See also United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir.

1997) ("the best reading of the Act defines reckless disregard as an extension of gross

negligence").  The statute's legislative history confirms this reading.  When Congress amended

the FCA in 1986, adding the word "knowingly," the accompanying Senate Report noted that "those doing business with the Government have an obligation to make a limited inquiry to insure that the claims they submit are accurate."  S. Rep. No. 99-345, at 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5272.[49]  These authorities confirm it was not error for this Court to instruct the jury that failure to inquire when known facts reasonably compel such inquiry falls within the FCA's definition of "knowledge."[50]

### 2.      Conspiracy

The Court instructed the jury at length on the definition and elements of conspiracy, (*see* May 4, 2007 AM Tr. at 48, 58-65), and defendants point to several alleged errors in these instructions, two of which merit discussion.[51]

---

[49] The report elaborates further:

> In fashioning the appropriate standard of knowledge for liability under the civil False Claims Act, S. 1562 adopts the concept that individuals and contractors receiving public funds have some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek.  A rigid definition of that "duty," however, would ignore the wide variance in sophistication of program recipients.  Consequently, S. 1562 defines this obligation as "to make such inquiry as would be reasonable and prudent conduct under the circumstances to ascertain the true and accurate basis of the claim."  Only those who act in "gross negligence" of this duty will be found liable under the False Claims Act.

S. Rep. No. 99-345, at 20 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5285.

[50] Even if the law will not construe a defendant's failure to make reasonable inquiry as actual knowledge, any error was harmless.  As Judge Oberdorfer stated in *Ervin*, section 3729(b)'s knowledge standard embraces "the refusal to learn of information which an individual, in the exercise of prudent judgment, should have discovered."  *See* 370 F. Supp. 2d at 42. Whether imprudent failure to discover information connotes reckless disregard, as in *Ervin*, or actual knowledge, as this Court instructed, it satisfies the FCA's "knowingly" definition.

[51] Three other complaints blatantly contradict the record.  First, defendants assert the Court imposed "liability for acts of co-conspirators absent the required showing of

First, defendants assert that the Court failed to instruct or improperly instructed the jury as to the intent and/or knowledge necessary to join a conspiracy. (Motion Eight at 29-31.) In their view, the Court's instructions reduced the standard to gross negligence when specific intent was required. (Reply Eight at 24.) In fact, the Court twice explained in its charge that to find a particular defendant liable for conspiracy, the jury must find that the defendant "willfully became a member of the conspiracy." (May 4, 2007 AM Tr. at 59, 60.) Defendants do not contend this instruction misstated the law, nor can they.[52] *See*, *e.g.*, *United States v. White*, 116 F.3d 903, 927

---

foreseeability." (Motion Five at 27.) But the Court clearly instructed the jury: "A participant in a conspiracy . . . is liable for the acts of his co-conspirators . . . as long as those acts were reasonably foreseeable." (May 4, 2007 AM Tr. at 63.) Second, defendants claim this Court "failed to instruct on the clearly applicable intra-corporate conspiracy doctrine." (Motion Five at 27.) Yet the Court in fact instructed on this very doctrine: "no . . . conspiracy is possible under the law between corporations that are commonly owned and controlled and that regularly conduct their business affairs in such a manner as to constitute, in effect, a single business entity or enterprise." (May 4, 2007 AM Tr. at 62.) This quotation from the record also answers defendants' third complaint, that the Court was "willing[] to permit the jury to conclude that HC and HII were simultaneously co-conspirators and alter-egos." (Motion Five at 27.) Juxtaposed with portions of the alter ego definition – "a parent corporation is the principal stockholder of a subsidiary corporation and conducts its business . . . [and] the parent corporation has . . . conducted the subsidiary's business [such that] its business interests and the parent corporation's interests cannot be reasonably separated," (*id.* at 57) – this instruction clarified that HC and HII could not be both co-conspirators and alter egos.

Additionally, defendants claim the Court instructed "that receipt of a benefit is 'simply irrelevant' to whether a party agreed to conspire," and that this statement conflicts with Supreme Court precedent. (Motion Five at 26.) This critique misstates the record, (*See* May 4, 2007 AM Tr. at 63), and mischaracterizes dicta as a holding, *see Direct Sales Co. v. United States*, 319 U.S. 703, 713 (1943). But even if it were entirely accurate, receipt of a benefit would still be *inessential* to a conspiracy. *See*, *e.g.*, *United States v. Shoup*, 608 F.2d 950, 956-57 (3d Cir. 1979) (explaining why "a stake in the venture" is not an essential element of conspiracy).

[52] HII and HC's motion misreads the Court's instructions on willfulness. First, they claim the Court instructed that as to subsection (a)(3), "intent is unnecessary, and [] '[k]nowledge is all that is required under the act.'" (Motion Five at 26.) In fact, the Court made these statements while defining "knowingly," the mental state specified in subsections (a)(1) and (a)(2). (*See* May 4, 2007 AM Tr. at 48.) They further claim the Court instructed that willfulness was merely "sufficient" but not necessary to impose liability under subsection (a)(3). (Motion Five at 26.)

(D.C. Cir. 1997); *United States v. Yunis*, 924 F.2d 1086, 1096 (D.C. Cir. 1991).

Instead, they suggest the charge was misleading because it was not given coincident with the elements of a FCA conspiracy claim, but rather along with several pages of instructions on conspiracy generally, and because it failed to define "willfully," which the jury allegedly could have confused with the Court's definition of "knowingly."[53]  (Motion Eight at 30-31.)  Like the trial to which they pertained, the jury instructions in this case were quite lengthy, but they were not so convoluted as to induce confusion.  When the Court read the applicable provisions of the FCA, it listed their elements in accordance with the statute.  (May 4, 2007 AM Tr. at 46-48.)  In particular, it listed the first element of subsections (a)(1) and (a)(2) as "the defendant knowingly."  (*Id.* at 46, 47.)  By contrast, the Court listed the first element of subsection (a)(3) as "the defendant conspired with one or more persons."  (*Id.* at 48.)  The Court later separately defined "knowingly" and "conspired."  (*Id.* at 49-50, 59.)  While the Court could certainly have ordered these instructions differently, the order it followed was logical and within its broad discretion.  *See Joy*, 999 F.2d at 556.

Second, defendants assert the Court improperly omitted damages as an essential element of FCA conspiracy.  (Motion Eight at 28 n.16.)  They cite this Court's Memorandum Opinion & Order of March 7, 2007 [613] listing damages as an element, which in turn cited its opinion in *United States v. Bouchey*, 860 F. Supp. 890, 893 (D.D.C. 1994).  Notwithstanding this Court's

---

The record reflects no such instruction.  (*See* May 4, 2007 AM Tr. at 59-60.)

[53] It appears that defendants have adopted contradictory premises: they claim the jury *must* have assumed the definition of "knowingly" applied to the word "willfully," even though they are separated by a full nine pages in the transcript, but could not have associated "willfully" with FCA conspiracy *because* the two instructions were separated by nine transcript pages.

language in *Bouchey*, other courts have concluded that damage to the government is *not* an essential element of FCA conspiracy.  *See, e.g.*, *United States ex rel. Finney v. NextWave Telecom, Inc.*, 337 B.R. 479, 489 (S.D.N.Y. 2006); *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, No. 94-7316, 2004 U.S. Dist. LEXIS 14532, at *13 (E.D. Pa. July 28, 2004); *United States v. St. Luke's Subacute Hosp. & Nursing Centre, Inc.*, No. C 00-1976, 2004 U.S. Dist. LEXIS 25380, at *15 (N.D. Cal. Dec. 16, 2004); *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 331 (S.D.N.Y. 2004).  Moreover, given that the jury specifically found the government suffered damage on each contract, any error was clearly harmless.

### 3.      Imputed Knowledge

The Court also instructed the jury on imputed knowledge and collective imputed knowledge.  (May 4, 2007 AM Tr. at 54-55.)  Defendants insist this instruction was flawed because it "was incomplete in that it failed to state that knowledge may be imputed *only* if the agent is acting with the intent to benefit the principal."  (Motion Five at 24.)

"As a general rule, knowledge acquired by a corporation's officers or agents is properly attributable to the corporation itself."  *BCCI Holdings, S.A. v. Clifford*, 964 F. Supp. 468, 478 (D.D.C. 1997) (Green, J.).  *Accord United States v. Sun-Diamond Growers of Cal.*, 964 F. Supp. 486, 491 n.10 (D.D.C. 1997) (Urbina, J.) ("knowledge obtained by a corporate agent acting within the scope of his employment is imputed to the corporation").  Several exceptions to this rule exist, such as where

> the officer or agent is "adversely interested" to the corporation.  This exception
> follows logically from the rule's purpose.  It cannot be presumed that an officer or
> agent will communicate knowledge to a corporation where "it is to the agent's
> own interest not to impart the knowledge to the principal."

*BCCI Holdings, S.A.*, 964 F. Supp. at 478 (internal citations omitted).  Defendants' first

complaint implicates this "adverse agent" exception.

Yet because the rule endeavors "to protect third parties . . . not [] to serve 'as a shield for unfair dealing,'" the exception "applies only to fraud *against* the corporation, not to fraud *on behalf of* the corporation." *Id.* (citing *FDIC v. Ernst & Young*, 967 F.2d 166, 171 (5th Cir. 1992)). Indeed, according to our Court of Appeals,

> [t]he Supreme Court has held that if a company's agents withhold knowledge from it, even fraudulently, that fact "cannot alter the legal effect of their acts or of their knowledge with respect to the company in regard to third parties who had no connection whatever with them in relation to the perpetration of the fraud, and no knowledge that any such fraud had been perpetrated."

*Bowen v. Mount Vernon Sav. Bank*, 105 F.2d 796, 799 (D.C. Cir. 1939) (quoting *Armstrong v. Ashley*, 204 U.S. 272, 283 (1907)). *Bowen* admittedly involved very different facts from those in the instant case, but the Court of Appeals' skeptical commentary on the adverse agent exception is worth repeating:

> The so-called presumption that the principal knows what the agent knows is irrebuttable; it cannot be avoided by showing that the agent did not in fact communicate his knowledge. It should follow that it cannot be avoided by showing that the agent had such an adverse interest that he would not be likely to communicate his knowledge.

*Id.*

Here, considering that the corporate defendants all benefitted (at least in the short term) from the actions of their allegedly adverse agents – they obtained high-priced construction projects funded by the United States government, and according to the jury's verdict, charged the government significantly more than it would otherwise have paid – these same defendants cannot avoid imputation of their agents' knowledge in a suit by the defrauded third party, the United States. The Court concludes its omission of defendants' proposed qualifying language –

45

"knowledge may be imputed *only* if the agent is acting with the intent to benefit the principal" –

was not error.

Next, defendants contend the FCA does not permit collective knowledge imputation.[54]

Yet in the FCA case they cite for this proposition, the court simply concluded *those facts* did not

"warrant the use of the collective corporate knowledge doctrine."  *United States v. United Techs.*

*Corp.*, 51 F. Supp. 2d 167, 199 (D. Conn. 1999).  And while the seminal case discussing this

doctrine involved corporate criminal liability, *United States v. Bank of New England, N.A.*, 821

F.2d 844, 856 (1st Cir. 1987), the doctrine has been applied in the civil context as well, and in

this Circuit, *see United States v. Phillip Morris USA, Inc.*, 449 F. Supp. 2d 1, 893-95 (D.D.C.

2006) (Kessler, J.).  Absent any authority to the contrary, the Court concludes its instruction on

the collective knowledge doctrine was not improper.[55]

---

[54] Defendants also argue that no factual basis for a collective imputed knowledge instruction existed.  (Motion Five at 25 n.10.)  The factual riposte to this argument is set forth below.  *See infra* part III.A.1.a.iv.

[55] Defendants characterize the doctrine's application here as "a judicial repeal of Section 3729(b)'s definition of 'knowing.'" (Reply Five at 15.)  They propose that the jury could have conflated the collective imputed knowledge instruction with the Court's (allegedly) flawed definition of "knowingly" to hold HII liable for an "amalgamation of attributed information" of which its agents were "negligently unaware." (Motion Five at 25 n.11.)  As explained above, any error in the Court's definition of "knowingly" was harmless.  *See supra* part II.D.1.  Further, defendants' critique ignores the public policy rationale for the collective knowledge doctrine:

> Corporations compartmentalize knowledge, subdividing the elements of specific duties and operations into smaller components.  The aggregate of those components constitutes the corporation's knowledge of a particular operation.  It is irrelevant whether employees administering one component of an operation know the specific activities of employees administering another aspect of the operation.

*Bank of New England*, 821 F.2d at 856.  This rationale applies with equal force when the "operation" consists of defrauding the federal government, and it is in no way incompatible with

4.        **Imputed Liability**

Because five of the six defendants at trial were corporations, the Court instructed the jury

on multiple theories of imputed liability.  (*See* May 4, 2007 AM Tr. at 52-58 (discussing, *inter*

*alia*, respondeat superior, agency, joint venture, apparent authority, imputed knowledge,

collective imputed knowledge, and alter ego).)  Defendants characterize these instructions as

"repetitive" but do not specifically indicate which among the imputed liability instructions could

have been excluded as purely redundant.[56]  (Motion Five at 25-26.)  And even had they done so,

"the mere fact that an instruction is repetitive is not a basis for reversal, as long as the legal

principles it enunciates are correct."  *Lewy v. S. Pac. Transp. Co.*, 799 F.2d 1281, 1299 (9th Cir.

1986).  Indeed, to constitute grounds for a new trial, repetitious instructions must be grossly

prejudicial.  *See*, *e.g.*, *Howard v. Cincinnati Sheet Metal & Roofing Co.*, 234 F.2d 233, 236 (7th

Cir. 1956) ("The jury was told twenty times 'your verdict should be for the defendant,' 'plaintiff

cannot recover,' 'defendant would not be liable' and 'defendant would not be guilty of

negligence.' . . . [T]he instructions as a whole unduly emphasized defendant's version of the case

_____

section 3729(b).  Indeed, the two appear complementary.  The Senate Report accompanying the 1986 FCA amendments explains that the Act's definition of "knowingly" endeavors "to reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand.'"  S. Rep. No. 99-345, at 21 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5285. Analogously, the collective knowledge doctrine ensures that "a corporation cannot plead innocence by asserting that the information obtained by several employees was not acquired by any one individual employee who then would have comprehended its full import," *United States v. T.I.M.E.-D.C., Inc.*, 381 F. Supp. 730, 738 (W.D.W. Va. 1974) – i.e., that each individual employee had "buried his head in the sand."

[56] In the course of giving these instructions, the Court could – as defendants suggest – have limited them to specific facts, circumstances, or parties, but defendants offer no authority suggesting it was required to do so.  Moreover, considering that defendants believe the imputed knowledge instructions, as read, "occupied a disproportionate percentage of the Court's total charge," this would hardly have helped matters.

47

. . . ."). It is well established that federal civil plaintiffs may pursue multiple theories of liability,

and where the evidence establishes an adequate factual basis, the Court may properly instruct on

them. *See*, *e.g.*, *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 125 (3d Cir. 1999).

Defendants cannot gain a second bite at the apple by arguing otherwise.[57]   Hence, to the extent

---

[57] HC and HII also raise several challenges to the Court's alter ego instruction. They first challenge the instruction's wording as misstating the law, (Motion Five at 27), but they have waived this particular issue: after defense counsel represented – without drawing an objection – that the parties had "reached agreement on the language," the Court accepted HII and HC's Supplemental Proposed Jury Instruction Number 2 in lieu of plaintiffs' alter ego instruction, (*see* May 3, 2007 PM Tr. at 75-77).
   Second, they contend alter ego is an issue of law for the court, rather than one of fact for the jury, but this argument fares no better than it did pretrial. This Court explained in its Memorandum Opinion & Order of March 20, 2007 [737], denying HII and HC's motion *in limine*:

> In light of the fact-specific nature of the determination, the Court finds that an alter ego analysis is a matter for the jury . . . . Moreover, there is nothing in *Labadie Coal* that creates a requirement that the *court* must determine alter ego liability. *See Labadie Coal*, 672 F.2d at 92. In fact, the issue was decided by the court in *Labadie Coal* only because this was not a case where the jury was a trier of fact as to any issue. *Id.* Finally, as shown by *Dorocon, Inc. v. Burke*, Civ. No. 02-2556 (CKK), 2005 WL 3454338, at *2, *15 (D.D.C. 2005) (Kollar-Kotelly, J.), a jury *may* hear and resolve an issue of liability on a veil piercing theory.

(Mem. Op. & Order of Mar. 20, 2007 [737] at 2-3.) The Court stands by its original ruling.
   Third, they argue no legally sufficient evidentiary basis for the instruction existed. (Motion Five at 27.) Under *Labadie Coal*, to succeed on an alter ego claim, a plaintiff must demonstrate: 1) a "unity of interest and ownership" between parent and subsidiary such that their "separate personalities . . . no longer exist"; and 2) that an inequitable result will follow unless the corporate veil is pierced. 672 F.2d at 96. The Court agrees with HC's argument, articulated more fully in its renewed motion for judgment as a matter of law, that the government introduced only minimal evidence on these points. (*See* Motion Three at 7-14; Reply Three at 25-27.) But defendants never explain how the allegedly unwarranted alter ego instruction caused such prejudice as to comprise "a clear miscarriage of justice." *Wild v. Alster*, 377 F. Supp. 2d 186, 189 (D.D.C. 2005) (Walton, J.). In fact, plaintiffs offered ample evidence from which the jury could reasonably have found HC liable on either or both of their other pleaded theories – conspiracy and/or "caused to be presented." *See infra* part III.A.1.a.ii. Hence, any error was harmless.

any of defendants' challenges to the jury instructions succeeds, the error was harmless and does
not compel a new trial.

### E.    Admission of Evidence Contrary to Stipulation

On the record during trial, the parties jointly stipulated that: "BHIC did not exist at the
time Contracts 20A, 29, 07 were bid or entered into."  (Apr. 25, 2007 PM Tr. at 36-37.)  "The
general rule is that parties are bound by stipulations voluntarily made . . . ."  *Farmers Coop.
Elevator Ass'n Non-Stock of Big Springs, Neb. v. Strand*, 382 F.2d 224, 231 (8th Cir. 1967).
Further, "stipulations of fact fairly entered into are controlling and conclusive, and courts are
bound to enforce them."  *Mobil Exploration & Producing U.S., Inc. v. NLRB*, 200 F.3d 230, 234
n.1 (5th Cir. 1999) (citations omitted).  *Accord Fisher v. First Stamford Bank & Trust Co.*, 751
F.2d 519, 523 (2d Cir. 1984) ("stipulation of fact that is fairly entered into is controlling on the
parties and the court is bound to enforce it").

BHIC claims the Court permitted plaintiffs to contradict the quoted stipulation by
introducing Plaintiffs' Exhibit 682, BHIC's pre-qualification application for a contract not at
issue here.  (Motion Eight at 26-28.)  Though defendants initially objected to the exhibit's
admission on authentication grounds, (Apr. 12, 2007 AM Tr. at 63-66), the parties subsequently
stipulated to its admissibility, and the Court received it "without objection," (Apr. 25, 2007 AM
Tr. at 126).  Hence, BHIC has waived any challenge to this exhibit.[58]  Defendants also point to a

---

[58] Though defendants now insist they stipulated only to the document's authenticity,
(Reply Eight at 20 n.11), they did not qualify their stipulation on the record, (*see* Apr. 25, 2007
AM Tr. at 126).  Furthermore, while defendants read the document to "impl[y] that BHIC had
been in existence since 1986," (Motion Eight at 27), the exhibit was relevant for unrelated
reasons.  For example, it was evidence that BHIC performed work on Contracts 20A and 07:
"We recently completed Contract 20A in Cairo . . . and are currently constructing . . . Contract 07
in Alexandria, Egypt." (Pl.'s Ex. 682.)

question relator's counsel posed to Alf Hill[59] and to a statement by government counsel in

closing argument[60] as contradicting the stipulation.  Considered in context, however, these short

---

[59] The exchange progressed as follows:

Q. . . . This is a prequalification application, right?
A. That's correct.
Q. For June 1992?
A. That's correct.
Q. And the company submitting it is BHIC?
A. That's correct.
Q. And it's for Contract 35?
A. That's correct.
. . .
Q. Now the last paragraph, could you read that for me, please, for the jury?
A. Bill Harbert International Construction, Inc., was incorporated as BLH
Enterprises, Inc., on June 10, 1986, in the State of Alabama.  On December 9,
1991, the name was changed to Bill Harbert International Construction, Inc.
Q. Okay.  So according to this document which was submitted to the government,
BHIC existed since 1986, right?
A. Yes.
Q. It just had a different name apparently, right?
A. I don't know.  It's a different name.  I don't know if it's the same company.

(Apr. 12, 2007 AM Tr. at 55-57.)

[60] Government counsel argued:

Now . . . why are we suing BHIC? . . . Now, what I want you to do to answer that
question is look at a document that BHIC . . . submitted to the United States
government. . . .

Now you look at [page] 19A, the paragraph that's entitled "Company
Background." . . .

According to Mr. Lavine, what this should say is Alan Hall is out buying paper
and folders and staplers and, you know, going off to Staples and Office Depot to
get the office set up.  But what it says is, "Bill Harbert International Construction,
Inc. was incorporated as BLH Enterprises on June 10th, 1986, in the state of
Alabama.  On December 9, 1991, the name was changed to Bill Harbert
International Construction, Inc."

blurbs merely supported plaintiffs' theory that BHIC was effectively indistinguishable from BLH

Enterprises, an entity that *did* exist at "the time [when] Contracts 20A, 29, 07 were bid or entered

into." As they explain in their opposition:

> Plaintiffs do not dispute that at the time the contracts at issue were bid or entered
> into BHIC by the name of BHIC did not exist. However, the evidence at trial
> established that a company named BLH Enterprises was originally formed in 1986
> and ultimately became BHIC in 1992. BLH Enterprises, just like BHIC, was
> 100% owned by Bill L. Harbert. The evidence showed that one of the principal
> purposes of the reorganization and name change from BLH Enterprises to BHIC
> was to create a company that would hold ownership in, and provide support
> services to Bilhar.

(Opposition Eight at 12 n.9.)   This position is not inconsistent with the stipulation that BHIC did

not exist prior to 1992, and the Court did not breach its duty in permitting plaintiffs to argue it.[61]

---

> So BHIC was in existence at the time Bill Harbert, Roy Anderson, and Tommy
> Kitchens were doing what they were doing rigging the bids, dealing with the
> profits on Contract 20A, 07, 29. That's what they told CWO.

> Now just to add to this history, we look at page 22. This was what BHIC says
> again . . . . It says, "We've recently completed – "we," and that means BHIC –
> Contract 20A in Cairo and are currently constructing Contract 27 in Cairo and
> Contract 07 in Alexandria, Egypt."

