UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* RICHARD F. MILLER, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 95-cv-1231 (RCL) |
| BILL HARBERT INTERNATIONAL CONSTRUCTION, INC., *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

Four years ago one individual and five corporate entities[1] were found to have repeatedly and extensively fleeced the United States by engaging in a broad conspiracy to rig the bidding process for several construction contracts in Egypt that were funded by the U.S. Agency for International Development ("USAID"). Following a seven-week trial and jury verdict, the Court entered judgment against these defendants for numerous violations of the False Claims Act ("FCA") and ordered them—pursuant to the relevant provisions of the Act—to pay treble damages and the costs and attorneys' fees of relator Richard F. Miller. Having escaped judgment on the merits through an appeal of legal issues unrelated to the quality and quantity of evidence implicating them in the deceptive scheme to extract excessive funds from an agency that provides aid to third-world and developing countries—think "anti-Robin Hood"—

---

[1] The defendants include E. Roy Anderson, Harbert Corporation ("HC"), Harbert International, Inc. ("HII"), Bill Harbert International Construction ("BHIC"), Bilhar International Establishment ("BIE"), and Harbert Construction Services (U.K.) Ltd. ("HUK"). In addition, a second individual defendant—Bill L. Harbert ("Harbert")—went to trial but was dismissed prior to the verdict due to the expiration of the relevant statute of limitations. Order, May 4, 2007 [854].

defendants now attempt to avoid their obligations to pay Mr. Miller's counsel for their previously-successful and now partially-successful prosecution of the FCA claims in this case. In light of the Circuit Court's decision, the Court today will grant certain of these requests, deny others, and amend the original fee award as necessary.

## II.     BACKGROUND

Though this matter concerns sordid acts and this suit has a substantial history, the Court sets forth only the facts and procedural history necessary to the resolution of the issue before it.

### A.     Original Proceedings before this Court

In 1995, Richard F. Miller, who was then Vice President of a construction company operating abroad, brought a claim under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, alleging that defendants—in collusion with other corporate entities and contractors—were conspiring to rig the bidding process for development projects in Egypt funded by USAID. These projects were part of a U.S. policy to repay Egypt for its recognition of Israel following the Camp David Accords of 1979. The allegations in Mr. Miller's complaint focused on the bidding for one particular development project, Contract 20A, which involved the installation of large-diameter sewer pipes throughout heavily-populated districts in Cairo. Mr. Miller maintained that the company he worked for—J.A. Jones Construction Company ("Jones")—entered a joint-venture with HII, and together they extracted commitments from the only other two bidders for Contract 20A to either overbid or not bid at all. As a result of this collusion, the joint venture extracted $10 million in excess profits from the project, while the other participants received payments of $2.2 and $3 million for their role in the scheme.

In conjunction with FCA procedures, Mr. Miller's complaint was filed *in camera* and remained under seal while the United States evaluated its statutory options to either (1) intervene

and proceed with the action itself, (2) decline to take over the action, in which case the relator may pursue the suit, or (3) petition the Court for an extension of the 60-day period during which the complaint remains sealed. 31 U.S.C. § 3730(b). In this case, the United States chose to pursue criminal investigations into the alleged conspiracy and ultimately obtained guilty pleas or convictions from at least five U.S. entities. Throughout this period, the United States filed several motions to keep Miller's complaint under seal.

Nearly six years after Mr. Miller filed suit, the United States permitted the unsealing of his complaint and simultaneously filed its own civil complaint against the defendants now before the Court. This new complaint repeated Mr. Miller's allegations as to Contract 20A and the broader scheme, while adding new claims relating to two other projects: Contract 29, which concerned the building of a wastewater treatment plant near Cairo, and Contract 07, which involved the construction of sewers in Alexandria. Mr. Miller subsequently amended his own complaint to mirror the pleadings filed by the United States, and the plaintiffs jointly pursued prosecution of these civil claims against all defendants.

After five years of discovery and motion practice,[2] this matter proceeded to trial in March 2007.[3] The trial was extensive, to say the least. It lasted over seven weeks, included testimony by more than forty witnesses, and involved the introduction of more than 500 exhibits. Ten days after beginning deliberations, the jury returned a verdict for plaintiffs and against defendants on all counts,[4] having found that all of the defendants "conspired to defraud the Government" and that every defendant "knowingly presented or caused to be presented a false or fraudulent claim

---

[2] This case was reassigned on December 2, 2005 following the death of Judge William B. Bryant. In March of 2006, the Court informed the parties that the case had lingered a sufficient period of time, and that trial would begin in one year. Order, Mar. 13, 2006 [235]. True to its word, jury selection began on March 19, 2007.