(May 3, 2007 AM Tr. at 67-69.)

[61] Nor did the Court err in refusing defendants' requests for curative instructions (*See*
May 3, 2007 AM Tr. at 107, 108.) Though the distinction does rely to some extent on semantics,
plaintiffs did *not* stipulate that neither BHIC *nor any predecessor company* existed "at the time
Contracts 20A, 29, 07 were bid or entered into." Plaintiffs did *not* seek to disprove the stipulated
fact that BHIC did not exist prior to 1992. Rather, they sought to prove that BHIC, by its own
admission, is a direct outgrowth of an entity that *did* exist when the bid-rigging occurred. The
Court does not take lightly BHIC's concern about its counsel's credibility with the jury. (*See*
Motion Eight at 28-29.) Yet the Court has confidence that after hearing testimony concerning the
complex corporate restructuring from which most of these defendants emerged, the jury was able
to appreciate the distinction between plaintiffs' argument and the stipulated fact.

Additionally, "a curative instruction that Plaintiffs were asserting no claims that BHIC
made misrepresentations to the government on Contract 35" was also unnecessary. (*See* Motion
Eight at 28 n.15.) Plaintiffs never argued such a claim to the jury, and "Contract 35" appeared

### F.        Judicial Bias

Defendants next seek a new trial based on an alleged appearance of judicial bias created by this Court's comments, questions, and evidentiary rulings.  (Motion Eight at 9-18.)  In evaluating this claim, the Court "consider[s] the record as a whole, not merely isolated remarks."[62]  *Newman v. A.E. Staley Mfg. Co.*, 648 F.2d 330, 334-35 (5th Cir. 1981).

"A trial judge is not required to sit mute in the courtroom and merely wield his gavel as moderator."  *United States v. Jackson*, 627 F.2d 1198, 1206 (D.C. Cir. 1980), *overruled in part on other grounds by United States v. Lipscomb*, 702 F.2d 1049, 1053-54 (D.C. Cir. 1983).  Rather, a judge may "interrogate witnesses," Fed. R. Evid. 614(b), "when he deems that the end of justice may be served thereby and for the purpose of making the case clear to the jurors," *Griffin v. United States*, 164 F.2d 903, 904 (D.C. Cir. 1947).  Though they should not ask "questions that signal their belief or disbelief of witnesses," *United States v. Tilghman*, 134 F.3d

---

nowhere on the verdict form.

[62] As defendants correctly note, "[t]he influence of a trial judge on the jury is necessarily and properly of great weight."  *Quercia v. United States*, 289 U.S. 466, 470 (1933).  Yet twice during the trial – at the opening and close of the evidence – this Court instructed the jury:

> You should not infer or conclude from any ruling or other comment that I make that I have any opinion on the merits of the case favoring one side or the other.  I do not favor one side or the other. . . . During the course of the trial I may ask a question of a witness.  You should not take my questions to witnesses as [] any indication as to my opinion of how you should determine the facts.  If I say or do anything at any time during this case, including giving these instructions[,] which seem[s] to indicate my opinion on any of the evidence, then I instruct[] you to disregard that indication.  Nothing I say or do should influence or suggest to you that I favor any party in this case.  I did not mean to express or suggest any opinion about which witnesses should be believed or which facts are established.

(Mar. 20, 2007 AM Tr. at 20-21, 23.  *See also* May 4, 2007 AM Tr. at 27 (near-identical language).)  If such instructions were *entirely* futile, courts would not give them.

414, 416 (D.C. Cir. 1998), "[j]udges enjoy broad latitude regarding the type of questions asked

and the extent of their questioning," *United States v. Stover*, 329 F.3d 859, 868 (D.C. Cir. 2003).

Considered in context, the Court's challenged questions and comments did not exceed

this "broad latitude."  First, during Ernest Teal's testimony, relator's counsel queried him about a

proposed audit of Contract 20A.  (Mar. 28, 2007 AM Tr. at 47-55.)  According to Teal, he "had

determined that we needed to go take a look at" Contract 20A but never followed through with

an audit because a superior, Jurgen Schoenwasser, directed him not to do so.  (*Id.* at 47, 49.)

Relator's counsel asked Teal whether "any other superior [had] ever[] overruled [his] decision to

conduct an audit," to which Teal responded negatively.  (*Id.* at 54.)  This Court then asked,

"That's like a red flag to a bull, isn't it, to an auditor[]?"  (*Id.*)  Teal answered, "To me it was,

yes, sir."  (*Id.* at 55.)  Defendants insist the Court's question "clearly told the jury that the Judge

believed there was something sinister in the cancellation of the audit."[63]  (Motion Eight at 11.)

Yet the Court simply asked *Teal* if – in light of his auditor's training – *he* found something amiss

in Schoenwasser's order.  Teal was free to disagree, and defendants had ample opportunity to

cross-examine on this point (and did).

Second, after a lengthy cross-examination concerning the revised engineer's estimate on

Contract 20A, the Court asked Michael Gould a series of questions:

> THE COURT: Do you know if it was the same people that did the May estimate
> as did the October estimate for AMBRIC?

---

[63] Absent the Court's question, defendants suggest the jury could reasonably have
concluded "there was no significance to the lack of an audit."  (Motion Eight at 11.)  But this
alternative interpretation is not altogether plausible: while Teal's testimony suggested that an
audit might have been more productive after the job was done, or at least once work had started,
these timing considerations would not explain why Schoenwasser refused Teal's offer to
reschedule.  (*See* Mar. 28, 2007 AM Tr. at 52, 92-93.)

THE WITNESS: I do believe that's true, Your Honor . . . .
THE COURT: Wasn't it unusual, in your experience, for the bids to come back at double [] the original engineer's estimate . . . ?
THE WITNESS: Yes, we thought that was very unusual.
THE COURT: Ever happen before?
THE WITNESS: We've had bids come in considerably higher than the engineer's estimate, but I don't recall having them come in double.

(Apr. 5, 2007 AM Tr. at 81.)  Defendants contend this exchange "suggested to the jury that the

Judge discounted the original . . . estimate, rejected the fully developed AMBRIC estimate . . .

and viewed the [revised engineer's] estimate to be the proper one for comparison."  (Motion

Eight at 12.)  Objectively, however, the Court's questions do not bear this interpretation.  Rather,

they helped the jury to put the discrepancies among the bids and estimates in proper context.[64]

Third, defendants argue the Court's interaction with plaintiffs' expert demonstrated that

the Court believed the winning bids on all contracts must have been inflated, and that a bid-

rigging conspiracy existed.  (Motion Eight at 13.)  Each question or comment that defendants

cite, however, did nothing more than provide helpful clarification to the jury.[65]

---

[64] To wit, had different individuals produced the May and October estimates, their variance might be more easily explicable.  Similarly, lay jurors would have no way of knowing whether such discrepancies might be common among estimates and bids on large-scale construction projects.  The Court's questions helped the jury to properly evaluate the disparity.

[65] Defendants first take issue with the following exchange:

Q. . . . Let's talk for a minute about whether or not the estimators or the people who are actually valuing this job know about any agreements.  Now, would you agree with me, sir, that, under your analysis, that being the assumption of a cartel, the assumption of increased prices, that people had to know when they bid the jobs? . . . .
A. No, it's not correct. . . . I would agree that upper management at some level has to know. . . . I agree that [som]eone submitting the bid has to be influenced by somebody who knows about the cartel . . . .
Q. Right.  And if there is no evidence of that, then, again, your analysis is not relevant . . . .

A. I, in fact, would have said exactly the opposite.  I would have said that, if there
is no evidence, that you can infer – if we know that there is a cartel – remember,
I'm still under the hypothesis – I think you can infer that management had some
mechanism for influencing the bid; otherwise, they engaged in really bad
management.
Q. That is –
THE COURT: There was no point to have the cartel.
THE WITNESS: Well, and, moreover, they have to make payments and they are
getting no return on their investment.

(Apr. 5, 2007 PM Tr. at 138-40.)  The Court's question simply clarified McAfee's testimony that
assuming a cartel whose objective was to secure contracts at higher prices than would be
obtainable through competitive bidding, it would be "really bad management" to allow one's
subordinates to proceed as though the company would be competing for the contract.  In short,
there would be no point to having formed the cartel if bids were to be formulated competitively.
Defendants juxtapose the Court's comment with its ruling immediately afterward sustaining an
objection to defense counsel's question, "And that's very possibly what happened in this case,
sir[?]" (Motion Eight at 13; Apr. 5, 2007 PM Tr. at 140.)  Yet the Court ruled properly on this
objection: as established *ad nauseum* by counsel for both sides, McAfee lacked knowledge of the
facts and was not prepared to render an opinion on what happened in this case.

Defendants next find fault with the following dialogue:

Q. . . . If you have a situation where you have two bidders on a contract and they
compete . . . then your cartel assessment is not applicable to that contract; is that
correct, sir?
. . .
A. Yes, in the hypothetical you just gave me, my assumption of a cartel would be
wrong.
Q. Right
THE COURT: But in his hypothetical, if another company did not bid, then you
could have a cartel.
THE WITNESS: Oh well, then I had three bidders, one of whom was paid off not
to bid, and I would then have a cartel, yes.

(Apr. 5, 2007 PM Tr. at 133-35.)  Again, the Court's objective was clarification: for McAfee, the
generic term "bidders" included not just *actual* bidders but also those parties referred to as
"schleppers," *potential* bidders paid by the actual bidders not to bid.  (*Id.* at 113, 135.)
Defendants also suggest the elicited testimony contradicted the evidence, (Motion Eight at 14),
but as this amounts to an evidentiary sufficiency argument, the Court will address it below, *see
infra* part III.A.1.a.

In passing, defendants refer to two other exchanges between the Court and McAfee.
First, after McAfee affirmed that the three depositions listed on a document were the three he

Finally, defendants contend this Court's rulings on objections "clearly telegraphed to the jury [its] view of the case." (Motion Eight at 15.) They first cite three instances in which the Court overruled their objections that plaintiffs' counsel's questions misstated the evidence.[66] (*See* Mar. 26, 2007 AM Tr. at 16; Mar. 30, 2007 PM Tr. at 78; Apr. 17, 2007 PM Tr. at 63.) Their disagreement with these rulings amounts to an attack on the sufficiency of the evidence that Greselin reached an agreement with Schmidt on Contract 29, and that Harbert-Jones was a party to collusion on Contract 07. (*See* Motion Eight at 15-16.) The Court will address these matters below. *See infra* part III.A.2-3.

Additionally, defendants point to two instances in which the Court sustained plaintiffs' objections that defense counsel's questions misstated the evidence. (Motion Eight at 17.) In both cases, however, defendants' questions *did* misstate the evidence. First, Ollis testified that Anderson did not identify which contract had been "set up;" he did not, as defense counsel stated, *deny* that Anderson was speaking of Contract 20A. (Mar. 28, 2007 AM Tr. at 15.)

---

would have reviewed "[p]rior to [his] deposition" and stated he did not recall whether he had subsequently *requested* others, the Court asked, "But I take it from your prior answer you implied you did, in fact, review others?" (Apr. 9, 2007 PM Tr. at 7-8.) McAfee's answer left open whether he had subsequently *reviewed* other depositions *after* his own; the Court sought only to fill this void. Second, defendants object to the Court's elaborating on a hypothetical posed to McAfee by plaintiffs' counsel on redirect. (*See id.* at 65-67.) Following up on cross-examination questions by HC's counsel, plaintiffs' counsel read an excerpt of Ruggieri's testimony and asked how it would "fit with the economic theory and analysis" McAfee had discussed on direct. (*Id.* at 64-65.) Understandably, given his limited knowledge of the facts, McAfee needed more information to answer the question. The Court simply amplified the "hypothetical" until McAfee had sufficient "context to understand how [the] testimony fit[]." (*Id.* at 65-67.) This was not error.

[66] For some reason, defendants also choose to quote a question by government's counsel to which the Court *sustained* defendants' objections. (*See* Motion Eight at 16 (quoting Apr. 17, 2007 PM Tr. at 87).) It is unclear whether and on what grounds defendants challenge this ruling.

Second, HC's counsel stated during his cross-examination of McAfee that

> Fru-Con, the people who were involved with these discussions about payoffs, never told the people doing the actual bidding that there was anything going on, any bid rigging or anything like that, and that those people who actually did the bidding came up with their best bid of $131 million.

(Apr. 5, 2007 PM Tr. at 114.)  Contrary to defendants' assertions, Dieter Kadenbach's testimony – that *to his knowledge*, no estimator knew of his conversations with Schmidt or was influenced by conversations with competitors, (Mar. 22, 2007 PM Tr. at 14, 25) – does *not* establish that the "people doing the actual bidding" were wholly ignorant of any collusive agreement and also immune to pressure from those in the know.

Considering the record as a whole, *Newman v. A.E. Staley Mfg. Co.*, 648 F.2d 330, 334-35 (5th Cir. 1981), the Court concludes its comments, questions, and evidentiary rulings did not create an appearance of judicial bias that would compel a new trial.

## G.     Admission of Finances Evidence

Before trial, the Court denied motions by HII and HC to exclude evidence of defendants' current wealth and of their profits on the three contracts at issue.  (Order of Mar. 15, 2007 [723] at 3, 4-5.)  Declining to issue a "blanket exclusion," the Court observed that wealth evidence "could prove relevant," and that there were "many potential, permissible uses" for profits evidence.  (*Id.*)  During the trial, plaintiffs introduced both types of evidence, and defendants now insist the Court should have excluded this evidence as irrelevant, or alternatively, under Federal Rule of Evidence 403.  (Motion Five at 30-33, 34-47.)[67]

---

[67] Separately, BHIC and HUK demand a new trial because plaintiffs referred to profits in their arguments on damages.  (Motion Eight at 25-26 ("Profits in themselves are completely irrelevant" to FCA damages).)  They do not specify which evidentiary rule this argument breached, so the Court construes it as attacking relevancy.

## 1.     Profits

The FCA expressly provides that a violator may be liable only for the "amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3129(a) (2008).  Hence, the proper measure of damages in this FCA action was "the difference between what the United States paid and what it would have paid had there been no bid-rigging agreement."[68]  (May 4, 2007 AM Tr. at 65 (final jury instruction).)  *See also United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 922-23 (4th Cir. 2003) ("the amount of money the government paid by reason of the false statements over and above what it would have paid absent the false statement"), *followed by United States ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Group*, 370 F. Supp. 2d 18, 55 (D.D.C. 2005) (Oberdorfer, J.); *United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003), *cert. denied* 541 U.S. 936 (2004) ("Ordinarily the measure of the government's damages under the FCA would be the amount that it paid out by reason of the false statements over and above what it would have paid if the claims had been truthful." (citation omitted)).

Yet "where the defendant by his own wrong has prevented a [] precise computation" of this difference, damages are not entirely foreclosed.  *Bigelow v. RKO Pictures, Inc.*, 327 U.S.

---

[68] Defendants contend that plaintiffs "employed a concerted strategy" to confuse the jury about the proper measure of damages by inserting the word "should" in place of the word "would" at critical points in their presentation.  (Reply Five at 17 & n.16.  *See also* Motion Two at 8.)  In such a complex case, it is hardly surprising that plaintiffs' counsel may have misspoken or made typographical errors on a bare handful of occasions.  Moreover, even assuming that defendants are correct in attributing nefarious motives to their adversaries, the Court's instruction on the proper measure of damages – "the difference between what the United States paid and what it *would* have paid had there been no bid-rigging agreement," (May 4, 2007 AM Tr. at 65 (emphasis added)) – eliminated any confusion engendered by plaintiffs' counsel's single misstatement during closing, (May 1, 2007 PM Tr. at 71).

251, 264 (1946).  *See also New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1077 (2d Cir. 1988) (plaintiff's burden of proving what would have been paid absent collusion is lightened where "there is a dearth of market information unaffected by the collusive action of the defendants").  Though "the jury may not render a verdict based on speculation or guesswork," in such a case it "may make a just and reasonable estimate of the damage based on relevant data."[69] *Bigelow*, 327 U.S. at 264.  *See also Samaritan Inns v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997) ("Although a court will not permit a plaintiff to recover damages based on 'mere speculation or guess,' the fact that an estimate is uncertain or inexact will not defeat recovery, once the fact of injury is shown." (citations omitted)).

As defendants rightly point out, profits should not be used as an automatic proxy when a defendant's conduct has obscured the difference between what the government paid and what it would have paid but for the fraud.  *See United States ex rel. Taylor v. Gabelli*, No. 03-8762, 2005 U.S. Dist. LEXIS 26821, at *50-51 (S.D.N.Y. Nov. 4, 2005) ("False Claims Act does not permit the Relator to disgorge defendants' profits").  Yet this does not render profits wholly irrelevant.

Once it found liability, to calculate damages, the jury had to determine "what [the government] would have paid had there been no bid-rigging agreement."  (*See* May 4, 2007 AM Tr. at 65.)  Because each contract was unique, no perfectly comparable data – the winning bid for an identical project, produced under identical conditions, absent collusion among the bidders –

---

[69] While *Bigelow* involved the Sherman Act, not the FCA, the Supreme Court confirmed this "ancient" principle – "that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created" – "is not restricted to proof of damage in antitrust suits."  327 U.S. at 265.

was available.[70]  Hence, due to defendants' collusion, the jury could not precisely determine what the government would have paid on any of the three contracts under competitive conditions, and it was left to consider other "relevant data."  *See Bigelow*, 327 U.S. at 264.

Plaintiffs suggest profits could be among these "relevant data" because "evidence of total job costs plus a reasonable profit – calculated by subtracting the profits from the total contract price and adding in a typical profit percentage supported by the evidence – is indicative of what the fair market value of the contracts would have been absent collusion."  (Opposition Five at 29-30.  *See also id.* at 30 n.33 (describing supporting evidence).)  Defendants respond that no evidence demonstrates "how the *final* costs of a project are indicative of the bid amount the government would have accepted for a project had there been open, competitive and uncontrolled bidding."  (Reply Five at 17-18.)  Essentially, they contend plaintiffs mistakenly interchange final costs (which determine ultimate profits) with estimated costs (which factor into a bid).

But plaintiffs' proposed equation is not completely off the mark.  Plaintiffs offered evidence that, *inter alia*, profits on international construction contracts of this type typically fell in the 6-15% range.  (*See, e.g.*, Mar. 21, 2007 AM Tr. at 82-83; Mar. 22, 2007 AM Tr. at 36, 63; Mar. 28, 2007 AM Tr. at 60.)  Thus, generally, a *competitive* bidder's final costs equal 85-94% of

---

[70] For this very reason, plaintiffs *were* "reliev[ed] [] of their burden to prove damages with" precision.  (*Contra* Reply Five at 17 n.17.)  While there may not have been a "dearth of market information" generally, the array of facts to which defendants point does not include any evidence of a readily comparable contract price set under competitive conditions.  (*See id.*)  Further, there was no need for plaintiffs to "demonstrate that it would have been impossible to present" evidence of the true difference between what the government paid and what it would have paid absent collusion.  (*See* Motion Six at 7.)  In seeking judgment notwithstanding the verdict, BHIC and HUK suggest plaintiffs could have hired an expert to calculate the government's precise damages.  (*Id.*)  Considering the innumerable variables involved, such a calculation would be wildly speculative.

his winning bid (what the government pays).  Plaintiffs presented evidence of these defendants'

final costs – their bids less their profits.  (*See* Mar. 14, 2007 AM Tr. at 96-97; Pl.'s Ex. 622; Mar.

26, 2007 AM Tr. at 83-84; Pl.'s Ex. 636.)  Plaintiffs propose that these values would have

comprised 85-94% of successful bids in a competitive environment – that is, what the

government would have paid.  This chain of reasoning is far from illogical, and it need not – and

indeed, as explained above, *could* not – yield the precise amount the government would have

paid absent collusion.  It simply provides a reasonable proxy.  To this extent, then, profits

evidence was relevant to damages.[71]

Nevertheless, defendants assert the risk of unfair prejudice from this evidence

substantially outweighed its probative value because coupled with plaintiffs' explicit appeals, it

encouraged the jury to substitute disgorgement of profits for the proper damages measure.

(Motion Five at 33; Reply Five at 18-20; Reply Eight at 18-19.)  During closing arguments,

government's counsel and relator's counsel both referred to defendants' profits.[72]  But read in

---

[71] The Court does not suggest profits were the *only* relevant data the jury could have considered in crafting its damages award.  *See United States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988) ("trier of fact must deduce [value crucial to FCA damages measure] from all the evidence presented").  The jury might also have considered, *inter alia*, the various bids and engineer's estimates as well as side payments to co-conspirators.  *See infra* part III.A.1.b.  To be relevant to damages, these pieces of evidence need only bear some relationship to "the difference between what the United States paid and what it would have paid had there been no bid-rigging agreement."

[72] Counsel for the government "walk[ed] through [] several methods of [computing] damages" with the jury.  (May 1, 2007 PM Tr. at 72.)  He referred to "method 4" as yielding a "bare minimum on 20A" based on Terry Musika's chart.  (*Id.* at 75.)  He then argued as follows:

So on this method the $30 million is the key.  That's the number, keep in mind, that was actually on the Harbert-Jones books.  That's what they reported on their books as the profit on 20A, and you'll recall that that was a 28 percent . . . profit. If you subtract the true profit – that is, the $55 million – which includes the profit

context, their comments amounted to nothing more than a simple, entirely permissible argument: if Harbert-Jones felt it necessary to "hide" $25 million in profits on Contract 20A, then apparently even *they* thought the government had paid (at least) an extra $25 million due to the bid-rigging.  Plaintiffs simply pointed to another "relevant dat[um]" for the jury to consider when calculating the premium the government paid due to the bid-rigging.

  In any event, if plaintiffs' counsel *did* intend to encourage the jury to adopt disgorgement as a remedy, their efforts obviously failed.  As to each contract, the jury's damages award was considerably lower than the correlative profits.  (*Compare* Verdict Form [858] at 9 ($29,920,000 on Contract 20A), *with* Mar. 14, 2007 AM Tr. at 96-97 ($55 million in total profits on Contract 20A); Verdict Form [858] at 10 ($3.4 million on Contract 29), *with* Mar. 26, 2007 AM Tr. at 83-84, Pl.'s Ex. 636 ($58.5 million on Contract 29); *and* Verdict Form [858] at 12 ($1,026,029.22 on Contract 07), *with* Pl.'s Ex. 622 ($19 million on Contract 07).)

---

hidden . . . from the $30 million . . . they got a bare minimum of 25, and we think this is relevant as a floor, an absolute floor.  We're not saying that that's the number you should use . . . because . . . why in the world would anyone ever let them hide the bulk of the profits and walk away with them?