[3] During this period, two of the defendants named in the operative complaints—Jones and its parent company, Philipp Holzmann, A.G.—filed for bankruptcy and settled with plaintiffs. They were subsequently dismissed from the case. Order, Aug. 3, 2007 [880]; Minute Order, Mar. 8, 2007.

[4] Claims against defendant Anderson relating to Contracts 20A and 07 were previously dismissed on statute of limitations grounds, so the final verdict only included judgment on Contract 29 as to him.

for payment or approval to the United States" with respect to Contracts 20A, 29 and 07. Verdict Form 2–5, May 14, 2007 [858]. The jury then specified damages of $29,920,000, $3,400,000, and $1,026,029.22 on Contracts 20A, 29 and 07, respectively. *Id*. at 9–12.

Following the verdict, the Court entered judgment against all defendants. *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 501 F. Supp. 2d 51 (D.D.C. 2007) ("*Miller I*"). In that opinion, the Court held that it lacked personal jurisdiction over HUK with respect to claims relating to Contracts 29 and 07, and therefore entered judgment against that particular defendant only for claims arising from Contract 20A. *Id*. at 53. Pursuant to the FCA, the Court then trebled the damages against all defendants, 31 U.S.C. § 3729(a), and entered a final judgment in excess of $90 million. *Id*. at 57–58. After several months of extensive briefing, the Court subsequently re-affirmed final judgment in a lengthy opinion denying defendants' motions seeking judgment notwithstanding the verdict, a new trial or alteration of the original judgment. *Miller v. Holzmann*, 563 F. Supp. 2d 54 (D.D.C. 2008) ("*Miller II*").

Two months later, the Court turned to Mr. Miller's request for fees and costs. *Miller v. Holzmann*, 575 F. Supp. 2d 2 (D.D.C. 2008) ("*Miller III*"). Having prevailed on all claims, Mr. Miller was entitled to receive compensation for reasonable expenses pursuant to 31 U.S.C. § 3730(d). In a 95-page opinion, the Court tediously reviewed over 70 pages of billing records, and concluded that defendants were obligated to pay more than $7 million in attorneys' fees and almost $300,000 in expenses and costs to plaintiff Miller. *Id*. at 58. Shortly thereafter, Mr. Miller requested—and received—supplemental awards for additional attorneys' fees and costs (collectively, the "fee award"). Order, Feb. 26, 2009 [1053]. Following entry of this award, defendants filed notice of their intention to appeal both the Court's denial of a directed verdict or new trial, as well as its award of litigation costs and attorneys' fees to Mr. Miller.

4

### B. The Appeal

In an opinion release in the Summer of 2010, the D.C. Circuit surveyed several legal matters—including the proper application of relevant statutes of limitations, questions of preemption, jurisdiction and settlement, several evidentiary matters at trial, and arguments concerning the overall sufficiency of the evidence—to reverse in part and affirm in part this Court's entry of judgment against all defendants. *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871 (D.C. Cir. 2010) ("*Miller IV*"). A total of three legal decisions were called into question by the opinion: first, the Circuit Court held that the statute of limitations had run on all claims relating to Contracts 29 and 07, which were only added after the suit was unsealed in 2001, *id*. at 880–82; second, it found error in this Court's decision to permit the United States to present evidence that BHIC existed throughout a particular period of time notwithstanding an agreed-upon stipulation to the contrary, *id*. at 888–89; and third, it concluded that this Court's admission of testimony concerning the wealth of defendants HII and HC was prejudicial and warranted a new trial. *Id*. at 896–98. The cumulative result of these three errors is that (1) judgment as to all defendants on claims relating to Contracts 29 and 07 has been reversed and those claims have been dismissed, (2) judgment as to defendants BHIC, HII and HC on claims relating to Contract 20A has been reversed, and (3) judgment as to defendants BIE and HUK on claims relating to Contract 20A has been affirmed. *Id*. at 907.

### C. Current Fee Dispute

The D.C. Circuit's opinion on the merits did not address defendants' appeal from the Court's entry of the fee award against all defendants, but instead directed this Court to "consider the appellants' requests for vacatur of the [fee orders], and to modify the award of fees and costs in a manner consistent with this court's opinion and judgment." Mandate, Dec. 30, 2010 [1079].