(*Id.*)  Counsel for relator argued similarly:

The amount of profits, the true profits, were $55 million.  That's with all of the bogus expenses added back in there.  We know that the amount of profits that Harbert-Jones reported on its books is $30 million . . . So what we've done is said the difference between 55 and 30, the $25 million, gives the defendants what they reported on their books.  It holds them to the number they wrote on the books . . . but takes away . . . what they hid . . . .  So that's the minimum.  That's the floor, the very bottom.

(May 3, 2007 PM Tr. at 40-41.)

2.      **Wealth**

Though the Court did decline to issue a blanket exclusion, it was "hard pressed to imagine how [] evidence [of defendants' financial condition] could be relevant, or how any relevance could help but be substantially outweighed by the undue prejudice and confusion likely to ensue." (Order of Mar. 16, 2007 [723] at 3.)   Indeed, "[c]ourts have held that appealing to the sympathy of jurors through references to the relative wealth of the defendants . . . is improper and may be cause for reversal." *Adams Labs. v. Jacobs Eng'g Co., Inc.*, 761 F.2d 1218, 1226 (7th Cir. 1985).   And remarks "suggesting that the defendant should respond in damages because it was rich and the plaintiff poor" may be grounds for a new trial. *Wash. Annapolis Hotel Co. v. Riddle*, 171 F.2d 732, 740 (D.C. Cir. 1948).   More broadly, however, isolated remarks, themselves prejudicial, may have minimal or no impact on the jury in the course of a lengthy trial. *See, e.g., United States v. Edmond*, 52 F.3d 1080, 1102 (D.C. Cir. 1995) (isolated comments by judge to defense counsel purportedly evincing bias did not warrant new trial).

While cross-examining Raymond Harbert, relator's counsel inquired about the wealth of HII, HC, and non-defendant Harbert Management Company ("HMC"), which manages HC's and other third parties' assets.   (Apr. 24, 2007 AM Tr. at 16.)   He asked Harbert about HII's current revenues as well as the values HMC manages for its clients, generally, and for HC, in particular. (*Id.* at 10, 16-17, 18.)   Defendants insist these facts bore no relevance to any material issue in the case, and that relator's counsel elicited them only to incite jury bias.   (Motion Five at 34-37.)

First, this evidence was relevant.   In *Labadie Coal Co. v. Black*, 672 F.2d 92 (D.C. Cir. 1982), our Court of Appeals adopted a two-part inquiry to be pursued in determining whether to pierce a corporate veil.   672 F.2d at 96.   For present purposes, only the second element, fairness,

matters: "if the acts are treated as those of the [subsidiary] corporation alone, will an inequitable

result follow?" *Id.*  Though fraud and purposeful undercapitalization both satisfy this prong of

*Labadie*, neither is a prerequisite to veil-piercing: "a case must only 'present an element of

injustice or fundamental unfairness.'" *Id.* at 99 (quoting *DeWitt Truck Brokers, Inc. v. W. Ray

Flemming Fruit Co.*, 540 F.2d 681, 687 (4th Cir. 1976)).  Thus, where "adherence to corporate

form . . . could very well 'lead to an evasion of legal obligations,'" evidence of a defendant's

present financial condition will be relevant to the alter ego analysis.  *Bufco Corp. v. NLRB*, 147

F.3d 964, 969 (D.C. Cir. 1998) (quoting *NLRB v. Greater Kansas City Roofing*, 2 F.3d 1047,

1052 (10th Cir. 1993)).  Here, the Court had barred relator from pursuing an alter ego theory of

liability at trial, (Mem. Op. & Order of Mar. 14, 2007 [716] at 4), but the government remained

free to do so, and did.  Evidence of HII and HC's present financial condition was relevant to

whether adherence to corporate form in this case might allow the putative alter ego, HC, to evade

the impact of a judgment against an inadequately capitalized HII.[73]  *Bufco Corp.*, 147 F.3d at 969.

It matters not that relator's counsel, rather than government counsel, elicited the information.

Second, defendants insist that coupled with plaintiffs' improper arguments, this

information tended to "appeal to the sympathy of the jurors [and] to incite an anti-defendant

bias." (Motion Five at 35.)  This contention implicates Federal Rule of Evidence 403.  Thus,

though as explained above, evidence of defendants' wealth had probative value – indeed, under

*Labadie*, it was crucial to the government's alter ego theory – the Court must still determine

---

[73] This logic does not extend to Raymond Harbert's testimony concerning the total value of assets HMC manages for its clients.  But however prejudicial this information may have been independently, a few isolated phrases uttered in the course of seven weeks of testimony do not create the sort of pervasive prejudice that will merit a new trial.  *See Edmond*, 52 F.3d at 1102.

64

whether the risk of unfair prejudice substantially outweighed this value.

Reasonably, knowledge that a defendant has the resources to pay a judgment may increase jurors' comfort level in making a large damages award.  As the cases defendants cite suggest, however, this danger will most likely materialize when a vast disparity in wealth exists between the parties.  *See, e.g., Adams Labs., Inc.*, 761 F.2d at 1226 ("references to the relative wealth of the defendants in contrast to the relative poverty of the plaintiffs" are improper); *Draper v. Airco, Inc.*, 580 F.2d 91, 95 (3d Cir. 1978) ("references to financial disparity" are improper); *Wash. Annapolis Hotel Co.*, 171 F.2d at 740.  In closing, relator's counsel did refer to the "less fortunate people in other countries" whom USAID might have assisted with the excess funds paid to defendants due to the bid-rigging.[74]  (May 3, 2007 PM Tr. at 17.)  But plaintiffs here never even approached the sort of egregious misconduct and overt pandering that have compelled reversal or a new trial in other cases.  *See, e.g., Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 285 (5th Cir. 1975) (during closing argument, counsel discussed "the value which his own son would place on his father's life, . . . [his] personal association with the deceased, [and] the image of deceased's children crying at graveside and forlornly awaiting the return of their father").

After careful consideration, the Court does not believe that a bare handful of remarks in the course of a seven-week trial, cherry-picked by defendants from all over the record, created such unfair prejudice as to *substantially outweigh* the significant probative value of evidence of defendants' wealth.  That defense counsel, from the outset, attempted to paint defendants as

---

[74] Similarly, government counsel elicited from Michael Gould that the U.S. would devote any damages recovered in this lawsuit to other construction projects in Egypt.  (Apr. 3, 2007 PM Tr. at 119-20.)

"deep pockets" targeted due to their financial success, only bolsters this conclusion.  Defense

counsel opened with this theme,[75] returned to it while cross-examining the relator,[76] and finally,

cleverly wove the complained of testimony into that theme during closing:

> If there was ever a doubt about why these plaintiffs have focused on [HII], that doubt must have been erased for you when Raymond Harbert was on the stand and Mr. Cultice was cross-examining him.  Remember all those questions about *how much HII is worth today*, fifteen years after the events in question?  Do you remember that Mr. Cultice thought it was necessary for you to know that Mr. Harbert's new business that wasn't even formed until HII was out of the construction business, manages *billions of dollars of assets*?

(May 2, 2007 PM Tr. at 7 (emphasis added).)  As defense counsel spoke these words to the jury,

a slide depicting seven, green dollar signs projected onto a screen behind him.  In light of this

display, defendants' complaints of unfair prejudice ring somewhat hollow.

The Court concludes evidence of HC and HII's wealth was relevant, and though it posed

a danger of unfair prejudice, this danger did not substantially outweigh the information's

probative value.

## H.    Apportionment of Damages

Lastly, defendants seek a new trial because they contend the jury should have been

directed to apportion damages among the various defendants.  (Motion Five at 44-45.)

As a general matter, "the form of verdict is within the trial court's discretion."  *Hall v.*

*Gen. Motors Corp.*, 647 F.2d 175, 179 n.10 (D.C. Cir. 1980).  And more specifically, "[w]here . .

---

[75] *(See* Mar. 20, 2007 PM Tr. at 36 (characterizing relator as "desperate [in the] pursuit of money"), 38-39 (characterizing John Harbert as a "man you could trust" and describing his "very large and successful business . . . [with] interests [that] ranged well beyond construction" and that became "so diverse that he formed an umbrella company").)

[76] *(See* Mar. 29, 2007 PM Tr. at 65 (closing relator's cross-examination with, "And isn't it the case that sometimes innocent corporations get swept up just because they have money?").)

. defendants, if liable at all, are liable for causing the same injury, a jury given special interrogatories should be asked what amount of damages the plaintiff has suffered.  All defendants found liable for the injury are then jointly and severally liable for the single award of compensatory damages." *Gagnon v. Ball*, 696 F.2d 17, 19 n.2 (2d Cir. 1982).  Joint and several liability applies equally in a FCA case.  *United States v. Uzzell*, 648 F. Supp. 1362, 1368 (D.D.C. 1986) (Green, J.).

The verdict form in this case asked the jury to determine which defendants, if any, had participated in a conspiracy and which defendants, if any, had committed substantive FCA violations as to each contract.[77]  (Verdict Form [858] at 2-8.)  It then required them to determine how much damage any liable defendants had caused the government on each contract.[78]  (*Id.* at 9-12.)  Under joint and several liability, this procedure was proper.[79]

---

[77] HII contends "it was critical . . . to have its responsibility for the alleged submission of false claims, if any, separately determined by the jury [because] HII was not a partner in the Harbert-Jones 20A and 07 joint ventures at the time any claims were submitted, and [] exited the international construction business altogether while these projects were still underway."  (Reply Five at 20.)  Further, HII points to the FCA's *scienter* requirement, which must be "satisfied as to each defendant and as to each claim."  (*Id.*)  These arguments implicate *liability*, not damages.  Moreover, the verdict form, as administered, answered both: the jury specifically found that HII "knowingly made, used or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the government," and that it "knowingly presented or caused to be presented a false or fraudulent claim for payment or approval to the United States," on each of the three contracts.  (Verdict Form [858] at 3-8.)

[78] Because plaintiffs retained a live cause of action against defendant Anderson only as to a single claim submitted pursuant to Contract 29, but had live claims against the other defendants as to *all* claims submitted on *each* contract, the jury was asked to separately determine the damages attributable to Anderson's conduct.  (*See* Verdict Form [858] at 11.)

[79] Defendants argue that the Court's adoption, in the Memorandum Opinion accompanying its judgment, of the "proportionate share" approach confirms the need for a jury to allocate damages among them.  (Motion Five at 44-45.)  As explained below, *see infra* part IV.A.2, the Court erred in applying *McDermott, Inc. v. Amclyde*, 511 U.S. 202 (1994), to refuse

In sum, close examination of defendants' proposed grounds for a new trial divulges no "clear miscarriage of justice" or "manifest error of law or fact."  *See Wild v. Alster*, 377 F. Supp. 2d 186, 189 (D.D.C. 2005) (Walton, J.); *Nyman v. FDIC*, 967 F. Supp. 1562, 1569 (D.D.C. 1997) (Urbina, J.).  To the extent defendants' motions seek a new trial on the bases canvassed above, or on any other ground not herein discussed, they shall be DENIED.

## III.    JNOV Motions

### A.    Sufficiency of the Evidence

Defendants challenge the sufficiency of the evidence in virtually every respect.  In addressing their various arguments, the Court will separately examine the evidence, as to each contract, of liability and damages.[80]  Plaintiffs' complaints stated claims under three separate FCA provisions, two substantive and one inchoate: (1) knowingly presenting (or causing to be presented) a false or fraudulent claim to the government for payment or approval;[81] (2) knowingly making, using, or causing to be made or used, a false record or statement to get a false

---

defendant Anderson a proportionate offset based on payments the government received from settling co-defendants.  While the Court referred again to *McDermott* in apportioning that offset across the three contracts with respect to the other defendants, it relied only on *McDermott*'s broad, motivating principles.  *See infra* part IV.A.2.

[80] The damages measure in a FCA case – "the difference between what the United States paid and what it would have paid had there been no bid-rigging agreement," (May 4, 2007 AM Tr. at 65 (final jury instruction)) – incorporates a causal link between the bid-rigging and harm to the government, so the Court will not undertake separate causation analyses.

[81] The elements of this "caused to be presented" claim are: (1) the defendant knowingly; (2) submitted a claim, or caused a claim to be submitted, to the government; (3) that was false or fraudulent.  (May 4, 2007 AM Tr. at 46.)

or fraudulent claim paid or approved by the government;[82] and (3) conspiring to defraud the government by getting a false or fraudulent claim allowed or paid.[83]  31 U.S.C. § 3729(a) (2008). To the extent defendants separately challenge them in their motions, the Court will evaluate the evidence supporting the jury's liability findings regarding each provision for each contract.

### 1.    Contract 20A

### a.    Liability

In May 1988, Peter Schmidt of Holzmann, Jones' German parent company, gathered a group of pre-qualified Contract 20A bidders at Holzmann's Frankfurt headquarters – among them, Dieter Kadenbach of Bilfinger & Berger, Fru-Con's European parent.[84]  (Mar. 22, 2007 AM Tr. at 80-82.)  Schmidt asked the other bidders to ensure Jones' planned joint venture with HII – Harbert-Jones – would secure the contract by offering higher bids. (*Id.* at 82-83.)

---

[82] The elements of this "caused to be made" claim are: (1) the defendant knowingly; (2) either made or used, or caused another make or use, a false record or statement to get the government to pay its claim; (3) that the record or statement was false or fraudulent.  (May 4, 2007 AM Tr. at 47.)

[83] The elements of FCA conspiracy are: (1) the defendant conspired with one or more persons; (2) to get a false or fraudulent claim allowed or paid by the United States; (3) and one or more conspirators performed any act to effect the object of the conspiracy.  (May 4, 2007 AM Tr. at 48.)  To prove the defendant conspired, a plaintiff must prove: (1) an agreement to commit an unlawful act or to commit a lawful act by unlawful means; (2) that the defendant willfully joined, either at its inception or afterwards; and (3) one or more conspirators knowingly committed one or more overt acts in furtherance of some object or purpose of the conspiracy.  (May 4, 2007 AM Tr. at 59-61.)  Claims submitted to the government under any contract secured through a collusive conspiracy are, inevitably, false or fraudulent, *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543-45 (1943), and it is undisputed that claims were submitted pursuant to Contracts 20A, 29, and 07.  Thus, for each contract, formation of a collusive conspiracy is a central issue for plaintiffs' inchoate and substantive FCA claims.

[84] The record contains evidence from which the jury could have found these facts by a preponderance of the evidence.

Some weeks later, Kadenbach spoke to Schmidt by phone.  (*Id.* at 83.)  Schmidt claimed

he "could find a solution or an arrangement with the other competitors," and the two men then

reached a verbal agreement whereby Fru-Con would bid higher than Harbert-Jones in exchange

for 2-3% of the final contract price.  (*Id.* at 82-83.)  Pursuant to this agreement, Kadenbach

ensured that a 15% markup – roughly $20 million – was added to Fru-Con's August and

December 1988 bids on Contract 20A.  (*Id.* at 87-89.)  After the joint venture had won the

contract, Bilfinger & Berger sent an invoice for $1,026,000 to Holzmann seeking payment for its

performance of the bargain; Holzmann paid the invoice in full.  (*Id.* at 90-94; Pl.'s Exs. 17, 18.)

In or around August 1988, Schmidt met with Constantine Iatrou of Archirodon, Fuller's

parent company, and offered to compensate Fuller if it would refrain from bidding on Contract

20A.  (Mar. 21, 2007 AM Tr. at 15-16.)  Iatrou ultimately signed a written agreement under

which the joint venture would pay Fuller a fee – 3% of the contract price less the value of a

proposed subcontract worth at least $25 million, or alternatively, 5% of the contract price – not to

tender a bid on Contract 20A.[85]  (*Id.* at 19-20, 24, 26; Pl.'s Ex. 1.)  The document further

provided that the joint venture would reciprocate by not bidding on another contract – either

Contract 29 or Contract 23 – to help assure Fuller would be the winning bidder.  (Mar. 21, 2007

AM Tr. at 28-29.)  In December 1988, Iatrou met again with Schmidt, and this time, Anderson

joined them.  (*Id.* at 40-44.)  During the meeting, Anderson handwrote an addendum to the

original agreement, making specific references to it, that set Fuller's fee at $3 million.  (*Id.* at 43,

45.)  Holzmann ultimately paid Archirodon through one of the latter's subsidiaries.  (*Id.* at 77-

---

[85] Thus, contrary to BHIC and HUK's assertion, the evidence *did* support the existence of
a "schlepper" – a third potential bidder paid not to bid – on Contract 20A.  (*See* Motion Eight at
14.)

78.)

### i.     HII

Based on the evidence, the jury could reasonably have found that HII, through the acts of its agents, Roy Anderson and Bill Harbert, conspired to submit false claims on Contract 20A and knowingly caused false claims to be presented and made.

Both Roy Anderson and Bill Harbert had authority to act for HII as to Contract 20A.  In the joint venture's 1988 tender documents on Contract 20A, HII represented that it – not HIE – owned a majority stake in the joint venture, and it held out Roy Anderson as its vice-president. (Pl.'s Exs. 109, 162.)  Bill Harbert, HII's president at the time, had sent Anderson to London some years before to work on HII's behalf.  (Pl.'s Ex. 250.)  In 1988 and 1989, he signed powers of attorney authorizing Anderson, "without reservation," to represent HII in bidding for international construction projects.  (Pl.'s Ex. 652A-D.)

Armed with this authority, Anderson participated extensively in the instant conspiracy. For example, at the December 1988 meeting between Schmidt and Iatrou, Anderson personally drafted an addendum to the original bid-rigging agreement.  (Mar. 21, 2007 AM Tr. at 40-45.) Along with his signature on the addendum,[86] the document's explicit references to language in the original agreement – a copy of which was present at the meeting – strongly support Anderson's awareness of its contents and import.  (*See id.* at 43-45, 48.)  The jury could have found that in drafting the addendum to this collusive agreement, and in ratifying it with his

---

[86] Iatrou testified that Anderson later crossed out his signature, and that he and Schmidt referred to Anderson in their correspondence by various nicknames because the parties wished to conceal Anderson's involvement in the bid-rigging agreement.  (*See* Mar. 21, 2007 AM Tr. at 48-49, 60, 66-67, 69.)

signature, Anderson, acting for HII, willfully joined and advanced the conspiracy.[87]

From this same evidence, the jury could reasonably have concluded that Anderson had

actual knowledge of the conspiracy to rig bids on Contract 20A.[88]   Additionally, Bill Harbert's

_____

[87] HII appears to argue that because Fuller had already performed its part of the bargain (by not bidding in August 1988) and had been disqualified from the second round of bidding, Anderson could not have joined the conspiracy in December. (Motion Two at 3-4.  *See also* Reply Two at 3.)  Yet it is hornbook law that one may join a conspiracy after the agreement's inception, (*see* May 4, 2007 AM Tr. at 59-61), and HII offers no authority for its novel twist on this rule – that one may join a conspiracy after the agreement's inception *only* so long as it remains wholly executory.

Moreover, there was circumstantial evidence from which the jury could have concluded that Anderson joined the conspiracy much earlier – that he represented HII at the May 1988 meeting where Schmidt originally proposed a collusive arrangement.  Initially, Kadenbach "was sure" a "Harbert" representative attended, (Mar. 22, 2007 AM Tr. at 82), but he later conceded his certainty rested on Schmidt's statement that "somebody" from "Harbert" was present, (*id.* at 103-04).  Nonetheless, considering that HII was the majority partner in the joint venture for which Schmidt sought to secure Contract 20A, the jury could reasonably have concluded that someone from HII was, indeed, present.  Prior to that meeting, Bill Harbert, HII's President, had sent Anderson to London to work on HII's behalf.  (Pl.'s Ex. 250.)  He had also signed powers of attorney authorizing Anderson, "without reservation," to represent HII in bidding for international construction projects.  (Pl.'s Exs. 652A-D.)  Anderson attended the Contract 20A reconciliation meeting with Jones in June 1988, and along with John Ollis of Jones, he determined the final markup.  (Mar. 26, 2007 PM Tr. at 29-30; Apr. 13, 2007 AM Tr. at 38, 48; Apr. 16, 2007 PM Tr. at 18.)   In August and December 1988, Anderson signed tenders on Contract 20A as HII's vice-president.  (Pl.'s Exs. 109, 162.)  In light of Anderson's explicit status as HII's point-man in Europe for international contracting and his attendance at the December 1988 renegotiation with Fuller, it would be reasonable to infer that if a HII representative attended the May meeting, it would have been Anderson.

Further, the jury could reasonably have concluded that Anderson was contemporaneously aware of and acted on Schmidt's original, August 1988 agreement with Fuller.  Before Schmidt met with Fuller, Anderson and his team of estimators prepared two separate bid packages, one 3.5% higher than the other, and sent them both to Cairo.  (Apr. 12, 2007 PM Tr. at 54-56.)  After Schmidt and Iatrou agreed that Fuller would not bid, Anderson instructed that the higher bid be submitted.  (*See id.*)  While defendants claim this last-minute adjustment to the joint venture's bid was designed to account for fluctuations in steel prices, the jury could reasonably have inferred that Anderson ordered the higher bid submitted once Schmidt told him Fuller was onboard.

[88] As this Court instructed the jury, the False Claims Act knowledge standard also embraces deliberate ignorance and reckless disregard.  (*See* May 4, 2007 AM Tr. at 48.)  The jury

1990 pocket calendar, in which he documented the precise amounts of the five Fuller payoff

tranches, reflects his knowledge.[89]   (*See* Pl. Ex. 5.)  But for HII's participation in the conspiracy,

claims submitted by the joint venture on Contract 20A would not have been false.  *See Hess*, 317

U.S. at 543-45.  Hence, the jury could reasonably have concluded that HII knowingly[90] caused

false claims to be made and presented to the government on Contract 20A.[91]  Moreover, once the

jury concluded HII had willfully joined the bid-rigging conspiracy, it could properly have held

HII liable for its co-conspirators' knowing creation and presentation of false claims.  *See*

*Halberstam v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983).  (*See also* May 4, 2007 AM Tr. at 59,

62.)

  Thus, there was evidence in the record from which the jury could reasonably have found

---

could have concluded Anderson satisfied the standard for reckless disregard when he authorized payment on inflated pre-bid invoices and wire transfers from the joint venture to HUK that disguised payoffs to co-conspirators, and when he signed the sale-leaseback agreement and invoices that concealed some of the joint venture's profits.  (*See* Apr. 9, 2007 PM Tr. at 108-09; 118-19; Apr. 11, 2007 PM Tr. at 119, 126-27, 131-33; Joint Stipulation 1.)