In response, defendants split into two groups and moved to vacate the fee award. The first group of defendants include BHIC, HII and HC—the three defendants who successfully obtained reversals as to all claims against them. In their motion, this group argues that because the underlying judgment against them has been vacated, the predicate basis for the fee award no longer exists. Motion of HII, HC and BHIC to Vacate Awards of Costs and Attorneys' Fees 3–4, Mar. 4, 2011 [1080]. In response, Mr. Miller concedes that vacatur is appropriate for these three defendants, but reserves the right to seek reinstatement of the fee award should he prevail in a new trial. Response to the HI-HC-BHC Motion to Vacate Fee Awards 1, Mar. 18, 2011 [1083].

The second group of defendants—HUK and BIE—also initially requested that the Court vacate the fee award. HUK and BIE's Motion to Vacate Awards of Costs and Attorneys' Fees, Mar. 9, 2011 [1081] ("Ds.' Mtn."). These defendants argue that plaintiff Miller cannot collect fees incurred in pursuing claims upon which he did not prevail, and that the Circuit Court's reversal of judgment against HUK and BIE with respect to Contracts 29 and 07 means that Miller did not prevail on those claims. *Id.* at 1–4. In addition, these defendants assert that "because the Court of Appeals vacated the judgment against HII, HC and BHIC in full, relator was not the 'prevailing party' with respect to claims against those parties and cannot recover fees incurred in pursuing those claims against those parties from any party, including [HUK and BIE]." *Id.* at 4. In essence, these defendants maintain that because at least some of the fees generated in pursuit of claims relating to Contract 20A are tied to claims asserted against BHIC, HII and HC, Mr. Miller cannot collect *any* fees from *any* party.

In response to this motion, plaintiff Miller opposes complete vacatur of the fee award as unsupported by established law, Opposition to the Bilhar-HUK Motion to Vacate Fee Awards, Mar. 23, 2011 [1084] ("P's Opp."), and simultaneously cross-moves for an adjustment of the fee

6

award to account for the dismissal of all claims concerning Contracts 29 and 07. Motion to Adjust Fee Awards as to Bilhar and HUK, Mar. 23, 2011 [1085] ("P's Cross-Mtn."). In his cross-motion, Mr. Miller indicates that some reduction in the fee award might be appropriate, *id*. at 1–2, and suggests that any such discount should mirror the 12.89% reduction to the damage award that resulted from the dismissal of certain claims by the Circuit Court. *Id*. at 3–4.[5] He therefore proposes that the fee award be reduced from $7,564,168.55 to $6,589,147.22 for the initial award and from $732,678.74 to $638,236.45 for the supplemental award. *Id*. at 4. In response to Mr. Miller's opposition and cross-motion, BIE and HUK abandon their initial request for a complete vacatur of the fee award and merely propose an alternative method for discounting the fee award. Specifically, these defendants assert that claims related to Contract 20A and those related to Contracts 29 and 07 are divisible and that the Court can and should reduce the fee award by two-thirds to reflect the Circuit Court's dismissal of claims related to two of the three development projects at issue in this case. Response in Opposition to Relator Richard F. Miller's Motion to Adjust the Fee Awards, Apr. 6, 2011 [1086] ("Ds.' Opp."). Mr. Miller sharply criticizes this approach by both pointing out that the claims related to Contract 20A constituted the overwhelming majority of the focus in this case and emphasizing that much of the work performed to prosecute this action centered on the overall conspiracy and is not divisible between particular claims. Reply in Support of Plaintiff Richard F. Miller's Motion to Adjust Fee Awards, Apr. 13, 2011 [1087] ("P's Reply").

For the reasons set forth below, the Court will vacate the fee award as to BHIC, HII and HC, but will affirm that award as to BIE and HUK. Consistent with the following discussion, the Court will also amend the fee award as appropriate.

---

[5] The jury awarded a total of $34,346,029.22 in damages at trial, of which $29,920,000 were attributable to Contract 20A. *Miller II*, 563 F. Supp. 2d at 74 n.3. Thus, by dismissing all claims not linked to Contract 20A, the Circuit Court reduced jury damages by ($34,346,029.22 - $29,920,000) / $34,346,029.22 = 12.89%.

## III. ANALYSIS

The False Claims Act provides that where "the Government proceeds with an action brought by a person . . . such person shall . . . receive at least 15 percent but not more than 25 percent of the proceeds . . . . Any such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs." 31 U.S.C. § 3730(d)(1). This provision ensures that the attorneys' fees and costs incurred by any prevailing relator are reimbursed by the violators of the Act. *Miller III*, 575 F. Supp. 2d at 8. In the wake of the Circuit Court's partial reversal of judgment against defendants, two questions concerning the continuing validity of the fee award now linger. First, does Mr. Miller remain a "prevailing party" against any or all defendants? Second, does the dismissal of certain claims advanced by Mr. Miller necessitate a reduction to the fee award beyond the discounts previously provided? The Court addresses each of these questions in turn.