 [89] In concluding Bill Harbert had knowledge of the conspiracy, the jury could also have considered his 1985 letter to his brother lamenting increased competition on Egyptian construction projects, (Pl.'s Ex. 249); his establishment in 1986 of business contacts with Schmidt, the conspiracy's ringleader, (Pl.'s Ex. 251); and his wire transfers to and from what plaintiffs colorfully referred to as the Holzmann "slush fund," an account through which payoffs for Contracts 20A and 29 passed, (Pl.'s Exs. 21, 22, 365).

 [90] The Court instructed the jury on imputed knowledge, (May 4, 2007 AM Tr. at 54), and in light of the other evidence, the jury could reasonably have concluded that Anderson, at least, acquired knowledge of the conspiracy (and consequently, the claims' falsity) while acting within the scope of his duties as HII's representative on Contract 20A, (*see, e.g.*, Pl.'s Exs. 109, 162, 250, 652A-D).

 [91] After imputing Anderson's knowledge to HII, the jury could also have reasonably concluded that HII's provision of bonding support to the joint venture enabled the joint venture to bid on Contract 20A and was thus a but-for cause of its submission of false claims.  (*See* Pl.'s Exs. 109, 307.)  *See infra* note 95 (discussing plaintiffs' "caused to be presented" theory).

HII liable on Contract 20A.

###                ii.        HC

Likewise, the jury could reasonably have found that HC, imbued with the knowledge of

its agent, Bill Harbert, conspired to submit false claims on Contract 20A.

Bill Harbert served as HC's president until July 1990, after which he became vice

chairman of its board of directors.  (Pl.'s Ex. 574A.)  He also served as its chief operating officer

from August 1984 to December 1991.  (*Id.*)  As explained above, the jury could have concluded

from Bill Harbert's 1990 pocket calendar notes that he gained knowledge of the bid-rigging on

Contract 20A while serving as a fiduciary and manager of HC.[92]  Based on the Court's

instruction, the jury could have imputed this knowledge to HC.[93]

––––––––––––––––––––––

[92] Further, given that Harbert originally sent Anderson to London to pursue international construction contracts and that Anderson was one of Harbert's two "key deputies," (Apr. 24, 2007 AM Tr. at 11), the jury could reasonably have inferred that Anderson acted with Harbert's blessing or at his behest.

[93] HC insists that no evidence indicates Harbert acquired this knowledge – or took any action – "while acting within the scope of his . . . employment" or while "wearing his HC 'hat.'" (Motion Three at 15, 18.)  But the jury could reasonably have concluded that where, as here, a single person held managerial or fiduciary positions with multiple, interrelated corporate entities, whose interests were in some respects aligned, he could wear more than one "hat" at a time. Plaintiffs' counsel advanced this very theory to the jury, (Mar. 20, 2007 AM Tr. at 72, 84-85; May 3, 2007 PM Tr. at 9-10), and the jury evidently agreed.

Relatedly, HC contends Harbert was an adverse agent who pursued bid-rigging in his own personal interests and against those of HC.  (Motion Three at 17-20.)  As the Court explained above, however, *see supra* part II.D.3, the "adverse agent" exception "applies only to fraud *against* the corporation, not to fraud *on behalf of* the corporation."  *BCCI Holdings, S.A. v. Clifford*, 964 F. Supp. 468, 478 (D.D.C. 1997) (Green, J.).  HC's adverse agent theory appears to rest on its characterization of the sale-leaseback transaction used to conceal joint venture profits on Contract 20A: defendants asserted throughout trial that Bill Harbert engineered this scheme to retaliate against his brother, John, by depressing HIE's apparent value and then buying HII's share in HIE at a bargain price.  (*See* Motion Three at 17.)  Absent evidence that Harbert knew in September 1990, when the transaction was initiated, that HII would later sell him its share in HIE, this theory is largely speculative.  Further, for the adverse agent doctrine to apply, many

Further, the jury viewed several pieces of evidence from which it could have found HC willfully advanced the conspiracy by rendering services and providing support crucial to HIE's securing (and submitting false claims on) Contract 20A.[94]  Most significantly, in an internal workpaper, HC's independent auditors wrote that "[a]ccording to [HC]'s management, HIE depends on HC to provide its credit facilities, security clearance and bonding capacity.  It would not be possible for HIE to [continue] operating as it has [been] . . . without the total support of HC and HII."  (Pl.'s Ex. 299.)  This language appears in a section entitled "Matters for Attention of Partner."  (*Id.*)  The jury could reasonably have inferred that the author, a lower level employee, would accurately report the client's representations in a memorandum to his superior, lest the partner be embarrassed by subsequent reliance on the information.  Further, the jury could reasonably have credited HC's own representations to its auditor; it could thus have

---

courts hold that the agent's interests must be *completely* adverse to the principal's in a given transaction.  *E.g.*, *Pereira v. Aetna Cas. & Sur. Co.*, 186 F.3d 196, 207 (2d Cir. 1999); *Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 773 (4th Cir. 1995).  *But cf. Baena v. KPMG LLP*, 453 F.3d 1, 7 (1st Cir. 2006) (agent's conduct not imputable where "wrongdoing is done *primarily* for personal benefit") (emphasis added).  Here, while HC did not receive any profits from Contract 20A *directly*, the jury could reasonably have concluded that it nonetheless reaped benefits through the conspiracy's enrichment of its subsidiaries, HII and HIE.  (*See* Apr. 10, 2007 PM Tr. at 60-68; Joint Stipulation 1.)  Moreover, as explained below, to the extent Harbert's interests may have *become* adverse to HC's *after* he acquired knowledge of the conspiracy, the jury need not have imputed Harbert's actions to HC along with his knowledge.  Instead, it could reasonably have concluded that HC advanced the conspiracy through its own knowing provision of services to HIE.

[94] HC repeatedly cites to this Court's Memorandum Opinion & Order of March 14, 2007, for the proposition that it must have performed "fraudulent" actions in furtherance of the conspiracy to be held liable.  (*See, e.g.*, Motion Three at 20.  *See also* Reply Three at 17.)  HC misconstrues the Court's opinion, which did not presume to judicially amend the False Claims Act.  (*See* Mem. Op. & Order of Mar. 14, 2007 [716] at 8.)  The Act itself does not specify that a defendant must perform "fraudulent" acts to be liable, and HC cites no case law or other authority that supports this interpretation.

concluded the services HC provided were essential to HIE's performance of – and submission of false claims on – Contracts 20A and 07.

Three other exhibits bolster this conclusion.  First, in a letter to HC's auditors, HC's vice president and general counsel indicated that HC retained some connection to HIE even after HII sold its interest to Bill Harbert in 1991, and he characterized HC's continuing bonding obligations on "'HIE jobs' contracted in HII's name" as "significant."  (Pl.'s Ex. 307.)  Again, the jury could have given great weight to HC's representations to its auditors and thus concluded that support from HC, whose assets far exceeded those of HIE, was crucial to HIE's ability to bid for and perform the subject contracts.  Second, plaintiffs presented two letters to Southtrust Bank drafted by Margaret Russo, HC's treasurer's assistant, whose duties included "coordinat[ing] all of the bank accounts for any of the Harbert companies with Southtrust."  (Apr. 4, 2007 PM Tr. at 22; *see* Pl.'s Exs. 269, 448.)  The letters, written on HC letterhead in 1989 and 1991, change the signature authority and mailing address on a Harbert-Jones joint venture bank account used for Contract 20A.  (Pl.'s Exs. 269, 448.)  According to Terri Mashburn, bookkeeper for HIE, "anytime [a 'Harbert company' employee] needed to change anything, we would go through Margaret and she would take care of all the paperwork."  (Apr. 4, 2007 PM Tr. at 22.)  Based on these letters, the jury could reasonably have concluded that HC knowingly advanced the conspiracy by providing financial management services to HIE, without which HIE could not have submitted false claims on Contract 20A.

Based on this evidence, the jury could have found that HC willfully joined and aided a conspiracy to rig bids on Contract 20A.  Once it had so concluded, it could properly have held HC liable for its co-conspirators' knowing creation and presentation of false claims.  *See*

*Halberstam v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983).  (*See also* May 4, 2007 AM Tr. at 59,

62.)  Moreover, the jury could also have concluded that by providing essential services to HIE,

HC, itself, knowingly caused false claims to be made and presented on Contract 20A.[95]

### iii.    BHIC

Similarly, the jury could reasonably have found that BHIC, armed with its agents'

knowledge, conspired to submit false claims on Contract 20A and also knowingly caused such

claims to be made and presented.

At various times, Bill Harbert served as BHIC's president, CEO, and chairman.  (*See*

Mar. 30, 2007 AM Tr. at 14; Pl.'s Ex. 263.)  The Court has discussed his knowledge of and

---

[95] HC attacks plaintiffs' "caused to be presented" theory as "novel," but the FCA clearly sets forth this basis for liability.  *See* 31 U.S.C. § 3729(a)(1) (2008).  Various authorities have explicitly recognized this theory as legitimate under the statute.  *See*, *e.g.*, *United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 120 (D.D.C. 2003) (Lamberth, J.); *United States ex rel. Atkinson v. Penn. Shipbuilding Co.*, 255 F. Supp. 2d 351, 405 (E.D. Pa. 2002).  If the defendant satisfies the FCA's knowledge standard, ordinary causation principles apply – his conduct must be at least a substantial factor in causing, if not the but-for cause of, submission of false claims.  *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 244 (3d Cir. 2004).  HC's contention that this theory of liability conflicts with the Supreme Court's analysis in *United States v. Bestfoods*, 524 U.S. 51 (1998), is a non sequitur.  (*See* Motion Three at 23-24.)  *Bestfoods* discusses the conditions under which a plaintiff may hold a parent corporation liable for its subsidiary's conduct.  524 U.S. at 61.  Here, under section 3729(a)(1), plaintiffs would hold HC liable for *its own* conduct – that is, for its knowing provision of resources necessary to HIE's submission of false claims.

Furthermore, both plaintiffs clearly alleged a violation of section 3729(a)(1) in their complaints.  (*See* Relator's Fifth Amended Complaint [687] ¶¶ 92-93; Government's Third Amended Complaint [419] ¶¶ 120-22.)  Relator's complaint alleges facts that support plaintiffs' "caused to be presented" theory.  (Relator's Fifth Amended Complaint [687] ¶¶ 14-18.)  Similarly, while the government's complaint admittedly focuses on an alter ego theory, it does allege some facts supporting a "caused to be presented" theory.  (Government's Third Amended Complaint [419] ¶¶ 23, 25.)  HC's expressed surprise, if genuine, is therefore unwarranted.

involvement in the conspiracy above.[96]  Though BHIC correctly states the rule that an agent's

knowledge may be imputed to the principal only when he acquires that knowledge in the course

of his agency, *see BCCI Holdings, S.A. v. Clifford*, 964 F. Supp. 468, 478 (D.D.C. 1997) (Green,

J.), it grossly oversimplifies this rule's application, (*see* Reply Four at 3).  First, though Harbert

may have *initially* learned of the bid-rigging prior to BHIC's formation, he thereafter acquired

additional knowledge of the conspiracy as it progressed.  For example, after BHIC commenced

operation, Harbert received – and necessarily, acquired knowledge of – clandestine payments

associated with Contract 20A.  (*See* Joint Stipulation 1; Pl.'s Exs. 467, 481.)  Second, and more

to the point, BHIC emerged from the reorganization and renaming of BLH Enterprises and was,

like its predecessor, wholly owned by Harbert.  (Pl.'s Ex. 263.)  Plaintiffs offered evidence that

Harbert intended this new company to hold ownership in and provide support services to HIE,

(*see* Pl.'s Exs. 263, 682; Mar. 30, 2007 AM Tr. at 13-14), the entity to which Contracts 20A and

07 had been assigned and which actually made and submitted numerous false claims, some after

1992.  Thus, the jury could reasonably have concluded that BHIC's very *raison d'etre* was to

facilitate and further the ongoing conspiracy through aid to HIE.

The jury could also have imputed Tommy Kitchens' knowledge of the conspiracy to

BHIC.  Kitchens served as BHIC's executive vice president from its inception.  (*See* Mar. 30,

2007 AM Tr. at 64.)  When he resigned in 1995, having failed to extract a $1 million "bonus"

from Bill Harbert, he wrote Harbert a letter in which he detailed the "accomplishments of

---

[96] Additionally, defendant Anderson claimed to be "President and CEO" of BHIC's "international operations," (Pl.'s Exs. 389, 568A), and held a power of attorney for BHIC from May 12, 1992 onward, (*see* Mar. 30, 2007 AM Tr. at 61-62; Pl.'s Ex. 386).  The jury could reasonably have inferred that after this date, Anderson acted for BHIC as well as for HII and/or HIE.

Contract 20A."  (Mar. 30, 2007 AM Tr. at 69-71.)  He identified the exact amounts of bid-

rigging payoffs routed through Holzmann, profits concealed through the sale-leaseback

transaction, and profits "deferred" to Contract 27.  (*See id.* at 71; Pl.'s Ex. 23.)  *See also infra*

note 149.  BHIC contends the letter demonstrates only "Kitchens' knowledge of various financial

transactions," (Reply Four at 5), but the jury could easily have read between the lines.  From

Kitchens' bitter tone, his reference to transactions otherwise identified as disguised payoffs and

concealed profits as "accomplishments," and his knowledge of specific monetary values, the jury

could reasonably have inferred that as BHIC's executive vice president, Kitchens actively

worked to advance the conspiracy and thus expected to share in its profits.

        Imputing Harbert and/or Kitchens' knowledge to BHIC, the jury could then have

concluded that BHIC willfully joined the conspiracy after its inception.  Specifically, BHIC

provided administrative and accounting support to the joint venture for contracts which it knew

had been secured through unlawful collusion.  (Apr. 4, 2007 PM Tr. at 26-29, 94, 101, 102.)

BHIC managed joint venture bank accounts, prepared joint venture financial records, and

handled home office invoicing – all in regard to Contract 20A.  (*Id.* at 26-29, 77-99.)   The jury

could reasonably have found that these "ministerial acts" enable the joint venture to perform and

submit false claims on Contract 20A, thus advancing the conspiracy.[97]  And having concluded

that BHIC had knowingly participated in the conspiracy, the jury could properly hold BHIC

liable for its co-conspirators' knowing creation and presentation of false claims.  *See Halberstam*

*v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983).

_____

        [97] Moreover, it could reasonably have deemed these services *essential* to the joint
venture's ability to perform, and submit false claims, on Contract 20A, and it might thus have
concluded that BHIC caused these false claims to be made and presented.

iv.     HUK

As with its co-defendants, the jury could reasonably have found HUK willfully joined the conspiracy to rig bids on Contract 20A.  The law imputes to a corporation the collective knowledge of its employees and agents, *Phillip Morris USA, Inc.*, 449 F. Supp. 2d at 893-95, and when aggregated, HUK's agents' individual knowledge embraces the full bid-rigging conspiracy.

First, at a joint venture bid reconciliation meeting held in June 1988 at HUK's offices, Ian Young, a HUK employee who ultimately signed the cover letter on the joint venture's Contract 20A bid, served as chief estimator for the Harbert side.  (Mar. 26, 2007 PM Tr. at 11-13; Pl.'s Ex. 162; Apr. 9, 2007 PM Tr. at 102-03.)  According to Carl Nagel, a Jones estimator, Young and his team engaged in "arm twisting" during the meeting.  (Mar. 26, 2007 PM Tr. at 43.)  Without identifying line items they felt had been miscalculated, they insisted on raising the bid above Nagel's $95.2 million estimate, and though he acceded to their demands, Nagel never doubted his original calculations.  (*Id.* at 44-45.)

HUK attributes the pressure Nagel described to a difference of opinion on construction methods.  (Motion Four at 10.)  Indeed, Nagel himself acknowledged that reasonable and experienced estimators could hold such differing opinions.  (Mar. 27, 2007 AM Tr. at 29.)  But while the Harbert team's "arm twisting" might thus bear an innocent explanation, the jury was entitled to view it with skepticism in light of the other evidence of bid-rigging.[98]  As explained

---

[98] In essence, HUK merely posits that another – in its opinion, better – explanation of the facts exists.  But at this stage in the litigation, the relevant question is whether the view adopted by the jury in reaching its verdict was at all *reasonable.  See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).  The Court must review the record as a whole, disregarding all evidence favorable to HUK which the jury was not required to believe, and must draw all reasonable inferences in favor of the jury's verdict.  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

above, the jury heard evidence of a collusive agreement: only Fru-Con and the joint venture would bid, and Fru-Con's bid would exceed the joint venture's, however high, to ensure the joint venture would secure the contract.  The jury also heard expert testimony on how, according to economic theory, parties to such an agreement typically behave:  a collusive agreement's inherent purpose is to raise prices, and to realize benefits from their agreement, managers who form a cartel must exert influence on their companies' price-setting processes.  (*See*, *e.g.*, Apr. 5, 2007 PM Tr. at 84, 94-95, 138-40.)  Under the circumstances, the jury could reasonably have construed Young's "arm twisting" as evidence of such influence.  At the very least, they could have inferred he knew the joint venture's bid would be artificially inflated.[99]

HUK's managing director, Colin Towsey, also testified to HUK's direct participation in the conspiracy, as a conduit for payoffs to co-conspirators on Contract 20A.  (*See* Apr. 9, 2007 PM Tr. at 118-124; Apr. 4, 2007 PM Tr. at 38-66.)  Towsey received invoices for engineering services purportedly requested by and rendered to HUK in Turkey, Germany, and elsewhere.  (*Id.* at 118-20.  *See also* Pl.'s Exs. 435, 438.)  Though Towsey recognized HUK had neither ordered nor received such services – nor had authority to do so under its services agreement with HIE – he nonetheless paid the invoices at Tommy Kitchens' instruction.  (Apr. 9, 2007 PM Tr. at 120-21.)  As plaintiffs point out, Towsey denied knowledge of the conspiracy, but the jury need not have found his denials credible.  Regardless, however, it could reasonably have found Towsey at least knew false invoices were used to make unjustified payments related to Contract 20A.

---

[99] Defendants insist plaintiffs offered no evidence that those preparing the bids knew of the conspiracy.  (*E.g.*, Motion Four at 25.)  But as explained herein, there was evidence from which the jury could reasonably have concluded that both Young and Anderson knew of the conspiracy and consequently nudged the joint venture's August and December bids upwards.

There was also evidence from which the jury could have imputed defendant Anderson's knowledge of these invoices' true nature to HUK.  HUK protests that Anderson lacked authority to act for it and thus was not its agent, but its analysis primarily addresses the *actual* authority that flows from a formal agency relationship.  (Motion Four at 11-12.)  Even if Anderson lacked actual authority, plaintiffs introduced evidence of his *apparent* authority.  Apparent authority arises from "'written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him.'"  *DBI Architects, P.C. v. Am. Express Travel-Related Servs. Co., Inc.*, 388 F.3d 886, 890 (D.C. Cir. 2004) (quoting Restatement (Second) of Agency § 27 (1958)).  An "agent cannot by his own acts imbue himself with apparent authority." *Evans v. Skinner*, 742 F. Supp. 30, 33 (D.D.C. 1990) (Richey, J.) (quoting *Fennell v. TLB Kent Co.*, 865 F.2d 498, 503 (2d Cir. 1989)).  But such authority *can* arise when one holds himself out as an agent, and the putative principal unreasonably fails to deny or ratifies these representations. *See DBI Architects*, 338 F.3d at 894.

Towsey  testified that Anderson – and Anderson alone – hired him to work for HUK and informed him when he was appointed managing director.  (Apr. 9, 2007 PM Tr. at 75-76, 84-85.) According to Towsey, Anderson maintained an office at HUK's London headquarters, and HUK designated him as a signatory on its bank account.  (*Id.* at 78, 82.)  From these facts,[100] the jury

---

[100] Plaintiffs also presented evidence that HUK, a nominally independent corporation, was in reality HIE's London office.  Bookkeeper Terri Mashburn testified that HIE and HUK were treated interchangeably in HII's general ledger, and that "depositing [] into HIE's account was in effect the same thing as depositing [] into [HUK's] account because they were the same general ledger books."  (Apr. 5, 2007 AM Tr. at 34-35.)  She viewed HUK as "just one of the offices for HIE."  (*Id.* at 34.)  The jury also heard testimony that Anderson, HIE's president, ran the "Harbert" London office shared by HUK.  (*E.g.*, Apr. 13, 2007 AM Tr. at 37-38.)  If the jury

could reasonably have concluded that HUK either authorized Anderson to act on its behalf or knowingly permitted him to do so.[101]

When Towsey received the false invoices, he looked to Roy Anderson, the man who had hired him to run HUK and who had initially served as his sole point of contact, for guidance on how to proceed. (*Id.* at 117-18.) Thus, the jury could reasonably have found that Anderson learned HUK had received the invoices, and directed Towsey to contact Kitchens, in his role as HUK's agent. Anderson would have recognized these invoices as cover for payoffs to co-conspirators, and the jury could properly have imputed this knowledge to HUK.

Thus, after imputing the aggregate the knowledge acquired by Young, Towsey, and Anderson in the course of their agencies, and considering its role as a conduit for payoffs, the jury could reasonably have concluded that HUK willfully joined and participated in the bid-rigging conspiracy. It could then have deemed HUK liable for its co-conspirators' knowing

---

accepted that HUK was but "one of the offices for HIE," this conclusion would augment the case for Anderson's role as HUK's agent.

[101] HUK argues that Anderson was not its agent – and thus the jury could not impute his knowledge – because it exerted no control over him. (Reply Four at 9.) In the classical formulation, an agency relationship exists where the principal authorizes the agent to act on his behalf, and the agent subjects himself to the principal's control. Restatement (Third) of Agency § 1.01 (2006). When agency rests on apparent, rather than actual, authority, however, the principal need not, and usually does not, control the agent because their relationship arises not from mutual assent but from equitable principles: a principal who intentionally or negligently creates in another an appearance of authority on which third parties reasonably rely may not later deny such authority existed. *See id.* § 3.03 cmt. b. Nonetheless, plaintiffs offered some evidence from which the jury might have found HUK *did* exert some control over Anderson. Bill Harbert owned 49% of HUK and served as one of its two directors. (Apr. 9, 2007 PM Tr. at 86; Mar. 30, 2007 AM Tr. at 14-15.) It was he who originally sent Anderson, one of his "two key deputies" to London, where Anderson hired HUK's initial employees and installed himself in HUK's offices. (*See* Pl.'s Ex. 250; Apr. 24, 2007 AM Tr. at 11; Apr. 9, 2007 PM Tr. at 75-76.) The jury could thus have concluded HUK, through its director, Harbert, controlled Anderson.

creation and presentation of false claims.  *See Halberstam v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983).

### b.    Damages

As set forth above, *see supra* part II.G.1, the proper measure of damages in this FCA action was "the difference between what the United States paid and what it would have paid had there been no bid-rigging agreement."  (May 4, 2007 AM Tr. at 65 (final jury instruction).)  Thus, in calculating damages, the jury's first task was to determine "what [the government] would have paid had there been no bid-rigging agreement."[102]  (*See id.*)  Because each contract was unique,

---

[102] For the government to have suffered damages, of course, this value must exceed what the government actually paid.  For three reasons, defendants contend it did not.