### A. Prevailing Party

A party seeking fees under a "prevailing party" statute must have obtained some form of relief from the court. *District of Columbia v. Straus*, 590 F.3d 898, 901 (D.C. Cir. 2010). After the Circuit Court's opinion in *Miller IV*, plaintiff no longer has any right to relief against BHIC, HII or HC, *see supra* Section II.C, and as a result Mr. Miller no longer constitutes a prevailing party. *See Straus*, 590 F.3d at 901 (including "judicial pronouncement . . . accompanied by judicial relief" among requirements to qualify as "prevailing party"). The Court thus vacates the fee award against these three defendants pending the outcome of any subsequent proceedings.

With respect to defendants BIE and HUK, however, the Court concludes that Mr. Miller remains a prevailing party. The law is settled that a party need not obtain favorable outcomes on every claim or argument to be considered a "prevailing party" for these purposes; instead, a

8

prevailing party need only "succeed on any significant issue in litigation which achieves some of the benefit the part[y] sought in bringing suit." *Raton Gas Transmission Co. v. FERC*, 891 F.2d 323, 327 (D.C. Cir. 1989). And the other argument advanced by BIE and HUK—that because Mr. Miller is no longer a "prevailing party" against the other three defendants, he cannot collect fees for claims against those defendants from BIE or HUK—is contrary to established law. The normal practice in assessing liability for attorneys' fees is that all defendants are jointly and severally liable. *Kaseman v. District of Columbia*, 444 F.3d 637, 640 (D.C. Cir. 2006). Nor can the Court equitably differentiate these fees among the defendants, as they were all involved in an extensive scheme to rig the bidding process for numerous development projects, of which Contracts 20A, 29 and 07 were merely a part. In these circumstances, there is simply no sound basis upon which counsel's efforts to establish the existence of the conspiracy is divisible among defendants. Indeed, the Court previously rejected this very contention when declining to sever HUK's obligations concerning fees even though it was found liable only for claims related to Contract 20A. *Miller III*, 575 F. Supp. 2d at 33; *see also Turner v. D.C. Bd. of Elections & Ethics*, 354 F.3d 890, 898–99 (D.C. Cir. 2004) (holding that division of attorneys' fees award is only permitted where "there are fractionable parts of a lawsuit not fairly attributable to other parties"). Having found no reason not to apply the normal rule of joint and several liability here, the Court holds that BIE and HUK shall be liable for the entirety of the fee award, less any further necessary reductions.

> **B.    Awards for Partial Success**
>
>> **1.    The *Hensley* Inquiry**

In *Hensley v. Eckerhart*, the Supreme Court addressed the problem of awarding attorneys' fees pursuant to fee-shifting statutes where the prevailing party was successful on

some—but not all—of her claims. 461 U.S. 424 (1983). The *Hensley* Court articulated two questions for a trial court facing this scenario, and the D.C. Circuit has fashioned those questions into a two-stage inquiry for the calculation of attorneys' fees in cases of partial success:

> Under the first inquiry, if the lawsuit presents unrelated claims—some successful and some not—a court must confine fee awards to work done on the successful claims. . . . Under the second *Hensley* inquiry, the factfinder must then consider whether the success obtained on the remaining claims is proportional to the efforts expended by counsel.

*George Hyman Constr. Co. v. Brooks*, 963 F.2d 1532, 1535 (D.C. Cir. 1992); *see also Int'l Ctr. for Tech. Assessment v. Vilsack*, 602 F. Supp. 2d 228, 231 (D.D.C. 2009) ("The Supreme Court has held that where a plaintiff succeeds on only some of his claims, two critical questions must be addressed. First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?") (quotations omitted).[6]

The two phases in this inquiry are distinct. In the first, the Court reviews the particulars of a plaintiff's claims to determine whether the overlap in the facts or legal issues renders the construction of any easy divisions between various tasks performed by counsel in pursuit of particular claims impossible. *Hensley*, 461 U.S. at 434. Where such natural dividing lines exist, the Court immediately strikes fees incurred in pursuit of claims that are both unrelated and unsuccessful. *See id*. at 435 ("[C]ongressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim."); *Copeland v. Marshall*, 641 F.2d 880, 890 (D.C. Cir. 1980) ("[N]o compensation should be paid for time spent

---

[6] Though *Hensley* involved §1988 of the civil rights statutes, the D.C. Circuit has made clear that the basic framework established in that case applies to any federal statute that awards fees to the "prevailing party," *George Hyman Constr.*, 963 F.2d at 1535—including the FCA here.