First, defendants point out that before forming its agreement with Harbert-Jones, Fru-Con had independently determined it could not profitably perform Contract 20A and thus intended to bid high to avoid securing the contract.  (Motion Two at 4; Motion Four at 25.)  When Kadenbach met with Schmidt and agreed that Fru-Con would bid high in exchange for 2-3% of the final contract price, he may have known his company would bid high, regardless.  But *Schmidt* did not.  Absent their agreement, Harbert-Jones would have believed Fru-Con was a viable competitor striving to submit the lowest bid.  Having secured Fru-Con's cooperation, it could safely raise its own bids (in August and December 1988) to increase its expected profits, knowing Fru-Con would not undercut them.  At the very least, to break even, Harbert-Jones would need to raise its bids to cover the cost of the promised payoff to Fru-Con.  Hence, Fru-Con's secret intent to bid high is irrelevant to whether the government suffered damages.

Second, defendants note that Fuller could not obtain bonding and was disqualified from further participation after failing to bid in August.  (Motion Four at 24.)  When Iatrou agreed that Fuller would refrain from bidding in exchange for either 3% of the contract price less the value of a proposed subcontract, or 5% of the contract price, he may have known that Fuller could not find bonding and thus *could not* bid.  But again, *Schmidt* did not.  Without this agreement, Harbert-Jones would have believed Fuller was a viable competitor.  With it, Harbert-Jones could increase its August bid, comfortable in the knowledge that Fuller would not undercut it, and if nothing else, the promised payoff to Fuller raised the joint venture's break-even bid value.

Finally, defendants assert that even if the conspiracy had an inflationary effect on the August 1988 bids, this did not transfer to the December bids.  (Motion Four at 25.)  When Harbert-Jones and Fru-Con's August bids came in at more than double the $58 million engineer's estimate, AMBRIC ordered a new engineer's estimate, which yielded a figure of $120 million.  (Apr. 3, 2007 PM Tr. at 60, 70.)  AMBRIC then reduced the scope of work and lowered its estimate to $109 million, a decrease of 9.2%.  (*Id.* at 68-69, 70.)  Because Harbert-Jones

no perfectly comparable data – the winning bid for an identical project, produced under identical conditions, absent collusion among the bidders – was available.[103]  Hence, due to defendants' collusion, the jury could not precisely determine what the government would have paid on Contract 20A under competitive conditions, and it was left to "make a just and reasonable estimate of the damage based on relevant data." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946).

Throughout the trial, plaintiffs presented several "relevant data" to the jury.

---

reduced its bid by 11.6% from August to December, defendants argue, any inflation must have been eliminated. (Motion Four at 25 n.13.)  By this calculation, the August bid could have incorporated no more than $4 million in padding.  (*Id.*)  They offer no basis for this assumption, and indeed, the evidence suggests otherwise.  Had Harbert-Jones secured Contract 20A at a price of $129 million, it would have owed 2-3% – or $2.58-3.87 million – to Fru-Con and at least another 3% – or $3.87 million – to Fuller.  If the $129 million bid included only $4 million in padding, these payoffs would have eaten into the joint venture's profits by at least $2.45 million.  The jury evidently discounted this illogical chain of reasoning.

[103] Defendants argue that plaintiffs were required to show that the joint venture did not satisfactorily perform its contractual obligations or alternatively, "evidence of a lower bid by a viable candidate." (Motion Two at 6 (citing *United States ex rel. Ervin & Assocs. v. Hamilton Secs. Group*, 370 F. Supp. 2d 18, 56 (D.D.C. 2005)).)  But the authorities on which they rely are factually distinguishable n certain, crucial respects.  In *Ervin*, Judge Oberdorfer examined the Fourth Circuit's decision in *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908 (4th Cir. 2003), in which the defendants had allegedly gained an unfair advantage over other bidders by failing to disclose conflicts of interest.  *See* 370 F. Supp. 2d at 54-55.  There, the Court of Appeals concluded the plaintiffs had failed to prove damages because they had not shown harm to the government.  352 F.3d at 922-23.  The plaintiff "presented no evidence that the government did not get what it paid for or that another firm could have performed the work for less."  *Id.* at 923.

Unlike this case, neither *Ervin* nor *Harrison* involved collusive bid-rigging.  Collusion among bidders, alone, does not preclude the plaintiff from presenting "evidence of a lower bid by a viable candidate."  But where, as here, *all viable candidates* have allegedly participated in the conspiracy – and the collusive agreement, by its terms, ensures *all bids* are inflated – no such evidence will exist.  Hence, *Ervin*'s language is inapposite, and plaintiffs need not have presented evidence of a lower, viable bid.  "Any other rule . . . would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages [incalculable]."  *Bigelow*, 327 U.S. at 264.

First, the jury heard evidence of performance cost estimates for Contract 20A by

AMBRIC, Jones, and Fuller.  Before August 1988, AMBRIC engineers estimated Contract 20A

at $136.8 million, then $90 million, and finally $58 million.  (Apr. 3, 2007 PM Tr. at 60; Apr. 4,

2007 AM Tr. at 21, 78-79.)  After Harbert-Jones and Fru-Con's unexpectedly high August bids,

AMBRIC ordered a new engineer's estimate, which came in at $120 million.  (*Id.* at 60, 70.)

AMBRIC then lowered this estimate to $109 million based on the reduced scope of work.  (*Id.* at

68-69, 70.)  Prior to the reconciliation meeting with the Harbert team, Carl Nagel of Jones

prepared an independent estimate of $95.2 million.[104]  (Mar. 26, 2007 PM Tr. at 31.)   Though

Fuller joined the conspiracy and did not ultimately bid, it prepared an estimate for Contract 20A

of approximately $80 million.[105]  (Mar. 21, 2007 AM Tr. at 80-82, 94.  *See also* Mar. 22, 2007

---

[104] This estimate assumed that inexpensive, "trench box" shoring would be used in some areas but that more costly and reliable soldier pile lagging would be used in others.  (*Id.* at 36-40.)  It also allowed for "risk and profit."  (*Id.* at 35.)  During the reconciliation meeting, Nagel reluctantly elevated his estimate to $103 million at the Harbert team's insistence.  (*Id.* at 41-44.)

   For several reasons, defendants argue Nagel's original estimate "cannot properly be considered as the measure of what another qualified contractor would have bid for Contract 20A."  (Motion Two at 13-15.)  Yet nothing indicates the jury simply adopted this measure wholesale – indeed, defendants' own calculations demonstrate otherwise.  (*Id.* at 7.)  Whatever the Nagel estimate's flaws as a proxy for what the government would have paid in a competitive environment, such a fairly and conservatively computed estimate would have some influence on a competitive bidder's final bid.  It was thus relevant evidence which the jury could properly consider in calculating damages.

[105] Defendants decry this evidence as wholly irrelevant because as of August 1988, Fuller had no intention of submitting this bid, and because Fuller's inability to secure bonding would have rendered its bid unacceptable.  (Motion Two at 9-11.)  To be relevant, however, evidence need only have *some* tendency to make any material fact more or less probable.  Fed. R. Evid. 401.  Plaintiffs' witnesses' testimony established that Fuller had experience with similar construction projects, having secured and competently performed Contract 25, and that its Cairo team compiled its estimate for Contract 20A.  (Mar. 21, 2007 AM Tr. at 79-81; Apr. 3, 2007 PM Tr. at 58-59.)  That Fuller could not, in the end, obtain bonding does not impugn its estimators' calculations.  Its estimate is simply evidence of what experienced estimators – such as Harbert-Jones' Alf Hill – might have compiled had they anticipated unfettered competition among the

AM Tr. at 25-35.)

Second, the jury heard evidence of another, relevant bid. As Dr. Gould explained, Contract 20A was a scaled-down version of the defunct Contract 20,[106] on which procurement occurred in 1984-85 and on which Harbert-Jones had bid $61 million. (Apr. 3, 2007 PM Tr. at 51-52.)

Third, the jury heard evidence of the joint venture's actual costs and profits. Plaintiffs' expert Terry Musika testified that Harbert-Jones booked $30 million in profits, concealed another $25 million through various methods, and incurred $62 million in costs on Contract 20A. (Apr. 10, 2007 AM Tr. at 54-97.) Plaintiffs also offered evidence that profits on international construction contracts of this type typically fell in the 6-15% range. (*See*, *e.g.*, Mar. 21, 2007 AM Tr. at 82-83; Mar. 22, 2007 AM Tr. at 36, 63; Mar. 28, 2007 AM Tr. at 60.)

In their closing arguments, plaintiffs proposed how the jury might translate these data into "a just and reasonable estimate of the damage." First, they suggested the jury calculate a plausible, competitive bid using cost and typical profits data, then subtract this value from the $107 million the government actually paid. (*See* May 1, 2007 PM Tr. at 72-74.) As explained above, the jury could have reasoned that if average profits were 6-15%, then a successful competitive bidder's final costs typically account for 85-94% of what the government ultimately

---

three pre-qualified bidders. In this sense, it *is* "demonstrative of what Harbert-Jones 20A . . . would have tendered absent collusion." (*Contra* Motion Two at 10.) Defendants' objections pertain only to the weight of the evidence – which the jury was entitled to assess for itself.

[106] After the winning bidder pulled out, and the runner-up commenced and then stopped work, USAID reevaluated the project, attempted to mitigate newly materialized risks, and reduced the scope of work. (Apr. 3, 2007 PM Tr. at 50-51.) It then issued a revised tender request, Contract 20A. (*Id.* at 51-52.)

pays. *See supra* part II.G.1.  By this logic, defendants' final costs ($52 million) would equal 85-94% of a successful, competitive bid on Contract 20A.  Second, plaintiffs proposed the jury adopt Nagel's "free-of-influence" $95.2 million estimate, proportionately reduced based on the post-August 1988 scope of work changes.  (May 1, 2007 PM Tr. at 73-74.)  Third, they suggested a similar modification of the Fuller estimate.[107]  (*Id.* at 74.)  Finally, plaintiffs argued that if Harbert-Jones felt it necessary to "hide" $25 million in profits, then apparently even *defendants* thought the government had paid (at least) an extra $25 million due to the bid-rigging.  (*Id.* at 75.)

In the end, the jury awarded plaintiffs $29,920,000 in damages on Contract 20A.  (Verdict Form [858] at 9.)  By extension, it must have determined that the government would have paid $77,080,000 on Contract 20A to a winning bidder under competitive conditions.[108]  The Court will not speculate as to how the jury arrived at this exact figure.  Plaintiffs' counsel's list of "methods" was far from exhaustive, and the jury was entitled to compute "a just and reasonable estimate of the damage," *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946), in any

---

[107] Notably, the jury could also have adjusted the Nagel or Fuller estimates – or any of the various engineers' estimates – based on evidence of typical profit margins.

[108] To be clear, this "winning bidder" would almost certainly have been Harbert-Jones. Fuller's inability to secure bonding would render any bid it offered unacceptable, and Fru-Con had pre-determined it would bid high to avoid securing the contract.  Given these facts, the jury's task was, in effect, to calculate what Harbert-Jones would have bid had it believed itself to be truly competing with Fuller and Fru-Con.  Defendants argue that "the very lowest the Harbert-Jones 20A bid amount would have been" was $124,990,369, a figure that appears in the joint venture's cover letter to CWO, dated July 18, 1988.  (Motion Two at 15-16.)  This presumption ignores, however, that by the letter's date, Schmidt had already narrowed the competitive field by securing Fru-Con's cooperation, and it assumes the letter did not anticipate Fuller would agree to refrain from bidding.  Hence, the jury could reasonably have refused to accept this figure as representative of what Harbert-Jones would have bid under competitive conditions.

logical manner, based on any relevant data in the record.   The Court "need not – and indeed cannot – reconstruct the precise mathematical formula that the jury adopted." *Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1239 (D.C. Cir. 1984).  It suffices that plaintiffs introduced several pieces of relevant evidence from which the jury could estimate what the government would have paid but for the bid-rigging.  Its award falls within the broad range described by these data.

In sum, the Court concludes plaintiffs presented sufficient evidence of each defendant's liability, and of the government's damages, on Contract 20A.  The jury's verdict on Contract 20A was perfectly reasonable, and the Court will not disturb it.  *McGill v. Munoz*, 203 F.3d 843, 845 (D.C. Cir. 2000).

### 2.    Contract 29

#### a.    Liability

In spring 1989, Schmidt hosted another meeting at Holzmann's offices, and this time, he invited Giovanni Greselin of ABB SUSA and "a gentleman from Harbert."  (Mar. 23, 2007 PM Tr. at 120-21.)  SUSA "was running out of work," and Harbert-Jones would be its sole competitor in the bidding for Contract 29.  (*Id.*)  As the signed, "handwritten minutes" Greselin later provided to his superior, Luigi Ruggieri,[109] reflect, "Greselin on the one side and Schmidt

---

[109] Anderson renews his objection to the admission of Ruggieri's testimony "on the grounds previously stated to the Court."  (Motion One at 5 n.3.)  Yet he neither identifies those grounds nor directs the Court to any portion of the record or previously-filed document in which they were stated.  (*See id.*)  Fortunately for Anderson, HII joins in renewing his objection and specifies its basis.  (Motion Two at 18 n.11.)  Pre-trial, defendants sought to exclude Ruggieri's testimony "unless and until [plaintiffs] prove[] by a preponderance of the evidence that there was a conspiracy by these defendants to rig Contract 29."  (Mem. Op. of Mar. 20, 2007 [734] at 1.)  The Court admitted the testimony under Federal Rule of Evidence 104, and because this testimony qualified as non-hearsay under Rule 801(d)(2)(E), the Court now reaffirms its decision.  The latter rule provides that an out-of-court statement is admissible for its truth if the proponent shows by a preponderance of the evidence that: (1) a conspiracy existed; (2) the

and the guy from Harbert on the other [] decided . . . that one of the two [companies] would win and the other one would cover with the higher price." (*Id.* at 121.)  "[T]he loser would be compensated in kind" – that is, the Contract 29 winner would bid high on another contract to allow the loser a turn – "or in cash" – to the tune of $4 million.  (*Id.* at 121-22.)

Despite having fleshed out these details, the meeting participants could not cement their agreement until Greselin had obtained Ruggieri's approval.  (*Id.* at 124.)  Greselin subsequently made his pitch to Ruggieri, who ratified the deal and determined SUSA would "win" the contract and would pay Harbert-Jones in cash. (*Id.* at 124-25.)  Ruggieri directed Greselin to "interface as needed with [] Schmidt and [the Harbert man] to that effect." (*Id.* at 125.)  After Greselin left, Ruggieri shredded his copy of the "minutes" because he believed it to be "an illegal document . . . probably against a number of laws."  (*Id.* at 126.)

Meanwhile, Robert Hemler, Greselin's subordinate, began preparing SUSA's bid on Contract 29.  (Mar. 23, 2007 AM Tr. at 74-75.)  Although Hemler's team produced an internal cost estimate of $85 million, an independent engineer sent in by Greselin predicted costs of $155 million.  (*Id.* at 75-76.)  Hemler managed to convince Greselin that the engineer's estimate was too high, but it was like "pulling [] teeth." (*Id.* at 78-79.)  In July 1989, after Hemler extracted a last-minute, $5 million reduction from Greselin, SUSA submitted an initial bid of $131,978,000 on Contract 29.  (*Id.* at 84; Mar. 23, 2007 PM Tr. at 67-68.)  Hemler characterized this bid as

---

declarant and defendant were members of this conspiracy; and (3) that the statement was made during the course and in furtherance of the conspiracy.  Fed. R. Evid. 801(d)(2)(E).  As explained herein, the record contains evidence from which a jury could reasonably find that SUSA and HII, through their agents, Greselin, Ruggieri, and Anderson, agreed to rig bids on Contract 29, and that Greselin's statements to Ruggieri were made to finalize this agreement.  Thus, Ruggieri's testimony was admissible as non-hearsay against both Anderson and HII.

lying at the "high end" of the "competitive range," the low end being "about $120 million." (Mar. 23, 2007 AM Tr. at 86.)  Prior to the bid opening, Hemler, fearing stiff competition from Harbert-Jones, pleaded with Greselin to further lower SUSA's bid, but Greselin refused.  (Mar. 23, 2007 PM Tr. at 14.)  Harbert-Jones, meanwhile, entered a bid of $147,424,305.  (*Id.* at 9.) Naturally, CWO selected ABB SUSA's lower bid.  (*See id.* at 37.)  But $132 million exceeded the sum USAID had allocated for Contract 29, and rather than impose the excess cost on the Egyptian government, CWO negotiated with SUSA over certain line items to reduce the contract value to $114,869,355.[110]  (*Id.* at 88, 90.)

In 1990, once these negotiations had ended, Ruggieri met with Schmidt to finalize SUSA's payoff to Harbert-Jones.  (Mar. 26, 2007 AM Tr. at 17.)  Because the contract had been awarded below the original bid price, he insisted on reducing the payoff amount from $4 million down to $3.4 million.  (*Id.* at 17, 21.)  To conceal the nature of the transaction and to shield the two parent companies, they agreed that invoicing and payment would occur between a Swiss Holzmann subsidiary and a British SUSA subsidiary.  (*Id.* at 17-19.)  The payoff process proceeded as agreed.  (*Id.* at 22-26; Pl.'s Exs. 21, 22, 637.)

### i.      Anderson

Before discussing the evidence of Anderson's participation, the Court must address a threshold argument that he and other defendants raise:  they contend plaintiffs offered no evidence that the parties ever reached an agreement.  (Motion One at 5-7; Motion Four at 21-22.) As noted above, Greselin could not definitively obligate SUSA without Ruggieri's approval.

---

[110] Change orders and additions boosted the amount eventually paid to $134-$135 million. (Mar. 23, 2007 PM Tr. at 92.)

(Mar. 23, 2007 PM Tr. at 124.)  Though Ruggieri ratified the terms presented in the "minutes"

document and instructed Greselin to "interface" with Schmidt and the "guy from Harbert" to

effectuate them, he had no personal knowledge of how, or if, Greselin performed this task.  (*Id.*

at 125; Mar. 26, 2007 AM Tr. at 45.)  Greselin, himself, testified that he did not meet with

Schmidt again before the bidding and did not specifically recall talking with him on the

telephone; but he never flatly denied having communicated with *anyone* associated with Harbert-

Jones after obtaining Ruggieri's approval.[111]  (Apr. 25, 2007 PM Tr. at 81.)

     Defendants forget that jurors may make reasonable inferences from the evidence and may

employ their common sense.  (*See* May 4, 2007 AM Tr. at 29.)  Greselin, Schmidt, and the "guy

from Harbert" reached an "agreement in principle" to rig the bidding on Contract 29.[112]  (Apr. 25,

2007 PM Tr. at 78.)  Ruggieri ratified their agreement, selected from the alternative bid-rigging

and payoff methods Schmidt had offered, and directed Greselin to carry out the plan.  (Mar. 23,

2007 PM Tr. at 124-25.)  The bidding and payoffs then proceeded *as Ruggieri had specified*.[113]

---

[111] Greselin did not appear at defendants' civil trial but did testify at Anderson's criminal trial.  Defendants introduced portions of his testimony into evidence during their case.  (*See* Apr. 25, 2007 PM Tr. at 60-81.)

[112] Anderson's contention that Greselin "was [not] even capable of accepting" Schmidt's "double-alternative" proposal is specious.  (Motion One at 5.)  The presence of alternatives does not defeat an agreement.  Using counsel's example, even when two friends "can't decide what restaurant to go to" without "further discussion," they may nonetheless have agreed they will dine together.  (May 2, 2007 AM Tr. at 71.)

[113] Anderson asserts that had an agreement been reached, Ruggieri and Schmidt would not have negotiated the payoff amount – it would already have been decided.  (Motion One at 6.)  In particular, he contends that "[i]f Greselin had followed Ruggieri's orders and met with Schmidt to communicate and reach agreement that [SUSA] wanted only to pay money for protection on Contract 29, there would have been no reason for Schmidt to press [Ruggieri] for 'in kind' compensation."  (Motion One at 4.)

     This argument is flawed for at least two reasons.  First, since the parties' original

The jury could reasonably have attributed this to more than mere happenstance.  Ruggieri

believed that SUSA had made a deal with Harbert-Jones, observed events consistent with this

deal, and consequently paid $3.4 million to Harbert-Jones.  (*Id.* at 73.)  In defendants' version,

Harbert-Jones' bid simply happened to exceed SUSA's, and Schmidt "snookered" Ruggieri into

paying $3.4 million for nothing.  (*See* Mar. 26, 2007 AM Tr. at 71-72; May 2, 2007 AM Tr. at

85-86).  The jury could reasonably have deemed Ruggieri's interpretation of events more

plausible.[114]

---

discussion, circumstances had changed markedly: given CWO's reductions in Contract 29's
scope and overall value, it was perfectly reasonable to revisit the payoff amount.  Second,
Ruggieri never testified that Schmidt "pressed" him for in-kind compensation; instead, he stated
he had a "feeling" that Schmidt "preferred" compensation in kind to a cash payoff.  (Mar. 26,
2007 AM Tr. at 68-69.)

[114]  In his reply, Anderson offers a thorough treatise on what constitutes a "reasonable
inference."  (Reply One at 1-3 & n.2.)  As is likely self-evident, in this Opinion, where the Court
discusses inferences the jury could have made, it has determined these inferences are ones that
"'reasonable and fair-minded men [and women] in the exercise of impartial judgment' might
draw from the evidence."  *Georgetown Hotel v. NLRB*, 835 F.2d 1467, 1475 (D.C. Cir. 1987)
(quoting *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1326 (11th Cir. 1982)).
Anderson's true quibble appears to be that plaintiffs presented no *direct* evidence on certain
points – the communication cementing the agreement, and his connection to it.  (Reply One at 3.)
He disregards, however, that

> [c]ircumstantial evidence can be of high probative quality.  For example if one
> goes to bed and there is no snow on the ground, and one wakes up to find snow on
> the ground, the snow is powerful evidence – albeit wholly circumstantial – that it
> snowed while one was asleep.

*Kimberlin v. Quinlan*, 6 F.3d 789, 808 (D.C. Cir. 1993) (Edwards, J., dissenting), *vacated on
other grounds by* 515 U.S. 321 (1995).  Plaintiffs presented evidence that Ruggieri provided the
necessary approval for the original "agreement in principle," that he ordered Greselin to carry out
the agreement, and that the bidding and payoffs transpired as agreed.  Just as one may reasonably
infer on awaking to a blanketed ground "that it snowed while one was asleep," so, here, the jury
could have reasonably inferred that the bidding and payoffs occurred pursuant to a finalized
agreement.