litigating claims upon which the party seeking the fee did not ultimately prevail."). Where such ready distinctions do not exist, however, the Court in the second phase turns to the process of weighing the outcomes generated by the suit against the efforts expended by counsel. *Goos v. Nat'l Ass'n of Realtors*, 997 F.2d 1565, 1569 (D.C. Cir. 1993) ("*Goos I*"). "[I]f the successful and unsuccessful claims 'share a common core of facts or are based on related legal theories, then a court should simply compute the appropriate fee as a function of degree of success.'" *Pigford v. Vilsack*, 613 F. Supp. 2d 78, 82 (D.D.C. 2009) (quoting *George Hyman Constr.*, 963 F.2d at 1537); *see also Am. Lands Alliance v. Norton*, 525 F. Supp. 2d 135, 146 (D.D.C. 2007) ("A second inquiry that must be undertaken when partial success was achieved requires the court to ask whether the success obtained is proportional to the effort reasonably expended on the case.") (quotations omitted). The Court now turns to each stage of this inquiry.

### 2. Plaintiff's Claims are Interrelated

"If a party succeeded on only some of its claims, then the Court must ask whether the claims on which the plaintiff succeeded were 'related to the claims upon which the plaintiff was unsuccessful.'" *Lake Pilots Ass'n, Inc. v. Coast Guard*, 310 F. Supp. 2d 333, 344 (D.D.C. 2004) (quoting *Hensley*, 461 U.S. at 434). This inquiry requires the Court to conduct an issue-by-issue assessment of a plaintiff's claims. *Am. Lands*, 525 F. Supp. 2d at 146. Recognizing that work on a case often blends across multiple claims, the test for unrelatedness is a stringent one: "Fees for time spent on claims that ultimately were unsuccessful should be excluded only when the claims are 'distinctly different' in all respects, both legal and factual, from plaintiff's successful claims." *Morgan v. District of Columbia*, 824 F.2d 1049, 1066 (D.C. Cir. 1987) (quoting *Hensley*, 461 U.S. at 434). A party attempting to establish that certain claims are related therefore need not show "a virtually complete factual overlap" between the claims, but must only demonstrate that

11

the claims share a "common core of facts." *Goos I*, 997 F.2d at 1570. At the same time, a party asserting unrelatedness must do more than highlight distinct elements among particular claims or portions of attorneys' work that are unmistakably limited to certain claims; he must establish substantial differences between the factual development and legal theories underlying the particular claims. *Pigford*, 613 F. Supp. 2d at 83.

The Court has little doubt that all claims brought by Mr. Miller are "related" under this standard. At its core, this case is not an amalgamation of independent contract disputes into a single lawsuit, but is best understood as an action concerning an overarching conspiracy between the defendants to rig the bidding system in order to extract excessive payments from USAID for development projects in Egypt. For example, in denying defendants' post-trial motions, the Court noted that "[i]n their pleadings and at trial, plaintiffs alleged that defendants colluded on Contracts 20A, 29 and 07 in furtherance of a single, overarching conspiracy." *Miller II*, 563 F. Supp. 2d at 138. And in the immediate aftermath of the trial, the Court explained that "the evidence showed at trial [that] the breadth of this conspiracy was intricate, far-reaching and involved a deliberate attempt to rig bids on USAID contracts." *Miller I*, 501 F. Supp. 2d at 56. The overlapping nature of Mr. Miller's claims was again highlighted by the Court in awarding attorneys' fees against all defendants, *see Miller III*, 575 F. Supp. 2d at 32 ("Plaintiffs alleged an overarching conspiracy to rig bids on government contracts."), and the D.C. Circuit affirmed on appeal that "the jury found an overarching conspiracy spanning Contracts 20A, 29 and 07." *Miller IV*, 608 F.3d at 899. In sum, the claims related to particular Contracts are merely three instances in which the conspirators' scheme was executed—not distinct and unrelated acts. This is simply not a case where the claims overwhelmingly involve distinct legal and factual issues and are thus unrelated under *Hensley*. *Pigford*, 613 F. Supp. 2d at 83.