Even if the parties had such an agreement, however, Anderson claims plaintiffs presented

no evidence of his connection to it.[115]   (Motion One at 7-12.)   When Greselin first met with

Schmidt, someone associated with "Harbert-Jones" joined them.   (Apr. 25, 2007 PM Tr. at 69.

*See also* Mar. 23, 2007 PM Tr. at 120-21.)   Though no witness particularly identified this

individual as Anderson, plaintiffs presented other evidence from which the jury could reasonably

have concluded it was he.   First, Anderson had the authority to approve the joint venture's

involvement in bid-rigging: he was managing partner of the joint venture and held powers of

---

[115] Attacking the evidence linking him to the conspiracy, Anderson observes that precedents in "this District and this Circuit are legion that a jury verdict may not rest upon improper inferences or the fact finder's speculation about the evidence," and to prove his point, he cites and quotes from many of them.   (Motion One at 9-12.)   He implicitly concedes that whether an inference is reasonable or speculative depends heavily on a case's unique facts, and he thus attempts to analogize only one of his numerous examples.   (*Id.* at 11 (discussing *Wilson v. Good Humor Corp.*, 757 F.2d 1293 (D.C. Cir. 1985)).   *See also* Motion Two at 19-20 (examining same case).)

In *Wilson*, the trial court granted defendant David Williams' motion for a directed verdict because no reasonable jury could find that *he* was the ice cream truck driver whose negligence caused plaintiffs' child's death.   757 F.2d at 1298-99.   Plaintiffs presented only one identification witness, who testified he spoke with the driver at the accident scene and wrote down the man's name.   *Id.* at 1298.   Yet the witness never visually identified Williams, never offered a physical description of the driver, and never produced the paper on which he had transcribed the driver's name.   *Id.*   He believed "vaguely" that the driver's name had been *Davis* Williams.   *Id.*   On appeal, the Court of Appeals agreed that such a "bare and uncertain identification of the [defendant's] name" would not, alone, "permit a reasonable juror to conclude that the vendor at issue was in fact the defendant Williams."   *Id.*

Anderson contends the same result should obtain here, where *no witness* identified Anderson as having attended the Schmidt-Greselin meeting or described the "guy from Harbert" who did.   (Motion One at 11.)   In *Wilson*, however, *no other evidence* linked Williams to the accident.   Here, as explained below, plaintiffs presented several other pieces of circumstantial evidence connecting Anderson to the Schmidt-Greselin meeting.   The syllogism proposed in Anderson's reply brief fails precisely because it ignores these critical facts.   It characterizes Anderson only as "a Harbert man" rather than as Harbert's point man for bidding on Egyptian construction contracts, who had represented HII at meetings hosted by Schmidt to rig bids on other such contracts, and whose travel records reflect his presence at the meeting location around the time it occurred.

attorney to act for HII, its majority partner, and for the joint venture, itself, in bidding on Contract 29.  (Pl.'s Ex. 653C.)  Second, Anderson was intimately involved in collusion – spearheaded by Schmidt – on Contracts 20A and 07:  he represented HII in at least two meetings among the competitors to rig bids on these contracts.  (Mar. 21, 2007 AM Tr. at 42-50; Mar. 21, 2007 PM Tr. at 87-88; Mar. 22, 2007 PM Tr. at 62-69.)  Third, Anderson spent three days in Frankfurt, site of Holzmann's headquarters, around the time when the Schmidt-Greselin meeting occurred.[116] (Pl.'s Ex. 596(a); Apr. 4, 2007 PM Tr. at 74-76.)  Fourth, during that meeting, the unidentified Harbert-Jones man did not object to the negotiated terms but did balk at signing the written "minutes" document.  (Apr. 25, 2007 PM Tr. at 77.)  Coincidentally, some months before, when Anderson represented HII at a meeting on Contract 20A bid-rigging payoffs, Anderson first signed a written agreement documenting the conspiracy's terms but then scratched out his name to disguise his involvement.  (Mar. 21, 2007 AM Tr. at 48-49.)  From this circumstantial evidence, the jury could reasonably have inferred that Anderson was the "gentleman from Harbert" who attended the Schmidt-Greselin meeting.

Next, Anderson challenges plaintiffs' exhibit 648, the sole documentary evidence of the claim on which he was found liable.  He contends the document should have been excluded as incomplete, or alternatively, that its incompleteness so diminished its weight that no reasonable jury could have concluded it proved a false claim was submitted or presented to the government.

---

[116] Anderson minutely dissects Ruggieri and Greselin's testimony to demonstrate that his Frankfurt travel could not have coincided with the Schmidt-Greselin meeting.  (Reply One at 12-13.)  But given the lapse of *eighteen years*, the jury could reasonably have inferred that Ruggieri and Greselin's statements about when certain events occurred might be somewhat imprecise. While Anderson's travel record, alone, does not prove he attended the Schmidt-Greselin meeting, the jury might reasonably have attached some significance to his presence in Frankfurt within mere days of the time frames mentioned by the witnesses.

(Motion One at 13-16.)  Federal Rule of Evidence 106, which partially codifies the common-law

rule of completeness, provides that an adverse party may require the introduction of omitted

portions of an incomplete document "which ought in fairness to be considered

contemporaneously with it."  Fed. R. Evid. 106; *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153,

171-72 (1988).  As the Supreme Court explained in *Rainey*, the rule assures that "when one party

has made use of a portion of a document, *such that misunderstanding or distortion can be*

*averted only through presentation of another portion*, the material required for completeness is

*ipso facto* relevant."  488 U.S. at 172 (emphasis added).[117]

Though at least four pages of exhibit 648 appeared to be missing, the exhibit nonetheless

had substantial probative value, and its incompleteness did not give rise to unfair prejudice.  Its

relevance was two-fold: it reflected that claim 56 was submitted to, and paid by, the government,

and it stated the value of that claim.  (*See* Pl.'s Ex. 648.)  The omitted pages, which the

government did not have, and which provided only "backup" information on the costs billed in

the interim statement, could neither have aided nor hindered these purposes, so their absence did

---

[117] Anderson states a more categorical rule: when "a document is incomplete or deficient on its face . . . [its] admission into evidence is deemed improper."  (Motion One at 13.)  But the authorities on which he relies do not support this inflexible reading.  *See Weir v. Crown Equip. Corp.*, 217 F.3d 453, 458-59 (7th Cir. 2000) (though trial court found many of plaintiff's proffered accident reports were "vague, incomplete, and otherwise confusing," it nonetheless admitted the most clearly relevant reports); *Cortes v. Maxus Exploration Co.*, 758 F. Supp. 1182, 1184-85 (S.D. Tex. 1991) (EEOC probable cause determination excluded under Rule 403 due to its "demonstrable lack of probative value"); *Seol v. Saipan Honeymoon Corp.*, 5 N. Mar. I. 238, 241 (1999) (trial court, in fairness, should have excluded incomplete exhibit because plaintiffs' counsel refused to produce the second page).  Rather, in this Circuit, "application of the rule of completeness is a matter for the trial judge's discretion."  *United States v. Washington*, 12 F.3d 1128, 1137 (D.C. Cir. 1994).

not detract from the exhibit's probative value.[118]   (*See* Mar. 26, 2007 AM Tr. at 113, 116.)

Further, although the appearance of official government insignia on a document "will indubitably

influence the jury . . . such an influence is permissible and does not rise to the level of unfair

prejudice" where, as here, the document has some probative value.  *Cortes v. Maxus Exploration*

*Co.*, 758 F. Supp. 1182, 1185 (S.D. Tex. 1991).  Thus, the Court did not err in admitting

plaintiffs' exhibit 648.[119]

Furthermore, considering the narrow purposes for which plaintiffs relied on the exhibit,

its probative value was more than sufficient to support the jury's verdict.  As explained above,

plaintiffs presented other evidence sufficient to prove that SUSA secured Contract 29 by virtue

of a bid-rigging conspiracy to which Anderson was a party.  Claims submitted to the government

under any contract secured through a collusive conspiracy are, inevitably, false or fraudulent.

*Hess*, 317 U.S. at 543-45.  Exhibit 648 reflected that SUSA submitted a claim to the government

which the government paid.  Nothing in the record suggests, and Anderson does not contend, that

the omitted pages would have indicated otherwise.

Hence, the record contains sufficient evidence from which the jury could reasonably have

---

[118] Anderson suggests only that these pages could have revealed "whether the government's check was attributable to a change order, as opposed to original work," but it is unclear why he believes this distinction important.  (Motion One at 15.)  Once SUSA had obtained the contract through collusion, every invoice it submitted was false, *see supra* note 83, and because this invoice fell within the limitations period, Anderson could be held liable for it.

[119] Contrary to Anderson's assertion, plaintiffs *did* lay an evidentiary foundation for the exhibit.  (*See* Mar. 26, 2007 AM Tr. at 85-87.)  They offered testimony from German Gallegos, a former SUSA CFO familiar with its interim billing statements and with the checks the U.S. sent in response.  (*Id.* at 75-91.)  He identified exhibit 648 as an interim billing statement, number 56, on Contract 29, with an attached U.S. Treasury check in the amount billed.  (*Id.* at 86-87.)  He further testified that SUSA maintained such records as a regular business practice.  (*Id.* at 87.)  Anderson does not indicate in what respect he believes this foundation deficient.

found Anderson liable on claim 56 of Contract 29.

### ii. HII

As with Contract 20A, the jury could reasonably have found HII liable on Contract 29 by

virtue of the knowledge and acts of its agent, Roy Anderson. As discussed above, plaintiffs

demonstrated that Anderson played a prominent role in the bid-rigging on Contract 29. *See*

*supra* part III.A.2.a.i. He had authority to act for HII with respect to Contract 29,[120] and under the

circumstances, the jury could reasonably have concluded that he exercised that authority.

The conclusions that Anderson was the "Harbert" man and that he acted for HII are

mutually reinforcing. As Ruggieri testified, only two companies had pre-qualified to bid on

Contract 29: SUSA, and the joint venture between J.A. Jones and HII. (Mar. 23, 2007 PM Tr. at

120-21.) Three individuals attended the bid-rigging meeting for that contract: Greselin, of

SUSA; Schmidt, of J.A. Jones' parent company; and the "gentleman from Harbert." (*Id.*) From

all the evidence, the jury could reasonably have inferred that the "gentleman from Harbert"

represented the other joint venture partner, HII, and that he was the same gentleman who

represented HII at the Contract 20A bid-rigging meeting, Roy Anderson. Indeed, the original

written agreement to collude on Contract 20A – to which Anderson hand-drafted an addendum,

(Pl.'s Ex. 2) – specifically contemplated future bid-rigging on, *inter alia*, Contract 29, (Pl. Ex.'s

---

[120]   In the joint venture's 1988 tender documents on Contract 20A, HII represented that it
– not HIE – owned a majority stake in the joint venture, and it held out Roy Anderson as its vice-
president. (Pl.'s Exs. 109, 162.) Bill Harbert, then HII's president, had sent Anderson to London
some years before to work on HII's behalf. (Pl.'s Ex. 250.) He granted Anderson the authority,
"without reservation," to represent HII in bidding for international construction projects,
including Contract 29. (Pl.'s Exs. 116, 653C.)

1).[121]  Given HII's participation, through Anderson, in the Contract 20A conspiracy, the jury

might have viewed this reference as additional evidence that HII was more likely than not the

"Harbert" whose delegate attended the Schmidt-Greselin meeting.

Finally, regardless of whether Anderson attended the meeting or did so on HII's behalf,

plaintiffs presented evidence from which the jury could reasonably have found that this meeting

was part of a broad, overarching conspiracy to rig bids on construction contracts.  *See infra* part

III.A.4.  Having willfully joined this conspiracy at its outset, *see supra* part III.A.1.a.i, HII could

be held liable for its co-conspirators' actions in furtherance thereof, including their knowing

creation and presentation of false claims on Contract 29.  *See Halberstam v. Welch*, 705 F.2d

472, 487 (D.C. Cir. 1983).

## b.    Damages

Defendants assert plaintiffs failed to prove the government suffered any damages on

Contract 29 – essentially, that the bid-rigging agreement had no impact whatsoever on the price

the government paid.  (Motion One at 16-17; Motion Two at 23-26; Motion Four at 27-28.)

They first point out that Hemler, who prepared SUSA's Contract 29 bid, was unaware of the bid-

rigging agreement with Harbert-Jones and characterized SUSA's ultimate bid as "reasonable"

and "fair."  (Mar. 23, 2007 PM Tr. at 61, 95, 105; Mar. 23, 2007 PM Tr. at 127, 128.)  Even

Greselin testified that "the price was low and not raised."  (Mar. 25, 2007 PM Tr. at 79.)

Hemler also testified, however, that he had identified at least $10 million in "potential

savings" in SUSA's June 27, 1989 bid calculation of $137 million – that is, he believed SUSA

---

[121] HII seeks to diminish this reference's significance, (Motion Two at 21-23), but its
critique once again relies on an erroneous premise – that one may join a conspiracy after the
agreement's inception *only* so long as it remains wholly executory.  *See supra* note 87.

could profitably perform the contract for $127 million.  (*See* Mar. 23, 2007 AM Tr. at 84; Pl.'s

Ex. 75.)  Mere days before its submission on July 2, Hemler persuaded Greselin to reduce

SUSA's bid by $5 million, only half the potential amount. (Mar. 23, 2007 AM Tr. at 84-85.)

After CWO received SUSA's initial bid, but before it opened the sealed bid envelopes, Hemler –

fearing stiff competition from Harbert-Jones – pleaded with Greselin to further lower SUSA's

bid.[122]  (Mar. 23, 2007 PM Tr. at 14.)  Greselin, who knew Harbert-Jones posed no threat,

refused.  (*Id.*)  Hemler described Greselin's "uncommon" involvement in the bidding process as

"the most singular remarkable incident of [his] 35-year career."  (*Id.* at 97, 110.)  The jury could

reasonably have concluded that but for Greselin's "very forceful" influence, (*id.* at 45), Hemler

would have submitted an amended bid of as little as $127 million, and hence that SUSA's initial

bid was inflated by as much as $5 million.

Defendants further note that post-award negotiations with USAID reduced the contract

price by $17.1 million, and they argue this process must have eliminated any inflation the bid-

rigging might have caused.  Yet as defendants' evidence reflects, a reduction in the "provisional

sum" accounted for most of the decrease.  (*See* Defs.' Ex. 334.)  Hemler explained that CWO's

tender documents had instructed Contract 29 competitors to add "a provisional amount of 10

percent" to their final bids, (Mar. 23, 2007 AM Tr. at 83); because it was added to the top, this

---

[122] Though defendants, in a footnote, state that USAID rules precluded SUSA from submitting a revised bid, they cite no authority for this proposition.  (*See* Reply Two at 21 n.17.) Hemler, at least, believed that SUSA had "the opportunity to consider a price adjustment just before the commercial bid opening."  (Pl.'s Ex. 77.)

Plaintiffs rely in part on Hemler's suspicion that Harbert-Jones had submitted a bid "around $120 million" in arguing that but for Greselin's opposition, Hemler would have reduced SUSA's bid to $120 million.  (Opposition Two at 26.)  The jury may well have adopted this logic.  As discussed herein, however, even a more conservative reading of the evidence justifies the jury's verdict.

sum could not have concealed any padding that might have been included in SUSA's bid.  CWO

reduced the provisional sum percentage to 1 percent, and this change accounted for $10.8 million

of the total $17.1 million decline in the contract price.  (Def. Ex. 334.)  To achieve the additional

$6.3 million in savings, CWO eliminated certain line items from its tender request and reduced

SUSA's projected mobilization costs.  (*Id.*)  While these line items may have harbored *some* of

the alleged inflation in SUSA's bid, reasonably, they must also have included some legitimate

costs.  The jury could thus have concluded that even if CWO's hard-nosed negotiating tactics

eliminated some of the remaining $5 million in "potential savings," the final contract price still

incorporated some amount of inflation attributable to the bid-rigging.[123]

As with Contract 20A, due to defendants' collusion, the jury could not precisely calculate

what the government would have paid under competitive conditions, and it thus endeavored to

"make a just and reasonable estimate . . . based on relevant data," *Bigelow v. RKO Radio

Pictures, Inc.*, 327 U.S. 251, 264 (1946).  Plaintiffs presented several such relevant data to the

---

[123] Defendants argue that "[t]he evidence indicates that CWO would have 'forced the price down'" to no more than $114 million under any circumstances because any excess costs would have fallen to the Egyptian government.  (Motion Two at 25 (quoting Mar. 23, 2007 PM Tr. at 109).)  As an initial matter, this argument mischaracterizes a statement Hemler conspicuously couched as an "opinion."  (Mar. 23, 2007 PM Tr. at 109.)  The jury need not have accepted Hemler's opinion, and thus the Court need not do so either.  *See In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 87 (D.D.C. 2006) (Hogan, C.J.) (on a Rule 50(b) motion, the court "must disregard all evidence favorable to the movant that the jury was not required to believe").  Nonetheless, even if credited, defendants' premise does not redeem their causation argument.  They imply CWO had no incentive to negotiate a price below $114 million because USAID had promised to contribute that sum.  Arguably, it was in CWO's interest to negotiate as much work from SUSA as it could get for that $114 million.  Thus, USAID would have paid $114 million regardless of the amount of SUSA's bid.  Assuming this was the case, however, absent the bid-rigging, CWO would have had to eliminate fewer line items from the bid – and thus would have received more value in return for its $114 million – to reach the magic number.  However defendants wish to construe the situation, the government still suffered compensable harm due to the bid-rigging.

jury.  First, plaintiffs' expert, Professor McAfee, testified that according to economic theory, a cartel bidder must incorporate certain, inherent costs of collusion, including "any payments made to competitors," into his bid to avoid a net loss.  (Apr. 5, 2007 PM Tr. at 99-100.)  *See also United States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988) (though payoffs to co-conspirators set "neither a floor nor a conclusive presumption of the measure of damages" in a bid-rigging case, they are "relevant as circumstantial evidence").  The jury also heard that via their subsidiaries, SUSA remitted a $3.4 million payoff to Harbert-Jones.  (Mar. 26, 2007 AM Tr. at 22-26; Pl.'s Exs. 21, 22, 637.)  From this testimony, the jury could reasonably have concluded that unless the final contract price of $114 million included at least $3.4 million in padding, SUSA would have had to perform the contract at a loss.  Second, as explained above, the jury could reasonably have concluded that bid-rigging inflated the bid CWO accepted on Contract 29 by up to $5 million.  Thus, the jury could have determined that the government paid up to $5 million – and likely, at least $3.4 million – more than it would have absent defendants' collusion.  Under these circumstances, its $3.4 million damages award was an eminently "just and reasonable estimate" adequately supported by the evidence.

### 3.    Contract 07

#### a.    Liability

In 1990, USAID pre-qualified both Harbert-Jones and Fru-Con to bid on a third Egyptian construction project, Contract 07.  (Mar. 22, 2007 PM Tr. at 63-64.)  Roughly two months before the bidding date, Schmidt telephoned Werner Hoffmeister of Bilfinger & Berger, Fru-Con's parent company, with an invitation to meet to discuss "the procedure of the bidding."  (*Id.* at 64.)  Hoffmeister accepted and traveled to Holzmann's Frankfurt offices, where he met with Schmidt

and Anderson.  (*Id.* at 64-65.)  Schmidt proposed that Fru-Con should bid high to permit Harbert-Jones to secure the contract, but Hoffmeister initially balked.  (*Id.* at 65-66.)  He questioned how the scheme could work unless all other pre-qualified companies participated, and even if such consensus were achieved, he felt Contract 07 should go to Fru-Con, not Harbert-Jones.  (*Id.* at 66-67.)  Schmidt then indicated that the other competitors either were, or soon would be, onboard, and Anderson agreed to contact Morrison-Knudsen, the only potential bidder whose consent Schmidt had not yet obtained.[124]  (*Id.* at 67.)

Two weeks after their initial meeting, Schmidt called Hoffmeister to inform him that Morrison-Knudsen could not be contacted, and he proposed a new arrangement: if CWO awarded Contract 07 to either Harbert-Jones or Fru-Con, the winner would pay 1.5 million dollars or Deutschmarks to the loser.  (*Id.* at 68-69.)  Hoffmeister agreed.  (*Id.* at 69.)  Just before the bid date, he heard from Schmidt again: Schmidt had heard rumors that Fru-Con and other competitors would not bid, and he feared that if Harbert-Jones proved the sole bidder, CWO would void the tender and start afresh.  (*Id.* at 69.)  Though Hoffmeister tried to intervene with Fru-Con, his trusted contacts in the subsidiary were both on vacation, and Hoffmeister was unwilling to discuss the situation with anyone else.  (*Id.* at 69-70.)  Though Fru-Con did not enter a bid, Schmidt's fears proved groundless, and Harbert-Jones secured the contract by underbidding Morrison-Knudsen.  (*Id.* at 70.)  After additional discussions, Holzmann paid the $1.5 million loser's fee to Bilfinger & Berger.  (*Id.*)

---

[124] Soon afterward, Anderson traveled to Boise, Idaho, where Morrison-Knudsen had located its headquarters, and his travel record suggests he at least planned to visit Morrison-Knudsen.  (Pl.'s Ex. 607; Apr. 4, 2007 PM Tr. at 73-74.)  Defendants offered video deposition testimony from Morrison-Knudsen executives that indicated Anderson never proposed any sort of financial arrangement on Contract 07 to them.  (*See* Apr. 25, 2007 PM Tr. at 26-27.)

For several reasons, defendants contend plaintiffs failed to present sufficient evidence that any claims submitted on Contract 07 were false.  (Motion Two at 27-28; Motion Four at 19-20.)  They point out that Schmidt, Anderson, and Hoffmeister never agreed on which company would win the contract, that Hoffmeister in fact instructed the Fru-Con team to prepare a competitive bid, and that the evidence showed Morrison-Knudsen had prepared a competitive, though losing, bid.  These facts may establish that Contract 07 was not subject to the same sort of bid-rigging that occurred on Contracts 20A and 29, but they do not impugn the jury's verdict.  Collusion may take many forms, but in whatever guise, it renders false or fraudulent all claims submitted to the government on a contract thereby obtained.[125]

"[W]hen a contract is initially obtained through fraud or deception, every claim for payment submitted pursuant to that contract is thereby tainted and triggers FCA liability regardless of whether the claim is itself 'false or fraudulent.'" *United States ex rel. Bettis v. Odebrecht Contractors of Cal.*, 297 F. Supp. 2d 272, 279 (D.D.C. 2004) (Huvelle, J.).  In its bid documents, Harbert-Jones certified that its bid was made "without connection with any other . . . corporation making any other tender for the same purpose."  (Pl.'s Ex. 683; *see also* Pl.'s Ex.