Another factor weighing in favor of relatedness is the evidence itself. Throughout trial, witnesses frequently discussed various agreements among all the defendants and described bidding processes in general terms, and they were rarely limited to testimony concerning a single Contract. Similarly, key documents detailed the overarching conspiracy, and were often relevant to more than one of the construction projects. In developing this evidence, Mr. Miller's counsel undoubtedly spent most of their time investigating and reviewing generally-applicable evidence, rather than narrowly focusing on proof of isolated conduct. "Where plaintiffs' claims for relief involve a common core of facts . . . much of counsel's time will be devoted generally to the litigation as a whole and the focus should be on the significance of the overall relief obtained." *Int'l Ctr. for Tech.*, 602 F. Supp. 2d at 232. In other words, plaintiff's inability to prevail on claims—due to the operation of statutes of limitations—concerning every project identified in this suit does not compel the Court to slash the fee award where the majority of work performed was in pursuit of evidence establishing the scheme and actions taken in furtherance of it. *See Pub. Citizen Health Research Grp. v. Young*, 909 F.2d 546, 552 (D.C. Cir. 1990) (explaining that under *Hensley* "a district court should not reduce the award for unsuccessful theories if the issue was all part and parcel of one matter"); *see also Goos v. Nat'l Ass'n of Realtors*, 68 F.3d 1380, 1384 (D.C. Cir. 1995) ("It is a plaintiff's overall success, and not the number of counts she prevails on, that determines the amount of fees she is entitled to.") ("*Goos II*").

Finally, and perhaps most importantly, both parties in their briefing fail to discuss the Court's prior rulings as to whether claims arising from Contracts 29 or 07 are related to those arising from Contract 20A. In resolving the parties' original dispute over plaintiff's claim for fees, the Court was presented with two arguments concerning divisions among the claims: first, defendants jointly asserted that any fees incurred while developing claims against Harbert—who

had been previously dismissed on statute of limitations grounds—were non-compensable; and second, defendant HUK individually maintained that it should not be equally liable for Mr. Miller's attorneys' fees since it had only been found liable on claims related to Contract 20A. *Miller III*, 575 F. Supp. 2d at 31–32. The Court rejected both of these positions. As to the former, the Court explained that "[p]laintiffs alleged an overarching conspiracy to rig bids on government contracts of which Harbert was a ringleader. . . . Their claims against Harbert and against the present defendants were part and parcel of one matter—those against Harbert were by no means fractionable." *Id*. at 33 (quotations omitted). As to the latter, the Court found that all claims in this case are "closely intertwined," and that in presenting their case with respect to Contract 20A, plaintiffs developed evidence and presented facts to the jury concerning Contracts 29 and 07. *Id*. at 33. The Court therefore held HUK equally liable for the entirety of plaintiff's attorneys' fees. Order, Aug. 12, 2008 [972].

Here, the claims emanating from each of the three development projects were part of a continuous process of U.S.-funded development in Egypt which defendants conspired to profit from, and counsel's efforts in prosecuting this action were directed primarily toward exposing the fraudulent acts undertaken in the name of this seedy conspiracy. In light of these facts, the same rationales that informed the Court's earlier decisions in *Miller III* apply with equal force in this context, and defendants BIE and HUK provide no justification for the Court's abandonment of its prior holding.[7] The Court therefore has little trouble concluding that plaintiff's claims are

---

[7] Nor does the D.C. Circuit's opinion require reconsideration of these holdings. In analyzing the statute of limitations, the Circuit Court's inquiry was on whether the *allegations in Mr. Miller's original complaint* provide sufficient notice of claims relating to Contracts 29 and 07. Those allegations were generally scant, and provided little detail concerning any overarching conspiracy or any relation between the various events that ultimately were raised at trial. By contrast, the inquiry here focuses on *the work performed by Mr. Miller's counsel*, the majority of which occurred after the complaint was unsealed, when the conspiracy allegations were broadened and allegations concerning Contracts 29 and 07 were added. *See generally Miller III*, 575 F. Supp. 2d at 44 (including appendix with 19 pages of billing prior to 2001 and 51 pages of billing after 2001). As a result, the vast majority of that work focused on developing evidence of the overarching conspiracy. Thus, the D.C. Circuit's holding that the "naked

14

unrelated and non-fractionable, and moves to the second stage of the *Hensley* inquiry. *See Goos I*, 997 F.2d at 1569 ("In assessing the fees for related claims, 'a court is to skip the first *Hensley* inquiry and move to its second.'") (quoting *George Hyman Constr.*, 963 F.2d at 1537).

### 3. Reduction in Fees for Lack of Success

Having determined that the claims arising from Contracts 29 and 07 are related to claims arising from Contract 20A, the second step of the *Hensley* analysis is to determine whether "the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Id*. at 1571.[8] A reduction in total fees is generally warranted where a plaintiff achieves only limited success. *Id*. at 1571–72. As the D.C. Circuit explained:

> *Hensley* by no means entitles plaintiffs to reimbursement of their entire fees if they pursue multifarious and marginal claims. And where the pursuit of multiple claims inflates the total hours beyond what is reasonable for the litigation, a reduction is clearly appropriate. Indeed, the courts have in many instances properly reduced fees where a plaintiff failed to prevail on related claims. However, a reduction is not appropriate if it is based solely on a plaintiff's failure to prevail on a related claim; the focus must be on whether the hours were reasonably expended in relation to the results obtained.