---

[125] Even HII appears to acknowledge, in its reply brief, that a loser's fee arrangement could give rise to FCA liability.  (*See* Reply Two at 22.)  BHIC, on the other hand, insists that "collusion, like bid rigging, requires that competition be eliminated."  (Reply Four at 15 (citing *Hess*, 317 U.S. at 543.)  This semantic argument is a non sequitur – nothing in the FCA requires a jury to find "collusion" to hold a party liable.  Moreover, while the collusion in *Hess* did consist of a "conspiracy to remove all possible competition," the Supreme Court in no way suggested that its description of the jury's factual findings in that case should be read as exclusively defining collusion within the FCA.  *See* 317 U.S. at 543.  Here, plaintiffs' expert testified that the term "collusion" embraces any situation in which a group of firms or individuals get together to try to circumvent the competitive process and generally increase the price." (Apr. 5, 2007 PM Tr. at 77.)  A jury could reasonably find that this much broader definition, which defendants did not challenge, encompasses the loser's fee arrangement on Contract 07.

146.)  In fact, this statement was untrue: Harbert-Jones had formed a side agreement with its

competitor, Fru-Con.  (*See* Mar. 22, 2007 PM Tr. at 68-69.)

More concretely, as discussed below, the jury could reasonably have concluded that this

side agreement prompted Harbert-Jones to submit an inflated bid.  *See infra* part III.A.3.b.

Consequently, the claims Harbert-Jones submitted to the government on Contract 07

incorporated this inflation, and these illegitimate charges rendered the claims false.  *See United*

*States ex rel. Marcus v. Hess*, 317 U.S. 537, 543 (1943) (where collusion among bidders inflated

contract price, the initial fraud "entered into every swollen estimate which was the basic cause

for payment of every dollar" paid by the government).  *See also* S. Rep. No. 99-345, at 9 (1986),

*reprinted in* 1986 U.S.C.C.A.N. 5266, 5274 ("each and every claim submitted under a contract . .

. which was originally obtained by means of false statements or other corrupt or fraudulent

conduct . . . constitutes a false claim").       The jury could reasonably have held HII directly

liable for the involvement of its agent, Roy Anderson, in conspiring to submit these false claims

and in causing them to be made and presented to the government.[126]  As discussed below, it could

---

[126] HII again disclaims responsibility for Anderson's knowledge and conduct; alternatively, it insists Anderson knew nothing of the loser's fee agreement.  (Motion Two at 27; Reply Two at 22-23.)  As to each contention, there was evidence from which the jury could reasonably have reached the opposite conclusion.

First, it could have imputed Anderson's knowledge and actions in willfully joining and advancing the collusive conspiracy on Contract 07 to HII.  HII expressly empowered Anderson to act on its behalf in bidding on Contract 07, (*see* Pl.'s Ex. 652C), and Anderson thereafter signed and identified himself as an HII officer on documents related to Contract 07, (*see* Pl.'s Ex. 145; Def.'s Ex. 368).  At the Frankfurt meeting on Contract 07, three individuals – Hoffmeister, Schmidt, and Anderson – discussed a collusive arrangement involving three companies – Fru-Con, J.A. Jones, and HII.  (*See* Mar. 22, 2007 PM Tr. at 64-65.)  At the meeting, Hoffmeister represented Fru-Con, and the jury could reasonably have inferred that Schmidt and Anderson represented, respectively, J.A. Jones and HII.

Second, Anderson's evident role as Schmidt's partner in the Contract 07 scheme indicates he would have known about the loser's fee agreement.  At the Frankfurt meeting, Schmidt

have imputed this liability to other participants in the overarching conspiracy, including HC and

BHIC.[127]   *See infra* part III.A.4.

### b.   Damages

As with its liability finding, evidence presented at trial supported the jury's

$1,026,029.22[128] damages award on Contract 07.  First, Hoffmeister testified that Harbert-Jones,

---

delegated the task of contacting the last remaining competitor, Morrison-Knudsen, to Anderson. (*Id.* at 67.)  Anderson accepted this duty, and plaintiffs offered some evidence that he pursued it, albeit unsuccessfully.  (*See* Pl. Ex. 607; Apr. 4, 2007 PM Tr. at 73-74; Apr. 25, 2007 PM Tr. at 26-27.)  Additionally, in November 1990, Anderson spoke with John Ollis of Jones, who was then working on the Harbert-Jones Contract 07 bid.  (Mar. 27, 2007 PM Tr. at 40-42.)  When Ollis brought up that Jones' estimating team had not yet arranged a reconciliation meeting with their Harbert counterparts, Anderson told him that "this thing had been set up," and that all the pre-qualified contractors "were part of the setup."  (*Id.* at 41-42.)  Though inaccurate – no party disputes that Morrison-Knudsen was not "part of the setup" – Anderson's statement does indicate he knew an agreement had been reached on Contract 07 – more than he would have known had his involvement ended after the Frankfurt meeting.

From this evidence, the jury could reasonably have concluded that Anderson knew of the loser's fee arrangement and imputed his knowledge to HII.  Reasoning that but for the collusive conspiracy, which HII had, through Anderson, willfully joined, claims submitted on Contract 07 would not have been false, the jury could have held HII liable for causing these false claims to be made and presented to the government.

[127] The jury might also have recalled that Anderson claimed to be "President and CEO" of BHIC's "international operations," (Pl.'s Exs. 389, 568A), and held a power of attorney for BHIC from May 12, 1992 onward, (*see* Mar. 30, 2007 AM Tr. at 61-62; Pl.'s Ex. 386).  It might reasonably have inferred that after this date, Anderson acted for BHIC as well as for HII and/or HIE.  Armed with Anderson's knowledge, BHIC provided support services essential to the joint venture's performance of Contract 07.  (*See* Pl.'s Exs. 383, 615B-E, 682; Apr. 4, 2007 PM Tr. at 97-111.)  From these facts, the jury could reasonably have concluded that BHIC willfully joined and advanced the conspiracy, and knowingly caused false claims to be created and presented to the government on Contract 07.  *See United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 244 (3d Cir. 2004).

[128] According to defendants, the jury must have extracted this value from a Contract *20A* payoff invoice, which would amount to clear error.  (Motion Two at 28-29 (citing Pl.'s Exs. 617, 618); Motion Seven at 2-4.)  Throughout their filings, defendants repeatedly accuse plaintiffs and the jury of speculation, but the proverbial shoe now seems to be on the other foot.  While HII has identified a striking coincidence, it again conflates correlation with causation.  In reviewing a

via Holzmann, paid a loser's fee of 1.5 million dollars or Deutschmarks to Bilfinger & Berger.[129] (Mar. 22, 2007 PM Tr. at 68-69.)  According to plaintiffs' expert, Professor McAfee, economic theory prescribes that a bidder must incorporate such "payments made to competitors" into his bid to avoid a net loss.  (Apr. 5, 2007 PM Tr. at 99-100.)  Hence, Harbert-Jones had a strong incentive to account for the anticipated payoff in its bid rather than risk surrendering a significant chunk of its profits should it secure the contract.

Second, John Ollis' testimony concerning his November 1990 conversation with Anderson suggests Harbert-Jones acted on this incentive.  When Ollis expressed concern that the Jones and Harbert teams had not yet reconciled their estimates for Contract 07, despite the rapidly approaching bid submission deadline, Anderson told him that "he and Alf Hill needed room to maneuver."  (Mar. 27, 2007 PM Tr. at 41.)  This, he implied, had caused the delay in scheduling a reconciliation meeting.  (*Id.*)  He then told Ollis that something had been "set up."  (*Id.* at 42.)  Understanding Anderson to be referring to the bidding on Contract 07, Ollis protested that Harbert-Jones should submit a competitive bid because other big contractors might not be in on the "setup."  (*Id.*)  Anderson's response speaks volumes.  He did not correct Ollis by

---

damages award, a court may not hypothesize as to the precise formula the jury adopted. *Carter*, 727 F.2d at 1239.  Its duty is simply to confirm that the award falls "within a reasonable range" and is supported by the evidence. *Id.*  As explained herein, the jury's Contract 07 damages award satisfies both criteria.

[129] HII asserts that because the Court admitted Rainer Hermann's prior testimony against Anderson, alone, and Hoffmeister learned of the payment from Hermann, the record contains no evidence admissible against HII that the fee was actually paid.  (Motion Two at 30.)  This Court limited Hermann's former testimony's admissibility because only Anderson had had an opportunity to cross-examine him.  (*See* Mem. Op. of Mar. 16, 2007 [722] at 7.)  But this limitation extended only to Hermann's prior testimony at Anderson's criminal trial – not to out-of-court statements he had previously made to co-conspirators.  (*See id.* at 4-7.)  The jury was free to consider these hearsay statements, admitted through Hoffmeister, against *all* defendants.

explaining the "setup" had nothing to do with the bidding process; nor did he clarify that Harbert-Jones would, naturally, submit a competitive bid.  (*See id.*)  Instead, he assured Ollis that "all the prequalified contractors were part of the setup," implicitly confirming Ollis' interpretation of his original words.  (*Id.*)  Based on this testimony, the jury could reasonably have concluded that Anderson needed "room to maneuver" because he wanted to ensure Harbert-Jones submitted an inflated bid without undue interference from the Jones estimating team.[130]

Third, though Morrison-Knudsen, Harbert-Jones' sole competitor on Contract 07, originally bid high, it later adjusted its bid down $5 million – $3 million below Harbert-Jones' bid.  (Apr. 19, 2007 PM Tr. at 47-49.)  While Morrison-Knudsen's inexperience and ultimate disqualification do detract from the weight of this evidence, it does suggest that Contract 07 could have been profitably performed for less than Harbert-Jones chose to bid.

From this evidence, the jury could reasonably have concluded that Anderson caused the Harbert-Jones bid to be inflated by as much as 1.5 million dollars or Deutschmarks.  Thanks to defendants' collusion, the jury could not precisely calculate the difference between what the government actually paid and what it would have paid absent the loser's fee arrangement, so the jury was left to "make a just and reasonable estimate . . . based on relevant data," *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946).  Under the circumstances, its award of $1,026,029.22 was entirely reasonable and within the range supported by the evidence.

---

[130] Alf Hill testified that he personally prepared the Harbert-Jones Contract 07 bid without influence from Anderson and that to his knowledge, the bidding was competitive.  (*See* Apr. 11, 2007 PM Tr. at 23, 25, 30, 106.)  Yet Anderson's comments to Ollis – "he and Alf Hill needed room to maneuver" – implicate Hill in the conspiracy, (*see* Mar. 27, 2007 PM Tr. at 41), so the jury need not have credited Hill's assertions of non-involvement, *In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 87 (D.D.C. 2006) (Hogan, C.J.).

4.      **Overarching Conspiracy**

In their pleadings and at trial, plaintiffs alleged that defendants colluded on Contracts

20A, 29, and 07 in furtherance of a single, overarching conspiracy.  (*See* May 4, 2007 AM Tr. at

58; Gov't's Third Am. Compl. [419] ¶3; Relator's Fifth Am. Compl. ¶¶ 1-2.)  In deciding this

issue, the jury looked to "whether the defendants shared a common goal, whether there was any

interdependence between the alleged participants in the conspiracy, and whether there was any

overlap among the alleged participants, including the presence of core participants linked to all

the contracts."  (May 4, 2007 AM Tr. at 58 (quoting *United States v. Gatling*, 96 F.3d 1511, 1520

(D.C. Cir. 1996)).)

Plaintiffs' evidence reflected: (1) a common goal uniting the schemes on Contracts 20A,

29, and 07 – namely, reducing competitive pressures in bidding on USAID-funded infrastructure

projects in Egypt;[131] (2) interdependence among the alleged participants;[132] (3) significant overlap

among the participants;[133] and (4) ubiquitous characters whose involvement extended to all three

---

[131] As the Court of Appeals instructed in *Gatling*, "a conspiracy's purpose should not be defined in too narrow or specific terms."  96 F.3d at 1520.  *See also United States v. Tarantino*, 846 F.2d 1384, 1393 (D.C. Cir. 1988) (citing "the possession and distribution of narcotics for profit" as a shared goal sufficiently particularized to support a single conspiracy).  Here, the shared goal of boosting profit by limiting competition on a particularized set of government-funded contracts is more than sufficiently narrow to support a single, overarching conspiracy.

[132] The written bid-rigging agreement on Contract 20A contemplates future collusion on Contract 29, (*see* Pl.'s Ex. 1; Mar. 21, 2007 AM Tr. at 29-30); Schmidt proposed a *quid pro quo* on Contract 29 to SUSA, (Mar. 23, 2007 PM Tr. at 120-21); and Anderson blithely referred to the companies pre-qualified by USAID to bid on Egyptian infrastructure projects as "the Frankfurt Club," (Mar. 27, 2007 PM Tr. at 44).

[133] For example, both Harbert-Jones and Fru-Con participated in collusion on Contracts 20A and 07, with Fru-Con receiving payoffs for its cooperation in both instances.  (*See* Mar. 22, 2007 AM Tr. at 80-94; Mar. 22, 2007 PM Tr. at 63-70; Pl.'s Exs. 17, 18.)

contracts.[134]  They also demonstrated that defendants repeatedly made collusion-related payoffs

through false invoices and routed them through affiliated companies, often via a single

Holzmann bank account.[135]

Based on this evidence, the jury could reasonably have concluded that defendants acted

pursuant to a single, overarching conspiracy.[136]  "[O]nce [a] conspiracy has been formed, all its

members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy.  A

conspirator need not participate actively in or benefit from the wrongful action in order to be

found liable . . . so long as the purpose . . . was to advance the overall object of the conspiracy."

*Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983).  Therefore, having willfully joined the

conspiracy as to Contract 20A, HC and BHIC could each be found liable for their co-

conspirators' creation and presentation of false claims to the government on Contracts 29 and 07.

Accordingly, to the extent defendants' motions for judgment notwithstanding the jury's

verdict challenge the sufficiency of the evidence, they shall be DENIED.

_____

[134] Schmidt, and to a slightly lesser extent, Anderson, emerged as ringleaders in coordinating collusion among bidders on each contract.  (*See, e.g.*, Mar. 22, 2007 AM Tr. at 80-94 (describing Schmidt's role in bid-rigging on Contract 20A); Mar. 21, 2007 AM Tr. at 40-45 (describing Anderson's attendance and conduct at meeting to finalize payoffs to Fuller on Contract 20A); Mar. 23, 2007 PM Tr. at 120-22 (describing meeting at which Schmidt proposed bid-rigging on Contract 29); *supra* part III.A.2.a.i (discussing evidence from which jury could reasonably have concluded Anderson attended Schmidt-Greselin meeting); Mar. 22, 2007 PM Tr. at 63-70 (describing Schmidt-initiated loser's fee arrangement on Contract 07 and Anderson's role in securing agreement of all competitors); *supra* note 126 (discussing evidence from which jury could reasonably have concluded Anderson knew of the loser's fee arrangement).)

[135] *(See, e.g.*, Mar. 22, 2007 AM Tr. at 91-95; Pl.'s Exs. 17-18; Mar. 21, 2007 AM Tr. at 76-80; Mar. 25, 2007 AM Tr. at 18-30; Pl.'s Exs. 21, 22, 365, 372-79, 635, 637.)

[136] In Anderson's criminal case, the Eleventh Circuit Court of Appeals sustained the jury's guilty verdict as to Sherman Act conspiracy based on a similar body of evidence. *See United States v. Anderson*, 326 F.3d 1319, 1327-28 (11th Cir. 2003).

## B.        Statute of Limitations

HII renews its assertion that the six-year limitations period set by 31 U.S.C. § 3731(b)(1)

bars plaintiffs' substantive Contract 07 claims, all but the last three of their substantive Contract

29 claims, and their FCA conspiracy claim.[137]   (Motion Two at 31-33.)   This argument fares no

---

[137] In a final, "kitchen sink" footnote, HII also requests reconsideration of the Court's ruling that the government's Contract 20A claims relate back to the filing date of relator's sealed complaint pursuant to Federal Rule of Civil Procedure 15(c)(2).  (Motion Two at 33 n.23.)  HII again directs the Court's attention to *United States v. Baylor University Medical Center*, 469 F.3d 263 (2d Cir. 2006), where the Second Circuit Court of Appeals held that under this Rule, claims in a government complaint in intervention do not relate back to the date a *qui tam* complaint was filed *under seal*.  *See* 469 F.3d at 270.  As this Court previously concluded, however, *Baylor*'s reasoning and holding do not bind this Court, and decisions in this Circuit have uniformly held that relation back under Rule 15(c)(2) *does* apply to FCA claims.  *See United States ex rel. Ortega v. Columbia Healthcare, Inc.*, 240 F. Supp. 2d 8, 14 (D.D.C. 2003) (Lamberth, J.); *United States ex rel. Purcell v. MWI Corp.*, 254 F. Supp. 2d 69, 75-76 (D.D.C. 2003) (Urbina, J.).  Hence, the Court reaffirms its prior holding.  (*See* Mem. Op. & Order of Mar. 14, 2007 [711] at 4.)

Moreover, notwithstanding *Baylor*, Rule 15(c)(1) authorizes relation back where the law that provides the statute of limitations applicable to the action permits.  Fed. R. Civ. P. 15(c)(1).  "[I]f that law affords a more forgiving principle of relation back than the one provided in this rule, it should be available to save the claim."  Fed. R. Civ. P. 15 Advisory Committee's Note.  Certain characteristics of the FCA demonstrate it is one such law.  Specifically, the FCA requires relators to file their complaints under seal and to then stand idly by while the government investigates the alleged fraud.  31 U.S.C. §3730(b) (2008).  By its terms, at least, the statute places no limitation on the duration of the government's investigation: though initially limited to sixty days, a district court can extend the investigation period for good cause shown.  *Id.*  The government may intervene at any time before this investigation period ends.  *Id.*  Moreover, nothing in the FCA otherwise limits the government's ability to seek redress for related, fraudulent conduct it uncovers during its investigation, whether or not it satisfies Rule 15(c)(2).  As seen in this very case, this leniency poses practical problems, but one cannot deny that the FCA purposefully affords the government great latitude to conduct a thorough – and if necessary, lengthy – investigation before filing its complaint.  Based on this rationale, at least one other district court has held that government complaints in intervention relate back to the filing date of the relator's original, sealed complaint under Rule 15(c)(1).  *See United States ex rel. Ven-A-Care of the Fla. Keys, Inc. v. Dey, Inc.*, 498 F. Supp. 2d 389, 397-99 (D. Mass. 2007).  Indeed, *Baylor*, itself, concedes "[t]here is a colorable argument that the FCA implicitly 'permit[s]' a form of relation back."  469 F.3d at 270.  Hence, even if the government's claims did not relate back under Rule 15(c)(2), Rule 15(c)(1) would nonetheless save them.

better than it did pre-trial.

This Court previously held that plaintiffs' Contract 29 and 07 claims relate back to the filing date of relator's original complaint because they form part of the overarching conspiracy alleged in that complaint. (Mem. Op. & Order of Mar. 6, 2007 [613] at 9-12 (sustaining relator's objection to magistrate judge's recommendation that only Contract 20A claims could relate back). *See also* Mem. Op. & Order of Mar. 14, 2007 [711] (rejecting statute of limitations arguments raised in memorandum filed by HII and HC).) In asking the Court to revisit this ruling, HII rehashes the same set of arguments this Court has already rejected. (*See* Motion Two at 31.) It simply asks the Court to reconsider, "taking account of the trial evidence." (*Id.*) As explained above, plaintiffs offered evidence sufficient to sustain the conclusion that defendants' collusion on Contracts 20A, 29, and 07 comprised a single, overarching conspiracy. *See supra* part III.A.4. Thus, the trial evidence entirely supports the Court's earlier rulings.[138]

The Court also held that the FCA's six-year limitations period does not bar plaintiffs' FCA conspiracy claims because *some* overt acts in furtherance of the conspiracy occurred within that time frame. (Mem. Op. & Order of Mar. 14, 2007 [711] at 4-6.) It did not, however, directly address one of the issues HII raised in its pre-trial filing and which it now asks the Court to

---

[138] Because HII does not identify particular exhibits or testimony which it believes would prompt the Court to question its previous conclusion, (*see* Motion Two at 31), the Court's reconsideration begins and ends with this determination.

> It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones . . . Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.

*Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005).

reconsider: whether, even if plaintiffs' claims were not barred, they could use evidence of overt acts that occurred before June 30, 1989 to prove those claims.  (*See* Motion Two at 33; Mem. Supp. HII and HC's Mot. in Limine to Exclude Evidence [557] at 3-7.)  At trial, this Court permitted plaintiffs to introduce evidence of meetings and communications that took place before June 30, 1989; HII contends this was clear error.  (Motion Two at 33.)

In its pre-trial statute of limitations rulings, this Court relied on Judge's Friedman's decision in *United States ex rel. Fisher v. Network Software Associates*, 180 F. Supp. 2d 192 (D.D.C. 2002).  Particular language in that opinion bears on the present question:

> [T]he prevailing law in this circuit [holds] that "the statute of limitations in a civil damages action for conspiracy runs separately from each overt act that is alleged to cause damage . . . ."  *Lawrence v. Acree, 215 U.S. App. D.C. 16, 665 F.2d 1319, 1324 & n.7 (D.C. Cir. 1981)*; see *Thomas v. World Communications, 681 F. Supp. 55, 73 (D.D.C. 1988)*; see also *Scherer v. Balkema, 840 F.2d 437, 439-40 (7th Cir. 1988)*.  Under this rule, relator may attempt to prove the underlying conspiratorial agreement through those overt acts that occurred after November 22, 1993, but not those acts that occurred before that date; if successful, he may recover damages for all violations committed as a part of the conspiracy from that date forward.  Thus, the statute of limitations bars recovery for some but not all of the acts committed as a part of the conspiracy alleged in Count 3.

180 F. Supp. 2d at 195.  Based on this language, this Court stated that relator could "not use overt acts occurring prior to the date the statute of limitations began to run" to prove the underlying conspiratorial agreement.  (Mem. Op. & Order [613] at 6.)

A nuanced reading of these opinions confirms the Court did not err in admitting plaintiffs' evidence of pre-June 30, 1989 acts and events.  Though the *Fisher* opinion does not delve deeply into the underlying facts, it appears to involve a situation where the plaintiff endeavored to prove an agreement existed through circumstantial evidence – that is, subsequent conduct consistent with an earlier, pre-limitations deadline agreement.  *See* 180 F. Supp. 2d at

193-95.  Here, however, plaintiffs had unearthed *direct* evidence of the underlying conspiratorial

agreement – testimony by conspirators concerning meetings at which they formulated the

agreement and documents in which they memorialized its terms – and had no need to employ

circumstantial evidence to establish its existence.  (*See, e.g.*, Mar. 22, 2007 AM Tr. at 80-94;

Mar. 23, 2007 PM Tr. at 120-24; Pl.'s Ex. 1, 2.)