*Goos II*, 68 F.3d at 1387. While a failure to prevail on related claims does not mandate a strict reduction in fee awards, it does serve as evidence that some discount may be appropriate. *See Raton*, 891 F.2d at 330 ("Since Raton did not prevail on all of its contentions, it is evident that some reduction in the amount is called for."). Ultimately, the appropriate size of the fee reduction is a matter of discretion for the Court, as there is no standard method for calculating

---

assertions devoid of further factual enhancement" in Mr. Miller's original complaint fail to provide notice of claims related to Contracts 29 or 07, *Miller IV*, 608 F.3d at 882, does not alter this Court's conclusion that the factual and legal issues developed in the evidence and presented at trial render all claims related for these purposes.

[8] Defendants point to Mr. Miller's statement that no fees should be awarded for claims arising out of Contracts 29 and 07, P's Opp. at 2, to argue that Mr. Miller concedes that his claims are fractionable. Ds.' Opp. at 4. This is incorrect. As Mr. Miller correctly observes, his counsel is entitled to receive their fees for all work which reasonably contributed to success in this suit, P's Reply at 3, and those fees should not be reduced solely because they relate in some way to Contracts 29 or 07. *Goos II*, 68 F.3d at 1387.

15

such cuts. *Id.* at 330; *see also Dickens v. Friendship-Edison PCS*, 724 F. Supp. 2d 113, 121 (D.D.C. 2010) ("It is within a court's discretion to reduce the overall fee award to reflect that degree of success, regardless of whether the total number of hours expended was reasonable.").

There is no requirement—particularly in a substantial and far-ranging dispute such as this—that the Court undertake the burdensome task of going line-by-line through counsel's billing statements to pinpoint the specific tasks that were related only to Contract 20A or the conspiracy. *Copeland*, 641 F.2d at 903. Indeed, the parties do not suggest that such an approach is necessary, P's Mtn. at 3–4; Ds.' Mtn. at 3, but instead offer competing plans for reducing the fee award to account for Mr. Miller's reduced level of success. For their part, BIE and HUK argue that because Mr. Miller prevailed on claims related to only one of the three development projects, the attorneys' fees award should be reduced by two-thirds. Ds.' Opp. at 5–6. The Court cannot accept this mechanical reduction in counsel's fees. Apart from concerns with its underlying logical foundation, *see Raton*, 891 F.2d at 331 (noting that this "approach could rest logically *only* upon the highly unlikely premise that [plaintiff] devoted an equal amount of time to each" claim); *see also Pigford*, 613 F. Supp. 2d at 85 ("[S]imply reducing [the] fee by a fraction corresponding to the number of unsuccessful claims is not likely to result in a fair and reasonable fee."), this approach would merely replicate the first stage of the *Hensley* inquiry, which focuses solely on the nature of the claims and does not account for the level of success achieved by plaintiff—a key element in the latter stage of the *Hensley* inquiry. Indeed, at least one court in this district has held that *Hensley* mandates rejection of a purely mathematical reduction in fees equal to the percentage of claims that were unsuccessful, *Am. Lands*, 525 F. Supp. 2d at 147, while the D.C. Circuit has cited with approval a Tenth Circuit opinion rebuking a lower court for adopting this approach. *Goos II*, 68 F.3d at 1385 (citing *Jane L. v. Bangerter*,

16

61 F.3d 1505, 1512 (10th Cir. 1995)); *see also Int'l Ctr. for Tech.*, 602 F. Supp. 2d at 233 (rejecting "excessive" reduction of one-third where plaintiff was unsuccessful on one of three claims); *Thomas v. District of Columbia*, No. 03 Civ. 1791, 2007 U.S. Dist. LEXIS 20236, at *13–14 (D.D.C. Mar. 22, 2007) (rejecting 80% reduction where plaintiff succeeded on only one of five claims). A reduction in fees strictly tied to the percentage of unsuccessful claims is therefore inappropriate absent some indicia that the resulting discount (1) accurately reflects the actual time expended by counsel on each claim and (2) properly approximates the level of success achieved by that plaintiff. Defendants make no such showing.