Separately, they introduced evidence of pre-June 30, 1989 acts in furtherance of this

agreement – for example, the co-conspirators' submission of inflated bids on Contract 20A – to

prove causation and damages.[139]  *Fisher* does not intimate that evidence of acts occurring prior to

the limitations date cannot be used for this quite distinct purpose.  Furthermore, given that

defendants' pre-trial motion sought to exclude evidence of "meetings, conversations, or other

---

[139] Notably, defendants' pre-trial motion sought to exclude evidence of "meetings, conversations, or other alleged 'conspiratorial' conduct that occurred prior to June 30, 1989, offered for the purpose of proving an underlying conspiratorial agreement."  (*See* Mem. Supp. HII and HC's Mot. in Limine to Exclude Evidence [557] at 6.)  As a matter of logic, meetings and conversations during which the parties reach agreement cannot logically be considered acts in furtherance of that agreement.  Furthermore, the "meetings, conversations, [and] other alleged 'conspiratorial' conduct" that defendants sought to exclude were not necessarily "overt acts" as contemplated by *Fisher*.  *Fisher*'s analysis rested on the Court of Appeals' holding in *Lawrence* that "the statute of limitations in a civil damages action for conspiracy runs separately from each overt act *that is alleged to cause damage* to the plaintiff."  665 F.2d at 1324 (emphasis added).  *Lawrence*, itself, does not delimit the evidence a civil conspiracy plaintiff may use for particular purposes but rather the conspiracy-generated injuries for which a plaintiff may recover.  *See id. Accord Scherer v. Balkema*, 840 F.2d 437, 439-40 (7th Cir. 1988) (setting forth rationale for confining civil conspiracy plaintiff's recovery to injuries caused by overt acts within the limitations period).  To the extent *Fisher* imposes evidentiary limitations, its references to "overt acts" can reasonably be read to mean "overt acts that [are] alleged to [have] cause[d] damage."  *See Fisher*, 180 F. Supp. 2d at 195; *Lawrence*, 665 F.2d at 1324.  This is so because evidence of such acts transpiring outside the limitations period is irrelevant:  under *Lawrence*, the plaintiff cannot recover for the injuries they caused.  *See Fisher*, 180 F. Supp. 2d at 195 (rejecting as contrary to *Lawrence* relator's position that overt acts occurring prior to the limitations date "are relevant as part of a continuing violation theory").  Evidence of *other* overt acts will not necessarily pose the same relevancy problem.

alleged 'conspiratorial' conduct that occurred prior to June 30, 1989" only insofar as it was used

"for the purpose of proving an underlying conspiratorial agreement," (*see* Mem. Supp. HII and

HC's Mot. in Limine to Exclude Evidence [557] at 5, 6), they have waived any objection to its

introduction for other purposes.  Consequently, to the extent they rest on statute of limitations

grounds, defendants' renewed motions for judgment as a matter of law shall be DENIED.

To the extent defendants raise any ground for judgment as a matter of law not herein

addressed, their motions shall be, likewise, DENIED.

### IV.     Motions for Remittitur or Other Relief

#### A.     Anderson's Liability

Hedging his bets, Anderson also seeks to lessen the sum he owes by several methods: he

seeks remittitur, a complete or partial offset based on payments by settling co-defendants, and/or

a reduction in the assessed statutory penalty.[140]

#### 1.     Remittitur

Contending the jury assessed excessive damages against him, Anderson asks this Court to

follow the process described in *Nyman v. FDIC*, 967 F. Supp. 1562 (D.D.C. 1997) (Urbina, J.).

(Motion One at 18-23.)  If the Court finds the verdict amount to be excessive, he asks that it

"order a new trial limited to the issue of damages," or "[i]n the alternative . . . grant the motion

for a remittitur by conditioning the denial of a motion for a new trial on the plaintiff's acceptance

of the reduced damage award."  967 F. Supp. at 1573.

In this Circuit, courts "only require remittitur when (1) the verdict is beyond all reason, so

---

[140] Anderson also asks the Court to modify the Judgment to reflect that he is not liable for the relator's attorneys' fees and costs.  (Motion One at 33.)  The Court will address this argument in its Opinion on relator's motion for fees.

as to shock the conscience, or (2) the verdict is so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate." *Peyton v. DiMario*, 287 F.3d 1121, 1126 (D.C. Cir. 2002). Here, the jury found Anderson liable in the amount of $46,538.40, for claim 56 on Contract 29. (Verdict Form [858] at 11.)

While the Court can conceive of cases in which a $46,538.40 verdict might "shock the conscience," Anderson's is simply not one of them. Conceding as much, he acknowledges the award was not excessive in an absolute sense, but he nonetheless insists it is inordinately large when considered in relation to the jury's overall damages award on Contract 29, $3.4 million. (Motion One at 19.) He notes that while $3.4 million is equal to only 2.5% of the total value of all claims submitted on Contract 29, $46,538.40 is equal to 60% of the total value of claim 56. (*Id.* at 20.) Anderson suggests that his liability should more appropriately have been 2.5% of the value of claim 56, or $1,956.16. (*Id.* & n.9.) But the jury need not have found that the premium paid by the government on Contract 29 was distributed evenly across all 56 false claims.

Further, caught up in his calculations, Anderson forgets to tether his argument to the damages measure applied in this case: "the difference between what the United States paid and what it would have paid had there been no bid-rigging agreement." (May 4, 2007 AM Tr. at 65 (final jury instruction).) Where, as here, "the defendant by his own wrong has prevented a [] precise computation" of this difference, the jury "may make a just and reasonable estimate of the damage based on relevant data." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946). Based on the information in Plaintiff's Exhibit 648 and on other relevant data, the jury were entitled to make a "just and reasonable estimate" of the premium paid by the government on

116

claim 56, for which Anderson would be jointly and severally liable with the other defendants.[141]

Anderson offers nothing beyond his "2.5%" argument to persuade the Court that $46,538.40 is an unreasonable sum, and objectively, it does not appear so.  The total value of claim 56 was $77,564, and the damages award does not exceed this value.  Because the damages award against him was neither beyond all reason nor inordinately large, the Court finds Anderson has demonstrated no basis for a remittitur order.  In this regard, his motion shall be DENIED.

## 2.    Set-Off

Anderson next protests that alone among the defendants, he received no credit for amounts the government obtained from settling co-defendants, and he contends these settlement payments entirely, or at least proportionately, offset his liability.  (Motion One at 23-33.)  In the Memorandum Opinion accompanying its Judgment, this Court adopted *McDermott, Inc. v. Amclyde*'s proportionate share approach in denying Anderson a set-off.  (Mem. Op. [882] at 4-7.) This was error.  Because Anderson shared joint and several liability with the other defendants as

---

[141] Seeking a new trial, Anderson contends the jury calculated damages based on HII's 60% share in the Harbert-Jones joint venture that bid on Contract 29.  (*See* Motion One at 20.) This is pure speculation.

> In reviewing the amount of the jury's award, [the court] need not – and indeed cannot – reconstruct the precise mathematical formula that the jury adopted.  Nor need [it] explore every possible quantitative analysis or compute the basis of every penny and dollar in the award. [Its] inquiry ends once [it is] satisfied that the award is within a reasonable range and that the jury did not engage in speculation or improper activity.

*Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1239 (D.C. Cir. 1984).  The law simply does not permit a court to hypothesize as to how the jury must have calculated specific awards.  And as explained above, the jury followed the proper damages measure in reaching a just and reasonable estimate of "the difference between what the United States paid and what it would have paid had there been no bid-rigging agreement."  Anderson's motion for a new trial on this ground shall be DENIED.

to the government's damages on claim 56, he was entitled to a proportionate credit.

As the Court acknowledged in a prior opinion in this case, contribution and indemnification are unavailable among joint tortfeasors under the False Claims Act. *United States ex rel. Miller v. Bill Harbert Int'l Construction, Inc.*, 505 F. Supp. 2d 20, 26 (D.D.C. 2007) (collecting cases). Nonetheless, "when a plaintiff receives a settlement from one defendant, a nonsettling defendant is entitled to a credit of the settlement amount against any judgment obtained by the plaintiff against the nonsettling defendant as long as both the settlement and judgment represent common damages." *Singer v. Olympia Brewing Co.*, 878 F.2d 596, 600 (2d Cir. 1989), *cert. denied*, 493 U.S. 1024 (1990). *See also United States v. Zan Mach. Co.*, 803 F. Supp. 620, 623 (E.D.N.Y. 1992) (applying this rule in FCA case).

When this Court entered Judgment, the United States had received a total of $13.7 million from settling co-defendants.[142]  Although at trial the jury calculated the government's damages as to each of the three contracts, the earlier settlement payments were not allocated among the three contracts but were structured as undivided, lump sums.  For HC, HII, BHIC, and Bilhar, with whom the settling co-defendants shared joint and several liability as to all three contracts, the settlement payments and judgment represented "common damages."  Hence, a simple, *pro tanto* credit against their overall liability would have been appropriate.[143]  *See Zan*

---

[142] The government had received $3.2 million from Bilfinger & Berger, $500,000 from AICI, and $10 million from ABB SUSA.  (Mem. Op. of Aug. 10, 2007 [882] at 3.)

[143] In *McDermott*, the Supreme Court debated the merits of two approaches before adopting the proportionate share rule for admiralty cases.  511 U.S. at 208-217 (citing Restatement (Second) of Torts § 886A (1977)).  While it ultimately deemed the *pro tanto* rule without contribution inferior, it found "arguments for the two approaches [were] closely matched," and its choice rested largely on the proportionate share rule's consistency with its earlier decision in *United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975), another admiralty

*Mach. Co.*, 803 F. Supp. at 623.  For HUK and Anderson, however, with whom the settling co-defendants shared joint and several liability only as to one contract and one claim, respectively, this was not the case.  Because the $13.7 million in settlement payments embraced items of damages for which HUK and Anderson were not liable, they were not entitled to credits of the full amount.[144]

At the most elemental level, *McDermott* and its predecessor, *United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975), rest on notions of fairness and proportionality.  *See* 511 U.S. at 208, 217 (proportionate share approach prevails due to its "consistency with *Reliable Transfer*," which itself adopted proportionate fault rule based on "interest in fairness").  In

---

case.  511 U.S. at 217.

> Lower court decisions since *McDermott* emphasize that this same outcome need not result in all other, non-admiralty contexts, and that the *pro tanto* rule without contribution remains a viable alternative.  *See Am. Cyanamid v. Capuano*, 381 F.3d 6, 20-21 (1st Cir. 2004) (noting that CERCLA does not dictate partial settlement's impact on contribution rights among joint wrongdoers but allows district court to choose among various approaches); *Schadel v. Iowa Interstate R.R., Ltd.*, 381 F.3d 671, 678 (7th Cir. 2004) (approving *pro tanto* approach in FELA case); *Fluck v. Blevins*, 969 F. Supp. 1231, 1237 (D. Or. 1997) ("choice of the proportionate liability method in *McDermott* does not necessarily mean that the Court would adopt that method for crediting a partial settlement in a securities case").

[144] The law disfavors double recovery as unjust enrichment, so "a plaintiff who has recovered any item of damage from one coconspirator may not again recover the same item from another conspirator."  *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 348 (1971).  To effectuate this rule, a non-settling defendant is entitled to offset his liability based on amounts received from settling joint wrongdoers, but *only* to the extent those settlement payments relate to the same item(s) of damages.  Logically, a defendant cannot offset his liability based on compensatory payments for harms for which he bears no responsibility.  Thus, here, HUK merited a credit based on the portion of the $13.7 million aggregate that redressed the government's damages on Contract 20A, and Anderson deserved a credit in the amount attributable to the government's damages on claim 56 of Contract 29.  This conclusion comports with the motivating rationale in another case discussed in this Court's Memorandum Opinion – namely, the avoidance of unjust enrichment.  *See Rose v. Associated Anesthesiologists*, 501 F.2d 806 (D.C. Cir. 1974).

keeping with these principles, this Court held that in calculating offsets, "the $13.7 million must be allocated in the manner in which the jury apportioned liability across each of the three contracts." (Mem. Op. [882] at 10.) The Court calculated the portions of that aggregate value applicable to each contract accordingly.[145]

It now follows the same procedure in calculating the portion applicable to claim 56 of Contract 29: the jury found the government's damages on claim 56 to be $46,538.40, (*see* Verdict Form [858] at 11), which accounts for 0.1355% of the government's total damages. Applying this proportion to the total settlement payment value, $18,563.50 of the $13.7 million served to compensate the government as to claim 56. Anderson was entitled to a credit in this amount, which reduces his total liability from $149,615.20 to $131,051.70.[146]

To the extent Anderson's motion seeks amendment of the Judgment to afford him a proportionate credit based on payments the government received from settling co-defendants, his motion shall be GRANTED, and the Judgment [883] shall be amended to reflect his post-credit liability of $131,051.70.

---

[145] The jury determined the government suffered damages of $29,920,000.00 on Contract 20A; $3,400,000.00 on Contract 29; and $1,026,029.22 on Contract 07. (Verdict Form [858] at 9, 10, 12.) Thus, Contract 20A accounted for 87.11% of the government's total damages, Contract 29 for 9.899%, and Contract 07 for 2.987%. (Mem. Op. [882] at 10.) The Court applied the jury's proportions to the total settlement payment value and found that of the $13.7 million, $11,934,546 applied to Contract 20A; $1,356,200 to Contract 29; and $409,234 to Contract 07. (*Id.*)

[146] The credit applies to Anderson's trebled liability of $139,615.20. *United States v. Bornstein*, 423 U.S. 303, 316-17 (1976) ("[I]n computing the [] damages authorized by the [FCA], the Government's actual damages are to be doubled before any subtractions are made for compensatory payments previously received by the Government from any source."). Incorporating the $18,563.50 credit, and the $10,000 statutory penalty reduces this amount to $131,051.70.

###### B.        Statutory Penalty

Finally, defendants protest the Court's assessment of the maximum statutory per claim penalty against each of them.  (Motion One at 33-39; Motion Seven at 6-13.)

A defendant found liable for violating the FCA must pay a mandatory civil penalty to the United States "of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a) (2008).  The trial court enjoys considerable discretion in setting a penalty amount within the prescribed range.  *See Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 132 (2003).  Broadly, the penalty's twin purposes are punishment and deterrence.[147]  *See, e.g., United States v. Mackby*, 261 F.3d 821, 830 (9th Cir. 2001) (analyzing sanction under Excessive Fines Clause).  As this Court explained in the Memorandum Opinion accompanying its Judgment, however, no statutory standard or judicially defined set of criteria governs this discretionary assessment.  (Mem. Op. of Aug. 10, 2007 [882] at 8.)  The Court thus considered "the totality of the circumstances, including such factors as the seriousness of the misconduct, the *scienter* of the defendants, and the amount of damages suffered by the United States as a result of the misconduct."[148]  (*Id.*)

---

[147] Defendants plaintively offer that they will almost certainly never engage in bid-rigging or similar wrongful conduct in future.  (*See* Motion One at 35 n.18; Motion Seven at 13.)  Even if these defendants have learned their lesson, the penalty's deterrence purpose is broader: the Court hoped the $10,000 per claim statutory penalty it imposed in this case would serve as a "deterrent to future conduct from entities in similar situations," not the deterrent to these defendants.  (*See* Mem. Op. of Aug. 10, 2007 [882] at 9.)

[148] Other courts had utilized these factors.  *See Hays v. Hoffman*, 325 F.3d 982, 994 (8th Cir. 2003) (factoring seriousness of misconduct and harm caused by the misconduct into civil penalty calculation); *United States v. Rogan*, 459 F. Supp. 2d 692, 727 (N.D. Ill. 2006) (same); *Ervin*, 370 F. Supp. 2d at 50 (considering wrongdoers' *scienter* in calculating civil penalty).

BHIC and HUK find fault with the Court's discretionary assessment, but their arguments

amount to an assault on the sufficiency of the evidence, which the Court has already addressed at

length.[149]   The Court reaffirms its original analysis and finds a $10,000 per claim statutory

penalty was entirely appropriate.

Anderson offers several additional arguments of his own.   In a footnote, this Court cited

*United States v. Murphy*, 937 F.2d 1032, 1035-36 (6th Cir. 1991), as standing for the proposition

that "the involvement of a defendant in bid-rigging is sufficient to impose the maximum $10,000

---

[149] For example, defendants find fault with the Court's observations that: "Anderson was present at, and participated in meetings at which the rigging of bids was discussed and agreed upon[,] . . . [and] as managing partner of the Harbert Jones Joint Venture, submitted tenders on the contracts at issue to the government, with the knowledge of the bid-rigging conspiracy[;]" and Bill Harbert, who "held various ownership and officer positions at the various corporate entities involved in the bid-rigging conspiracy," possessed the requisite knowledge thereof. (Mem. Op. [882] at 9.)   The Court has already extensively canvassed both men's intimate involvement in the conspiracy.   *See supra* part III.A.

Defendants also challenge the Court's consideration of their efforts to cover up their scheme. (Mem. Op. of Aug. 10, 2007 [882] at 8-9.)   Yet the jury heard evidence of – for example – a fraudulent "sale-leaseback" transaction that raised the Harbert-Jones joint venture's apparent costs on Contract 20A (and consequently, lowered its apparent profits) by $10.4 million. (Joint Stipulation 1.)   They also heard testimony that the joint venture hid an additional $6 million in profits on Contract 20A by funneling them first to Contract 27, and then to Contract 33A, on the false premise that these projects would ultimately incur expenses attributable to Contract 20A.  (Apr. 10, 2007 AM Tr. at 84-89.)

Defendants propose an alternative explanation for each suspicious practice.   (*See* Motion Seven at 10-12.)   They assert that Bill Harbert designed the sale-leaseback transaction to depress HII's value and to create a pool of funds from which he could subsequently purchase an interest in HII at a bargain price.  (Motion Seven at 10.)   But the "unanimous testimony" they cite consists of single-source hearsay, and they ignore that this transaction ultimately lined Jones' pockets as well as Harbert's.  (*See* Mar. 27, 2007 PM Tr. at 88-89; Mar. 28, 2007 PM Tr. at 107; Mar. 29, 2007 PM Tr. at 17-18; Joint Stipulation 1.)   Further, they characterize their "cost-shifting" among various contracts as legitimate.  (Motion Seven at 10-11.)   But as testimony at trial established, because the costs were never actually incurred, the joint venture ought then to have amended Contract 20A's books accordingly.  (Apr. 10, 2007 AM Tr. at 84-89.) Particularly considered in light of the other evidence of bid-rigging on Contract 20A, the Court, like the jury, found defendants' explanations implausible.

civil penalty under the FCA." (Mem. Op. of Aug. 10, 2007 [882] at 8 n.6.)  Hoping to distinguish *Murphy*, Anderson points out that the defendants there were repeat offenders.  *See Murphy*, 937 F.2d at 1036.  But Anderson, too, participated in bid-rigging more than once: thanks to the statute of limitations, he faced liability here only as to Contract 29, but he was also intimately involved in subverting the bidding process on Contract 20A.  As factors in mitigation, Anderson notes that he has already paid a $25,000 criminal penalty and that his bid-rigging activities did not bring him personal riches.  (Motion One at 34-35.)  The first point ignores Congress's intent.  It is beyond question that Congress may impose both a criminal and a civil sanction for the same conduct, *United States ex re. Marcus v. Hess*, 317 U.S. 537, 549 (1943) (citing *Helvering v. Mitchell*, 303 U.S. 391 (1938)), and Congress has done so for collusive conspiracies on U.S. government contracts, which subject the participants to both criminal liability under the Sherman Act and civil liability under the FCA, *see* 15 U.S.C. § 1 (2008); 31 U.S.C. § 3729 (2008).  The second point rests on a faulty premise.  Anderson characterizes his income as "relatively modest" and claims he possesses limited resources.  Yet a salary of $160,000 per year, in 1991, is not, in this Court's view, mere peanuts.   Hence, none of Anderson's arguments persuades the Court that he merits a lesser penalty.[150]

---

[150] Defendant Anderson suffers from Alzheimer's, a cruel and debilitating disease, and the Court is not without compassion for his plight.  Yet as the Court recounted in its Memorandum Opinion, Anderson's actions lay at the heart of the conspiracy:

> Defendant Anderson was present at, and participated in meetings at which the rigging of bids was discussed and agreed upon.  Moreover, defendant Anderson, as managing director of the Harbert Jones Joint Venture, submitted tenders on the contracts at issue to the government, with the knowledge of the bid-rigging conspiracy.

(Mem. Op. of Aug. 10, 2007 [882] at 9.)  His present condition in no way mitigates the

To the extent they seek amendment of the Judgment to impose a lesser statutory penalty, defendants' motions must be DENIED.  Further, to the extent defendants' motions seek vacation, alteration, or amendment on any basis not already addressed, they shall be DENIED.

## V.     Conclusion

A casual glance at defendants' voluminous post-trial filings might leave one with the impression that their trial was riddled with errors, and that the deck was stacked against them. This would be a mistake.  This Court has overseen defendants' case for only three of its now-thirteen years, but as expressed in this Opinion, its meticulous review of its own legal rulings and of the jury's verdict has led it to the inexorable conclusion that our judicial system afforded these defendants a fair shake.  For the reasons set forth above, the Court resolves defendants' post-trial motions as follows:

(1) Anderson's Post-Judgment Motion [893] ("Motion One") shall be GRANTED in part and DENIED in part.  To the extent Anderson's motion seeks amendment of the Judgment to afford him a proportionate credit based on payments the government received from settling co-defendants, his motion shall be GRANTED, and the Judgment [883] shall be amended to reflect his post-credit liability of $131,051.70.  In all other respects, his motion shall be DENIED;

(2) HII's Motion for Judgment as a Matter of Law [894] ("Motion Two") shall be DENIED;

(3) HC's Motion for Judgment as a Matter of Law [895] ("Motion Three") shall be DENIED;

(4) BHIC and HUK's Motion for Judgment as a Matter of Law [896] ("Motion Four")

---

egregiousness of his former conduct.

124

shall be DENIED;

(5) HII and HC's Motion for a New Trial as to All Claims [897] ("Motion Five") shall be DENIED;

(6) Bilhar's Motion for Post-Trial Judgment as a Matter of Law, or in the Alternative, for a New Trial [898] ("Motion Six") shall be DENIED;

(7) BHIC and HUK's Motion to Alter, Amend, or Vacate the Judgment [899, 901] ("Motion Seven") shall be DENIED; and

(8) BHIC and HUK's Motion for New Trial [900, 904] ("Motion Eight") shall be DENIED.

A separate order shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, June 23, 2008.