For his part, Mr. Miller suggests that the appropriate reduction in attorneys' fees should mirror the reduction in overall damages resulting from the D.C. Circuit's reversal of portions of the judgment. P's Mtn. at 4. The Court cannot accept this metric either. The fundamental question in the second stage of the *Hensley* inquiry is whether the fees sought by counsel are proper *when compared to* the level of success achieved. Evaluating this question requires the Court to balance two factors: the extent of energy expended by counsel, and the results achieved by the litigation. Plaintiff's proposed method, however, only takes the latter factor into account while ignoring entirely the question of how much time and effort counsel put into developing claims concerning Contracts 29 and 07. Thus, in the same way that an approach that looks only to the number of claims upon which a plaintiff succeeded risks under-awarding efforts in cases where attorneys achieved great successes, Mr. Miller's proposal risks awarding excessive fees for efforts directed towards fruitless endeavors. An appropriate award therefore accounts both for energy expended and success achieved.

To measure the effort expended by counsel on particular claims, a common practice is to review the time allocation of certain practices throughout the case. *See, e.g.*, *Raton Gas*, 891

17

F.2d at 331; *Dickens*, 724 F. Supp. 2d at 121. For example, in one recent unpublished opinion awarding fees at the appellate level, the D.C. Circuit used the number of pages devoted to each claim as a metric for appropriating attorney's efforts. *Judicial Watch, Inc. v. Dep't of Commerce*, No. 05-5366, 2007 U.S. App. LEXIS 2337, at *3–4 (D.C. Cir. Jan. 31, 2007) (per curiam). Adopting a similar tack here, the Court readily confirms what it recalls from pretrial litigation and the trial itself: the majority of the efforts undertaken by Mr. Miller in this case focused on claims arising from Contract 20A or the development of the overarching conspiracy, and not to matters solely related to Contracts 29 or 07. For example, in the Court's opinion denying most of the defendants' challenges to final judgment, "Contract 20A" was mentioned 92 times and the "conspiracy" was mentioned 155 times; meanwhile "Contract 29" and "Contract 07" were only discussed 86 times *combined*. In that same opinion, the Court's discussion as to the sufficiency of the evidence related to Contract 20A went on for more pages than the combined discussions concerning Contracts 29 or 07. Contract 20A also remained the center of attention for all parties involved on appeal. In Mr. Miller's brief on appeal, for example, Contract 20A was discussed for 7 pages in the fact section and another 5 when examining the sufficiency of the evidence—fifty percent more than the discussion of Contracts 29 and 07 *combined*. And this pattern of contributing significantly more time and effort to claims related to Contract 20A was also present in defendants' briefing on reply, in which Contract 20A received 10 pages worth of discussion while Contracts 29 and 07 only garnered four.[9] The record is thus consistent with the Court's own recollection of the proceedings and at trial—the overwhelming majority of effort exerted by Mr. Miller's counsel was spent litigating Contract 20A and the conspiracy generally.

---

[9] In his reply briefing, Mr. Miller also points out that counsel at trial focused the vast majority of her efforts at closing argument—over twenty-seven pages of transcript—to discussing Contract 20A, and relatively little effort—just under six pages—discussing either Contract 29 or Contract 07. P's Reply at 2.

The Court is thus presented with two figures to evaluate in weighing a reduction of the fee award. On the one hand, the various measures above indicate that Mr. Miller's counsel invested roughly 70% of their efforts to support claims related to Contract 20A and the overall conspiracy, and the rest on Contracts 29 and 07. On the other hand, in terms of overall damages, Mr. Miller still achieved tremendous success in this action, as nearly 88% of the original damage award remains intact. In light of Mr. Miller's significant achievements in this suit—including the fulfillment of his original and primary goals of exposing defendants' underhanded scheme and establishing the fraudulent nature of their conduct with respect to Contract 20A—and mindful that under any metric it is clear that Mr. Miller's counsel focused the majority of their efforts on these tasks, the Court concludes that Mr. Miller should retain 80% of his fee award.

## IV. CONCLUSION

After seven years of investigation and litigation, and seven weeks of intensive trial work, several citizens of the United States concluded what Mr. Miller had long suspected—defendants, along with others, engaged in sordid and deceptive practices to defraud the United States and extract millions in undeserved payments intended to benefit people in developing nations. The D.C. Circuit's subsequent holdings, while mandating a new trial for certain defendants, do not undermine the jury's conclusions as to BIE and HUK. The Court is thus unwilling to release these defendants from their obligations to compensate Mr. Miller's counsel for their extensive and tireless work, which resulted in what the Court views as nothing less than a tremendous victory. In such circumstances, and for the reasons set forth above, the Court holds that 20% reduction to reflect the dismissal of certain claims is appropriate.

A separate Order consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on May 12, 2011.